# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT
## NEW HAVEN

| | |
|---|---|
| FAMILY WIRELESS #1, LLC, a Michigan limited liability company, 4 ONE ENTERPRISES, LLC, a Michigan limited liability company, BEAULUKEN VENTURES, INC., a Michigan domestic profit corporation, NAPLES CELLULAR, LLC, a Florida limited liability company, EMPIRE INVESTMENT GROUP, LLC, a Michigan limited liability company, FRITZ & COMPANY, LLC, a Michigan limited liability company, GENERATION WIRELESS, LLC, a Michigan limited liability company, ELEVATION CAPITAL, INC., a Michigan domestic profit corporation, PK ROY & ASSOCIATES, LLC, a Michigan limited liability company, YASH COMMUNICATIONS, LLC, a New Jersey limited liability company, CENTRAL OFFICE PRODUCTS, INC., a Pennsylvania domestic close corporation, EXRS-WIRELESS 2, INC., a Minnesota domestic business corporation, JAS TECHNOLOGY, INC., a Pennsylvania domestic business corporation, MANDENT SOLUTIONS, LLC, a Minnesota limited liability company, DC WIRELESS, LLC, a Minnesota limited liability company, MUSSER WIRELESS, INC., a Pennsylvania domestic business corporation, CORRIDER VENTURES, INC., a Virginia corporation, LIBERTY COVE, INC., a New York domestic business corporation, BOBEVAN COMMUNICATIONS, LLC, a New Hampshire limited liability company, EXRS-WIRELESS, INC., a Minnesota domestic business corporation, VATAO ENTERPRISES, LLC, a Massachusetts limited liability company, R & E LEUNG ENTERPRISES, INC., a Massachusetts domestic profit corporation, ENTREPRENEUR INVESTMENT CORP., a Virginia corporation, O CUBED WIRELESS, LLC, a Minnesota limited liability company, RUSSELL WIRELESS, LLC, a Pennsylvania limited liability company, LHG STORES, LLC, an Ohio limited liability company, OHIO LHG, LLC, an Ohio limited liability company, HSL INC., an Indiana for-profit domestic corporation, B B & T COMMUNICATIONS, INC., a West Virginia corporation, EMG DELANCEY STREET, LLC, a New York limited liability company, MCQUINN & TAYLOR COMMUNICATIONS, LLC, a Missouri limited liability company, T.C. WIRELESS, INC., a Michigan domestic profit corporation, VATAO WIRELESS, INC., a Massachusetts domestic profit corporation, WEST VIRGINIA LHG, LLC, a West Virginia limited liability | Case No.: 3:15-cv-01310<br><br>Hon. Janet C. Hall<br><br>United States District Court<br><br><br>***Plaintiffs' Second Amended Complaint*** |

company, UMP HOLDING, LLC, a Minnesota limited )
liability company, CELLULAR SOLUTIONS, INC., a New )
Hampshire corporation, JCS WIRELESS, INC., a New York )
corporation, COMPANY TWENTY TWO, LLC, a New )
Jersey limited liability company, SMACKS TELECOM )
CORPORATION, a New York corporation, CELLULAR )
LEVEL, INC., an Indiana corporation, AIRZONE )
COMMUNICATIONS, INC., a Massachusetts corporation, )
DL MOBILE CORP., a Virginia corporation, )
                                                       )
                    Plaintiffs,                        )
                                                       )
v.                                                     )
                                                       )
AUTOMOTIVE TECHNOLOGIES, INC., a Connecticut )
corporation,                                           )
                                                       )
                    Defendant.                         )
                                                       )

## PLAINTIFFS' SECOND AMENDED COMPLAINT

NOW COME the above captioned Plaintiffs, by and through their counsel, Cooper & Riesterer, PLC, and Kern & Hillman, LLC, and for their Second Amended Complaint against Defendant Automotive Technologies, Inc., state as follows:

### PARTIES

1.      Plaintiff Family Wireless #1, LLC, is a limited liability company organized under the laws of the State of Michigan.  The sole member of Family Wireless # 1, LLC, Steve Bloom, is a citizen of the State of Michigan with an address of 4850 Deal Road, Fowlerville, MI 48836.

2.      Plaintiff 4 One Enterprises, LLC, is a limited liability company organized under the laws of the State of Michigan.  The sole member of 4 One Enterprises, LLC, Darryl Bartlett, is a citizen of the State of Michigan with an address of 79 Brynwood, Holland, MI 49423.

3.      Plaintiff Beauluken Ventures, Inc., is a domestic profit corporation incorporated under the laws of the State of Michigan with a principal place of business at 4014 E. Grand River, Howell, MI 48843.

4.      Plaintiff Naples Cellular, LLC, is a limited liability company organized under the laws of the State of Florida.  The sole member of Naples Cellular, LLC, Bruce Capobianco, is a citizen of the State of Florida with an address of 14661 Beaufort Circle, Naples, FL 34119.

5.      Plaintiff Empire Investment Group, LLC, is a limited liability company organized under the laws of the State of Michigan. The sole member of Empire Investment Group, LLC, Eric Hense, is a citizen of the State of Michigan with an address of 205 Lake Pines Drive, Brighton, MI 48114.

6.      Plaintiff Fritz & Company, LLC, is a limited liability company organized under the laws of the State of Michigan.  Both members of Fritz & Company, LLC, Joel Fritz and Barbara Fritz, are citizens of the State of Michigan with addresses of 1603 Avalon Avenue, Saginaw, MI 48368 and 6374 Golf Lakes Ct., E., Bay City, MI 48706, respectively.

7.      Plaintiff Generation Wireless, LLC, is a limited liability company organized under the laws of the State of Michigan. The sole member of Generation Wireless, LLC, Derrek Fridley, is a citizen of the State of Michigan with an address of 7655 Gooseberry Lane, Caledonia, MI 49316.

8.      Plaintiff Elevation Capital, Inc., is a domestic profit corporation incorporated under the laws of the State of Michigan with a principal place of business at 5154 Highland Road, Waterford, MI 48327.

9.      Plaintiff PK Roy & Associates, LLC, is a limited liability company organized under the laws of the State of Michigan.  The sole member of PK Roy & Associates, LLC, Pradip Roy, is a

citizen of the State of Michigan with an address of 3468 Crystal Waters Lane NE, Grand Rapids, MI 49525.

10. Plaintiff Yash Communications, LLC, is a limited liability company organized under the laws of the State of New Jersey. The sole member of Yash Communications, LLC, Vishal Sood, is a citizen of the State of New Jersey with an address of 37 Friendship Road, Howell, NJ 07731.

11. Plaintiff Central Office Products, Inc., is a domestic close corporation incorporated under the laws of the State of Pennsylvania with a principal place of business at 511 14th Street, Arnold, PA 15068.

12. Plaintiff EXRS-Wireless 2, Inc., is a domestic business corporation incorporated under the laws of the State of Minnesota with a principal place of business at 5466 St. Croix Trail, North Branch, MN 55056.

13. Plaintiff JAS Technology, Inc., is a domestic business corporation incorporated under the laws of the State of Pennsylvania with a principal place of business at 500 Millers Run Road, Suite 202, Morgan, PA 15064.

14. Plaintiff Mandent Solutions, LLC, is a limited liability company organized under the State of Minnesota. The sole member of Mandent Solutions, LLC, Brent Peterson, is a citizen of the State of Minnesota with an address of 15270 Creekside Lane, Dayton, MN 55369.

15. Plaintiff DC Wireless, LLC, is a limited liability company organized under the State of Minnesota. The sole member of DC Wireless, LLC, Duane Rosen, is a citizen of the State of Minnesota with an address of 17650 Argon Street N.W., Anoka, MN 55303.

16. Plaintiff Musser Wireless, Inc., is a domestic business corporation incorporated under the laws of the State of Pennsylvania with a principal place of business at 104 Cherrywood Court, Harrison City, PA 15636.

4

17.     Plaintiff Corridor Ventures, Inc., is a corporation organized under the laws of the State of Virginia with a principal place of business at 16434 Consumer Row, King George, VA 22485.

18.     Plaintiff Liberty Cove, Inc., is a domestic business corporation incorporated under the laws of the State of New York with a principal business of business at 367 Windsor Highway, New Windsor, NY 12553.

19.     Plaintiff Bobevan Communications, LLC, is a limited liability company organized under the laws of the State of New Hampshire.  The sole member of Bobevan Communications, LLC, Stephen Drelick, is a citizen of the State of New Hampshire with an address of 17 Hickory Ridge Road, Plaistow, NH 03865.

20.     Plaintiff EXRS-Wireless, Inc., is a domestic business corporation incorporated under the laws of the State of Minnesota with a principal place of business at 10340 Baltimore Street, Blaine, MN 55449.

21.     Plaintiff Vatao Enterprises, LLC, is a limited liability company organized under the laws of the State of Massachusetts.  The sole member of Vatao Enterprises, LLC, Muhammad Ghani, is a citizen of the State of Massachusetts with an address of 36 Bucklin Road, North Andover, MA 01845.

22.     Plaintiff R & E Leung Enterprises, Inc., is a domestic profit corporation incorporated under the laws of the State of Massachusetts with a principal place of business at 999 South Washington Street, North Attleboro, MA 02760.

23.     Plaintiff Entrepreneur Investment Corp, is a corporation incorporated under the laws of the State of Virginia with a principal place of business at 2219 Colonial Avenue SW, Roanoke, VA 24015.

24.     Plaintiff O Cubed Wireless, LLC, is a limited liability company organized under the laws of the State of Minnesota.  The sole member of O Cubed Wireless, LLC, Robert Cheney, is a citizen of the State of Minnesota with an address of 14430 Iodine Street NW, Ramsey, MN 55303.

25.     Plaintiff Russell Wireless, LLC, is a limited liability company organized under the laws of the State of Pennsylvania.  Both members of Russell Wireless, LLC, John Russell and Dave Russell, are citizens of the State of Pennsylvania with addresses of 3058 Hilltop Lane, Tyrone, PA 16686 and 3059 Hilltop Lane, Tyrone, PA 16686, respectively.

26.     Plaintiff LHG Stores, LLC, is a limited liability company organized under the laws of the State of Ohio.  All members of LHG Stores, LLC, John Russell, Chris Summers, and William Russell, are citizens of the State of Pennsylvania with addresses of 3058 Hilltop Lane, Tyrone, PA 16686, 330 E. Prospect Avenue, State College, PA 16801 and 333 Saddle Ridge Road, Port Matilda, PA 16870, respectively.

27.     Plaintiff Ohio LHG, LLC, is a limited liability company organized under the laws of the State of Ohio.  All members of Ohio LHG, LLC, John Russell, Chris Summers, and William Russell, are citizens of the State of Pennsylvania with addresses of 3058 Hilltop Lane, Tyrone, PA 16686, 330 E. Prospect Avenue, State College, PA 16801 and 333 Saddle Ridge Road, Port Matilda, PA 16870, respectively.

28.     Plaintiff HSL Inc. is a corporation incorporated under the laws of the State of Indiana with a principal place of business at 8437 Bells Oak Drive #134, Newburgh, IN 47630.

29.     Plaintiff B B & T Communications, Inc., is a corporation incorporated under the laws of the State of West Virginia with a principal place of business at 200 East 2nd Avenue, Williamson, WV 25661.

30.     Plaintiff EMG Delancey Street, LLC, is a limited liability company organized under the laws of the State of New York.  All members of EMG Delancey Street, LLC, John Russell, Chris Summers, and William Russell, are citizens of the State of Pennsylvania with addresses of 3058 Hilltop Lane, Tyrone, PA 16686, 330 E. Prospect Avenue, State College, PA 16801 and 333 Saddle Ridge Road, Port Matilda, PA 16870, respectively.

31.     Plaintiff McQuinn & Taylor Communications, LLC, is a limited liability company organized under the laws of the State of Missouri.  The sole member of McQuinn & Taylor Communications, LLC, Robert McQuinn, is a citizen of the State of Missouri with an address of 6415 Hilltop Heights, Country Club, MO 64505.

32.     Plaintiff T.C. Wireless, Inc., is a domestic profit corporation incorporated under the laws of the State of Michigan with a principal place of business at 2770 Silver Lake Road, Suite 3, Traverse City, MI 49684.

33.     Plaintiff Vatao Wireless, Inc., is a domestic profit corporation incorporated under the laws of the State of Massachusetts with a principal place of business at 36 Bucklin Road, North Andover, MA 01845.

34.     Plaintiff West Virginia LHG, LLC, is a limited liability company organized under the laws of the State of West Virginia.  The sole member of West Virginia LHG, LLC, John Russell, is a citizen of the State of Pennsylvania with an address of 3058 Hilltop Lane, Tyrone, PA 16686.

35.     Plaintiff UMP Holding, LLC, is a limited liability company organized under the laws of the State of Minnesota.  The sole member of UMP Holding, LLC, Mark Uline, is a citizen of the State of Minnesota with an address of 14613 Victor Hugo Boulevard North #2, Hugo, MN 55038.

36.     Plaintiff Cellular Solutions, Inc. is a corporation incorporated under the laws of the State of New Hampshire with a principal place of business at 291 Main Street, Unit B, Nashua, New Hampshire 03060.

37.     Plaintiff JCS Wireless, Inc. is a corporation incorporated under the laws of the State of New York with a principal place of business at 89 North Middletown Road, Pearl River, New York 10960.

38.     Plaintiff Company Twenty Two, LLC is a limited liability company organized under the laws of the State of New Jersey.  The sole member of Company Twenty Two, LLC, Will Stout, is a citizen of the State of New Jersey with an address of 22 Sunnyridge Road, Wayne, New Jersey 07470.

39.     Plaintiff Smacks Telecom Corporation is a corporation incorporated under the laws of the State of New York with a principal place of business at 3103 Route 22, Patterson, New York 12563.

40.     Plaintiff Cellular Level, Inc. is a corporation incorporated under the laws of the State of Indiana with a principal place of business at 4817 Williamsburg Drive, Fort Wayne, Indiana 46804.

41.     Plaintiff Airzone Communications, Inc. is a corporation incorporated under the laws of the State of Massachusetts with a principal place of business at 485 Arsenal Street, Watertown, Massachusetts 02472.

42.     Plaintiff DL Mobile Corp. is a corporation incorporated under the laws of the Commonwealth of Virginia with a principal place of business at 8163 Quinn Terrace, Vienna, Virginia 22180.

## JURISDICTION AND VENUE

43.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

44.     This Court has diversity jurisdiction over the present case pursuant to 28 U.S.C. § 1332 because:

a.      Defendant is a corporation organized under the laws of the state of Connecticut, with a principal place of business at 34 Industrial Park Place, Middletown, Connecticut 06457;

b.      No Plaintiff that is a corporation is incorporated under the laws of the state of Connecticut nor has a principal place of business in Connecticut; and

c.      No Plaintiff that is a limited liability company is organized under the laws of the state of Connecticut, nor is any member of a Plaintiff that is a limited liability company a citizen of the state of Connecticut.

45.     The amount in controversy exceeds $75,000 and this matter is within the jurisdiction of the Court.

46.     Venue is also proper in this district pursuant to 28 U.S.C. § 1391(a)(1), and § 1391(b)(1), as well as § 1391(b)(2), as Defendant resides, and a substantial part of the events or omissions giving rise to the claims occurred, in the District of Connecticut.

## GENERAL ALLEGATIONS

47.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

### *Verizon and its Use of Agents*

48.     Verizon Wireless ("Verizon") is a wireless telecommunications provider headquartered in Basking Ridge, New Jersey.

49.     Verizon offers and sells its services in large part through a vast network of retail stores. Many of these stores are owned and operated by Verizon ("Corporate Stores").

50.     Verizon also relies on agents to offer and sell its services under the terms and conditions of its license agreements. An agent with a license agreement with Verizon is generally referred to as a "direct agent" because the agent works directly for Verizon.

51.     Verizon utilizes some direct agents as "master agents" by entering into a license agreement that permits the master agent to contract with other individuals and entities to act as sub-agents of Verizon. In these instances, while the sub-agents do not directly contract with Verizon, they operate the same types of stores offering and selling Verizon services as direct agents.

52.     Master agents are ultimately responsible for the performance of their sub-agents and are tasked with meeting minimum sales quotas as required by their license agreements.

53.     For each Store operated by a sub-agent through the master agent's license agreement with Verizon, the master agent obtains and maintains a "sales code" – the identifier through which the sub-agent makes all sales of Verizon services. A sub-agent requires a sales code to operate. If the master agent "turns off" the sales code, the sub-agent's store location associated with that sales code is effectively shut down.

54.     Payments made to sub-agents by Verizon are made through the master agent. Verizon does not pay sub-agents directly.

### The Wireless Zone® Franchise

55.     Defendant is a master agent for Verizon. Differing from other master agents, which operate under license agreement models (whereby a license agreement exists between the master agent and sub-agent), Defendant's relationships between its sub-agents is that of franchisor-franchisee.

56.     The franchise offered by Defendant is Wireless Zone® ("Wireless Zone"). Instead of a license agreement, each sub-agent franchisee of Defendant has executed a franchise agreement with Defendant, which grants the franchisee the rights to operate a Wireless Zone store ("Store") and act as a sub-agent of Verizon under Defendant.

57.     Plaintiffs, each a "Franchisee," operate 122 Stores in the Wireless Zone franchise system ("System") that are a part of this litigation.

58.     Several Franchisees operated their own cellular phone stores representing Verizon for many years as direct agents prior to converting their stores to become franchisees of Defendant and sub-agents of Verizon.

59.     For each franchise store, Defendant and the respective Franchisee have executed a contract – a franchise agreement – setting forth the terms of the contractual franchise relationship, as well as other ancillary agreements.

60.     ATI has a copy of all relevant contracts referenced herein.

61.     Franchisees currently have active franchise agreements for years 2008, 2009, 2010, 2011, 2012, 2013, 2014, and 2015.

62.     Section 6.02 of each version of the franchise agreements provides for continuing royalty payments to be made to Defendant. A copy of Section 6.02 of each version of the franchise agreement from 2008 until 2015 is attached hereto as ***Exhibit 1***.

63.     While the language of Section 6.02 varies in the franchise agreements from 2008 to 2015 (the years at issue), the relevant language is relatively consistent.  Section 6.02A reads in part:

> Typically under Defendant's Provider Contract . . . certain customer payments are forwarded to the Provider and not retained by you or Defendant.  Provider then pays Defendant commissions ("Commissions") on these customer payments attributable to your store (emphasis added), which Defendant passes along to you as Defendant's sub-agent, minus deductions for amounts you owe Defendant. . . .  Defendant will deduct from the Provider Commissions Defendant transmits to you, as Continuing Royalties

payable by you to Defendant: (i) ten percent (10%) of Commissions Defendant receives from Provider attributable to your customer activations, upgrades, enhanced services, and other products or services, and (ii) twenty percent (20%) of Residuals (as defined below) Defendant receives from Provider attributable to your Store.

64.     Section 6.02 states generally that Defendant may collect as continuing royalties either ten percent (10%) of "Commissions" Defendant receives from the cell service provider attributable to customer activations, sales, and services, or, alternatively, 5% of "Gross Sales," as that term is defined in the franchise agreements.

65.     Upon information and belief, Defendant has always elected to collect continuing royalties on "Commissions."

66.     Section 6.02 further states: "Provider then pays Defendant commissions ('Commissions') on these customer payments attributable to your Store, which Defendant passes along to you as Defendant's sub-agent, minus deductions for amounts you owe Defendant."

67.     Neither Defendant's franchise agreements nor its FDDs provide any further definition of a "Commission."

### *Pass-through of Verizon and Vendor Spiffs*

68.     From time to time, Verizon would issue additional bonus performance incentive payments for sales of specific service plans or products, or for meeting certain key performance indicators ("KPIs") or other benchmarks. These are commonly referred to in the industry as "spiffs" and are paid to the individual or entity making the qualifying sale or meeting the identified benchmark.

69.     ATI historically passed through all spiffs from Verizon to its franchisees.

70.     Spiffs from Verizon earned by individual Plaintiffs were usually reflected on statements from Defendant and paid to Plaintiffs, less the 10% royalty commission withheld by Defendant.

71.     Plaintiffs have been made aware that Defendant has improperly concealed the existence of certain spiffs offered by Verizon and has withheld payment of spiffs earned and owing to Plaintiffs.

72.     Upon information and belief, Defendant believes that the franchise agreements do not apply to the spiff payments made by Verizon and that Defendant is free to keep the spiff amounts itself, passing them through only as it pleases.

73.     Similarly, from time to time, other cellular device and equipment vendors and/or manufacturers ("Vendors") incentivize sale of certain products by issuing additional bonus spiff payments for devices sold by Plaintiffs.

74.     Plaintiffs would sometimes receive payment of these Vendor spiffs from ATI. On other occasions, ATI failed to both notify Plaintiffs of the existence and availability of Vendor spiff compensation and to pay earned spiffs to Plaintiffs.

75.     Since the filling of the First Amended Complaint, Plaintiffs have been made aware of one such spiff offered in promotion of certain Motorola devices sold by Plaintiffs to customers on two-year cellular service contracts.

76.     Defendant has concealed the existence of this spiff or the extent of the spiff and has withheld payment of spiff compensation due to Plaintiffs, despite qualifying sales of Motorola devices by Plaintiffs during the relevant periods.

77.     Upon information and belief, at least one non-Plaintiff franchisee has independently obtained information regarding the Vendor and has confronted Defendant, demanding payment for the full amount of spiff money due to the franchisee.

78.     Upon information and belief, Defendant agreed that the franchisee was entitled to payment of the pass-through spiff compensation and forwarded the demanded spiff payments to the franchisee.

79.     Each of the Plaintiffs executed their respective franchise agreement with the understanding, based upon the plain reading of the FDD, that incentive spiffs would be paid to them as usual from

Verizon (less any applicable royalty for spiffs deemed to be commissions) and from Vendors, such as Motorola and Samsung, and that royalties would be charged only on commissions.

80.     Prior to the sale of Defendant in December of 2012 to Glentel USA, Inc., a subsidiary of Glentel, Inc., a Canadian corporation, upon information and belief, Defendant passed through all spiffs from Verizon to the sub-agents based on which sub-agents had earned the spiffs. Defendant similarly passed on spiffs from other Vendors.

81.     Since the sale of Defendant, and since new management has assumed control, almost all spiff distribution to Franchisees has stopped.

### *Verizon Contract Model and Edge Program*

82.     Prior to April 2014, Verizon device sales were made under one primary model (referred to as the "contract model").  Under the contract model, a customer would sign up for a one- or two-year service contract with Verizon for wireless services.

83.     To induce the customer to enter into the contract, the agent would often have to provide a device (cellular phone, tablet, etc.) to the customer at a discounted price.  Offering the device for a discount often results in the agent selling the device for substantially less than the dealer's cost of purchasing the device.  Upon execution of a service contract by the customer with Verizon, Verizon pays to the agent or sub-agent a commission for the contract.  Additionally, for certain devices, Verizon provides an additional commission to account for the agent's loss in selling the device below cost.  Based on the expected commissions, the agent could price and advertise its devices below cost to compete with other dealers of Verizon and other service providers.

84.     In April of 2014, Verizon launched the "Edge" program with Defendant as an alternative to the contract model. Under the Edge program, Verizon customers do not enter into a two-year service contract with Verizon, but instead sign up for month-to-month service plans. Under Edge,

new devices are no longer discounted, as in the prior two-year contract model, but monthly financing plans are offered to make the devices affordable. The customer pays the sales tax on the full price, makes a down payment, and pays the balance on an installment plan, which is automatically assigned to Verizon. The customer makes these monthly finance payments on the device typically on the same bill as the customer's Verizon service plan.

85.     Under Edge, agents are compensated differently by Verizon.  Because agents are not absorbing a loss on the cost of the device, Verizon pays only a single commission on the actual service contract. When an installment agreement is assigned to Verizon, Verizon reimburses the retail cost of the device to the agent making the sale, less any down payment made by the customer. Verizon assumes the installment agreement and collects the payments made by the customer.

86.     Commissions paid for service contracts under Edge are paid approximately a month after the month in which the customer signs up.  Reimbursement for the cost of the device (sometimes referred to as the "Installment Offset") is typically made by Verizon within seven days of the installment agreement's execution.

### ATI's Treatment of the Edge Program

87.     From March of 2014 until January 1, 2015, Defendant collected a 10% royalty on the commissions received under the Edge program for sale of the service contract.  Defendant did not withhold any royalty from the Installment Offset reimbursement payments made by Verizon, nor did it notify or otherwise indicate to any franchisees that it believed it was entitled to any such royalty.

88.     Defendant gave no indication at any time prior to December 30, 2014, that it believed it had a right to charge a royalty on this amount and that the failure to do so was a choice by Defendant that could change at any time.

15

89.     All literature issued from Defendants regarding the Edge program described the Installment Offset as a reimbursement for the equipment being sold.

90.     At some point after the inception of the Edge program, several months before the end of 2014, Defendant decided that it wanted to begin charging a royalty on the Installment Offset.

91.     On December 30, 2014, Defendant announced that, effective January 1, 2015, it intended to begin withholding a portion of the Installment Offset reimbursement payments Verizon had been making to Franchisees for phones provided to customers under the Edge program.

92.     Two days later, Defendant instituted the withholding in direct violation of its franchise agreements with Franchisees.

93.     Since that time, Defendant has taken the position that it believed, for several months before January 1, 2015, that it could collect a 10% royalty against the Installment Offset.

### *ATI's FDD*

94.     Pursuant to Federal Trade Commission ("FTC") regulations (16 CFR 436.1 *et seq.*; the *"Disclosure Rule"*), Defendant is required to issue to prospective franchisees a current franchise disclosure document ("FDD"), which includes, among other disclosures, the terms and conditions of the standard franchise agreement used by Defendant with its franchisees and specific information about the franchise offered.

95.     The Disclosure Rule sets forth 23 required Items in a Disclosure Document and establishes the information required to be disclosed under each Item.

96.     Items 5, 6, and 7 require disclosure of certain fees and estimated investments required of franchisees. Item 19 includes any financial performance representations a franchisor makes and the rules relating to such disclosures.

The Disclosure rule requires that a franchisor:

Disclose, in the following tabular form, all other fees that the franchisee must pay to the franchisor or its affiliates, or that the franchisor or its affiliates impose or collect in whole or in part for a third party. State the title ''OTHER FEES'' in capital letters using bold type. Include any formula used to compute the fees.

<div align="center">***</div>

In column 4, include remarks, definitions, or caveats that elaborate on the information in the table.

*16 C.F.R. § 436.2(f).* "Disclose," as defined in the Disclosure Rule, means "to present all material facts accurately, clearly, concisely, and legibly in plain English."

97.    The Disclosure Rule further provides:

Plain English means the organization of information and language usage understandable by a person unfamiliar with the franchise business. It incorporates short sentences; definite, concrete, everyday language; active voice; and tabular presentation of information, where possible. It avoids legal jargon, highly technical business terms, and multiple negatives.

*16 C.F.R. § 436.1.*

98.    Failure to provide an FDD that complies with the Disclosure Rule is deemed an "unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act" (the "Act").

99.    Upon information and belief, Defendant provided each Franchisee with an FDD shortly before execution of the respective franchise agreement between each Franchisee and Defendant.

100.    In FDDs issued in 2014 and 2015, after Defendant was aware of the Edge program and its alleged ability and intent to collect a royalty against the Installment Offset reimbursement, Defendant did not amend its FDD to disclose the Installment Offset royalty. In fact, no mention of the Installment Offset or even the Edge Program is made in either the 2014 FDD or 2015 FDD.

101.    The FDD makes clear that Defendant can change its structure from charging royalties on commissions to charging royalties on gross sales, but does not disclose that Defendant can redefine the common meaning of a commission to include any revenue it receives from the Provider.

<div align="center">17</div>

102.    The practical result of Defendant's imposition of the Installment Offset withholding has been significant and material, and in fact, has resulted in Defendant generating as much or more revenue per store than Plaintiffs themselves.

103.    The Disclosure Rule allows a Franchisor to make financial representations if the Franchisor has substantiated that the information is true and accurate at the time it is made.

104.    The Disclosure Rule, however, requires a Franchisor to notify a prospective franchisee if the seller knows of any material changes relating to a financial performance representation.

105.    Defendant made numerous financial performance representations, which were materially based upon the contract model used by Provider prior to the launch of the Edge program.

106.    A material basis for the financial performance representation made in Defendant's 2014 FDDs was the fact that all figures were based on the contract model.

107.    The implementation of the Edge program and Defendant's decision to charge a royalty on the reimbursement the Plaintiffs received for the phone equipment were significant and material changes that altered the performance of all of the franchise stores.

108.    When the Edge model was introduced, Defendant did not notify Plaintiffs who were prospective franchisees in 2014 of the material changes to the bases underlying the financial performance representations.

109.    Defendant was aware of the impact of the Edge program and the impact of the change in the relative income streams when it began charging a royalty on the Installment Offset, yet made no attempt to update its FDD or provide any clarification to the FDD to alert any Franchisee how the Franchisor would interpret and implement the Edge program.

110.    The changes made to the system as a result of the Edge Program and the charging of the royalty on the Installment Offset render the financial disclosures in the FDD materially inaccurate and misleading.

111.    The changes made to the system as a result of the Edge Program and the charging of the royalty on the Installment Offset render Defendant's representation in the FDD of the Continuing Royalties that it collects materially inaccurate and misleading.

112.    Had Plaintiffs known that Defendant would assert a position that any money flowing from Verizon was a commission, which gave them a right to extract a 10% royalty from it, despite the plain and common language in the FDD, Plaintiffs would not have joined as Wireless Zone franchisees because they simply could not compete with other Verizon stores outside of the Wireless Zone system.

## COUNT I

### BREACH OF CONTRACT AND COVENANT OF GOOD FAITH AND FAIR DEALING

113.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

114.    Each Plaintiff maintains a franchise agreement with Defendant for each Wireless Zone store it operates.

115.    The franchise agreements between Plaintiffs and Defendant do not permit Defendant to collect a royalty against the Installment Offset.

116.    Defendant's withholding of the Edge Installment Offset, therefore, is a breach of the franchise agreements with each Plaintiff.

117.    Counsel for Plaintiffs notified Defendant of the breach and demanded that Defendant cease improperly withholding royalties against the Installment Offset.

19

118.    Counsel for Defendant responded in a letter dated February 11, 2015, stating that it was entitled to collect a 10% royalty against the Installment Offset.

119.    Defendant has continued to withhold a portion of the Installment Offset.

120.    As a result of Defendant's breach, Plaintiffs have suffered, and continue to suffer, extensive damages of approximately $2,000 per month per store.

121.    Defendant does not have a right to unilaterally alter the contract by re-defining what amounts are considered "Commissions," and any attempt to do so is a breach of contract and a breach by Defendant of its duty of good faith and fair dealing under the franchise agreements with Plaintiffs.

122.    Plaintiffs are entitled to receive all Verizon and Vendor spiffs related to sales made by Plaintiffs.

123.    Defendant's failure to distribute spiffs from Verizon related to sales made by Plaintiffs (i.e. commissions) is a breach of contract.

124.    Defendant's failure to distribute spiffs from device and equipment Vendors related to sales made by Plaintiffs is a breach of contract.

**WHEREFORE, PLAINTIFFS REQUEST** this Court enter a judgment finding that Defendant's actions are a breach of the franchise agreements, and:

A.  Order Defendant to cease withholding any portion of the Installment Offset;

B.  Order Defendant to repay the amount wrongfully withheld by Defendant since January 1, 2015, with interest, together with all other damages incurred by Plaintiffs in connection with the multiple breaches committed by Defendant;

C.  Order that Defendant repay all spiffs received from Verizon related to sales made by Plaintiffs and wrongfully withheld by Defendant;

D.  Order that the franchise agreements between Defendant and each Plaintiff are void and of

no further force and effect against Plaintiffs, including any post-termination covenants due to

the multiple material breaches by Defendant; and

E.  Award any such additional relief as this Court deems just and proper.

## COUNT II

**FRAUDULENT MISREPRESENTATION RELATING TO 2014 FRANCHISE AGREEMENTS (BY PLAINTIFFS JAS TECHNOLOGY, INC., CENTRAL OFFICE PRODUCTS, INC., LHG STORES, LLC, CORRIDOR VENTURES, INC., ENTRPRENEUER INVESTMENT CORP., EMG DELANCEY STREET, LLC, RUSSELL WIRELESS, LLC, T. C. WIRELESS, INC. AND CELLULAR LEVEL, INC.)**

125.  Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully

restated herein.

126.  Defendant has asserted that it studied the issue of its ability to charge a royalty on the

Installment Offset for months and determined that it could charge a royalty on such amounts.

127.  Defendant's course of dealing and actions, including its written communications, however,

clearly created the impression that it could not and would not charge a royalty on the Installment

Offset.

128.  The act of charging a royalty on the Installment Offset creates a material change in the

business model and cash flow for Plaintiffs.

129.  Defendant had an affirmative duty, pursuant to the Disclosure Rule, to accurately represent

how it would collect royalties, including its position, as it now alleges, that it is entitled to a 10%

royalty on all payments from Verizon to Plaintiffs, including royalties against the Installment

Offset reimbursement, not just commissions.

130.  Plaintiffs Central Office Products, Inc., Entrepreneur Investment Corp., T. C. Wireless,

Inc., JAS Technology, Inc.; LHG Stores, LLC; Corridor Ventures, Inc.; EMG Delancey Street,

LLC; Cellular Level, Inc.; and Russell Wireless, LLC ("Count Two Plaintiffs") all executed either a renewal or new franchise agreement in 2014.

131.    The following Count Two Plaintiffs executed renewals of the franchise agreements for their franchise stores in 2014 after the implementation of the Edge program: Central Office Products, Inc., Entrepreneur Investment Corp., and T. C. Wireless, Inc.

132.    The following Count Two Plaintiffs opened new franchise stores in 2014 after the implementation of the Edge program: JAS Technology, Inc.; LHG Stores, LLC; Corridor Ventures, Inc.; EMG Delancey Street, LLC; and Russell Wireless, LLC. Each of the Plaintiffs who opened a new Store already operated other Stores or were owned by an individual or individuals already operating other Stores.

133.    Plaintiff Cellular Level, Inc. purchased an existing store (number WZ-672b, formerly WZ-672a) in 2014 after conducting due diligence regarding the financial condition and operations of the store.

134.    All of the Count Two Plaintiffs that opened a new Store or renewed a franchise agreement in 2014 for an existing Store were making sales under the Edge program in their existing Stores. Defendant was not collecting any royalty against Installment Offset reimbursement amounts from them during this time.

135.    Each Count Two Plaintiff that opened a new store or renewed a franchise agreement in 2014 received an FDD from Defendant in substantially the same form (excepting the redline) as the FDD attached as **_Exhibit 2, 2014 FDD_**. (Due to the large size of the complete FDD, only the franchise agreement attached to the 2014 FDD is included. The remaining attachments to the 2014 FDD are excluded.)

136.    Plaintiff Entrepreneur Investment Corp. executed a renewal of its franchise agreement for two stores, WZ-397 and WZ-605, on October 5, 2014.

137.    In signing these agreements, Plaintiff Entrepreneur Investment Corp. relied upon Defendant's FDD dated May 15, 2014. This document was furnished to Plaintiff by Defendant on or before August 26, 2014, date on which Plaintiff executed an acknowledgement of receipt of the document.

138.    Plaintiff T.C. Wireless, Inc. executed a renewal of its franchise agreement for store WZ-407 effective December 31, 2014.

139.    In signing this agreement, Plaintiff T.C. Wireless, Inc. relied upon Defendant's FDD dated May 2, 2014. This document was furnished to Plaintiff by Defendant on or before November 14, 2014, the date on which Plaintiff executed an acknowledgement of the receipt of the document.

140.    Plaintiff Central Office Products, Inc. executed a renewal of its franchise agreement for store WZ-369 on April 6, 2014.

141.    In signing this agreement, Plaintiff Central Office Products, Inc. relied upon Defendant's FDD dated July 17, 2013. This document was furnished to Plaintiff by Defendant on or before October 2, 2013, the date on which Plaintiff executed an acknowledgement of the receipt of this document.

142.    Plaintiff LHG Stores, LLC opened two new stores in 2014, WZ-797 and WZ-801. Plaintiff LHG Stores, LLC signed the franchise agreement for WZ-797 on August 1, 2014 and the franchise agreement for WZ-801 on July 21, 2014.

143.    In signing these agreements, Plaintiff LHG Stores, LLC relied upon Defendant's FDD dated May 2, 2014. Defendant provided this document to Plaintiff on or before May 19, 2014, when Plaintiff signed an acknowledgement of receipt of the document.

144.    Plaintiff Russell Wireless, LLC opened store WZ-809 in 2014, signing the franchise agreement for this store on October 15, 2014.

145.    In signing this agreement, Plaintiff Russell Wireless, LLC relied upon Defendant's FDD dated May 2, 2014. Defendant provided this document to Plaintiff on or before May 19, 2014, when Plaintiff signed an acknowledgement of receipt of the document.

146.    Plaintiff JAS Technology, Inc. opened store WZ-798 in 2014, signing the franchise agreement on July 3, 2014.

147.    In signing this agreement Plaintiff JAS Technology, Inc. relied upon Defendant's FDD dated May 2, 2014. Defendant provided this document to Plaintiff on or before June 10, 2014, when Plaintiff signed an acknowledgement of receipt of the document.

148.    Plaintiff Corridor Ventures, Inc. opened store WZ-799 in 2014, signing the franchise agreement on July 1, 2014.

149.    In signing this agreement, Plaintiff Corridor Ventures relied upon Defendant's FDD dated May 2, 2014. Defendant furnished Plaintiff with this document on or before May 27, 2014, when Plaintiff signed an acknowledgement of receipt of the document.

150.    Plaintiff EMG Delancey Street, LLC opened store WZ-810 in 2014, signing the franchise agreement on October 15, 2014.

151.    In signing that agreement, Plaintiff EMG Delancey Street, LLC relied upon Defendant's FDD dated May 2, 2014. Defendant provided this document to Plaintiff on or before May 19, 2014, when Plaintiff signed an acknowledgement of receipt of the document.

152.    Plaintiff Cellular Level, Inc. began operating WZ-672b, a then-existing store, in 2014 under a new franchise agreement on November 1, 2014.

153.   In signing the agreement for assignment of the franchise agreement, Plaintiff Cellular Level, Inc. relied upon Defendant's FDD dated May 2, 2014. Defendant furnished Plaintiff with this document on or before September 7, 2014, the date on which Plaintiff signed an acknowledgement of receipt of the document.

154.   From the time Defendant determined that it could charge a royalty on the Installment Offset, the representations regarding the Continuing Royalties contained in the 2014 FDDs distributed to the  were inaccurate and incomplete.

155.   Defendant had a duty to provide accurate, updated information pursuant to the Disclosure Rule.

156.   Defendant made no effort to update or amend its FDD or notify the respective Franchisees that the disclosures were inaccurate as required by the Disclosure Rule.

157.   In each instance, when Defendant provided each Count Two Plaintiff with the FDD for each particular new or renewed Wireless Zone franchise store, knowing that Plaintiffs were currently operating Stores and making no royalty payments for Edge Installment Offset reimbursements, Defendant did not disclose the relevant material facts required by the Disclosure Rule to the respective Count Two Plaintiffs.

158.   Specifically, Defendant failed in its FDD or otherwise during the sales process to notify each Count Two Plaintiff that the royalties Defendant was entitled to collect and intended to collect differed materially from the current financial model that the Plaintiff was operating under for its other Stores.

159.   When Defendant determined (however incorrectly) that the Installment Offset reimbursement payments from Verizon were "Commissions," it had a duty under the Disclosure

25

Rule to disclose this material information to the Count Two Plaintiffs, who were potential franchisees.

160.    Defendant failed in its FDD "to present all material facts" related to the Continuing Royalties chargeable under the franchise agreements "accurately, clearly, concisely, and legibly in plain English," such that "the organization of information and language usage" in the FDD was "understandable by a person unfamiliar with the franchise business." Even Count Two Plaintiffs, who were familiar with the business, were deceived by the omission by Defendant about the Installment Offset's treatment, such that they were lead to believe that Defendant could not collect commissions from the Installment Offset reimbursement payments.

161.    Had this information been available to Count Two Plaintiffs opening new Stores or renewing franchise agreements for existing Stores, Count Two Plaintiffs would not have opened new Stores or renewed Stores because the Stores would not be financially stable or viable.

162.    Defendant made the omissions knowing they were false and misleading, when it actually intended to collect royalties on the full revenues paid by Verizon to Plaintiffs, including the Installment Offset reimbursement amounts.

163.    Count Two Plaintiffs, based on Defendant's handling of the Edge program royalties from the program's inception until January 1, 2015, reasonably relied on Defendant's misrepresentation by omission in each case and executed their respective franchise agreements and/or renewal agreements with Defendant under the understanding that they would owe continuing royalties only on commissions paid to them by Verizon, and not all payments Verizon made, including the Installment Offset reimbursement amounts.

164.    As a result, Count Two Plaintiffs were and continue to be damaged by Defendant's recently discovered fraudulent misrepresentation by omission.

26

WHEREFORE, PLAINTIFFS REQUEST this Court enter judgment in favor of Count Two Plaintiffs and against Defendant, and:

A. Order that the franchise agreements, including any post-termination covenants, entered into between Defendant and each Count Two Plaintiff in 2014 are void and unenforceable and/or subject to rescission as a result of the fraud that induced Count Two Plaintiffs to enter into the agreements;

B. Award all damages incurred by Count Two Plaintiffs as a result of Defendant's fraudulent actions, and each respective Count Two Plaintiff's reliance thereon, including but not limited to repayment of the non-"Commission" revenue to Count Two Plaintiffs; and

C. Award any such additional relief as this Court deems just and proper.

## COUNT III

### NEGLIGENT MISREPRESENTATION REGARDING 2014 FRANCHISE AGREEMENTS (BY PLAINTIFFS LHG STORES, LLC, CORRIDOR VENTURES, INC., ENTRPRENEUER INVESTMENT CORP., EMG DELANCEY STREET, LLC, AND CELLULAR LEVEL, INC.)

165. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

166. LHG Stores, LLC, Corridor Ventures, Inc., Entrepreneur Investment Corp., and EMG Delancy Street, LLC are referred to collectively as "Count Three/Four Plaintiffs."

167. For the same reasons set forth above, Defendant had a duty to use reasonable care in making representations that it knew Count Three/Four Plaintiffs would rely on.

168. Defendant nevertheless, in each instance, failed to disclose the material fact that it believed it was entitled to continuing royalties on all payments from Verizon and instead stated in each respective FDD that continuing royalties were limited to "Commissions" received from Verizon.

169.    Defendant was negligent in omitting the material fact and breaching its duty to Count Three/Four Plaintiffs.

170.    Count Three/Four Plaintiffs, based on Defendant's handling of the Edge program royalties from the program's inception until January 1, 2015, reasonably relied on Defendant's misrepresentation by omission in each case and executed their respective franchise agreements and/or renewal agreements with Defendant under the understanding that they would owe continuing royalties only on commissions paid to them by Verizon, and not on all payments Verizon made.

171.    As a result, Count Three/Four Plaintiffs were and continue to be damaged by Defendant's recently discovered misrepresentation by omission.

**WHEREFORE, PLAINTIFFS REQUEST** this Court enter judgment in favor of Count Three/Four Plaintiffs and against Defendant, and:

A.  Order that the franchise agreements, including any post-termination covenants, entered into between Defendant and each Count Three/Four Plaintiff in 2014 are void and unenforceable and/or subject to rescission as a result of the fraud that induced Plaintiffs  to enter into the agreements;

B.  Award all damages incurred by Count Three/Four Plaintiffs as a result of Defendant's misrepresentation by omission and each Count Three/Four Plaintiff's reliance thereon, including, but not limited to, repayment of non-"Commission" revenue to Count Three/Four Plaintiffs; and

C.  Award any such additional relief as this Court deems just and proper.

## COUNT IV

**INNOCENT MISREPRESENTATION REGARDING 2014 FRANCHISE AGREEMENTS (BY PLAINTIFFS LHG STORES, LLC, CORRIDOR VENTURES, INC., ENTRPRENEUER INVESTMENT CORP., EMG DELANCEY STREET, LLC, AND CELLULAR LEVEL, INC.)**

172. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

173. Even if this Court finds that Defendant's misrepresentations by omission were not fraudulent or negligent, the misrepresentations described in the preceding two counts, made in connection with the making of a contract between each respective Count Three/Four Plaintiff and Defendant, resulted in injury to Count Three/Four Plaintiffs, which injury inured to the benefit of Defendant.

174. Count Three/Four Plaintiffs entered the franchise agreements under the impression, based on Defendant's omissions in the FDDs, that continuing royalties were only owed on commissions paid by Verizon – in other words, commissions on sales of services for Verizon.

175. Count Three/Four Plaintiffs' resulting injury, the revenue withheld by Defendant, has unjustly inured to the benefit of Defendant.

**WHEREFORE, PLAINTIFFS REQUEST** this Court enter judgment in favor of Count Three/Four Plaintiffs and against Defendant, and:

A. Order that the franchise agreements, including any post-termination covenants, entered into between Defendant and each Count Three/Four Plaintiff in 2014 are void and unenforceable and/or subject to rescission as a result of the fraud that induced Count Three/Four Plaintiffs to enter into the agreements;

B.  Award all damages incurred by Count Three/Four Plaintiffs as a result of Defendant's misrepresentation by omission and each Count Three/Four Plaintiff's reliance thereon, including, but not limited to, repayment of non-"Commission" revenue to Plaintiffs; and;

C.  Award any such additional relief as this Court deems just and proper.

<div align="center">

**COUNT V**

**VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
(BY PLAINTIFFS JAS TECHNOLOGY, INC., CENTRAL OFFICE PRODUCTS, INC., LHG STORES, LLC, CORRIDOR VENTURES, INC., ENTREPRENEUR INVESTMENT CORP., EMG DELANCEY STREET, LLC, RUSSELL WIRELESS, LLC, AND T.C. WIRELESS, INC.)**

</div>

176.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

177.    Failure to provide an FDD that complies with the Disclosure Rule is deemed an "unfair or deceptive act or practice in violation of Section 5 of the Act.

178.    The Connecticut Unfair Trade Practices Act (C.G.S. 42-110b *et seq.*) ("CUTPA") states that no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

179.    CUPTA further states at §420110b(b):

> It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USC 45(a)(1)), as from time to time amended.

In other words, a violation of the Act is considered a violation of CUPTA.

180.    Upon information and belief, Defendant is based in Connecticut.

181.    As set forth above, Defendant's FDDs, by the omissions described above, misrepresent actual amounts to be charged by Defendant as continuing royalties.

182.    Defendant's omissions in its FDDs are a violation of the Disclosure Rule, and, in turn, the CUTPA.

183.    Moreover, Defendant's omissions are unethical and unscrupulous, and are the cause of substantial injury to Plaintiffs.

184.    As a result of Defendant's CUTPA violations, Plaintiffs JAS Technology, Inc., Central Office Products, Inc., LHG Stores, LLC, Corridor Ventures, Inc., Entrepreneur Investment Corp., EMG Delancey Street, LLC, Russell Wireless, LLC, and T.C. Wireless, Inc. (the "Eight Plaintiffs") suffered extensive damages, including those revenues improperly retained by Defendant as described above.

**WHEREFORE, PLAINTIFFS REQUEST** that this Court order judgment in favor of the Eight Plaintiffs and against Defendant, and award actual and punitive damages to the Eight Plaintiffs, as well as attorney fees and costs as permitted by C.S.G. 42-110g, for damages incurred by the Eight Plaintiffs as a result of Defendant's CUTPA violations; and grant any other relief this Court deems appropriate.

**COUNT VI**

**VIOLATION OF THE NEW YORK FRANCHISE ACT
(BY PLAINTIFF EMG DELANCEY STREET, LLC)**

185.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

186.    Section 687 of the New York Franchise Act ("NYFA")( N.Y. Gen. Bus. Law § 680 *et seq.*) states that it is unlawful for a person, in connection with the offer, sale or purchase of any franchise, to directly or indirectly: (a) Employ any device, scheme, or artifice to defraud; (b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) Engage

in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

187. Defendant, in the sale of Wireless Zone franchises in New York, knowingly omitted statements of material fact from its FDDs that were necessary to notify Plaintiffs of the true intent of Defendant with respect to its rights to collect royalties.

188. Defendant's FDD and franchise agreements clearly state that it has a right to collect 10% of all "commissions" from its provider, yet despite the plain and common meaning, now asserts that it can interpret that word to mean and extend to all payments from its providers, including Verizon.

189. Defendant's failure to state or clarify that it was entitled to 10% of **all** payments from Verizon in its FDD or the franchise agreements constitutes fraud and deceit against Plaintiff EMG Delancey Street, LLC, operating a Wireless Zone franchise in New York.

190. During 2014 specifically, Defendant decided to begin collecting a royalty on the Installment Offset in 2015, which was a material and significant change from its prior practice, and did not disclose the information to its franchisees until two days before the implementation of the new royalty.

191. Plaintiff EMG Delancey Street, LLC entered into a franchise agreement with Defendant for store WZ-810 on October 15, 2014 in reliance on an FDD dated May 2, 2014 furnished by Defendant on or before May 19, 2014, the date on which Plaintiff executed an acknowledgement of receipt of the document.

192. This FDD contained material omissions and misleading information.

193.    Defendant had an affirmative duty, pursuant to the NYFA, to accurately represent how it would collect royalties, including its position, as it now alleges, that it is entitled to a 10% royalty on all payments from Verizon to Plaintiffs, and not just commissions.

194.    Defendant had an affirmative duty pursuant to the NYFA to ensure that the financial disclosures contained in the FDD were true and accurate, and not misleading.

195.    Defendant knew that the information it gave to EMG Delancey Street, LLC was not complete and accurate, but intended for the entity to rely upon the information.

196.    EMG Delancey Street, LLC did reasonably and justifiably rely upon the information to its detriment and entered into a franchise agreement with Defendant that they would not have had the correct and true information been disclosed.

197.    Because of the fraud committed by Defendant and the violation of the VRFA, Plaintiff EMG Delancey Street, LLC, has suffered damages.

**WHEREFORE, PLAINTIFFS REQUEST** that this Court enter judgment in favor of Plaintiff EMG Delancey Street, LLC and against Defendant and order that the respective franchise agreements are void and unenforceable, and/or subject to rescission, and Plaintiff EMG Delancey Street, LLC be paid by Defendant all damages as a result of its actions, including interest, attorney fees, and court costs as provided by statute; and any further relief this Court may deem fair and just under the circumstances.

<div align="center">

**COUNT VII**

**VIOLATION OF THE MARYLAND FRANCHISE INVESTMENT LAW (BY PLAINTIFF LHG STORES, LLC)**

</div>

198.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

199.    Section 14-227 of the Maryland Franchise Registration and Disclosure Law ("MFRL")(Md. Code, Bus. Reg. § 14-201 I2004) *et seq.*) creates civil liability for any person who sells a franchise to another by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, if the person who buys or is granted a franchise does not know of the untruth or omission.

200.    Defendant, in the sale of Wireless Zone franchises in Maryland, omitted statements of material fact from its FDDs that were necessary to notify Plaintiff LHG Store, LLC of the true intent of Defendant with respect to its rights to collect royalties.

201.    Defendant's FDD and franchise agreements clearly state that it has a right to collect 10% of all "commissions" from its provider, yet despite the plain and common meaning, now asserts that it can interpret that word to mean and extend to all payments from its providers, including Verizon.

202.    Defendant's failure to state or clarify that it was entitled to 10% of **all** payments from Verizon in its FDD or the franchise agreements constitutes fraud and deceit against Plaintiffs operating Wireless Zone franchises in Maryland.

203.    During 2014 specifically, Defendant decided to begin collecting a royalty on the Installment Offset in 2015, which was a material and significant change from its prior practice, and did not disclose the information to its franchisees until two days before the implementation of the new royalty.

204.    On April 9, 2014, LHG Stores, LLC entered into a franchise agreement with Defendant for store WZ-775, located and operated in the state of Maryland, whose address is 220 Marlboro Road, Suite 2, Easton, MD, 21601-2781.

205.     LHG Stores, LLC entered into this agreement based upon an FDD dated July 17, 2013 that was made materially false and misleading by Defendant's omission of statements of material fact that were necessary to notify LHG Stores, LLC of Defendant's true intent with respect to its right to collect royalties.

206.     LHG Stores, LLC was required to pay Defendant a franchise fee of more than $100.00 for the right to enter into the franchise agreement for store WZ-775.

207.     On July 21, 2014, LHG Stores, LLC entered into a franchise agreement with Defendant for store WZ-801, located and operated in the state of Maryland, whose address is 7583 Crain Highway, Upper Marlboro, MD 20772.

208.     LHG Stores, LLC entered into this agreement based upon an FDD dated May 2, 2014 that was made materially false and misleading by Defendant's omission of statements of material fact that were necessary to notify LHG Stores, LLC of Defendant's true intent with respect to its right to collect royalties.

209.     LHG Stores, LLC was required to pay Defendant a franchise fee of more than $100.00 for the right to enter into the franchise agreement for store WZ-801.

210.     Defendant had an affirmative duty, pursuant to the MFRL, to accurately represent how it would collect royalties, including its position, as it now alleges, that it is entitled to a 10% royalty on all payments from Verizon to Plaintiffs, and not just commissions.

211.     Defendant had an affirmative duty pursuant to the MFRL, to ensure that the financial disclosures contained in the FDD were true and accurate, and not misleading.

212.     Defendant knew that the information that it had given to LHG Stores, LLC, was not complete and accurate, but intended for it to rely upon the information.

213.    LHG Stores, LLC, did rely upon the information and entered into a franchise agreements with Defendant that it would not have, had the correct and true information been disclosed.

214.    Because of the fraud committed by Defendant and the violations of the MFRL, Plaintiff LHG Stores, LLC, has suffered damages.

**WHEREFORE, PLAINTIFFS REQUEST** that this Court enter judgment in favor of Plaintiff LHG Stores, LLC and against Defendant, and order that the franchise agreement between them is void and unenforceable, and/or subject to rescission, and Plaintiff LHG Stores, LLC be paid by Defendant all damages as a result of its actions, including interest, attorney fees, and court costs as provided by statute; and any further relief this Court may deem fair and just under the circumstances.

## COUNT VIII

### UNJUST ENRICHMENT

215.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

216.    Plaintiffs, by their efforts in operating their Wireless Zone stores and performing sales of Verizon services and products, performed as agents of Verizon to certain standards and benchmarks established by Verizon, which resulted in payment by Verizon of additional spiffs.

217.    Plaintiffs, also by their efforts operating their Wireless Zone stores and performing sales of Vendor products, performed as agents of Vendors to certain standards and benchmarks established by Vendors, which resulted in payment by Vendors of spiffs.

218.    Plaintiffs are entitled to the spiffs – part of the reasonable compensation for their efforts, which compensation Verizon and Vendors intended to pass to those agents responsible for achieving its benchmarks and standards.

36

219.    Despite having no right to the spiffs (save, perhaps, to a royalty if certain spiffs are considered "commissions"), Defendant has retained certain spiffs and parts of spiffs.

220.    If Defendant is allowed to retain the spiffs, Defendant will be unjustly enriched at Plaintiffs' expense.

**WHEREFORE, PLAINTIFFS REQUEST** this Court enter judgment in favor of Plaintiffs and against Defendant, and order Defendant to pay all commission spiffs withheld by Defendant to the respective Plaintiffs, and award any such additional relief as this Court deems just and proper

## COUNT IX

### VIOLATION OF COVENANT OF GOOD FAITH AND FAIR DEALING RELATING TO ALTERATION OF THE POINT OF SALE SYSTEM (BY ALL PLAINTIFFS EXCEPT BOBEVAN COMMUNICATIONS, LLC, DC WIRELESS, LLC, AND EMG DELANCEY STREET, LLC)

221.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

222.    Because Plaintiff Bobevan Communications, LLC operates under a new franchise model effective January 1, 2016, Count IX does not apply to it and reference to "Plaintiffs" in Count IX excludes Bobevan Communications, LLC.

223.    Because Plaintiffs DC Wireless, LLC and EMG Delancey Street, LLC are no longer operating franchise stores, Count IX does not apply to them and reference to "Plaintiffs" in Count IX excludes DC Wireless, LLC and EMG Delancey Street, LLC.

224.    Under its franchise agreements with Plaintiffs, Defendant requires Plaintiffs to purchase and use a computerized point of sale ("POS") system that meets Defendant's specifications.

225.    The franchise agreements further state that Defendant may designate a specific supplier of the POS system and may change the supplier; Defendant may also require the use of new and improved computers and software.

226.    At all times during the current term of each franchise agreement between Plaintiffs and Defendant ("Current Term"), Defendant has mandated a POS system.

227.    In approximately July of 2015, Defendant required Plaintiffs to switch to a new POS system called "RQ."

228.    Plaintiffs use RQ through a master license between Defendant and the licensor of the software. Payments for the use of RQ in Plaintiffs' stores are made by Defendant and billed to Plaintiffs.

229.    At all times during the Current Term prior to January 1, 2016, the POS system mandated by Defendant provided Plaintiffs with an accurate measure of revenue received by Plaintiffs less cost of goods sold and royalties owing to Defendant ("Gross Profits").

230.    Gross Profits were available in the POS System for each transaction, for each employee, and in the aggregate. This was true for RQ, the current POS system, until January 1, 2016.

231.    Most Plaintiffs and most franchisees compensate their employees at least partially by way of a commission to the employee on Gross Profits.

232.    On a daily and weekly basis, Plaintiffs determine Gross Profits to calculate employee compensation.

233.    During the Current Term, the POS system was the only mechanism by which Plaintiffs could calculate Gross Profits to timely determine employee compensation.

234.    In addition to use of Gross Profits for determining employee compensation, Plaintiffs rely and have always under the Current Term relied on Gross Profits figures from RQ and predecessor POS systems to determine revenue they will actually receive from sales.

235.    Determining actual Gross Profits on a daily and weekly basis was and is crucial for the operation of Plaintiffs' businesses, and is perhaps the most important component of RQ for Plaintiffs.

236.    In operating their businesses, Plaintiffs order inventory on a daily and weekly basis, and payment for the inventory of a given month becomes due at the same time that Gross Profits are paid to Plaintiffs.

237.    If the cost of inventory ordered in a month exceeds the Gross Profits due to Plaintiffs from Defendant, Defendant automatically withdraws the shortage from Plaintiffs' bank accounts.

238.    On a daily and weekly basis, Plaintiffs rely on real time Gross Profits figures from RQ to determine if and how much inventory can be ordered at the time, based on Gross Profits that will be available to offset inventory order costs.

239.    Since the time of filing of the first Amended Complaint, Defendant proposed an amendment to the franchise agreements of Plaintiffs ("Proposed Amendment") which would institute a new royalty model ("Proposed Model").

240.    None of the Plaintiffs, except Bobevan Communications, LLC, executed the Proposed Amendment.

241.    On January 1, 2016, Defendant altered the POS system used by Plaintiffs under their existing franchise agreements, such that Plaintiffs will no longer be able to determine Gross Profits in RQ.

242. Defendant's decision means that Plaintiffs will not be able to determine Gross Profits from a day or week for thirty to sixty days – at the time that Plaintiffs receive inventory invoices and commission/royalty settlement statements from Defendant.

243. Because of this, Plaintiffs will not be able to timely pay their employees accurately, nor will Plaintiffs know what funds will be available for inventory orders.

244. Numerous Plaintiffs raised these concerns directly with Defendant, and were told in response that "simple math" was all that was needed to calculate Gross Profits, and that Defendant was not changing its plans.

245. In reality, calculating Gross Profits in real time requires an individual calculation for each transaction in each of Plaintiffs' stores, a task simply not feasible for Plaintiffs.

246. Plaintiffs estimate that compiling accurate Gross Profits figures on a daily or weekly basis will require at least fifteen hours of additional accounting time per week.

247. Plaintiffs are not able to afford the costs of additional administrative personnel that are required to compute accurate Gross Profit figures.

248. Franchisees that signed the Proposed Amendment, which dramatically alters the royalty structure, are not faced with the same concerns.

249. The changes to RQ were, in fact, made to specifically make RQ work for the Proposed Model only and not work for the existing model.

250. Some representatives of Defendant, when made aware that their concerns regarding Gross Profits were not addressed, told those Plaintiffs to simply sign the Proposed Amendment.

251. Defendant's changes to RQ were made in a clear attempt to coerce Plaintiffs to sign the Proposed Amendment to operate under the Proposed Model.

252.    Defendant's overt actions, in changing RQ, were made with the intent to evade the spirit of the bargain in each of the Plaintiffs' franchise agreements with Defendant.

253.    The franchise agreements require Plaintiffs to use the POS system designated by Defendant, and to pay for a license to use the POS system.

254.    The spirit of such a requirement, and inherent in the requirement, is an understanding that the POS system required by Defendant will serve the purposes for which it is intended.

255.    Plaintiffs had a reasonable expectation that the POS system required by Defendant would remain useful to their business, and would not be altered to their detriment because of their unwillingness to execute a different Proposed Amendment which would alter their existing franchise agreements and the business model they contracted to operate under.

256.    At all times during the Current Term, and even prior to the Current Term, the POS system mandated by Defendant permitted Plaintiffs timely access to important business operations data and served the purpose for which it was intended.

257.    In the middle of the terms of existing franchise agreements, Defendant has abandoned Plaintiffs not signing the Proposed Amendment by making the POS system virtually useless to those Plaintiffs.

258.    Defendant's actions are clearly in bad faith and run contrary to the spirit of the franchise agreements and the reasonable expectations of these Plaintiffs.

259.    Defendant's purpose behind the change to RQ – to force Plaintiffs to sign the Proposed Amendment – is similarly in bad faith.

260.    Defendant's actions are a breach of its duty to deal fairly with Plaintiffs in good faith.

**WHEREFORE, PLAINTIFFS REQUEST** this Court enter judgment in favor of Plaintiffs (excepting Bobevans Communications, LLC, DC Wireless, LLC, and EMG Delancey Street, LLC) and against Defendant, and order:

A.    that Defendant be preliminarily and permanently enjoined from altering the POS system to deny access to Gross Profits figures for Plaintiffs operating under existing franchise agreements, for the duration of their franchise agreements, and require Defendant to revert RQ to its pre-January 1, 2016 state or otherwise alter RQ to allow Plaintiffs to determine Gross Profits from RQ;

B.    Defendant to pay Plaintiffs all damages incurred as a result of Defendant's bad faith alteration of RQ; and

C.    any such additional relief as this Court deems just and proper.

# COUNT X

**VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT'S PROHIBITION ON UNFAIR BUSINESS PRACTIES (BY ALL PLAINTIFFS EXCEPT BOBEVAN COMMUNICATIONS, LLC, DC WIRELESS, LLC, AND EMG DELANCEY STREET, LLC)**

261.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

262.    Because Plaintiff Bobevan Communications, LLC operates under a new franchise model effective January 1, 2016, Count X does not apply to it and reference to "Plaintiffs" in Count X excludes Bobevan Communications, LLC.

263.     Because Plaintiffs DC Wireless, LLC and EMG Delancey Street, LLC are no longer operating franchise stores, Count X does not apply to them and reference to "Plaintiffs" in Count X excludes DC Wireless, LLC and EMG Delancey Street, LLC.

264.     As noted, CUTPA prohibits unfair methods of competition and unfair acts in the conduct of any trade or commerce. C.G.S. § 42-110b *et seq.*

265.     As discussed in the previous Count, Defendant altered the POS system used by Plaintiffs effective January 1, 2016, such that Plaintiffs not executing the Proposed Amendment are not able to accurately determine Gross Profits for a particular day or week until thirty to sixty days after the time.

266.     Defendant's alteration of the POS system specifically benefits the Proposed Model and franchisees operating under the Proposed Model, and significantly harms Plaintiffs operating under their existing franchise agreements and the existing royalty model.

267.     Defendant has notified Plaintiffs that, effective for the March 10, 2016 payment cycle, Defendant is ceasing payment of a spiff on the iPhone ("iPhone spiff"), indicating that those funds will be allocated to the Proposed Model.

268.     Defendant has notified Plaintiffs that, effective for the March 10, 2016 payment cycle, for those on the existing model under existing franchise agreements, Defendant will also discontinue payment of performance incentive programs ("PIPs") which have been in place in varying forms for the duration of all existing franchise agreements between Plaintiffs and Defendant.

269.     Defendant is offering a new form of PIP under the Proposed Amendment and Proposed Model.

270.     Defendant canceled the iPhone spiff and is discontinuing the PIPs and altering the POS system in a clear effort to coerce Plaintiffs to sign the Proposed Amendment.

271.    Defendant's actions are intended to harm Plaintiffs for refusing to agree to the Proposed Amendment.

272.    As a result of the cancelation of the iPhone spiff by Defendant, Plaintiffs have suffered and will continue to suffer significant losses in profitability.

273.    Loss of the iPhone spiff, in combination with cancelation of the PIPs and Defendant's withholding of the Installment Offset royalty, will cause many stores operated by Plaintiffs to close as a result of being financially unviable.

274.    Discontinuation by Defendant of support of the POS for Plaintiffs not operating under the Proposed Model will similarly disrupt Plaintiffs' operation of their stores under their existing franchise agreements.

275.    Defendant's actions in discontinuing one or both of the iPhone spiff and the PIPs for Plaintiffs who do not wish to sign the Proposed Amendment while at the same time continuing to wrongfully withhold a royalty on the Installment Offset threatens Plaintiffs with imminent harm to their business and goodwill that is not fully compensable in damages and will cause irreparable harm unless Defendant is enjoined from taking such action.

276.    Similarly, Defendant's altering of the POS system threatens Plaintiffs with imminent harm to their business and goodwill that is not fully compensable in damages and will cause irreparable harm unless Defendant is enjoined from taking such action.

277.    Without a functioning POS system – a system that has existed for the entire duration of the current franchise agreements between Plaintiffs and Defendant – Plaintiffs will be unable to obtain accurate data for operation of their stores under their existing franchise agreements.

278.    Operating without a POS system supported by Defendant would require Plaintiffs to manually tally and calculate numbers on a per-transaction basis for hundreds of transactions per month.

279.    Based on the timing of sales reports from Defendant, Plaintiffs will not be able to accurately determine profit-based compensation for employees in a timely manner.

280.    Plaintiffs, without accurate Gross Profits figures available to them, will be unable to determine their ability to order inventory on a daily and weekly basis.

281.    The impact on Plaintiffs' businesses will be significant, resulting in not only direct losses of revenue, but also incalculable damages related to hedging in ordering of inventory because of a lack of accurate Gross Profits figures on which ordering of inventory is based.

282.    Defendant's actions – placing Plaintiffs under significant operational and economic duress – are intended to force Plaintiffs to sign the Proposed Amendment.

283.    Defendant's actions deprive Plaintiffs of the ability to operate their stores under their existing franchise agreements for the term of those agreements.

284.    Defendant has effectually abandoned franchisees, including Plaintiffs, operating under their existing franchise agreements in favor of the Proposed Model, which is much more economically favorable to Defendant and harmful to Plaintiffs.

285.    Using the threat of serious harm to Plaintiffs' businesses and the businesses of other franchisees of Defendant to coerce Plaintiffs and other franchisees to execute the Proposed Amendment, Defendant's actions are immoral, unethical, oppressive, and unscrupulous, and certainly offend public policy by seeking to obtain signatures by duress and extortion.

286.    Defendant's actions harm not only Plaintiffs, but many additional franchisees of Defendant. Many franchisees who signed the Proposed Amendment did so under duress or were

extorted by Defendant. Those who did not are now left to operate under existing agreements stripped of financial and operational support by Defendant.

287.    Defendant's actions thereby have caused and continue to cause substantial injury to other businessmen – other franchisees of Defendant.

288.    Defendant's actions are a violation of CUTPA's prohibition against unfair methods of competition and unfair acts in the conduct of any trade or commerce.

289.    CUTPA provides for an award of actual damages in addition to costs and reasonable attorney fees. The Court may also order injunctive or equitable relief, and may award punitive damages under CUTPA.

290.    Defendant's attempt to cram down a Proposed Amendment to avoid addressing the issues raised by Plaintiffs in the present litigation, issues also raised by its other franchisees, is reprehensible and should subject Defendant to punitive damages, attorney fees, and costs for its violation of CUTPA.

**WHEREFORE, PLAINTIFFS REQUEST** this Court enter judgment in favor of Plaintiffs (excepting Bobevan Communications, LLC, DC Wireless, LLC, and EMG Delancey Street, LLC) and against Defendant, and order:

A.  that Defendant be preliminarily and permanently enjoined from discontinuing or canceling the PIPs and iPhone spiff for the duration of Plaintiffs' existing franchise agreements;

B.  that Defendant be preliminarily and permanently enjoined from altering the POS system to deny access to Gross Profits figures for Plaintiffs operating under existing franchise agreements, for the duration of their franchise agreements, and require

Defendant to revert RQ to its pre-January 1, 2016 state or otherwise alter RQ to allow Plaintiffs to determine Gross Profits from RQ;

C. that Defendant pay damages related to all PIPs and iPhone spiff money retained by Defendant;

D. that Defendant pay all damages related to disruption or discontinuation of support of the POS system;

E. that Defendant pay punitive damages for its violation of CUTPA;

F. that Defendant pay reasonable attorney fees and costs incurred by Plaintiffs in bringing this action; and

G. award any such additional relief as this Court deems just and proper.

Respectfully Submitted,
**COOPER & RIESTERER, PLC,**

/s/ Briar Siljander
Catherine A. Riesterer (phv07741)
Briar Siljander (phv07742)
7960 Grand River Road, Ste. 270
Brighton, MI  48114
(810) 227-3103

*and*

**Kern & Hillman, LLC**
Allan Hillman (CT27489)
2911 Dixwell Avenue, Suite 203
Hamden, CT 06518
(203) 782-9076
*Attorneys for Plaintiffs*

Dated:  February 17, 2015

47

**EXHIBIT 1 to SECOND AMENDED COMPLAINT**

2008

will pay ATI on a monthly basis a fee, of $200 per month, which ATI may deduct from your Commissions. Notwithstanding the forgoing, nothing herein implies that you have a right to a holdover and nothing will limit ATI's rights and remedies with respect to such holdover.

     5.03    **Notice Required By Law.** If a state or federal law should require ATI to provide you with a longer notice period, then this Franchise Agreement will remain in effect on a month-to-month basis until ATI has given you the amount of notice which the law may require. You must, however, have a Store lease which is effective during this post-expiration period.

## 6.    FRANCHISE FEES

     6.01    **Initial Fee.** You will, at the same time that you sign this Franchise Agreement, pay ATI the initial franchise fee listed in Section 1.06. The fee is fully earned upon payment, and will not be refunded or forgiven for any reason, except as set forth below. If you finance the initial franchise fee with ATI, then you must enter into the Promissory Note which is attached as Exhibit 2 to this Franchise Agreement. If you and ATI do not mutually agree on a location for your Store as required under Section 4 within one hundred twenty (120) days after the date of this Franchise Agreement, ATI can choose to terminate this Franchise Agreement. If that occurs, ATI will refund any franchise fees you paid up to the date of termination, less ATI's then incurred out-of-pocket expenses. ATI may require that you, and if you are an entity, all equity owners, sign a release, as a condition to granting the refund.

     If you are permitted to open a satellite store within the Protected Territory, you must sign a separate franchise agreement, on the then-current form, for the satellite store and pay an initial franchise fee of $1,500. If you are given approval to open an additional Store outside your Protected Territory (which approval ATI is not obligated to give), you must sign a separate franchise agreement for that location and pay the applicable then-current initial franchise fee.

     6.02    **Continuing Royalties.**

     A.    You will pay ATI continuing royalties during the term of this Franchise Agreement ("Continuing Royalties") calculated either under this Section 6.02.A or under Section 6.02.C. Typically under ATI's Provider Contract for your geographic area, certain customer payments are forwarded to Provider and not retained by you or ATI. Provider then pays ATI commissions ("Commissions") on these customer payments attributable to your Store, which ATI passes along to you as ATI's subagent, minus deductions for amounts you owe ATI. Subject to Section 6.02.C, ATI will deduct from the Provider Commissions ATI transmits to you, as Continuing Royalties payable by you to ATI: (i) ten percent (10%) of Commissions ATI receives from Provider attributable to your customer activations, sales and services; plus (ii) ten percent (10%) of amounts you receive attributable to customer payments you retain for sales of other products and services; plus (iii) twenty percent (20%) of residual customer use Commissions ATI receives from Provider attributable to your Store. If your monthly Commissions are less than the Continuing Royalties and any other payments you owe to ATI, ATI will retain all of your Commissions for the period and you will pay the balance you owe to ATI no later than the first day of the following month that the payments are due. Any amounts you owe Provider for "demo lines" will also be paid in a like manner pursuant to the Security Agreement and Demo Line Payment attached to this Franchise Agreement as Exhibit 3 and Electronic Funds Transfer Authorization attached to this Franchise Agreement as Exhibit 4.

     B.    Residual customer use Commissions paid by Providers will be escrowed by ATI on a monthly or quarterly basis, as they are received by ATI from Providers. Twenty percent (20%) of that escrow will be retained by ATI as Continuing Royalties due ATI from you under Section 6.02.A and from all other franchisees or subagents under a similar provision. The remainder of the escrow will be divided among ATI franchisees and subagents by the present number of qualifying active customers as defined in the Provider Contract. You will receive your portion of the residual escrow based upon the number of your qualifying active customers, subject to set-offs as described in paragraph 6.02 A.

     C.    If the economic terms of the Provider Contract used by ATI for services sold at your Store is changed to the detriment of ATI, you agree to pay ATI, by the 10th business day of each subsequent month, Continuing Royalties equal to the greater of the following:

2008

      1.      Five percent (5%) of your Gross Sales, as defined in Section 6.03 below; or

      2.      The amounts due ATI in accordance with Section 6.02.A and 6.02.B above.

      D.      You acknowledge that ATI's franchisees may be serviced by different Providers offering different compensation programs. Therefore, the amounts and methods of paying for Continuing Royalties will vary between franchisees located in different wireless service territories, and may include other forms of payment to ATI by Providers.

      **6.03**      **Gross Sales.** The term "Gross Sales" means the total amount charged for all merchandise and services sold or rendered by you, for which compensation is not separately received from Provider, including equipment other than wireless telephones, personal communications devices, other forms of wireless and wireline communications and all other products sold from, and all other services offered from, your Store, whether payment for the merchandise and services will be made by cash, check, credit, charge account, barter or exchange and if by credit, whether or not the credit will be collected or not. All amounts charged for work left at your Store will be deemed "Gross Sales" on the day the work is received by you. The term "Gross Sales" will exclude any amounts paid by you for any federal, state, county and city sales taxes or other similar taxes which may now and hereafter be imposed or required to be paid by you as against sales on the premises. If at any time any Commissions, as described in Section 6.02, are no longer paid, then the term "Gross Sales" will be expanded to include the sale of wireless and wireline communications equipment (new or used).

      **6.04**      **New Programs.** ATI reserves the right in the exercise of its sole and exclusive business judgment, to provide for a royalty or other form of fee payment by you with regard to programs, marketing efforts, products, services or other revenue generating opportunities, that ATI makes available under the System, at such time as same are introduced into and made part of the System.

      **6.05**      **Withholding Commissions.** During any period that you are in default under this Franchise Agreement or any other agreement between you and ATI, ATI may hold the Commissions, and other amounts ATI receives from Providers that are payable to you, after ATI deducts any amounts due to ATI, until you have cured the defaults to the satisfaction of ATI or until this Franchise Agreement is terminated. On termination or expiration of this Franchise Agreement, you authorize ATI to use any such withheld amounts to pay any remaining amounts owed to ATI or to any third parties in connection with your Store (such as vendors and landlords). After termination or expiration of this Franchise Agreement, ATI may continue withholding for these purposes until the later of: (a) receipt by ATI of confirmation that all amounts owed by you to third parties in connection with your Store have been paid in full; or (b) nine (9) months after the date of termination. Third party creditors of yours are not intended beneficiaries of this Franchise Agreement and do not have any right to compel ATI to make payment to them. ATI will not be liable to you for any payment it may make to a third party under this Section 6.05.

**7.**      **FRANCHISEE PROMOTION AND ADVERTISING**

      **7.01**      **Collective Advertising and Promotion Fund.**

      A.      ATI will expend cooperative advertising monies (the "Collective Advertising and Promotion Fund") on local or regional advertising provided you comply with the rules and requirements of the applicable cooperative advertising program. The Collective Advertising and Promotion Fund will be funded by payments from Providers based on the Provider Contract in effect for the geographic region in which you operate the Store, or in the absence of Provider payments, by franchisee contributions under Section 7.01.B. Because the advertising programs vary from Provider to Provider, ATI cannot and will not warrant the type, level or effectiveness of cooperative advertising in the geographic region in which you operate your Store. In addition to amounts from the Collective Advertising and Promotion Fund expended on a collective basis, there may be other funds made available to you or for which matching funds are available from Provider for local advertising by you if you comply with Provider's and ATI's matching fund requirements.

      B.      In the event that Provider discontinues its cooperative advertising allowance program, ATI reserves the option to collect and you hereby agree to pay to the Collective Advertising and Promotion Fund an advertising contribution, not to exceed five percent (5%) of your Gross Sales and your portion of Commissions paid

2009

will pay ATI on a monthly basis a fee, of $200 per month, which ATI may deduct from your Commissions. Notwithstanding the forgoing, nothing herein implies that you have a right to a holdover and nothing will limit ATI's rights and remedies with respect to such holdover.

**5.03    Notice Required By Law.** If a state or federal law should require ATI to provide you with a longer notice period, then this Franchise Agreement will remain in effect on a month-to-month basis until ATI has given you the amount of notice which the law may require. You must, however, have a Store lease which is effective during this post-expiration period.

## 6.    FRANCHISE FEES

**6.01    Initial Fee.** You will, at the same time that you sign this Franchise Agreement, pay ATI the initial franchise fee listed in Section 1.06. The fee is fully earned upon payment, and will not be refunded or forgiven for any reason, except as stated below. If you finance the initial franchise fee with ATI, then you must enter into the Promissory Note which is attached as Exhibit 2 to this Franchise Agreement. If you and ATI do not mutually agree on a location for your Store as required under Section 4 within one hundred twenty (120) days after the date of this Franchise Agreement, ATI can choose to terminate this Franchise Agreement. If that occurs, ATI will refund any franchise fees you paid up to the date of termination, less ATI's then incurred out-of-pocket expenses. ATI may require that you, and if you are an entity, all equity owners, sign a release, as a condition to granting the refund.

If you are permitted to open a satellite store within the Protected Territory, you must sign a separate franchise agreement, on the then-current form, for the satellite store and pay an initial franchise fee of $1,500. If you are given approval to open an additional Store outside your Protected Territory (which approval ATI is not obligated to give), you must sign a separate franchise agreement for that location and pay the applicable then-current initial franchise fee.

If you paid an initial franchise fee of $1,000 because you were an existing ATI franchisee in good standing who owned franchises for 10 or more Stores (not including any satellite locations), and all of the franchises were owned by the same business entity, you may not transfer any franchise acquired at the $1,000 initial franchise fee unless the Store is in operation.

**6.02    Continuing Royalties.**

A.      You will pay ATI continuing royalties during the term of this Franchise Agreement ("Continuing Royalties") calculated either under the basis of Commissions (as defined below) described in this Section 6.02.A or under the Gross Sales basis described in Section 6.02.C. Typically under ATI's Provider Contract for your geographic area, certain customer payments are forwarded to Provider and not retained by you or ATI. Provider then pays ATI commissions ("Commissions") on these customer payments attributable to your Store, which ATI passes along to you as ATI's sub-agent, minus deductions for amounts you owe ATI. Subject to Section 6.02.C, ATI will deduct from the Provider Commissions ATI transmits to you, as Continuing Royalties payable by you to ATI: (i) ten percent (10%) of Commissions ATI receives from Provider attributable to your customer activations, upgrades, enhanced services, and other products or services; and (ii) twenty percent (20%) of residual customer use Commissions ATI receives from Provider attributable to your Store. Residuals may cease if your Store closes or is transferred.

If your monthly Commissions are less than the Continuing Royalties and any other payments you owe to ATI, ATI will retain all of your Commissions for the period and you will pay the balance you owe to ATI no later than the first day of the following month that the payments are due. Any amounts you owe Provider for "demo lines" will also be paid in a like manner pursuant to the Security Agreement and Demo Line Payment attached to this Franchise Agreement as Exhibit 3 and Electronic Funds Transfer Authorization attached to this Franchise Agreement as Exhibit 4.

B.      Residual customer use Commissions paid by Providers will be escrowed by ATI on a monthly or quarterly basis, as they are received by ATI from Providers. Twenty percent (20%) of that escrow will be retained by ATI as Continuing Royalties due ATI from you under Section 6.02.A and from all other franchisees or sub-agents under a similar provision. The remainder of the escrow will be divided among ATI franchisees and sub-

2009

agents by the present number of qualifying active customers as defined in the Provider Contract. You will receive your portion of the residual escrow based upon the number of your qualifying active customers, subject to set-offs as described in Section 6.02.A.

  C.  If the economic terms of the Provider Contract used by ATI for services sold at your Store is changed to the detriment of ATI, you agree (1) to pay ATI, by the 10th business day of each subsequent month, Continuing Royalties on the basis of Gross Sales, equal to five percent (5%) of your Gross Sales, as defined in Section 6.03 below, or (2) to the deduction by ATI of the Continuing Royalties in the amounts due ATI in accordance with Section 6.02.A and 6.02.B above; whichever is greater.

  D.  You acknowledge that ATI's franchisees may be serviced by different Providers offering different compensation programs. Therefore, the amounts and methods of paying for Continuing Royalties will vary between franchisees located in different wireless service territories, and may include other forms of payment to ATI by Providers.

  **6.03  Gross Sales.** The term "Gross Sales" means the total amount charged for all merchandise and services sold or rendered by you, for which compensation is not separately received from Provider, including equipment other than wireless telephones, personal communications devices, other forms of wireless and wireline communications and all other products sold from, and all other services offered from, your Store, whether payment for the merchandise and services will be made by cash, check, credit, charge account, barter or exchange and if by credit, whether or not the credit will be collected or not. All amounts charged for work left at your Store will be deemed "Gross Sales" on the day the work is received by you. The term "Gross Sales" will exclude any amounts paid by you for any federal, state, county and city sales taxes or other similar taxes which may now and hereafter be imposed or required to be paid by you as against sales on the premises. If at any time any Commissions, as described in Section 6.02, are no longer paid, then the term "Gross Sales" will be expanded to include the sale of wireless and wireline communications equipment (new or used).

  **6.04  New Programs.** ATI reserves the right in the exercise of its sole and exclusive business judgment, to provide for a royalty or other form of fee payment by you with regard to programs, marketing efforts, products, services or other revenue generating opportunities, that ATI makes available under the System, at such time as same are introduced into and made part of the System.

  **6.05  Withholding Commissions.** During any period that you or any of your principals are in default under this Franchise Agreement or any other agreement between you or any of your principals and ATI, ATI may hold the Commissions, and other amounts ATI receives from Providers that are payable to you, after ATI deducts any amounts due to ATI, until you or your principals have cured the defaults to the satisfaction of ATI or until this Franchise Agreement is terminated. On termination or expiration of this Franchise Agreement, you authorize ATI to use any such withheld amounts to pay any remaining amounts owed to ATI or to any third parties in connection with your Store (such as vendors and landlords). After termination or expiration of this Franchise Agreement, ATI may continue withholding for these purposes from amounts accrued before termination or expiration until the later of: (a) receipt by ATI of confirmation that all amounts owed by you to third parties in connection with your Store have been paid in full; or (b) nine (9) months after the date of termination. Third party creditors of yours are not intended beneficiaries of this Franchise Agreement and do not have any right to compel ATI to make payment to them. ATI will not be liable to you for any payment it may make to a third party under this Section 6.05. No Commissions or other amounts will accrue to you following termination or expiration of this Franchise Agreement.

## 7.  FRANCHISEE PROMOTION AND ADVERTISING

  **7.01  Collective Advertising and Promotion Fund.**

  A.  ATI will expend cooperative advertising monies (the "Collective Advertising and Promotion Fund") on local or regional advertising provided you comply with the rules and requirements of the applicable cooperative advertising program. The Collective Advertising and Promotion Fund will be funded by payments from Providers based on the Provider Contract in effect for the geographic region in which you operate the Store, or in the absence of Provider payments, by franchisee contributions under Section 7.01.B. Because the advertising programs vary from Provider to Provider, ATI cannot and will not warrant the type, level or effectiveness of cooperative

2010

will pay ATI on a monthly basis a fee, of $200 per month, which ATI may deduct from your Commissions. Notwithstanding the forgoing, nothing herein implies that you have a right to a holdover and nothing will limit ATI's rights and remedies with respect to such holdover.

**5.03    Notice Required By Law.** If a state or federal law should require ATI to provide you with a longer notice period, then this Franchise Agreement will remain in effect on a month-to-month basis until ATI has given you the amount of notice which the law may require. You must, however, have a Store lease which is effective during this post-expiration period.

## 6.    FRANCHISE FEES

**6.01    Initial Fee.** You will, at the same time that you sign this Franchise Agreement, pay ATI the initial franchise fee listed in Section 1.06. The fee is fully earned upon payment, and will not be refunded or forgiven for any reason, except as stated below. If you finance the initial franchise fee with ATI, then you must enter into the Promissory Note which is attached as Exhibit 2 to this Franchise Agreement. If you and ATI do not mutually agree on a location for your Store as required under Section 4 within one hundred twenty (120) days after the date of this Franchise Agreement, ATI can choose to terminate this Franchise Agreement. If that occurs, ATI will refund any franchise fees you paid up to the date of termination, less ATI's then incurred out-of-pocket expenses. ATI may require that you, and if you are an entity, all equity owners, sign a release, as a condition to granting the refund.

If you are permitted to open a satellite store within the Protected Territory, you must sign a separate franchise agreement, on the then-current form, for the satellite store and pay an initial franchise fee of $1,500. If you are given approval to open an additional Store outside your Protected Territory (which approval ATI is not obligated to give), you must sign a separate franchise agreement for that location and pay the applicable then-current initial franchise fee.

If you paid an initial franchise fee of $1,000 because you were an existing ATI franchisee in good standing who owned franchises for 10 or more Stores (not including any satellite locations), and all of the franchises were owned by the same business entity, you may not transfer any franchise acquired at the $1,000 initial franchise fee unless the Store is in operation.

**6.02    Continuing Royalties.**

A.    You will pay ATI continuing royalties during the term of this Franchise Agreement ("Continuing Royalties") calculated either under the basis of Commissions (as defined below) described in this Section 6.02.A or under the Gross Sales basis described in Section 6.02.C. Typically under ATI's Provider Contract for your geographic area, certain customer payments are forwarded to Provider and not retained by you or ATI. Provider then pays ATI commissions ("Commissions") on these customer payments attributable to your Store, which ATI passes along to you as ATI's sub-agent, minus deductions for amounts you owe ATI. Subject to Section 6.02.C, ATI will deduct from the Provider Commissions ATI transmits to you, as Continuing Royalties payable by you to ATI:  (i) ten percent (10%) of Commissions ATI receives from Provider attributable to your customer activations, upgrades, enhanced services, and other products or services; and (ii) twenty percent (20%) of residual customer use Commissions ATI receives from Provider attributable to your Store. Residuals may cease if your Store closes or is transferred.

If your monthly Commissions are less than the Continuing Royalties and any other payments you owe to ATI, ATI will retain all of your Commissions for the period and you will pay the balance you owe to ATI no later than the first day of the following month that the payments are due. Any amounts you owe Provider for "demo lines" will also be paid in a like manner pursuant to the Security Agreement and Demo Line Payment attached to this Franchise Agreement as Exhibit 3 and Electronic Funds Transfer Authorization attached to this Franchise Agreement as Exhibit 4.

B.    Residual customer use Commissions paid by Providers will be escrowed by ATI on a monthly or quarterly basis, as they are received by ATI from Providers. Twenty percent (20%) of that escrow will be retained by ATI as Continuing Royalties due ATI from you under Section 6.02.A and from all other franchisees or sub-agents under a similar provision. The remainder of the escrow will be divided among ATI franchisees and sub-

agents by the present number of qualifying active customers as defined in the Provider Contract. You will receive your portion of the residual escrow based upon the number of your qualifying active customers, subject to set-offs as described in Section 6.02.A.

C.      If the economic terms of the Provider Contract used by ATI for services sold at your Store is changed to the detriment of ATI, you agree (1) to pay ATI, by the 10th business day of each subsequent month, Continuing Royalties on the basis of Gross Sales, equal to five percent (5%) of your Gross Sales, as defined in Section 6.03 below, or (2) to the deduction by ATI of the Continuing Royalties in the amounts due ATI in accordance with Section 6.02.A and 6.02.B above; whichever is greater.

D.      You acknowledge that ATI's franchisees may be serviced by different Providers offering different compensation programs. Therefore, the amounts and methods of paying for Continuing Royalties will vary between franchisees located in different wireless service territories, and may include other forms of payment to ATI by Providers.

**6.03      Gross Sales.** The term "Gross Sales" means the total amount charged for all merchandise and services sold or rendered by you, for which compensation is not separately received from Provider, including equipment other than wireless telephones, personal communications devices, other forms of wireless and wireline communications and all other products sold from, and all other services offered from, your Store, whether payment for the merchandise and services will be made by cash, check, credit, charge account, barter or exchange and if by credit, whether or not the credit will be collected or not. All amounts charged for work left at your Store will be deemed "Gross Sales" on the day the work is received by you. The term "Gross Sales" will exclude any amounts paid by you for any federal, state, county and city sales taxes or other similar taxes which may now and hereafter be imposed or required to be paid by you as against sales on the premises. If at any time any Commissions, as described in Section 6.02, are no longer paid, then the term "Gross Sales" will be expanded to include the sale of wireless and wireline communications equipment (new or used).

**6.04      New Programs.** ATI reserves the right in the exercise of its sole and exclusive business judgment, to provide for a royalty or other form of fee payment by you with regard to programs, marketing efforts, products, services or other revenue generating opportunities, that ATI makes available under the System, at such time as same are introduced into and made part of the System.

**6.05      Withholding Commissions.** During any period that you or any of your principals are in default under this Franchise Agreement or any other agreement between you or any of your principals and ATI, ATI may hold the Commissions, and other amounts ATI receives from Providers that are payable to you, after ATI deducts any amounts due to ATI, until you or your principals have cured the defaults to the satisfaction of ATI or until this Franchise Agreement is terminated. On termination or expiration of this Franchise Agreement, you authorize ATI to use any such withheld amounts to pay any remaining amounts owed to ATI or to any third parties in connection with your Store (such as vendors and landlords). After termination or expiration of this Franchise Agreement, ATI may continue withholding for these purposes from amounts accrued before termination or expiration until the later of: (a) receipt by ATI of confirmation that all amounts owed by you to third parties in connection with your Store have been paid in full; or (b) nine (9) months after the date of termination. Third party creditors of yours are not intended beneficiaries of this Franchise Agreement and do not have any right to compel ATI to make payment to them. ATI will not be liable to you for any payment it may make to a third party under this Section 6.05. No Commissions or other amounts will accrue to you following termination or expiration of this Franchise Agreement.

7.      **FRANCHISEE PROMOTION AND ADVERTISING**

7.01      **Collective Advertising and Promotion Fund.**

A.      ATI will expend cooperative advertising monies (the "Collective Advertising and Promotion Fund") on local or regional advertising provided you comply with the rules and requirements of the applicable cooperative advertising program. The Collective Advertising and Promotion Fund will be funded by payments from Providers based on the Provider Contract in effect for the geographic region in which you operate the Store, or in the absence of Provider payments, by franchisee contributions under Section 7.01.B. Because the advertising programs vary from Provider to Provider, ATI cannot and will not warrant the type, level or effectiveness of cooperative

2011

A.   You must have an effective Store lease covering, at a minimum, the first three (3) years of the renewal term.

B.   You must notify ATI in writing, at least six (6) months before the expiration date of this Franchise Agreement, of your desire to renew this Franchise Agreement for the renewal period. You agree to sign the then-current form Franchise Agreement used by ATI, no later than three (3) months before the expiration date of this Franchise Agreement (the "Exercise Date"). The new form Franchise Agreement may contain materially different terms and obligations than this Franchise Agreement. You must pay the then-current renewal fee at the time you sign the new Franchise Agreement. If you operate a satellite location, the renewal fee for the satellite location will be the prorated amount of the renewal fee then in effect based on the number of months the satellite location's franchise agreement was in effect as a percentage of the initial term of the Franchise Agreement for the Base Store (84 months), rounded to the nearest full year.

C.   Even though ATI extends this right of renewal, you may not have the right to exercise this renewal option if, as of the Exercise Date, you have not paid all monies which are then due and owing to ATI or its affiliates, or if you have uncured defaults. You will cure any defaults or deficiencies which require correction prior to signing the renewal franchise agreement. ATI may elect to revoke the renewal option if you have received four (4) or more default notices within any two (2) year period during the term of this Franchise Agreement.

D.   You agree, as a condition to the renewal, that you will renovate and modernize the Store in order to meet ATI's then-prevailing design criteria and that you will expend all monies reasonably necessary to complete such renovation and modernization.

E.   You will sign a general release, in a form satisfactory to ATI, of any and all claims against ATI, its parent, subsidiaries or affiliates (if applicable) and their officers, directors, attorneys, shareholders, members, employees and agents in ATI's/their corporate and individual capacities.

F.   If ATI and you are actively pursuing the above procedures to renew but the term expires, this Franchise Agreement may continue as provided in this Section 5.02.F. If you fail to sign the renewal franchise agreement prior to the expiration of this Franchise Agreement, and if you continue to operate the Store beyond the term of this Franchise Agreement when a renewal is pending, it will be deemed to be on a month-to-month basis under the terms of this Franchise Agreement and subject to termination by ATI upon 30 days' notice or other notice as may be required by law. If the holdover period exceeds 180 days, this Franchise Agreement is subject to immediate termination upon notice by ATI to you unless applicable law requires a longer period. Upon termination after any holdover period, the applicable post-termination obligations contained in this Franchise Agreement continue to be applicable. If, for any reason, you continue to operate the Store beyond the term of this Franchise Agreement you will pay ATI on a monthly basis a fee, of $200 per month, which ATI may deduct from your Commissions. If ATI does not elect to deduct or all or part of the $200 fee or if your monthly Commissions are not sufficient to pay the $200 holdover fee and any other amounts you may owe ATI in full, you will pay the balance of the $200 fee no later than the first day of the month following the month in which the fee accrues. Notwithstanding the forgoing, nothing herein implies that you have a right to a holdover and nothing will limit ATI's rights and remedies with respect to such holdover.

5.03   Notice Required By Law. If a state or federal law should require ATI to provide you with a longer notice period, then this Franchise Agreement will remain in effect on a month-to-month basis until ATI has given you the amount of notice which the law may require. You must, however, have a Store lease which is effective during this post-expiration period.

6.   FRANCHISE FEES

6.01   Initial Fee. You will, at the same time that you sign this Franchise Agreement, pay ATI the initial franchise fee listed in Section 1.06. The fee is fully earned upon payment, and will not be refunded or

2011

forgiven for any reason, except as stated below. If you finance the initial franchise fee with ATI, then you must enter into the Promissory Note which is attached as Exhibit 2 to this Franchise Agreement. If you and ATI do not mutually agree on a location for your Store as required under Section 4 within one hundred twenty (120) days after the date of this Franchise Agreement, ATI can choose to terminate this Franchise Agreement. If that occurs, ATI will refund any franchise fees you paid up to the date of termination, less ATI's then incurred out-of-pocket expenses. ATI may require that you, and if you are an entity, all Owners, sign a release, as a condition to granting the refund.

If you are permitted to open a satellite Store within the Protected Territory, you must sign a separate franchise agreement, on the then-current form, for the satellite Store and pay an initial franchise fee of $1,500. If you are given approval to open an additional Store outside your Protected Territory (which approval ATI is not obligated to give), you must sign a separate franchise agreement for that location and pay the applicable then-current initial franchise fee.

If you paid an initial franchise fee of $1,000 because you were an existing ATI franchisee in good standing who owned franchises for 10 or more Stores (not including any satellite locations), and all of the franchises were owned by the same business entity, you may not transfer any franchise acquired at the $1,000 initial franchise fee unless the Store is in operation.

**6.02    Continuing Royalties.**

A.    You will pay ATI continuing royalties during the term of this Franchise Agreement ("Continuing Royalties") calculated either under the basis of Commissions (as defined below) described in this Section 6.02.A or under the Gross Sales basis described in Section 6.02.C. Typically under ATI's Provider Contract for your geographic area, certain customer payments are forwarded to Provider and not retained by you or ATI. Provider then pays ATI commissions ("Commissions") on these customer payments attributable to your Store, which ATI passes along to you as ATI's sub-agent, minus deductions you owe ATI. Subject to Section 6.02.C, ATI will deduct from the Provider Commissions ATI transmits to you, as Continuing Royalties payable by you to ATI: (i) ten percent (10%) of Commissions ATI receives from Provider attributable to your customer activations, upgrades, enhanced services, and other products or services; and (ii) twenty percent (20%) of residual customer use Commissions ATI receives from Provider attributable to your Store. Residuals may cease if your Store closes or is transferred.

If your monthly Commissions are less than the Continuing Royalties and any other payments you owe to ATI, ATI will retain all of your Commissions for the period and you will pay the balance you owe to ATI no later than the first day of the following month that the payments are due. Any amounts you owe Provider for "demo lines" will also be paid in a like manner pursuant to the Security Agreement and Demo Line Payment attached to this Franchise Agreement as Exhibit 3 and Electronic Funds Transfer Authorization attached to this Franchise Agreement as Exhibit 4.

B.    Residual customer use Commissions paid by Providers will be escrowed by ATI on a monthly or quarterly basis, as they are received by ATI from Providers. Twenty percent (20%) of that escrow will be retained by ATI as Continuing Royalties due ATI from you under Section 6.02.A and from all other franchisees or sub-agents under a similar provision. The remainder of the escrow will be divided among ATI franchisees and sub-agents by the present number of qualifying active customers as defined in the Provider Contract. You will receive your portion of the residual escrow based upon the number of your qualifying active customers, subject to set-offs as described in Section 6.02.A.

C.    If the economic terms of the Provider Contract used by ATI for services sold at your Store is changed to the detriment of ATI, you agree (1) to pay ATI, by the 10th business day of each subsequent month, Continuing Royalties on the basis of Gross Sales, equal to five percent (5%) of your Gross Sales, as defined in Section 6.03 below, or (2) to the deduction by ATI of the Continuing Royalties in the amounts due ATI in accordance with Section 6.02.A and 6.02.B above; whichever is greater.

2011

D.    You acknowledge that ATI's franchisees may be serviced by different Providers offering different compensation programs. Therefore, the amounts and methods of paying for Continuing Royalties will vary between franchisees located in different wireless service territories, and may include other forms of payment to ATI by Providers.

6.03    **Gross Sales.** The term "Gross Sales" means the total amount charged for all merchandise and services sold or rendered by you, for which compensation is not separately received from Provider, including equipment other than wireless telephones, personal communications devices, other forms of wireless and wireline communications, entertainment and security products and services, and all other products sold from, and all other services offered from, your Store, whether payment for the merchandise and services will be made by cash, check, credit, charge account, barter or exchange and if by credit, whether or not the credit will be collected or not. All amounts charged for work left at your Store will be deemed "Gross Sales" on the day the work is received by you. The term "Gross Sales" will exclude any amounts paid by you for any federal, state, county and city sales taxes or other similar taxes which may now and hereafter be imposed or required to be paid by you as against sales on the premises. If at any time any Commissions, as described in Section 6.02, are no longer paid, then the term "Gross Sales" will be expanded to include the sale of wireless and wireline communications equipment (new or used) and entertainment and security products (new or used) and services.

6.04    **New Programs.** ATI reserves the right in the exercise of its sole and exclusive business judgment, to provide for a royalty or other form of fee payment by you with regard to programs, marketing efforts, products, services or other revenue generating opportunities, that ATI makes available under the System, at such time as same are introduced into and made part of the System.

6.05    **Withholding Commissions.** During any period that you or any of your Owners are in default under this Franchise Agreement or any other agreement between you or any of your Owners and ATI, ATI may hold the Commissions, and other amounts ATI receives from Providers that are payable to you, after ATI deducts any amounts due to ATI, until you or your Owners have cured the defaults to the satisfaction of ATI or until this Franchise Agreement is terminated. On termination or expiration of this Franchise Agreement, you authorize ATI to use any such withheld amounts to pay any remaining amounts owed to ATI or to any third parties in connection with your Store (such as vendors and landlords). After termination or expiration of this Franchise Agreement, ATI may continue withholding for these purposes from amounts accrued before termination or expiration until the later of: (a) receipt by ATI of confirmation that all amounts owed by you to third parties in connection with your Store have been paid in full; or (b) nine (9) months after the date of termination. Third party creditors of yours are not intended beneficiaries of this Franchise Agreement and do not have any right to compel ATI to make payment to them. ATI will not be liable to you for any payment it may make to a third party under this Section 6.05. No Commissions or other amounts will accrue to you following termination or expiration of this Franchise Agreement.

## 7.    FRANCHISEE PROMOTION AND ADVERTISING

7.01    **Collective Advertising and Promotion Fund.**

A.    ATI will expend cooperative advertising monies (the "Collective Advertising and Promotion Fund") on local or regional advertising provided you comply with the rules and requirements of the applicable cooperative advertising program. The Collective Advertising and Promotion Fund will be funded by payments from Providers based on the Provider Contract in effect for the geographic region in which you operate the Store, or in the absence of Provider payments, by franchisee contributions under Section 7.01.B. Because the advertising programs vary from Provider to Provider, ATI cannot and will not warrant the type, level or effectiveness of cooperative advertising in the geographic region in which you operate your Store. In addition to amounts from the Collective Advertising and Promotion Fund expended on a collective basis, there may be

2012

number of months the satellite location's franchise agreement was in effect as a percentage of the initial term of the Franchise Agreement for the Base Store (84 months), rounded to the nearest full year.

C.     Even though ATI extends this right of renewal, you may not have the right to exercise this renewal option if, as of the Exercise Date, you have not paid all monies which are then due and owing to ATI or its affiliates, or if you have uncured defaults.  You will cure any defaults or deficiencies which require correction prior to signing the renewal franchise agreement.  ATI may elect to revoke the renewal option if you have received four (4) or more default notices within any two (2) year period during the term of this Franchise Agreement.

D.     You agree, as a condition to the renewal, that you will renovate and modernize the Store in order to meet ATI's then-prevailing design criteria and that you will expend all monies reasonably necessary to complete such renovation and modernization.

E.     You will sign a general release, in a form satisfactory to ATI, of any and all claims against ATI, its parent, subsidiaries or affiliates (if applicable) and their officers, directors, attorneys, shareholders, members, employees and agents in ATI's/their corporate and individual capacities.

F.     If ATI and you are actively pursuing the above procedures to renew but the term expires, this Franchise Agreement may continue as provided in this Section 5.02.F.  If you fail to sign the renewal franchise agreement prior to the expiration of this Franchise Agreement, and if you continue to operate the Store beyond the term of this Franchise Agreement when a renewal is pending, it will be deemed to be on a month-to-month basis under the terms of this Franchise Agreement and subject to termination by ATI upon 30 days' notice or other notice as may be required by law.  If the holdover period exceeds 180 days, this Franchise Agreement is subject to immediate termination upon notice by ATI to you unless applicable law requires a longer period.  Upon termination after any holdover period, the applicable post-termination obligations contained in this Franchise Agreement continue to be applicable.  If, for any reason, you continue to operate the Store beyond the term of this Franchise Agreement you will pay ATI on a monthly basis a fee, of $200 per month, which ATI may deduct from your Commissions.  If ATI does not elect to deduct or all or part of the $200 fee or if your monthly Commissions are not sufficient to pay the $200 holdover fee and any other amounts you may owe ATI in full, you will pay the balance of the $200 fee no later than the first day of the month following the month in which the fee accrues.  Notwithstanding the forgoing, nothing herein implies that you have a right to a holdover and nothing will limit ATI's rights and remedies with respect to such holdover.

5.03     **Notice Required By Law.**  If a state or federal law should require ATI to provide you with a longer notice period, then this Franchise Agreement will remain in effect on a month-to-month basis until ATI has given you the amount of notice which the law may require. You must, however, have a Store lease which is effective during this post-expiration period.

6.     **FRANCHISE FEES**

6.01     **Initial Fee.**  You will, at the same time that you sign this Franchise Agreement, pay ATI the initial franchise fee listed in Section 1.06.  The fee is fully earned upon payment, and will not be refunded or forgiven for any reason, except as stated below.  If you finance the initial franchise fee with ATI, then you must enter into the Promissory Note which is attached as Exhibit 2 to this Franchise Agreement.  If you and ATI do not mutually agree on a location for your Store as required under Section 4 within one hundred twenty (120) days after the date of this Franchise Agreement, ATI can choose to terminate this Franchise Agreement. If that occurs, ATI will refund any franchise fees you paid up to the date of termination, less ATI's then incurred out-of-pocket expenses.  ATI may require that you, and if you are an entity, all Owners, sign a release, as a condition to granting the refund.

If you are permitted to open a satellite Store within the Protected Territory, you must sign a separate franchise agreement, on the then-current form, for the satellite Store and pay an initial franchise fee of $1,500.

2012

If you are given approval to open an additional Store outside your Protected Territory (which approval ATI is not obligated to give), you must sign a separate franchise agreement for that location and pay the applicable then-current initial franchise fee.

If you paid an initial franchise fee of $1,000 because you were an existing ATI franchisee in good standing who owned franchises for 10 or more Stores (not including any satellite locations), and all of the franchises were owned by the same business entity, you may not transfer any franchise acquired at the $1,000 initial franchise fee unless the Store is in operation.

### 6.02    Continuing Royalties.

A.    You will pay ATI continuing royalties during the term of this Franchise Agreement ("Continuing Royalties") calculated either under the basis of Commissions (as defined below) described in this Section 6.02.A or under the Gross Sales basis described in Section 6.02.C. Typically under ATI's Provider Contract for your geographic area, certain customer payments are forwarded to Provider and not retained by you or ATI. Provider then pays ATI commissions ("Commissions") on these customer payments attributable to your Store, which ATI passes along to you as ATI's sub-agent, minus deductions for amounts you owe ATI. Subject to Section 6.02.C, ATI will deduct from the Provider Commissions ATI transmits to you, as Continuing Royalties payable by you to ATI:  (i) ten percent (10%) of Commissions ATI receives from Provider attributable to your customer activations, upgrades, enhanced services, and other products or services; and (ii) twenty percent (20%) of Residuals (as defined below) ATI receives from Provider attributable to your Store. Residuals may cease if your Store closes, is transferred, or you fail to meet minimum Provider-imposed performance criteria.

If your monthly Commissions are less than the Continuing Royalties and any other payments you owe to ATI, ATI will retain all of your Commissions for the period and you will pay the balance you owe to ATI no later than the first day of the following month that the payments are due. Any amounts you owe Provider for "demo lines" will also be paid in a like manner pursuant to the Security Agreement and Demo Line Payment attached to this Franchise Agreement as Exhibit 3 and Electronic Funds Transfer Authorization attached to this Franchise Agreement as Exhibit 4.

B.    "Residuals" are Commissions payable by a Provider in consideration of ongoing and continued service and support to subscribers as designated in the Provider Contract, and may also be known as account maintenance fees. "Continuing Residuals" are Residuals paid for a period of time following customer activation; "One-Time Residuals" are paid in one sum in connection with activation, in accordance with the Provider Contract. Residuals paid by Providers will be escrowed by ATI on a monthly or quarterly basis, as they are received by ATI from Providers. Twenty percent (20%) of that escrow will be retained by ATI as Continuing Royalties due ATI from you under Section 6.02.A and from all other franchisees or sub-agents under a similar provision. For Continuing Residuals, the remainder of the escrow will be divided among ATI franchisees and sub-agents by the present number of qualifying active customers as defined in the Provider Contract. For One-Time Residuals, the amount due to you will be paid for your qualifying active customers as defined in the Provider Contract. You will receive your portion of the escrow based upon the number of your qualifying active customers, subject to set-offs as described in Section 6.02.A.

C.    If the economic terms of the Provider Contract used by ATI for services sold at your Store is changed to the detriment of ATI, you agree (1) to pay ATI, by the 10th business day of each subsequent month, Continuing Royalties on the basis of Gross Sales, equal to five percent (5%) of your Gross Sales, as defined in Section 6.03 below, or (2) to the deduction by ATI of the Continuing Royalties in the amounts due ATI in accordance with Section 6.02.A and 6.02.B above; whichever is greater.

D.    You acknowledge that ATI's franchisees may be serviced by different Providers offering different compensation programs. Therefore, the amounts and methods of paying for Continuing Royalties will vary between franchisees located in different wireless service territories, and may include other forms of payment to ATI by Providers.

WZ-757 Rockville MD                                              7

2012

**6.03    Gross Sales.** The term "Gross Sales" means the total amount charged for all merchandise and services sold or rendered by you, for which compensation is not separately received from Provider, including equipment other than wireless telephones, personal communications devices, other forms of wireless and wireline communications, entertainment and security products and services, and all other products sold from, and all other services offered from, your Store, whether payment for the merchandise and services will be made by cash, check, credit, charge account, barter or exchange and if by credit, whether or not the credit will be collected or not.  All amounts charged for work left at your Store will be deemed "Gross Sales" on the day the work is received by you.  The term "Gross Sales" will exclude any amounts paid by you for any federal, state, county and city sales taxes or other similar taxes which may now and hereafter be imposed or required to be paid by you as against sales on the premises.  If at any time any Commissions, as described in Section 6.02, are no longer paid, then the term "Gross Sales" will be expanded to include the sale of wireless and wireline communications equipment (new or used) and entertainment and security products (new or used) and services.

**6.04    New Programs.** ATI reserves the right in the exercise of its sole and exclusive business judgment, to provide for a royalty or other form of fee payment by you with regard to programs, marketing efforts, products, services or other revenue generating opportunities, that ATI makes available under the System, at such time as same are introduced into and made part of the System.

**6.05    Withholding Commissions.** During any period that you or any of your Owners are in default under this Franchise Agreement or any other agreement between you or any of your Owners and ATI, ATI may hold the Commissions, and other amounts ATI receives from Providers that are payable to you, after ATI deducts any amounts due to ATI, until you or your Owners have cured the defaults to the satisfaction of ATI or until this Franchise Agreement is terminated.  On termination or expiration of this Franchise Agreement, you authorize ATI to use any such withheld amounts to pay any remaining amounts owed to ATI or to any third parties in connection with your Store (such as vendors and landlords).  After termination or expiration of this Franchise Agreement, ATI may continue withholding for these purposes from amounts accrued before termination or expiration until the later of: (a) receipt by ATI of confirmation that all amounts owed by you to third parties in connection with your Store have been paid in full; or (b) nine (9) months after the date of termination.  Third party creditors of yours are not intended beneficiaries of this Franchise Agreement and do not have any right to compel ATI to make payment to them.  ATI will not be liable to you for any payment it may make to a third party under this Section 6.05.  No Commissions or other amounts will accrue to you following termination or expiration of this Franchise Agreement.

## 7.    FRANCHISEE PROMOTION AND ADVERTISING

**7.01    Collective Advertising and Promotion Fund.**

A.      ATI will expend cooperative advertising monies (the "Collective Advertising and Promotion Fund") on local or regional advertising provided you comply with the rules and requirements of the applicable cooperative advertising program.  The Collective Advertising and Promotion Fund will be funded by payments from Providers based on the Provider Contract in effect for the geographic region in which you operate the Store, or in the absence of Provider payments, by franchisee contributions under Section 7.01.B.  Because the advertising programs vary from Provider to Provider, ATI cannot and will not warrant the type, level or effectiveness of cooperative advertising in the geographic region in which you operate your Store.  In addition to amounts from the Collective Advertising and Promotion Fund expended on a collective basis, there may be other funds made available to you or for which matching funds are available from Provider for local advertising by you if you comply with Provider's and ATI's matching fund requirements.

B.      In the event that Provider discontinues its cooperative advertising allowance program, ATI reserves the option to collect and you hereby agree to pay to the Collective Advertising and Promotion Fund an advertising contribution, not to exceed five percent (5%) of your Gross Sales and your portion of Commissions paid by Providers, payable by the 10th day of each successive month.  Subject to Section 6.02.C, ATI may

2013

F.      You will sign a general release, in a form satisfactory to ATI, of any and all claims against ATI, its parent, subsidiaries or affiliates (if applicable) and their officers, directors, attorneys, shareholders, members, employees and agents in ATI's/their corporate and individual capacities.

G.      If ATI and you are actively pursuing the above procedures to renew but the term expires, this Franchise Agreement may continue on a month-to-month basis as provided in this Section 5.02.G.  If you fail to sign the renewal franchise agreement prior to the expiration of this Franchise Agreement, and if you continue to operate the Store beyond the term of this Franchise Agreement when a renewal is pending, this Franchise Agreement will be deemed to be on a month-to-month basis under the terms of this Franchise Agreement; provided, however, either party may give the other party 30 days' advanced written notice (or such other notice as may be required by applicable  law) that it does not wish to continue to extend the term of this Franchise Agreement and, in such event, this Franchise Agreement will expire on the 30th day after receipt of the notice or, at ATI's election only, the expiration date will be the last day of the same month containing such 30th day.  Upon any expiration after or termination during any holdover period, as the case may be, the applicable post-termination obligations contained in this Franchise Agreement shall continue to be applicable. If, for any reason, you continue to operate the Store beyond the term of this Franchise Agreement you will pay ATI on a monthly basis a fee, of $200 per month, which ATI may deduct from your Commissions.  If ATI does not elect to deduct or all or part of the $200 fee or if your monthly Commissions are not sufficient to pay the $200 holdover fee and any other amounts you may owe ATI in full, you will pay the balance of the $200 fee no later than the first day of the month following the month in which the fee accrues. Notwithstanding the forgoing, nothing herein implies that you have a right to a holdover and nothing will limit ATI's rights and remedies with respect to such holdover.

**5.03    Notice Required By Law.**  If any applicable state or federal law should require ATI to provide you with a longer notice period, then this Franchise Agreement will remain in effect on a month-to-month basis until ATI has given you the amount of notice which the law may require. You must, however, have a Store lease which is effective during this post-expiration period.

## 6.    FRANCHISE FEES

**6.01    Initial Fee.**  You will, at the same time that you sign this Franchise Agreement, pay ATI the initial franchise fee listed in Section 1.06.  The fee is fully earned upon payment, and will not be refunded or forgiven for any reason, except as stated below.  If you finance the initial franchise fee with ATI, then you must enter into the Promissory Note which is attached as Exhibit 2 to this Franchise Agreement.  If you and ATI do not mutually agree on a location for your Store that is also acceptable to Provider as required under Section 4 within ninety (90) days after the date of this Franchise Agreement, ATI can choose to terminate this Franchise Agreement.  If that occurs, ATI will refund any franchise fees you paid up to the date of termination, less ATI's then incurred out-of-pocket expenses.  ATI may require that you, and if you are an entity, all Owners, sign a release, as a condition to granting the refund.  If ATI does not choose to terminate, you must comply with the development obligations in this Franchise Agreement and we will not refund any amount even if we terminate for failure to open your Store within the time required pursuant to Section 14.01.M.

If you are permitted to open a satellite Store within the Protected Territory, you must sign a separate franchise agreement, on the then-current form, for the satellite Store and pay an initial franchise fee of $1,500.  If you are given approval to open an additional Store outside your Protected Territory (which approval ATI is not obligated to give), you must sign a separate franchise agreement for that location and pay the applicable then-current initial franchise fee.

7

2013

If you paid an initial franchise fee of $1,000 because you were an existing ATI franchisee in good standing who owned franchises for 10 or more Stores (not including any satellite locations), and all of the franchises were owned by the same business entity, you may not transfer any franchise acquired at the $1,000 initial franchise fee unless the Store is in operation.

**6.02    Continuing Royalties.**

A.      You will pay ATI continuing royalties during the term of this Franchise Agreement ("Continuing Royalties") calculated either under the basis of Commissions (as defined below) described in this Section 6.02.A or under the Gross Sales basis described in Section 6.02.C.  Typically under ATI's Provider Contract for your geographic area, certain customer payments are forwarded to Provider and not retained by you or ATI.  Provider then pays ATI commissions ("Commissions") on these customer payments attributable to your Store, which ATI passes along to you as ATI's sub-agent, minus deductions for amounts you owe ATI.  Subject to Section 6.02.C, ATI will deduct from the Provider Commissions ATI transmits to you, as Continuing Royalties payable by you to ATI:  (i) ten percent (10%) of Commissions ATI receives from Provider attributable to your customer activations, upgrades, enhanced services, and other products or services; and (ii) twenty percent (20%) of Residuals (as defined below) ATI receives from Provider attributable to your Store.  Residuals may cease if your Store closes, is transferred, or you fail to meet minimum Provider-imposed performance criteria.

If your monthly Commissions are less than the Continuing Royalties and any other payments you owe to ATI, ATI will retain all of your Commissions for the period and you will pay the balance you owe to ATI no later than the first day of the following month that the payments are due.  Any amounts you owe Provider for "demo lines" will also be paid in a like manner pursuant to the Security Agreement and Demo Line Payment attached to this Franchise Agreement as Exhibit 3 and Electronic Funds Transfer Authorization attached to this Franchise Agreement as Exhibit 4.

B.      "Residuals" are Commissions payable by a Provider in consideration of ongoing and continued service and support to subscribers as designated in the Provider Contract, and may also be known as account maintenance fees.  "Continuing Residuals" are Residuals paid for a period of time following customer activation; "One-Time Residuals" are paid in one sum in connection with activation, in accordance with the Provider Contract.  Residuals paid by Providers will be escrowed by ATI on a monthly or quarterly basis, as they are received by ATI from Providers.  Twenty percent (20%) of that escrow will be retained by ATI as Continuing Royalties due ATI from you under Section 6.02.A and from all other franchisees or sub-agents under a similar provision.  For Continuing Residuals, the remainder of the escrow will be divided among ATI franchisees and sub-agents by the present number of qualifying active customers as defined in the Provider Contract.  For One-Time Residuals, the amount due to you will be paid for your qualifying active customers as defined in the Provider Contract.  You will receive your portion of the escrow based upon the number of your qualifying active customers, subject to set-offs as described in Section 6.02.A.

C.      If the economic terms of the Provider Contract used by ATI for services sold at your Store is changed to the detriment of ATI, you agree (1) to pay ATI, by the 10th business day of each subsequent month, Continuing Royalties on the basis of Gross Sales, equal to five percent (5%) of your Gross Sales, as defined in Section 6.03 below, or (2) to the deduction by ATI of the Continuing Royalties in the amounts due ATI in accordance with Section 6.02.A and 6.02.B above; whichever is greater.

D.      You acknowledge that ATI's franchisees may be serviced by different Providers offering different compensation programs.  Therefore, the amounts and methods of paying for Continuing Royalties will vary between franchisees located in different wireless service territories, and may include other forms of payment to ATI by Providers.

2013

**6.03    Gross Sales.**    The term "Gross Sales" means the total amount charged for all merchandise and services sold or rendered by you, for which compensation is not separately received from Provider, including equipment other than wireless telephones, personal communications devices, other forms of wireless and wireline communications, entertainment and security products and services, and all other products sold from, and all other services offered from, your Store, whether payment for the merchandise and services will be made by cash, check, credit, charge account, barter or exchange and if by credit, whether or not the credit will be collected or not.   All amounts charged for work left at your Store will be deemed "Gross Sales" on the day the work is received by you.   The term "Gross Sales" will exclude any amounts paid by you for any federal, state, county and city sales taxes or other similar taxes which may now and hereafter be imposed or required to be paid by you as against sales on the premises. If at any time any Commissions, as described in Section 6.02, are no longer paid, then the term "Gross Sales" will be expanded to include the sale of wireless and wireline communications equipment (new or used) and entertainment and security products (new or used) and services.

**6.04    New Programs**.   ATI reserves the right in the exercise of its sole and exclusive business judgment, to provide for a royalty or other form of fee payment by you with regard to programs, marketing efforts, products, services or other revenue generating opportunities, that ATI makes available under the System, at such time as same are introduced into and made part of the System.

**6.05    Withholding Commissions.**    During any period that you or any of your Owners are in default under this Franchise Agreement or any other agreement between you or any of your Owners and ATI, ATI may hold the Commissions, and other amounts ATI receives from Providers that are payable to you, after ATI deducts any amounts due to ATI, until you or your Owners have cured the defaults to the satisfaction of ATI or until this Franchise Agreement is terminated.   On termination or expiration of this Franchise Agreement, you authorize ATI to use any such withheld amounts to pay any remaining amounts owed to ATI or to any third parties in connection with your Store (such as vendors and landlords).   After termination or expiration of this Franchise Agreement, ATI may continue withholding for these purposes from amounts accrued before termination or expiration until the later of: (a) receipt by ATI of confirmation that all amounts owed by you to third parties in connection with your Store have been paid in full; or (b) nine (9) months after the date of termination.   Third party creditors of yours are not intended beneficiaries of this Franchise Agreement and do not have any right to compel ATI to make payment to them.   ATI will not be liable to you for any payment it may make to a third party under this Section 6.05.   No Commissions or other amounts will accrue to you following termination or expiration of this Franchise Agreement.

## 7.    FRANCHISEE PROMOTION AND ADVERTISING

**7.01    Collective Advertising and Promotion Fund.**

A.    ATI will expend cooperative advertising monies (the "Collective Advertising and Promotion Fund") on local or regional advertising provided you comply with the rules and requirements of the applicable cooperative advertising program.   The Collective Advertising and Promotion Fund will be funded by payments from Providers based on the Provider Contract in effect for the geographic region in which you operate the Store, or in the absence of Provider payments, by franchisee contributions under Section 7.01.B.  Because the advertising programs vary from Provider to Provider, ATI cannot and will not warrant the type, level or effectiveness of cooperative advertising in the geographic region in which you operate your Store.   In addition to amounts from the Collective Advertising and Promotion Fund expended on a collective basis, there may be other funds made available to you or for which matching funds are available from Provider for local advertising by you if you comply with Provider's and ATI's matching fund requirements.

2014

F.      You will sign a general release, in a form satisfactory to ATI, of any and all claims against ATI, its parent, subsidiaries or affiliates (if applicable) and their officers, directors, attorneys, shareholders, members, employees and agents in ATI's/their corporate and individual capacities.

G.      If ATI and you are actively pursuing the above procedures to renew but the term expires, this Franchise Agreement may continue on a month-to-month basis as provided in this Section 5.02.G. If you fail to sign the renewal franchise agreement before the expiration of this Franchise Agreement, and if you continue to operate the Store beyond the term of this Franchise Agreement when a renewal is pending, this Franchise Agreement will be deemed to be on a month-to-month basis under the terms of this Franchise Agreement; provided, however, either party may give the other party 30 days' advanced written notice (or such other notice as may be required by applicable  law) that it does not wish to continue to extend the term of this Franchise Agreement and, in such event, this Franchise Agreement will expire on the 30th day after receipt of the notice or, at ATI's election only, the expiration date will be the last day of the same month containing such 30th day.  Upon any expiration after or termination during any holdover period, as the case may be, the applicable post-termination obligations contained in this Franchise Agreement will continue to be applicable.  If, for any reason, you continue to operate the Store beyond the term of this Franchise Agreement you will pay ATI on a monthly basis a fee, of $200 per month, which ATI may deduct from your Commissions.  If ATI does not elect to deduct or all or part of the $200 fee or if your monthly Commissions are not sufficient to pay the $200 holdover fee and any other amounts you may owe ATI in full, you will pay the balance of the $200 fee no later than the first day of the month following the month in which the fee accrues. Notwithstanding the forgoing, nothing herein implies that you have a right to a holdover and nothing will limit ATI's rights and remedies for such holdover.

     **5.03    Notice Required By Law.**  If any applicable state or federal law should require ATI to provide you with a longer notice period, then this Franchise Agreement will remain in effect on a month-to-month basis until ATI has given you the amount of notice which the law may require. You must, however, have a Store lease which is effective during this post-expiration period.

6.    **FRANCHISE FEES**

     **6.01    Initial Fee.**  You will, at the same time that you sign this Franchise Agreement, pay ATI the initial franchise fee listed in Section 1.06.  The fee is fully earned upon payment, and will not be refunded or forgiven for any reason, except as stated below.  If you finance the initial franchise fee with ATI, then you must enter into the Promissory Note which is attached as Exhibit 2 to this Franchise Agreement.  If you and ATI do not mutually agree on a location for your Store that is also acceptable to Provider as required under Section 4 within ninety (90) days after the date of this Franchise Agreement, ATI can choose to terminate this Franchise Agreement.  If that occurs, ATI will refund any franchise fees you paid up to the date of termination, less ATI's then incurred out-of-pocket expenses.  ATI may require that you, and if you are an entity, all Owners, sign a release, as a condition to granting the refund.  If ATI does not choose to terminate, you must comply with the development obligations in this Franchise Agreement and we will not refund any amount even if we terminate for failure to open your Store within the time required under Section 14.01.M.

     If you are permitted to open a satellite Store within the Protected Territory, you must sign a separate franchise agreement, on the then-current form, for the satellite Store and pay an initial franchise fee of $1,500.  If you are given approval to open an additional Store outside your Protected Territory (which approval ATI is not obligated to give), you must sign a separate franchise agreement for that location and pay the applicable then-current initial franchise fee.

2014

If you paid an initial franchise fee of $1,000 because you were an existing ATI franchisee in good standing who owned franchises for 10 or more Stores (not including any satellite locations), and all of the franchises were owned by the same business entity, you may not transfer any franchise acquired at the $1,000 initial franchise fee unless the Store is in operation.

**6.02    Continuing Royalties.**

A.    You will pay ATI continuing royalties during the term of this Franchise Agreement ("Continuing Royalties") calculated either under the basis of Commissions (as defined below) described in this Section 6.02.A or under the Gross Sales basis described in Section 6.02.C. Typically under ATI's Provider Contract for your geographic area, certain customer payments are forwarded to Provider and not retained by you or ATI. Provider then pays ATI commissions ("Commissions") on these customer payments attributable to your Store, which ATI passes along to you as ATI's sub-agent, minus deductions for amounts you owe ATI. Subject to Section 6.02.C, ATI will deduct from the Provider Commissions ATI transmits to you, as Continuing Royalties payable by you to ATI: (i) ten percent (10%) of Commissions ATI receives from Provider attributable to your customer activations, upgrades, enhanced services, and other products or services; and (ii) twenty percent (20%) of Residuals (as defined below) ATI receives from Provider attributable to your Store. Residuals may cease if your Store closes, is transferred, or you fail to meet minimum Provider-imposed performance criteria.

If your monthly Commissions are less than the Continuing Royalties and any other payments you owe to ATI, ATI will retain all of your Commissions for the period and you will pay the balance you owe to ATI no later than the first day of the following month that the payments are due. Any amounts you owe Provider for "demo lines" will also be paid in a like manner under the Security Agreement and Demo Line Payment attached to this Franchise Agreement as Exhibit 3 and Electronic Funds Transfer Authorization attached to this Franchise Agreement as Exhibit 4.

B.    "Residuals" are Commissions payable by a Provider in consideration of ongoing and continued service and support to subscribers as designated in the Provider Contract, and may also be known as account maintenance fees. "Continuing Residuals" are Residuals paid for a period of time following customer activation; "One-Time Residuals" are paid in one sum in connection with activation, in accordance with the Provider Contract. Residuals paid by Providers will be escrowed by ATI on a monthly or quarterly basis, as they are received by ATI from Providers. Twenty percent (20%) of that escrow will be retained by ATI as Continuing Royalties due ATI from you under Section 6.02.A and from all other franchisees or sub-agents under a similar provision. For Continuing Residuals, the remainder of the escrow will be divided among ATI franchisees and sub-agents by the present number of qualifying active customers as defined in the Provider Contract. For One-Time Residuals, the amount due to you will be paid for your qualifying active customers as defined in the Provider Contract. You will receive your portion of the escrow based upon the number of your qualifying active customers, subject to set-offs as described in Section 6.02.A.

C.    If the economic terms of the Provider Contract used by ATI for services sold at your Store is changed to the detriment of ATI, you agree (1) to pay ATI, by the 10th business day of each subsequent month, Continuing Royalties on the basis of Gross Sales, equal to five percent (5%) of your Gross Sales, as defined in Section 6.03 below, or (2) to the deduction by ATI of the Continuing Royalties in the amounts due ATI in accordance with Section 6.02.A and 6.02.B above; whichever is greater.

D.    You acknowledge that ATI's franchisees may be serviced by different Providers offering different compensation programs. Therefore, the amounts and methods of paying for Continuing Royalties will vary between franchisees located in different wireless service territories, and may include other forms of payment to ATI by Providers.

2014

**6.03    Gross Sales.**   The term "Gross Sales" means the total amount charged for all merchandise and services sold or rendered by you, for which compensation is not separately received from Provider, including equipment other than wireless telephones, personal communications devices, other forms of wireless and wireline communications, entertainment and security products and services, and all other products sold from, and all other services offered from, your Store, whether payment for the merchandise and services will be made by cash, check, credit, charge account, barter or exchange and if by credit, whether or not the credit will be collected or not. All amounts charged for work left at your Store will be deemed "Gross Sales" on the day the work is received by you. The term "Gross Sales" will exclude any amounts paid by you for any federal, state, county and city sales taxes or other similar taxes which may now and hereafter be imposed or required to be paid by you as against sales on the premises. If at any time any Commissions, as described in Section 6.02, are no longer paid, then the term "Gross Sales" will be expanded to include the sale of wireless and wireline communications equipment (new or used) and entertainment and security products (new or used) and services.

**6.04    New Programs..**   ATI reserves the right in the exercise of its sole and exclusive business judgment, to provide for a royalty or other form of fee payment by you with regard to programs, marketing efforts, products, services or other revenue generating opportunities, that ATI makes available under the System, at such time as same are introduced into and made part of the System.

**6.05    Withholding Commissions.**   During any period that you or any of your Owners are in default under this Franchise Agreement or any other agreement between you or any of your Owners and ATI, ATI may hold the Commissions, and other amounts ATI receives from Providers that are payable to you, after ATI deducts any amounts due to ATI, until you or your Owners have cured the defaults to the satisfaction of ATI or until this Franchise Agreement is terminated. On termination or expiration of this Franchise Agreement, you authorize ATI to use any such withheld amounts to pay any remaining amounts owed to ATI or to any third parties in connection with your Store (such as vendors and landlords). After termination or expiration of this Franchise Agreement, ATI may continue withholding for these purposes from amounts accrued before termination or expiration until the later of: (a) receipt by ATI of confirmation that all amounts owed by you to third parties in connection with your Store have been paid in full; or (b) nine (9) months after the date of termination. Third party creditors of yours are not intended beneficiaries of this Franchise Agreement and do not have any right to compel ATI to make payment to them. ATI will not be liable to you for any payment it may make to a third party under this Section 6.05. No Commissions or other amounts will accrue to you following termination or expiration of this Franchise Agreement.

**7.    FRANCHISEE PROMOTION AND ADVERTISING**

**7.01    Collective Advertising and Promotion Fund.**

A.    ATI will expend cooperative advertising monies (the "Collective Advertising and Promotion Fund") on local or regional advertising provided you comply with the rules and requirements of the applicable cooperative advertising program. The Collective Advertising and Promotion Fund will be funded by payments from Providers based on the Provider Contract in effect for the geographic region in which you operate the Store, or in the absence of Provider payments, by franchisee contributions under Section 7.01.B. Because the advertising programs vary from Provider to Provider, ATI cannot and will not warrant the type, level or effectiveness of cooperative advertising in the geographic region in which you operate your Store. In addition to amounts from the Collective Advertising and Promotion Fund expended on a collective basis, there may be other funds made available to you or for which mahing funds are available from Provider for local advertising by you if you comply with Provider's and ATI's matching fund requirements.

## 6.    FRANCHISE FEES

**6.01    Initial Fee.**  You will, at the same time that you sign this Franchise Agreement, pay ATI the initial franchise fee listed in Section 1.06.  The fee is fully earned upon payment, and will not be refunded or forgiven for any reason, except as stated below.  If you finance the initial franchise fee with ATI, then you must enter into the Promissory Note which is attached as Exhibit 2 to this Franchise Agreement.  If you and ATI do not mutually agree on a location for your Store that is also acceptable to Provider as required under Section 4 within ninety (90) days after the date of this Franchise Agreement, ATI can choose to terminate this Franchise Agreement.  If that occurs, ATI will refund any franchise fees you paid up to the date of termination, less ATI's then incurred out-of-pocket expenses.  ATI may require that you, and if you are an entity, all Owners, sign a release, as a condition to granting the refund.  If ATI does not choose to terminate, you must comply with the development obligations in this Franchise Agreement and we will not refund any amount even if we terminate for failure to open your Store within the time required under Section 14.01.M.

If you are permitted to open a satellite Store within the Protected Territory, you must sign a separate franchise agreement, on the then-current form, for the satellite Store and pay an initial franchise fee of $1,500.  If you are given approval to open an additional Store outside your Protected Territory (which approval ATI is not obligated to give), you must sign a separate franchise agreement for that location and pay the applicable then-current initial franchise fee.

If you paid an initial franchise fee of $1,000 because you were an existing ATI franchisee in good standing who owned franchises for 10 or more Stores (not including any satellite locations), and all of the franchises were owned by the same business entity, you may not transfer any franchise acquired at the $1,000 initial franchise fee unless the Store is in operation.

### 6.02    Continuing Royalties.

A.    You will pay ATI continuing royalties during the term of this Franchise Agreement ("Continuing Royalties") calculated either under the basis of Commissions (as defined below) described in this Section 6.02.A or under the Gross Sales basis described in Section 6.02.C.  Typically under ATI's Provider Contract for your geographic area, certain customer payments are forwarded to Provider and not retained by you or ATI.  Provider then pays ATI commissions ("Commissions") on these customer payments attributable to your Store, which ATI passes along to you as ATI's sub-agent, minus deductions for amounts you owe ATI.  Subject to Section 6.02.C, ATI will deduct from the Provider Commissions ATI transmits to you, as Continuing Royalties payable by you to ATI:   (i) ten percent (10%) of Commissions ATI receives from Provider attributable to your customer activations, upgrades, enhanced services, and other products or services; and (ii) twenty percent (20%) of Residuals (as defined below) ATI receives from Provider attributable to your Store.  Residuals may cease if your Store closes, is transferred, or you fail to meet minimum Provider-imposed performance criteria.

If your monthly Commissions are less than the Continuing Royalties and any other payments you owe to ATI, ATI will retain all of your Commissions for the period and you will pay the balance you owe to ATI no later than the first day of the following month that the payments are due.  Any amounts you owe Provider for "demo lines" will also be paid in a like manner under the Security Agreement and Demo Line Payment attached to this Franchise Agreement as Exhibit 3 and Electronic Funds Transfer Authorization attached to this Franchise Agreement as Exhibit 4.

B.    "Residuals" are Commissions payable by a Provider in consideration of ongoing and continued service and support to subscribers as designated in the Provider Contract, and may also be known as account maintenance fees.  "Continuing Residuals" are Residuals paid for a period of time following customer activation; "One-Time Residuals" are paid in one sum in connection with activation, in accordance with the Provider Contract.  Residuals paid by Providers will be escrowed by ATI on a monthly or quarterly basis, as they are received by ATI from Providers.  Twenty percent (20%) of that escrow will be retained by ATI as Continuing Royalties due ATI from you under Section 6.02.A and from

all other franchisees or sub-agents under a similar provision. For Continuing Residuals, the remainder of the escrow will be divided among ATI franchisees and sub-agents by the present number of qualifying active customers as defined in the Provider Contract. For One-Time Residuals, the amount due to you will be paid for your qualifying active customers as defined in the Provider Contract. You will receive your portion of the escrow based upon the number of your qualifying active customers, subject to set-offs as described in Section 6.02.A.

C. If the economic terms of the Provider Contract used by ATI for services sold at your Store is changed to the detriment of ATI, you agree (1) to pay ATI, by the 10th business day of each subsequent month, Continuing Royalties on the basis of Gross Sales, equal to five percent (5%) of your Gross Sales, as defined in Section 6.03 below, or (2) to the deduction by ATI of the Continuing Royalties in the amounts due ATI in accordance with Section 6.02.A and 6.02.B above; whichever is greater.

D. You acknowledge that ATI's franchisees may be serviced by different Providers offering different compensation programs. Therefore, the amounts and methods of paying for Continuing Royalties will vary between franchisees located in different wireless service territories, and may include other forms of payment to ATI by Providers.

**6.03 Gross Sales.** The term "Gross Sales" means the total amount charged for all merchandise and services sold or rendered by you, for which compensation is not separately received from Provider, including equipment other than wireless telephones, personal communications devices, other forms of wireless and wireline communications, entertainment and security products and services, and all other products sold from, and all other services offered from, your Store, whether payment for the merchandise and services will be made by cash, check, credit, charge account, barter or exchange and if by credit, whether or not the credit will be collected or not. All amounts charged for work left at your Store will be deemed "Gross Sales" on the day the work is received by you. The term "Gross Sales" will exclude any amounts paid by you for any federal, state, county and city sales taxes or other similar taxes which may now and hereafter be imposed or required to be paid by you as against sales on the premises. If at any time any Commissions, as described in Section 6.02, are no longer paid, then the term "Gross Sales" will be expanded to include the sale of wireless and wireline communications equipment (new or used) and entertainment and security products (new or used) and services.

**6.04 New Programs**. ATI reserves the right in the exercise of its sole and exclusive business judgment, to provide for a royalty or other form of fee payment by you with regard to programs, marketing efforts, products, services or other revenue generating opportunities, that ATI makes available under the System, at such time as same are introduced into and made part of the System.

**6.05 Withholding Commissions.** During any period that you or any of your Owners are in default under this Franchise Agreement or any other agreement between you or any of your Owners and ATI, ATI may hold the Commissions, and other amounts ATI receives from Providers that are payable to you, after ATI deducts any amounts due to ATI, until you or your Owners have cured the defaults to the satisfaction of ATI or until this Franchise Agreement is terminated. On termination or expiration of this Franchise Agreement, you authorize ATI to use any such withheld amounts to pay any remaining amounts owed to ATI or to any third parties in connection with your Store (such as vendors and landlords). After termination or expiration of this Franchise Agreement, ATI may continue withholding for these purposes from amounts accrued before termination or expiration until the later of: (a) receipt by ATI of confirmation that all amounts owed by you to third parties in connection with your Store have been paid in full; or (b) nine (9) months after the date of termination. Third party creditors of yours are not intended beneficiaries of this Franchise Agreement and do not have any right to compel ATI to make payment to them. ATI will not be liable to you for any payment it may make to a third party under this Section 6.05. No Commissions or other amounts will accrue to you following termination or expiration of this Franchise Agreement.

**EXHIBIT 2 to SECOND AMENDED COMPLAINT**

**BLACKLINED**

# FRANCHISE DISCLOSURE DOCUMENT

Automotive Technologies, Inc.
A Connecticut corporation
34 Industrial Park Place
Middletown, Connecticut 06457
860/632-9494
FDD@wirelesszone.com
www.wirelesszone.com



The franchisee will sell and service wireless telephones, wireless data, satellite communications, personal communications devices and other forms of wireless, wireline and Internet based communication devices, services and accessories, and entertainment and security products and services.

The total investment necessary to begin operation of a **Wireless Zone®** franchise is between $99,250102,250 and $378,500.416,500.  This includes $52,000 to $210,000 that must be paid to the franchisor or affiliate.

This ~~disclosure document~~Disclosure Document summarizes certain provisions of your franchise agreement and other information in plain English.  Read this ~~disclosure document~~Disclosure Document and all accompanying agreements carefully.  You must receive this ~~disclosure document~~Disclosure Document at least 14 calendar days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no governmental agency has verified the information contained in this document**.

You may wish to receive your disclosure document in another format that is more convenient for you.  To discuss the availability of disclosures in different formats, contact the Legal Department at 34 Industrial Park Place, Middletown, Connecticut  06457  and 860/632-9494 extension 4.

The terms of your contract will govern your franchise relationship.  Don't rely on the disclosure document alone to understand your contract.  Read all of your contract carefully.  Show your contract and this ~~disclosure document~~Disclosure Document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment.  The information in this ~~disclosure document~~Disclosure Document can help you make up your mind.  More information on franchising, such as "*A Consumer's Guide to Buying a Franchise*," which can help you understand how to use this ~~disclosure document~~Disclosure Document, is available from the Federal Trade Commission.  You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C.  20580.  You can also visit the FTC's home page at www.ftc.gov for additional information.  Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state.   Ask your state agencies about them.

Issued:        ~~July 17, 2013~~May 2, 2014

## STATE COVER PAGE

Your state may have a franchise law that requires a franchisor to register or file with a state franchise administrator before offering or selling in your state. REGISTRATION OF A FRANCHISE BY A STATE DOES NOT MEAN THAT THE STATE RECOMMENDS THE FRANCHISE OR HAS VERIFIED THE INFORMATION IN THIS DISCLOSURE DOCUMENT.

Call the state franchise administrator listed in **Exhibit A** for information about the franchisor or about franchising in your state.

MANY FRANCHISE AGREEMENTS DO NOT ALLOW YOU TO RENEW UNCONDITIONALLY AFTER THE INITIAL TERM EXPIRES. YOU MAY HAVE TO SIGN A NEW AGREEMENT WITH DIFFERENT TERMS AND CONDITIONS IN ORDER TO CONTINUE TO OPERATE YOUR BUSINESS. BEFORE YOU BUY, CONSIDER WHAT RIGHTS YOU HAVE TO RENEW YOUR FRANCHISE, IF ANY, AND WHAT TERMS YOU MIGHT HAVE TO ACCEPT IN ORDER TO RENEW.

Please consider the following RISK FACTORS before you buy this franchise:

1. THE FRANCHISE AGREEMENT REQUIRES YOU TO RESOLVE DISPUTES WITH US BY LITIGATION ONLY IN CONNECTICUT. OUT-OF-STATE LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO LITIGATE WITH US IN CONNECTICUT THAN IN YOUR OWN STATE.

2. THE FRANCHISE AGREEMENT REQUIRES THAT CONNECTICUT LAW GOVERNS THE AGREEMENT, AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS.

3. THE COMMUNICATIONS SERVICES PROVIDERS WILL BE IN DIRECT COMPETITION WITH YOU.

4. ~~THE FRANCHISE AGREEMENT REQUIRES THE OWNERS OF THE FRANCHISEE AND, UNDER CERTAIN CIRCUMSTANCES, THEIR SPOUSES TO SIGN A GUARANTY OF PERFORMANCE, MAKING THOSE PERSONS JOINTLY AND SEVERALLY LIABLE FOR THE OBLIGATIONS UNDER THE FRANCHISE AGREEMENT AND PLACING THOSE PERSONS' PERSONAL ASSETS AT RISK.5.~~ THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

**We may use the services of one or more FRANCHISE BROKERS or referral sources to assist us in selling our franchise. A franchise broker or referral source represents us, not you. We pay this person a fee for selling our franchise or referring you to us. You should be sure to do your own investigation of the franchise.**

Effective Date: See the next page for state effective dates.

## STATE EFFECTIVE DATES

The following states require that the Franchise Disclosure Document be registered or filed with the state, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

This Franchise Disclosure Document is registered, on file or exempt from registration in the following states having franchise registration and disclosure laws, with the following effective dates:

| | |
|---|---|
| California | ~~August 2, 2013~~ _____, 2014 |
| Hawaii | ~~August 5, 2013~~ _____, 2014 |
| Illinois | ~~July 17, 2013~~ _____, 2014 |
| Indiana | ~~July 17, 2013~~ _____, 2014 |
| Maryland | ~~October 16, 2013~~ _____, 2014 |
| Michigan | ~~July 17, 2013~~ _____, 2014 |
| Minnesota | ~~July 31, 2013~~ _____, 2014 |
| New York | ~~July 17, 2013~~ _____, 2014 |
| North Dakota | ~~August 1, 2013~~ _____, 2014 |
| Rhode Island | ~~July 25, 2013~~ _____, 2014 |
| South Dakota | ~~July 24, 2013~~ _____, 2014 |
| Virginia | ~~August 22, 2013~~ _____, 2014 |
| Washington | ~~September 9, 2013~~ _____, 2014 |
| Wisconsin | ~~July 24, 2013~~ _____, 2014 |

In all the other states, the effective date of this ~~disclosure document~~Disclosure Document is the issuance date of <u>May 2, 2014.</u>~~July 17, 2013~~

## THE FOLLOWING APPLIES TO TRANSACTIONS GOVERNED BY
## THE MICHIGAN FRANCHISE INVESTMENT LAW ONLY)

THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU.

Each of the following provisions is void and unenforceable if contained in any documents relating to a franchise:

a. A prohibition on the right of a franchisee to join an association of franchisees.

b. A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protection provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

c. A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

d. A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) the term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

e. A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

f. A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

g. A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

(1) The failure of the proposed transferee to meet the franchisor's then-current reasonable qualifications or standards.

## THE FOLLOWING APPLIES TO TRANSACTIONS GOVERNED BY
## THE MICHIGAN FRANCHISE INVESTMENT LAW ONLY}

(2) The fact that the proposed transferee is a competitor of the franchisor or sub-franchisor.

(3) The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(4) The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

h.  A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor.  This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

i.  A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

~~If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, the franchisee may request the franchisor to arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations, if any, of the franchisor to provide real estate, improvements, equipment, inventory, training or other items included in the franchise offering are fulfilled.   At the option of the franchisor, a surety bond may be provided in place of escrow.~~

THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENFORCEMENT BY THE ATTORNEY GENERAL.

Any questions regarding this notice should be directed to:

<div align="center">

State of Michigan
Department of Attorney General
525 W. Ottawa Street
G. Mennen Williams Building, 1st Floor
Lansing, Michigan 48913
Telephone Number:   (517) 373-7117

</div>

# TABLE OF CONTENTS

ITEM

1. The Franchisor, and any Parents, Predecessors, and Affiliates . . . . . . . . . . . . . . . . . . . 1

Item 1 THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS, AND AFFILIATES . 1

2. Business Experience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Item 2 BUSINESS EXPERIENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

3. Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

4. Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5. Initial Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

6. Other Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Item 3 LITIGATION 8

Item 4 BANKRUPTCY 9

Item 5 INITIAL FEES 10

Item 6 OTHER FEES 14

7. Estimated Initial Investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

8. Restrictions on Sources of Products and Services . . . . . . . . . . . . . . . . . . . . . . . . . . 30

9. Franchisee's Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

10. Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

11. Franchisor's Assistance, Advertising, Computer Systems, and Training . . . . . . . . . . 38

12. Territory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

13. Trademarks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Item 7 ESTIMATED INITIAL INVESTMENT 25

Item 8 RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES 29

Item 9 FRANCHISEE'S OBLIGATIONS 32

Item 10 FINANCING 34

Item 11 FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING 36

Item 12 TERRITORY 44

Item 13 TRADEMARKS 47

Item 14 PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION 49

Item 15 OBLIGATION TO PARTICIPATE IN THE 50

Item 16 RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL 52

14. Patents, Copyrights, and Proprietary Information . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Item 17 RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION 53

15. Obligation to Participate in the Actual Operation of the Franchise Business . . . . . . . 54

16. Restrictions on What the Franchisee May Sell . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

17. Renewal, Termination, Transfer, and Dispute Resolution . . . . . . . . . . . . . . . . . . . . 56

18. Public Figures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

19. Financial Performance Representations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

20. Outlets and Franchisee Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

21. Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

22. Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

23. Receipts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Item 18 PUBLIC FIGURES 57

Item 19   FINANCIAL PERFORMANCE REPRESENTATIONS   57
Item 20   OUTLETS AND FRANCHISEE INFORMATION   62
Item 21   FINANCIAL STATEMENTS   84
Item 22   CONTRACTS   84
Item 23   RECEIPTS   85


Exhibit A     State Administrators and Agents for Service of Process
Exhibit B     Franchise Agreement

      Exhibits to the Franchise Agreement

      Exhibit 1 - Agreement with Landlord
      Exhibit 2 - Promissory Note
      Exhibit 3 - Security Agreement and Demo Line Payment
      Exhibit 4 - Electronic Funds Transfer Authorization
      Exhibit 5 - UCC-1 Financing Statement

      Exhibit 6 - Guaranty of Performance
      Exhibit 7 - Confidentiality, Non-Competition
                  and Assignment of Developments
                  Agreement
      Exhibit 8 - Provider Compliance Agreement
      Exhibit 9 - End User License Agreement

      ~~Exhibit 7 - Confidentiality, Non-Competition
                  and Assignment of Developments
                  Agreement
      Exhibit 8 - Provider Compliance Agreement
      Exhibit 9 - End User License Agreement~~

Exhibit C     Rider to the Franchise Agreement (Transfer)
Exhibit D     Transfer and Release Agreement
Exhibit E     SBA Addendum to Franchise Agreement
Exhibit F     Franchisee Participation Agreement (WZ Rewards)
Exhibit G     Addendum Re: Data Protection and Security
Exhibit H     Bill of Sale and Assignment, and Agreement to Purchase
              and Acceptance of Bill of Sale and Assignment
Exhibit I     Operations Manual Table of Contents
Exhibit J     Roster of Franchisees
Exhibit K     Financial Statements
Exhibit L     State Addenda and Agreement Riders

## Item 1

## THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS, AND AFFILIATES

To simplify the language in this Disclosure Document, "ATI," "we" and "our" means Automotive Technologies, Inc., the Franchisor. "You" means the person who buys the franchise. If "you" are a business entity, "you" includes your owners. Natural persons having an ownership interest in a business entity franchisee are called an "Owner" and collectively "Owners." Owners having a specified percentage ownership interest in a business entity franchisee of greater than 5%, greater than 20%, and greater than 51% will be referred as a 5% Owner, 20% Owner, or 51% Owner, respectively.

### Franchisor, Parents, Predecessors, and Affiliates

We are a Connecticut corporation, incorporated on July 1, 1988. Our principal address is 34 Industrial Park Place, Middletown, Connecticut 06457. We operate under our corporate name, the trademark "Wireless Zone," which we use in connection with our franchise system, and the trademark "Wireless Anywhere," which we use in certain non-franchise license arrangements. We do not intend to do business under any other names. We originally began our business under the trademark "The Car Phone Store."

We are a wholly-owned subsidiary of GLENTEL (USA), Inc., a Washington corporation with a principal address at 1201 3rd Avenue, Suite 3400, Seattle, Washington 98101-3034. GLENTEL (USA), Inc. is a wholly-owned subsidiary of GLENTEL Inc., a Canadian corporation with a principal address at 8501 Commerce Court, Burnaby, British Columbia, V5A 4N3, Canada. GLENTEL (USA), Inc. acquired 100% of the ownership of our corporation effective December 1, 2012 in a stock purchase transaction. Neither GLENTEL (USA), Inc. nor GLENTEL Inc. offer to provide products or services to you.

ATI, LLC, a Connecticut limited liability company formed on January 12, 2010, is a wholly-owned subsidiary of our entity. ATI, LLC's principal address is 34 Industrial Park Place, Middletown, Connecticut 06457. ATI, LLC directly or operating through one or more subsidiaries, may own and operate Wireless Zone® stores and may sell them to franchisees. In March 2003 we established the Wireless Zone Foundation for Giving, Inc. (the "Foundation"), a non-stock charitable organization exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. The principal address of the Foundation is the same as our address. The Foundation gives monetary grants to charitable organizations, including organizations servicing the communities in which Wireless Zone® franchisees live and work. We currently require that franchisees donate twenty-five-cents to the Foundation $0.25 for each account activation and upgrade transaction to the Foundation.

We have one1 affiliate, Allphones Retail Pty Limited ("Allphones") that offers franchises in any line of business. This other franchisor offers franchises in a similar line of business and, Allphones became an affiliated franchise programaffiliate of ours as a result of the acquisition of our corporation by our immediate parent GLENTEL (USA), Inc. effective December 1, 2012.Allphones Retail Pty Limited, an Australian corporation (" Allphones"), has a principal address at Suite 1, Level 7, 3 Rider Boulevard, Rhodes, New South Wales 2138. AllphonesIt operates and franchises retail stores in Australia that offer the sale of products, including

telecommunications services, mobile telephones, communications equipment, accessories and ancillary products under the name "Allphones." We do not have any other affiliates that offer franchises in any line of business or provide products or services to our franchisees.

**Agent for Service of Process**

If we have an agent for service of process in your state, we disclose that agent in Exhibit A.

**The Business We Offer**

We grant franchises for the operation of retail outlets ("Stores") operating under the mark Wireless Zone® and any other trademarks, trade names, service marks and related logos we may develop and authorize for Stores (the "Trademarks") and certain systems relating to the establishment, development and operation of a Store (the "System"). In geographic areas where we have not yet established a franchised Store, we may put in place sub-agents in order to begin to develop a customer base. These sub-agents, which may be wireless and wireline communications dealers, will add a product line from us and be entitled to receive limited services. We may also place sub-agents and licensees in non-traditional locations, such as within other retailers. See Item 12. These sub-agents may operate under the mark Wireless Zone® or the registered service mark "Wireless Anywhere®." When the geographic area in which the sub-agent is located comes under a Franchise Agreement with our franchisee, we may, in the exercise of our sole and exclusive business judgment, assign the sub-agent contract to the franchisee or continue the sub-agent as our sub-agent, with an appropriate amendment to the Franchise Agreement. We may also grant area development rights under a Development Agreement with qualified franchise prospects, requiring that the area developer open and operate, within a specified time period, a minimum number of franchised Stores in a defined geographic territory. Development Agreements would be offered under a separate disclosure document and are not offered by this Disclosure Document. We may also grant master franchises to independent licensees under a Master Franchise Agreement, granting them the right to sell franchises to operate Stores in a geographical territory. Master Franchise Agreements would also be offered under a separate disclosure document and are not offered by this Disclosure Document. ~~Finally, we may grant area representative rights to independent licensees under an Area Representative Agreement, granting the area representative the right to recruit franchisee prospects and provide site development and operating support and supervision in a geographical territory. Area Representative Agreements would be offered under a separate disclosure document and are not offered by this Disclosure Document.~~ Our business includes the sale of goods and services to our franchisees. We may also license the trademark Wireless Zone® and other proprietary rights to others in connection with the production and sale of Wireless Zone® brand products. We also sell directly and may license others to sell goods and services in connection with the trademark Wireless Zone® or any other trademarks, other than from a retail outlet. These other means of selling, also referred to as other channels of distribution, include direct sales by us via the Internet and outbound telemarketing and may include sales of goods and services by catalog, mail order, toll free telephone numbers for delivery, or other electronic means.

The franchise that we offer is for the operation of a Store under our standard franchise agreement (the "Franchise Agreement"), attached as Exhibit B. The various forms of Franchise Agreement we have used in the past and in other states may have terms and conditions different from the current form we offer to you. We reserve the right to revise the form and terms of the Franchise Agreement that we offer in the future.

The franchise is for the operation of a retail business specializing in wireless and wireline communication devices, services and accessories, which include the sale, installation and repair of wireless telephones and Internet based services.   In addition, you may sell wireless data, personal communication devices, satellite and/or cable television and radio systems, and other forms of wireless and wireline communication, and entertainment and security products and services.   You will operate your Store according to the System and under the Trademarks.   We contract with one or more providers ("Providers") that provide the communication services used by Store customers in a specific geographic area.   You and our franchisees in each specific geographic area must use only the particular Provider or Providers that are authorized to provide service in the area and with which we have contracted to provide communication services in the specific geographic area. The Providers may differ from area to area.

## The Market and Competition

The market for the products and services offered by a Store is developed and continues to evolve.   You will offer products and services to the general public and small businesses.   Sales of certain products and services are moderately seasonal.   You will compete with other similarly situated retail outlets and competitors offering products and services via the Internet and through other channels of distribution.      These competitors include Providers that provide the communication services to your customers for the wireless and wireline communication devices you will sell; branded stores owned or licensed by large and small chains and franchise systems, including company-owned outlets owned and operated by our immediate parent GLENTEL (USA), Inc. operating under the service mark "Diamond Wireless;" and department stores, big box stores and other vendors of personal communication devices, entertainment and security products and services, and Internet-based vendors.   Some of these competitors may be larger with better financial resources, and may be established longer with better name recognition.   We believe that our franchisees will be able to compete with other businesses providing these products and services as a result of the System, the advertising and promotional programs used to promote the Stores and the training we provide to you.   However, an investment in a Store, like any other business, involves business risks and the success of the franchise will be primarily dependent on your business abilities and your efforts.   We do not warrant, represent or guarantee that any specific franchisee or location will be successful or that you will achieve any specific sales or profit level or break even.

## Applicable Laws and Regulations

There are specific industry regulations that govern the operation of your Store. Retail sales of cell phone products, services and accessories are highly regulated by state and federal authorities.   Applicable laws and regulations address consumer sales and export sales, including: the Federal Communications Commission Wireless Local Number Portability regulations which require cell phone providers to allow individuals to switch cell phone providers while keeping the original cell phone number or to transfer a number previously assigned to a landline to a new cell phone; export laws, including the United States Export Administration Act and COCOM (Coordinating Committee for Multilateral Export Controls), which limit shipping high technology devices, including wireless telephones and other products, internationally;   the Discriminations and Preferences law (47 U.S.C.A. Section 202) which prohibits telecommunications providers from giving a preference to a person, class, locality, etc., for charges, classifications, regulations,

facilities or services; ~~and state insurance licensing regulations which regulate the sale of handset replacement/insurance plans to consumers~~-federal, state or local laws, rules or regulations for the sales of specific products and services you offer or sold to you, to include   limited lines insurance products; federal and state registration; and data/privacy/security compliance requirements for wireless telephones and other technology devices.   There are also state and local laws and regulations dealing with the disposal and recycling of technology devices, including wireless telephones.

As part of your business, you will offer credit to your customers to finance certain of their purchases.   You must comply with all laws governing the extension of credit, including the Consumer Credit Protection Act, the Truth and Lending Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Fair Debt Collections Practices Act and the Electronic Fund Transfer Act.   These laws regulate, among others, how you collect and use personal information, disclosures that must be made to consumers seeking and obtaining credit, discrimination in determining creditworthiness and the use of debit cards at point of sale terminals.   There may also be state and local laws regulating extensions of credit in your market.

You will also have to comply with laws and regulations that apply to businesses generally, including obtaining business licenses from local municipalities, and you will need to comply with: the Americans with Disabilities Act, which requires that employers provide reasonable accommodations for employees and customers with disabilities; the Fair Labor Standards Act; the Lanham Trademark Act and related laws that prohibit misuse of certain commercial marks of others; state laws governing various matters, such as minimum wage, overtime and other working conditions, laws applicable to health, sanitation, smoking, safety, fire and other matters; the Equal Employment Opportunity Commission and Occupational Safety and Health Administration regulations; ~~federal and local laws and regulations relating to consumer and employee data privacy, protection and security; as well as~~ federal and local discrimination, employment, sexual harassment, tax and environmental laws; and federal and local laws and regulations relating to citizenship or immigration status.  You should investigate the application of these laws ~~further~~. We may require that you sign an agreement to confirm your compliance with federal and state data privacy, protection and security requirements.  A sample agreement we require is attached as Exhibit G, Addendum to Franchise Agreement Regarding Compliance with Data Protection and Security of Personal Information (Massachusetts).

## Our and Our Affiliates' Prior Business Experience

We opened the first business of the type to be operated by you as a franchisee in 1988 under our original mark "The Car Phone Store" and we have operated additional Stores since then.  As of December 31, ~~2012~~2013, we did not operate any businesses of the type being offered.  We have offered franchises for the same type of business you will be operating since 1989, originally under the mark "The Car Phone Store."  We adopted the trademark Wireless Zone® for the System starting in late 1995.  We have never offered franchises in any other line of business.  We began offering Master Franchise Agreements for the System in 1999.  We began offering Development Agreements for the System in 2004.  We are not currently offering Master Franchise Agreements or Development Agreements but we may resume offering them in the future.  ~~We have never offered Area Representative Agreements but we may start offering them in the future.~~ As of December 31, ~~2012~~2013, we had entered into ~~two~~2 Master Franchise Agreements, of which ~~one~~1 was in effect as of December 31, ~~2012~~2013, and no Development Agreements.  We are servicing the Stores licensed by the master franchisee and the master

franchisee is no longer offering franchises under the existing Master Franchise Agreement; the Stores are treated as franchised Stores in Item 20.

Our wholly-owned subsidiary ATI, LLC was formed in January 2010. ATI, LLC may operate through one or more subsidiaries. ATI, LLC has operated businesses of the type being offered since 2010. See Item 20. ATI, LLC has never offered franchises in any line of business.

Our immediate parent GLENTEL (USA), Inc. is the majority owner of Diamond Wireless, LLC, a Utah limited liability company, which owns and operates company-owned outlets operating under the service mark "Diamond Wireless," offering goods and services of a type substantially similar to the goods and services to be offered by you as our franchisee under our trademark Wireless Zone®. Information about Diamond Wireless, LLC's company-owned "Diamond Wireless" outlets is included in Item 20 in the disclosure of company-owned outlets. Neither our immediate parent GLENTEL (USA), Inc. nor Diamond Wireless, LLC has ever offered franchises in any line of business.

Our affiliate Allphones began offering franchises in the telecommunications services, mobile telephone, communications equipment, accessories and ancillary products line of business in 1989 and as of December 31, 2012,2013, had 12259 franchised and 41licensed and 32 company owned stores in Australia. Allphones has never operated Wireless Zone® businesses of the type being offered and has never offered franchises providing the type of business you will operate as a Wireless Zone® franchisee. Except as described above, Allphones has not offered franchises in any other line of business.

## Item 2

## BUSINESS EXPERIENCE

### Chairman of the Board and Director:  Thomas E. Skidmore

Mr. Skidmore assumed his present position of Chairman of the Board and became a Director in December 2012. He has been a Director ofjoined our parent corporation, GLENTEL Inc., Burnaby, British Columbia, Canada, since August 1989. Heas a Director in 1989, and in 1990 was appointed Chief Executive Officer. In 1992, the Board of Directors of GLENTEL Inc. in 1990 andappointed Mr. Skidmore as Chairman, and he also assumed the additional responsibilities of Chairman andoffice of President in 1992. Mr. Skidmore also holds various offices with other affiliates of ours, including Director of AMT Group Pty Ltd.Limited since October 2012, Sydney, Australia.

### Director:  James M. Ash

Mr. Ash has been a Director since December 2012. He has been a partner of the law firm Husch Blackwell LLP in Kansas City, Missouri, since April 1993.

## Managing Director and Director: Kevin Sinclair, CFE

Mr. Sinclair assumed his present position of Managing Director in December 2012. He was our Chief Executive Officer from January 2007 until December 2012. Mr. Sinclair was our Chief Operating Officer from January 2001 until January 2007 and President from January 2001 to May 2011. Mr. Sinclair has been a Director since 2002. He ~~is presently a Board Member of the Connecticut Chapter of the Make-A-Wish Foundation and~~ assumed the positions of Chairman in October 2011 and Ex Officio Director in March 2003 of Wireless Zone Foundation for Giving, Inc., Middletown, Connecticut and held the position of President from May 2003 to October 2011. He was a Board Member of Wireless Communications Division, Consumer Electronics Association, Arlington, Virginia, from 2004 to April 2010. ~~Mr. Sinclair joined us as Director of Stores in October 1994, and also served as Vice President of Operations.~~

### ~~President & Chief Operations Officer: James Dunham, Jr.~~

~~Mr. Dunham assumed his present position of President in May 2011. He has been Chief Operations Officer (originally called Chief Operating Officer) since March 2010. Mr. Dunham joined us as Chief Strategy Officer in August 2009. He is currently a Board Member of Wireless Communications Division, Consumer Electronics Association, Arlington, Virginia. From November 2007 to July 2009, he was Senior Vice President and General Manager for Catalyst Business Solutions, Los Angeles, California.~~

## Senior Executive Vice President and Chief Operating Officer: Joseph James Johnson

Mr. Johnson ~~joined us as~~ assumed his present position of Chief Operating Officer in April 2014. He is also currently our Senior Executive Vice President, having assumed this position in May 2013. From June 2007 to May 2013 he held the positions of Negotiation Leader, Buyer and Senior Product Manager of Target Corp., Minneapolis, Minnesota.

## Chief Administrative Officer and Secretary: Susan E. Suhr, CFE

Ms. Suhr assumed her present position of Chief Administrative Officer in April 2007. She has been Secretary since January 2004. She served as Executive Vice President from January 2001 until December 2012, and served as a Director from 2002 until December 2012. Ms. Suhr joined us as Director of Administration and Business Development in 1994 and served as Vice President for Legal and Administrative Affairs from July 1997 until December 2000, and as Assistant Secretary from September 2000 until September 2004. She assumed the positions of President in October 2011 and Ex Officio Director in May 2003 of Wireless Zone Foundation for Giving, Inc. and held the position of Clerk from May 2003 to October 2011.

## Chief Financial Officer and Treasurer: Stephen J. Lewkowicz

Mr. Lewkowicz joined us as Chief Financial Officer in February 2001. He assumed the position of Treasurer in December 2012. He served as Executive Vice President from January 2004 until December 2012 and Assistant Treasurer from November 2011 until December ~~2012. He was~~ 2012, and served as a Director from January 2004 until December 2012. He assumed the positions of Treasurer and Ex Officio Director in May 2003 of Wireless Zone Foundation for Giving, Inc.

### Executive Vice President: Jas Boparai

Mr. Boparai assumed his present position of Executive Vice President in December 2012. He joined our parent corporation, GLENTEL Inc., Burnaby, British Columbia, Canada, in November 2006 and served as its Director, Finance until July 2010 when he was appointed its Chief Financial Officer. He served as its Vice President and Chief Financial Officer from July 2010 until November 2011. In November 2011 he was appointed Executive Vice President and Chief Financial Officer of GLENTEL Inc. Mr. Boparai also holds various offices with other affiliates of ours, including Director of AMT Group Pty Limited since October 2012.

### Executive Vice President: Cary T. Skidmore

Mr. Skidmore assumed his present position of Executive Vice President in December 2012. He joined our parent corporation, GLENTEL Inc., Burnaby, British Columbia, Canada, in May 1997 and served as Vice President, Marketing from December 2001 until November 2011, and has served as its Executive Vice President and Chief Marketing Officer since November 2011. Mr. Skidmore also holds various offices with other affiliates of ours, including Director of AMT Group Pty Limited since October 2012.

### Senior Executive Vice President Sales: David Staszewski

Mr. Staszewski assumed his present position of Executive Vice President in April 2014. He served as Senior Vice President Sales in from March 2010 2010 until April 2014. He was Vice President and General Manager from April 2007 until March 2010 and Vice President – Business Development from August 2006 to April 2007. He assumed the positions of Vice President in October 2011 and Ex Officio Director in October 2010 of Wireless Zone Foundation for Giving, Inc.

### Executive Vice President: Michael Broe

Mr. Broe assumed his present position in May 2011. He was Executive Vice President Corporate Stores and Real Estate from July 2010 until April 2011. From May 2008 until October 2009, he was Head of Store Operations for Goodyear Tire and Rubber Company, Akron, Ohio.

### Area Vice President, Franchise Operations New England and Upstate New York: David Haryasz

Mr. Haryasz joined us in his present position in December 2010. From March 2008 until May 2010, he was National Operations Manager for ING, Windsor, Connecticut.

### Area Vice President, Franchise Operations Mid-Atlantic and Metro NY: Jeffrey D. Panella

Mr. Panella assumed his present position in February 2007. He joined us as Director of Stores in September 2005, and served as Executive Director of Stores from November 2005, 2005 to February 2007.

**Area Vice President, Franchise Operations South:  Michael Zuest**

Mr. Zuest joined us in his present position in January 2011.  From January 2010 until January 2011, he was retired. From October 2001 until December 2009, he was Regional Vice President of AT&T, Atlanta, Georgia.

**Vice President – ~~System Standards~~Systems Excellence:  Craig Ahrens**

Mr. Ahrens joined us in his present position in December 2010.  From October 2004 until August 2005, April 2007 until December 2007 and June 2008 until December 2010, he was President of Rycon Partners, Simsbury, Connecticut.

**Director of ~~Store Development~~Design and Construction:  Doug Sager**

Mr. Sager assumed his present position in March 2010.  He joined us in May 2007 as New Franchise Coordinator.

**~~Executive Director of Franchise Development:   Clay Neff~~**

~~Mr. Neff joined us in October 2008 as Director of Franchise Development.   He assumed his current position of Executive Director of Franchise Development in September 2012 when he rejoined us after leaving in May 2012.   From May 2012 to September 2012 he was employed by First Light Home Care in Cincinnati, Ohio as Director of Franchise Development.   From August 2007 until October 2008, he was employed by Healthy Inspirations, Coronado, California, as Director of Franchise Sales.~~

**~~Director of Franchise Development:   Anthony Giannone~~**

~~Mr. Giannone joined us in his present position in January 2008.~~

**Acting Senior Director of Franchise Development: Janet Labanara**

Ms. Labanara ~~joined us in February 2011 as Regional Franchise Director. She~~ assumed ~~the~~her present position of Acting Senior Director of Franchise Development ~~in~~ in April 2014. She served as Director of Franchise Development from June 2012 to April 2014 and as Regional Franchise Director from February 2011 to June 2012. From July 2009 until November 2010 she was employed by Pocket Communications of Bloomfield, Connecticut, as a Director of Sales. From August 2008 until July 2009 she was employed by Level 3 Communications of Broomfield, Colorado, as an Account Director.~~ From March 2008 until August 2008 she was employed by Ivans of Tampa, Florida as a Strategic Client Executive.~~

**~~Director of Franchise Development:   Donald Bradley~~**  ~~Mr. Bradley assumed his present position in February 2012.   He joined us in July 2009 as Director of Stores, became Regional Sales Director in January 2010, and was Regional Franchise Director from January 2011 until January 2012.   From November 2008 until February 2009 he was unemployed.   From November 2007 until November 2008 he was employed by Sprint Nextel of Jensen Beach, Florida as a Sales Manager.~~

**Director of Franchise Development:   Glen Snyder**

Mr. Snyder joined us as Director of Franchise Development in December 2006.

**Director of Franchise Development:   Keith Dziki**

Mr. Dziki joined us in his present position in October 2012.  From February 2004 to October 2012 he was employed by Contours Express, LLC in Nicholasville, Kentucky, as Vice President Operations and Franchise Developer from February 2004 to June 2006 and then as President and Chief Operating Officer from June 2006 to October 2012.

**Director of Purchasing:   Alessandro Barranco**

Mr. Barranco assumed his present position in January 2004.  He joined us in November 1992 in our Sales Department, became Assistant Manager in October 1994, Warehouse Manager in February 1995, Corporate Buyer in June 2003. He assumed the positions of Vice President in October 2011 and Ex Officio Director in March 2006 of Wireless Zone Foundation for Giving, Inc.

**Director of Marketing:   Kevin Downs**

Mr. Downs joined us in his present position in July 2007.   He assumed the positions of Vice President in October 2011 and Ex Officio Director in October 2010 of Wireless Zone Foundation for Giving, Inc.

## Item 3

## LITIGATION

**Franchisor Litigation Against Franchisees in the Last Fiscal Year**

During fiscal year ~~2012~~,2013, we initiated ~~one~~1 lawsuit against franchisees as follows:

Suit for ~~collection~~Confirmation of Release

*Automotive Technologies, Inc. and ATI, LLC v. ~~Joseph Thomas and J.T. Industries, LLC,~~ ~~Civil Action No. 3:1212-cv-0129001290 (D. Conn.).~~M I E Consulting Inc. and Igor Velyunskiy,* United States District Court for the District of Connecticut, Case No. 3:13-cv-01795, filed on December 3, 2013.

**Affiliate Concluded Litigation**

*Australian Competition and Consumer Commission v. Allphones Retail Pty Limited, Matthew Donnellan, Ian Harkin and Anthony Baker,* NSD 408/2008 (Federal Court of Australia – New South Wales). In March 2008, the Australian Competition and Consumer Commission (the "ACCC") filed this action in the Federal Court in Sydney, New South Wales, Australia, against Allphones Retail Pty Limited ("Allphones"), Matthew Donnellan (a former director of Allphones), Anthony Baker (a director of Allphones) and Ian Harkin (a former employee of Allphones), alleging that between June 2003 and December 2007, Allphones engaged in unconscionable conduct in the operation of its franchise system by failing to provide disclosure, restricting franchisees' rights to associate, failing to provide for resolution of disputes by discussion followed by mediation, and by making misleading representations, in violation of the Australian Trade Practices Act and the Australian Franchising Code of Conduct. On April 28, 2010, by consent of the parties, the Federal Court entered orders finding that Allphones had engaged in the actions alleged in the action and that Mr. Donnellan, Mr. Baker and Mr. Harkin were knowingly involved in Allphones' conduct. The Federal Court ordered injunctions against Allphones and the individual defendants prohibiting them from committing similar violations for ~~three~~3 years and ordered Allphones to pay the ACCC's costs of the proceeding.

*Australian Competition and Consumer Commission v. Allphones Retail Pty Limited, Matthew Donnellan, Ian Harkin and Anthony Baker,* NSD 869/2009 (Federal Court of Australia – New South Wales). In August 2009, the ACCC filed this action in the Federal Court in Sydney, New South Wales, Australia, against Allphones, Matthew Donnellan, Anthony Baker and Ian Harkin, alleging generally the same misconduct by the same parties as in the 2008 injunction action described in the above paragraph (Case NSD 408/2008), and seeking money compensation on behalf of franchisees. On April 28, 2010, the Federal Court ordered, by consent of the parties, that Allphones, Mr. Donnellan and Mr. Baker pay the ACCC $3,000,000 Australian Dollars (equivalent to $2,773,925 US) in compensation and the costs of the proceeding.

*Australian Competition and Consumer Commission v. Allphones Retail Pty Limited, Matthew Donnellan, Ian Harkin and Anthony Baker,* NSD 1567/2008 (Federal Court of Australia – New South Wales). In June 2011, the ACCC filed a further action in the Federal Court in

Sydney, New South Wales, Australia, relating to injunctions issued in the main proceedings NSD 408/2008 in October 2008, for contempt alleging Allphones through its senior management violated the injunction orders entered against them in relating to its dealings with franchisees. The Federal Court made a finding of contempt on June 19, 2011 that Allphones had violated the injunctions and ordered Allphones to pay a penalty of $45,000 Australian Dollars (equivalent to $47,529 US), an amount reached by consent of the parties.

* * * * * * *

Other than these actions, no litigation is required to be disclosed in this Item.

.

## Item 4

## BANKRUPTCY

No bankruptcy information is required to be disclosed in this Item.

## Item 5

## INITIAL FEES

### Initial Franchise Fee.

You will pay us an initial franchise fee which varies from $30,000 to $1,000 based on your level of experience in the wireless and wireline sales industry and/or the location of your Store according to the following chart:

| Experience or Location | Amount | Remarks |
|---|---|---|
| For a new, start up franchisee | $30,000 | The fee will be less if your Store is in an enclosed mall.   See below. |
| For a franchisee with a minimum of one1 year acceptable wireless and wireline sales and/or service experience with us, a Wireless Zone® franchisee, or other Provider retailer | $20,000 | We will determine the knowledge and skill level and confirming documentation required for the reduced franchise fee in the exercise of our sole and exclusive business judgment. If you are an existing Wireless Zone® franchise in good standing, your fee will be less for an additional franchise outside your Protected Territory,¹ and for a satellite location¹:an additional franchise you acquire within your Protected Territory (a "Satellite Location"). See below. |
| For an enclosed mall (in-line Store, kiosk, cart) | $10,000 | The initial franchise fee is $10,000 even if you are a new, start up franchisee.   If you are an existing |

| Experience or Location | Amount | Remarks |
|---|---|---|
| | | Wireless Zone® franchisee in good standing, your fee will be less for an additional franchise outside your Protected Territory[1] and for a ~~satellite location[1]~~ Satellite Location.   See below. |
| For an existing Wireless Zone® franchisee in good standing acquiring an additional franchise outside the franchisee's Protected Territory[1] | $ 7,500 | If you are an existing Wireless Zone® franchisee in good standing and you purchase an additional Wireless Zone® franchise outside your Protected Territory, the initial franchise fee is $7,500.   ~~You will sign our Franchise Agreement on the then current form which may differ materially for the additional location.~~ This reduced franchise fee is offered to 51% Owners of an existing Wireless Zone® franchisee   who will also own at least 51% of the additional franchise or of the ownership interests in the franchisee entity acquiring the additional franchise.   However, through December 31, 2014, we will discount this fee to $5,000 and reduce the ownership requirement to 33%.   You must meet all our qualifications, including not having received a default letter from us in the 6 months before you sign the Franchise Agreement, and opening the Store within 120 days after you sign the Franchise Agreement. |
| For an existing Wireless Zone® franchisee in good standing who owns ~~10 or~~ more than 4 and less than 10 Wireless Zone® franchises (including any ~~satellite locations~~Satellite Locations), acquiring an additional franchise | $- ~~1,000~~5,000 | If you are an existing Wireless Zone® franchisee in good standing who owns ~~10 or~~ more than 4 and less than 10 Wireless Zone® franchises (including any ~~satellite locations~~Satellite Locations), and you purchase an additional Wireless Zone® franchise, ~~and all of the franchises are owned by the same business entity,~~ the initial franchise fee is ~~$1,000. You will sign our Franchise Agreement on the then current form which may differ materially for the additional location.~~ 5,000. You may not transfer any franchise acquired at the $~~1,000~~5,000 fee unless the Store is in operation. This reduced franchise fee is offered to 51% Owners of an existing Wireless Zone® franchisee who will also own at least 51% of the additional franchise or of the ownership interests in the franchisee entity acquiring the additional franchise.   However, through December 31, 2014, we will discount this fee to $2,500 and reduce the ownership requirement to 33%.   You must meet all our qualifications, including not having received a default letter from us in the 6 months before you sign the Franchise Agreement, and opening the Store within 120 days after you sign the Franchise Agreement. |
| For an existing Wireless Zone® franchisee in good standing who owns 10 or more Wireless Zone® | $ 1,000 | If you are an existing Wireless Zone® franchisee in good standing who owns 10 or more Wireless Zone® franchises (including any Satellite Locations), and |

| Experience or Location | Amount | Remarks |
|---|---|---|
| franchises (including any Satellite Locations), acquiring an additional franchise | | you purchase an additional Wireless Zone® franchise, the initial franchise fee is $1,000. You may not transfer any franchise acquired at the $1,000 fee unless the Store is in operation. This reduced franchise fee is offered to 51% Owners of an existing Wireless Zone® franchisee who will also own at least 51% of the additional franchise or of the ownership interests in the franchisee entity acquiring the additional franchise. However, through December 31, 2014, we will reduce the ownership requirement to 33%. You must meet all our qualifications, including not having received a default letter from us in the 6 months before you sign the Franchise Agreement, and opening the Store within 120 days after you sign the Franchise Agreement. |
| For ~~a satellite location~~an existing Wireless Zone® franchisee in good standing  acquiring a Satellite Location | $ 1,500 | ~~With regard to~~In all franchise categories, a franchisee may, with our prior written approval, open one or more ~~satellite locations~~Satellite Locations within the franchisee's Protected Territory[1], for which an additional franchise fee of $1,500 per location is due (reduced to $1,000 if the franchisee owns 10 or more Wireless Zone® franchises). ~~You will sign our Franchise Agreement on the then-current form which may differ materially for the satellite location.~~ |
| For an existing wireless telephone business that sells similar products and services of the Wireless Zone Provider and converts to a Store | $ 1,000 | The initial franchise fee covers the cost of converting up to ~~two~~2 existing Stores within a single Protected Territory[1]. |
| | $1,000 | A converting franchisee who sells products and services of the Wireless Zone Provider will pay $1,000 for each additional converted unit in excess of the initial ~~two~~2 units within the same Protected Territory. |

**Note:**

(1)   See Item 12 for a discussion of Protected Territory.

We are a subscriber to the Vet*Fran program of the International Franchise Association. Under that program, in addition to our criteria for new franchisees, if you are an honorably discharged veteran ~~and your application as a Wireless Zone® franchisee is not submitted by a franchise broker, franchise lead network, area developer, master franchisee, or area representative~~ you are entitled to a discount of 50% on an initial franchise fee of either $30,000, $20,000, or $10,000, or on a transfer fee.  If you are a business entity, the veteran must be a 51% Owner of the entity.  This Vet*Fran discount may not be combined with any other discount or incentive offer and is limited to ~~one~~1 discount per individual or franchisee entity.

Payment of the initial franchise fee is due in full when you sign the Franchise Agreement, but we may offer to finance up to 50% (for a new franchisee entering the System) or 100% (for an existing franchisee or Owner of an entity franchisee) of the initial franchise fee for 12 months, if you meet our credit standards. See Item 10. All franchise fees are fully earned by us and are non-refundable. If, however, we cannot mutually agree on a site for your Store ~~that is also acceptable to Provider~~ within 90 days after we and you sign the Franchise Agreement, we can ~~choose to~~ terminate the Franchise Agreement. If we do not choose to terminate, you must comply with the development obligations in the Franchise Agreement to open your Store within 180 days after we and you sign the Franchise Agreement, and we will not refund any amount even if we terminate for failure to open your Store within the time required. If we do elect to terminate for failure to mutually agree on a site, we will refund any franchise fees you paid up to the date of termination, less our then incurred out-of-pocket expenses. ~~We may require that~~ if you, and if you are an entity, all Owners, sign a ~~General Release~~ general release, as a condition to ~~granting the refund. The release will not release any liability specifically provided for by any applicable state statute regulating franchising~~ receiving the refund. The Transfer and Release Agreement attached as Exhibit D contains a sample form of general release in connection with a termination of the Franchise Agreement, or your entering into a subsequent term or transfer of the franchise or other event when we require you to deliver a general release to us, which we may modify to suit particular circumstances. The initial franchise fee is the same for all franchisees under this Disclosure Document except as described above, and except we may negotiate the initial franchise fee with franchisees who purchase franchises for multiple existing locations at the same time or similar circumstances or considerations.

If you acquire an existing Store from our affiliate ATI, LLC, you will pay ATI, LLC the purchase price for the assets you acquire. You and ATI, LLC will enter into the Bill of Sale and Assignment, and the Agreement to Purchase and Acceptance of Bill of Sale and Assignment, substantially in the form attached as Exhibit H. Payment of the purchase price is due in full when you sign the Franchise Agreement and is non-refundable. We may offer to finance a portion of the purchase price. See Item 10.

## Initial Product Inventory~~:~~

~~Prior to opening~~ Before you open or ~~assuming~~ assume operation of your Store, we may require that you purchase Initial Product Inventory from us at a cost ~~of~~ we currently estimate to be between $50,000 and $150,000, not including shipping, which will vary~~, unless you are renewing your franchise to operate at the same location. Your cost may be higher if a manufacturer or supplier raises prices to us. See Item 7 for a more detailed discussion of your initial investment~~. The actual amount and cost of Initial Product Inventory required for your store will be based in part upon the size of your store, anticipated customer buying patterns, and technological innovations. We may adopt a program to offer financing for your Initial Product Inventory. We may require payment in full electronically via ACH or wire transfer (EFT) ~~prior to~~ before delivery. Payment is non-refundable, except we may repurchase usable inventory if we terminate your Franchise Agreement. See Item 17. We may waive the requirement to purchase Initial Product Inventory if you are renewing your franchise to operate at the same location.

## Signs, Fixtures, Displays, Kiosk Deposit

Prior to openingBefore you open or assumingassume operation of your Store, you must order from us the signs, fixtures, displays, and computer Point of Sale (POS) workstation setup neededyou will need for the build out of a new Store, and if applicable, the cost of your kiosk if you will operate a kiosk location in a shopping mall or similar location. You will pay us a deposit equal to the amount of your items, including the estimated cost of shipping, which will vary, less any subsidies we and/or Provider may offer to subsidize all or a portion of certain items, and less any amount we offer to finance up to a maximum of $20,000 for all items combined (up to $15,000 of the cost of signs, fixtures, displays and kiosks, and up to $5,000 of the cost of computer Point of Sale (POS) workstation setup). We estimate the deposit will be $1,000 to $30,000, payable when you sign and acknowledge the cost estimate we provide to you and before we will authorize work to begin. You will pay us for all the remaining cost of signs, fixtures and displays and POS workstation setup, and if applicable, a kiosk, after any subsidies and which we do not finance, within 30 days of receiving an invoice from us with payment to be made via check, ACH or wire transfer (EFT) or by business (not personal) credit card. If payment is madeyou pay by credit card we may charge a credit card fee. Payment is non-refundable, except if your Store (including kiosk) closes, and you have paid all promissory notes associated with the opening and operation of your Store, we may offer to partially reimburse you for your cost based on the percentage of the resale value of any display items for which you paid for all or a portion of their cost. If your Store is a kiosk location, we may offer to partially reimburse you for your cost of the kiosk based on the percentage of the resale value of the kiosk if you paid for all or a portion of its cost. See Note 5 of Item 7.

## Sales Tax, Use Tax, Gross Receipts Tax, Excise Tax

You will bear the cost of and must pay any sales tax, use tax, gross receipts tax, excise tax, or other similar tax on your payments to us. We may collect these taxes from you for transmittal to the taxing authority. You will reimburse us for any taxes we must pay directly to any taxing authority. These payments are not refundable.

### [THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]

## Item 6

## OTHER FEES

## OTHER FEES

| Type of Fee | Amount | Due Date | Remarks [1] |
|---|---|---|---|
| Continuing Royalties [2,3] | Commission Basis:<br><br>• 10% of commissions we receive from Provider attributable to your customer activations, upgrades, enhanced services, and other products or services.<br>• 20% of Residuals (as defined in note 2) we receive from Provider attributable to your Store. Continuing Residuals may cease, and One Time Residuals may be charged back, if your Store closes, is transferred, or you fail to maintain minimum Provider-imposed performance criteria. | If you owe us Continuing Royalties under the Commission Basis, we receive commissions from Provider for your Store and deduct our share after Provider pays us. | Under our current Provider Contract, we receive commissions for certain of the products and services you sell, and we collect Continuing Royalties from you under the Commission Basis. If the commission formula in the Provider Contract changes to our detriment, we reserve the right to charge Continuing Royalties under the Gross Sales Basis, whichever is higher.<br><br>When we collect Continuing Royalties under the Commission Basis, we will pay you your share of the commissions we receive only if and when we receive payments from Provider and after our deductions, approximately 45 to 60 days after the end of each month or each calendar quarter in which we receive the commissions from Provider.[2] |
|  | Gross Sales Basis<br><br>• 5% of Gross Sales | If you owe us Continuing Royalties under the Gross Sales Basis, you pay us on the 10th day of each subsequent month. | The definition of Gross Sales is limited to sales of products and services not covered under the Commission Basis, unless Provider either no longer pays commissions or has changed the commission formula to our detriment and we have elected to collect Continuing Royalties from you under the Gross Sales Basis.[3] As long as Provider pays commissions and does not change our commission formula to our detriment, you do not pay Continuing Royalties on your sales of accessories or other non-commission sales under the |

| Type of Fee | Amount | Due Date | Remarks[1] |
|---|---|---|---|
| | | | Commission Basis. <br><br> If you convert an existing wireless telephone business to a Store, whether you receive residual commissions attributable to your prior business will depend on your agreement with your provider. |
| New Program Fees | A royalty or other fee payment in an amount we determine in our sole and exclusive business judgment. | As we determine. | We reserve the right to provide for a royalty or other form of fee payment with regard to new programs, marketing efforts, products, services or other revenue generating opportunities we make available to you. |
| Advertising Contribution[1] | Up to 5% of Gross Sales and your portion of Commissions. | Monthly, on 10th day of each subsequent month. | We reserve the right to collect an advertising contribution from you. |
| Foundation Contribution | The amount we designate. We currently require that you contribute $0.25 for each account activation and upgrade transaction. | When you make the customer sale. | You must participate in all philanthropic programs we support, including support for Wireless Zone Foundation for Giving, Inc. |
| Global Fund Contribution; Additional Point of Sale Software License | Our then-current global fund contribution amount; our current contribution amount required is $200 per month per Store, which will include up to three point of sale software licenses per Store. If you request additional point of sale software licenses, the Store will be charged $50 for each additional point of sale software license per month. | Monthly, on 10th day of each month. | Represents miscellaneous marketing and operating contributions, including the point of sale software license continuing monthly contribution we collect on behalf of a third-party vendor. Also included currently are the contributions we collect for participation in our gift card program and other amounts we specify. The amount and the services covered may change at our discretion. |
| Lease Service Fee | 10% of monthly rent. | Monthly | Fee only due if we sublet the Store premises to you. |
| Audits | Cost of audit, plus amount of underpayment with interest on underpayment. | Within 10 days of billing. | You must pay our cost of the audit fees if you understate Gross Sales by 3% or more or if you fail to produce your business books and records as requested. |
| Interest | The greater of 18% per annum or 3% per annum above prime (but not more than the highest rate | Payable to us on demand. | Interest is currently charged at 18% per annum (1.5% per month) unless limited by law. We can apply your payments to |

| Type of Fee | Amount | Due Date | Remarks [1] |
|---|---|---|---|
|  | allowed by law if less) on the unpaid balance. |  | any amount you owe us, regardless of any designation you make. |
| Sales Tax, Use Tax, Gross Receipts Tax, Excise Tax | The amount imposed by the taxing authority. | Payable to the taxing authority periodically as required by the taxing authority, or to us on demand. | You will bear the cost of and must pay any sales tax, use tax, gross receipts tax, excise tax, or other similar tax on your payments to us.   We may collect these taxes from you for transmittal to the taxing authority.   You will reimburse us for any taxes we must pay directly to any taxing authority. |
| Bank Charges, Administrative Costs, and Credit Card Fees | Our then-current fees, equal to the amount of the bank or credit card company charge to us, plus an administrative fee, currently $35. | Payable to us on demand. | We may charge fees to cover bank and credit card charges and our administration costs if an electronic funds transfer attempt is unsuccessful or you close your operating account, any check or other payment is returned not paid, or if you use a credit card to pay us. |
| Transfer Fee, Attorneys' Fees and Sales Commission [3] | Transfer fee in effect at the time of transfer for your Store (including any satellite locations in your Protected Territory); currently the transfer fee is $7,500 plus $1,500 for each satellite location, if we provide a full seven-year term following the transfer instead of the balance of time remaining under the Franchise Agreement; we estimate our attorneys' fees will be $0 - $1,200.<br><br>Sales commission is 10% of the sales price.<br><br>If you are a business entity and you make a transfer of the remaining term of the franchise agreement to a different business entity owned by the same persons in the same proportions, the transfer fee is currently $1,000 and we do not currently also charge | On or before date of transfer to new franchisee. | Transfer fee and our actual attorneys' fees, if any, are payable by the transferee. Although not required to extend the term following a transfer, we may, in our sole and exclusive business judgment, either keep the expiration date of the Franchise Agreement the same following the transfer, or grant a full term of seven years following the transfer, if greater. If we do not grant a new seven-year term, our policy is to reduce the transfer fee amount pro rata in proportion to the balance of the term remaining compared to seven years.<br><br>You pay us a sales commission if we help obtain the transferee. You must also pay all monies due to us as a condition of transfer.   There are other requirements.<br><br>See Note 2 below. |

| Type of Fee | Amount | Due Date | Remarks [1] |
|---|---|---|---|
| . | attorneys' fees or sales commissions. | | |

| Type of Fee | Amount | Due Date | Remarks[1] |
|---|---|---|---|
| Renewal Fee[6] | Renewal fee in effect at the time of renewal. Currently the renewal fee is $7,500 plus $1,500 (prorated) for any satellite location, but is $1,000 plus $1,500 (prorated) for any satellite location if your initial franchise fee was a reduced fee of $1,000 because you were an existing multi-unit franchisee of 10 or more Stores or a conversion franchisee that sold products and services of the Wireless Zone Provider. | 3 months before expiration of Franchise Agreement. | You must also sign the then-current form of franchise agreement. If you continue to operate your Wireless Zone Store after the Franchise Agreement expires, you will pay a Holdover Fee. See below. |
| Holdover Fee | $200 per month. | Upon your holding over after expiration of the Franchise Agreement when a renewal is pending. | We may deduct all or a portion of this fee from your royalty commissions, if your royalty commissions are sufficient to pay this fee, and any other amounts you may owe us. Otherwise you must pay any balance due no later than the first day of the month following the month in which the fee accrues. The fact that we collect this fee does not imply that you have a right to holdover. This is *not* credited against the renewal fee. |
| "No Show" Fee | Our then-current fee; our current fee is $200 per "no-show." | Upon billing. | Payable if you or any of your employees register for a training class, meeting or seminar, but fail to attend, or fail to attend a mandatory meeting. |
| Software License Fees | Vendor's then-current startup and ongoing fees per Store location; the current startup fee is $500; the ongoing fees are currently included in the "Global Fund Contribution" described above, currently $200 per Store location in the aggregate. | Upon billing. | Payable to a third party vendor, except that we currently collect the ongoing fees on behalf of the vendor. We may also relicense the software to you and collect the fees. See Item 11 Computer Equipment and the sample End User License Agreement attached as Exhibit 9 to the Franchise Agreement (Exhibit B). |

| Type of Fee | Amount | Due Date | Remarks [1] |
|---|---|---|---|
| Continuing Royalties [2, 3] | Commission Basis:<br><br>• 10% of commissions we receive from Provider attributable to your customer activations, upgrades, enhanced services, and other products or services.<br>• 20% of Residuals (as defined in Note 2) we receive from Provider attributable to your Store. | If you owe us Continuing Royalties under the Commission Basis, we receive commissions from Provider for your Store and deduct our share after Provider pays us. | Under our current Provider Contracts, we receive commissions for certain of the products and services you sell, and we collect Continuing Royalties from you under the Commission Basis. If the commission formula in one or more of the Provider Contracts changes to our detriment, we reserve the right to charge Continuing Royalties under the Gross Sales Basis, whichever is higher.<br><br>Continuing Residuals may cease, and One-Time Residuals may be charged back, if your Store closes, is transferred, or you fail to maintain minimum Provider-imposed performance criteria.<br><br>When we collect Continuing Royalties under the Commission Basis, we will pay you your share of the commissions we receive only if and when we receive payments from Provider and after our deductions, approximately 45 to 60 days after the end of each month or each calendar quarter in which we receive the commissions from Provider. [5]<br><br>If you convert an existing wireless telephone business to a Store, whether you receive residual commissions attributable to your prior business will depend on your agreement with your provider. |
| | Gross Sales Basis<br><br>• 5% of Gross Sales | If you owe us Continuing Royalties under the Gross Sales Basis, you pay us on the 10th day of each subsequent month. | The definition of Gross Sales is limited to sales of products and services not covered under the Commission Basis, unless Provider either no longer pays commissions or has changed the commission formula to our detriment and we have elected to |

| Type of Fee | Amount | Due Date | Remarks [1] |
|---|---|---|---|
| | | | collect Continuing Royalties from you under the Gross Sales Basis.[3] If Provider pays commissions and does not change our commission formula to our detriment, you do not pay Continuing Royalties on your sales of accessories or other non-commission sales under the Commission Basis. |
| New Program Fees | A royalty or other fee payment in an amount we determine. | As we determine. | We reserve the right to provide for a royalty or other form of fee payment on new programs, marketing efforts, products, services or other revenue generating opportunities we make available to you. |
| Advertising/ Marketing Contribution.[4] | Up to 5% of Gross Sales and your portion of Commissions. | Monthly, on 10th day of each subsequent month. | |
| Foundation Contribution | The amount we designate. We currently require that you contribute $0.25 for each account activation and upgrade transaction. | When you make the customer sale. | You must participate in all philanthropic programs we support, including support for Wireless Zone Foundation for Giving, Inc. |
| Global Fund Contribution; Additional Point of Sale Software License | Our then-current global fund contribution amount; our current contribution amount required is $200 per month per Store, which will include up to 3 point of sale software licenses per Store. If you request additional point of sale software licenses, the Store will be charged $50 for each additional point of sale software license per month. | Monthly, on 10th day of each month. | Represents miscellaneous marketing and operating contributions, including the point of sale software license continuing monthly contribution we collect on behalf of a third party vendor. Also included currently are the contributions we collect for participation in our gift card program and other amounts we specify. The amount and the services covered may change at our discretion. |
| Lease Service Fee | 10% of monthly rent. | Monthly | Fee only due if we sublet the Store premises to you. |
| Audits | Cost of audit, plus amount of underpayment with interest on underpayment. | Within 10 days of billing. | You must pay our cost of the audit fees if you understate Gross Sales by 3% or more or if you fail to produce your business books and records as requested. |
| Interest | 1.5% per month | Payable to us on demand. | Interest is currently charged on your outstanding balance owed to us at 1.5% per month unless |

| Type of Fee | Amount | Due Date | Remarks [1] |
|---|---|---|---|
| | | | limited by law. We can apply your payments to any amount you owe us, regardless of any designation you make. |
| Sales Tax, Use Tax, Gross Receipts Tax, Excise Tax | The amount imposed by the taxing authority. | Payable to the taxing authority periodically as required by the taxing authority, or to us on demand. | You will bear the cost of and must pay any sales tax, use tax, gross receipts tax, excise tax, or other similar tax on your payments to us.   We may collect these taxes from you for transmittal to the taxing authority.   You will reimburse us for any taxes we must pay directly to any taxing authority. |
| Bank Charges, Administrative Costs; and Credit Card Fees | Our then-current fees, equal to the amount of the bank or credit card company charge to us, plus an administrative fee, currently $35. | Payable to us on demand. | We may charge fees to cover bank and credit card charges and our administration costs if an electronic funds transfer attempt is unsuccessful or you close your operating account, any check or other payment is returned not paid, or if you use a credit card to pay us. |
| Transfer Fee, Attorneys' Fees and Sales Commission [5] | Transfer fee in effect at the time of transfer for your Store (including any Satellite Locations in your Protected Territory) plus our attorneys' fees.   Currently the transfer fee is $7,500 plus $1,500 for each Satellite Location.   We estimate our attorneys' fees will be $0 - $1,200. | On or before date of transfer to new franchisee. | Although not required to extend the term following a transfer, we may, in our sole and exclusive business judgment, either keep the expiration date of the Franchise Agreement the same following the transfer, or grant a full term of 7 years following the transfer, if greater.   We may discount the transfer fee in extraordinary circumstances.   We will also discount the fee through December 31, 2014 for a qualifying existing Wireless Zone franchisee (and owners of at least 33% of an existing Wireless Zone Store) who acquire at least a 33% interest in the transferred Store.   The discount will be to $5,500 if the existing franchisee purchaser owns less than 5 Wireless Zone Stores, $3,000 for owners of 5-9 Wireless Zone Stores, and $1,500 for owners of more than 10 Wireless Zone Stores. |

23

| Type of Fee | Amount | Due Date | Remarks [1] |
|---|---|---|---|
| | Sales commission is 10% of the sales price. | | You pay us a sales commission if we help obtain the transferee. You must also pay all monies due to us as a condition of transfer. |
| | If you are a business entity and you make a transfer of the remaining term of the franchise agreement to a different business entity owned by the same persons in the same proportions, the transfer fee is currently $1,000 and we do not currently also charge attorneys' fees or sales commissions. | | See Note 2 below. |
| Renewal Fee [6] | Renewal fee in effect at the time of renewal. Currently the renewal fee is $7,500, plus $1,500 (prorated) for any Satellite Location, but is $1,000 plus $1,500 (prorated) for any Satellite Location if your initial franchise fee was a reduced fee of $1,000 because you were an existing multi-unit franchisee of 10 or more Stores or a conversion franchisee that sold products and services of the Wireless Zone Provider. | 3 months before expiration of Franchise Agreement. | |
| Holdover Fee | $200 per month. | Upon your holding over after expiration of the Franchise Agreement when a renewal is pending. | If you continue to operate your Wireless Zone Store after the Franchise Agreement expires, you will pay a Holdover Fee. Otherwise you must pay any balance due no later than the first day of the month following the month in which the fee accrues. The fact that we collect this fee does not imply that you have a right to holdover. This is not credited against the renewal fee. |
| "No-Show" Fee | Our then-current fee; our current fee ranges from $200 - $1,000  per | Upon billing. | Payable if you or any of your employees register for a training class, meeting or seminar, but |

| Type of Fee | Amount | Due Date | Remarks [1] |
|---|---|---|---|
| | "no-show." Fee range is dependent on type and duration of the training class, meeting or seminar and you will be notified of "No-Show" fees in excess of $200 when registering for a training class, meeting or seminar. | | fail to attend, or fail to attend a mandatory meeting. |
| Computer Set Up Fee | $250 per computer. | Upon billing. | Payable if you do not purchase computer from us. |
| Software License Fees | Vendor's then-current startup and ongoing fees per Store location; the current startup fee is $500; the ongoing fees are currently included in the "Global Fund Contribution" described above, currently $200 per Store location in the aggregate. | Upon billing. | Payable to a third party vendor, except that we currently collect the ongoing fees on behalf of the vendor. We may also relicense the software to you and collect the fees. See Item 11 – Computer Equipment and the sample End User License Agreement attached as Exhibit 9 to the Franchise Agreement (Exhibit B). |
| Additional E-Mail Account Fee and Wireless Product Connection Fee | Our then-current fee. Our current fee for each additional e-mail account and wireless product connection is calculated per account, per month and billed annually as follows:<br><br>Accounts 1-24   $9/month<br>Accounts 25-49 $8/month<br>Accounts 50+    $7/month | Upon billing. | We provide two2 e-mail accounts for each Store at no charge. One is for general use by the Store and the other for the 51% Owner, or a 20% Owner who is the principal manager. We charge a fee for each additional e-mail account and wireless product connection to connect to our servers which are synchronized to our outside vendors' and/or Providers' applications. See Item 11 under Computer Equipment. |
| Initial Training Fee | Our then-current fee for additional attendees, plus you must also pay the costs of travel, lodging, meals and additional expenses for yourself (or a proxy) and your employees; our current fee is $625 per additional attendee. | Upon billing. | We do not charge any initial training fee for one1 Owner (or approved general manager serving as your proxy) to attend our entire initial training program. We may charge our initial training fee for each additional attendee you send to a portion of the program. |
| Additional Training [7] | Our then-current fee for individualized training, plus travel, lodging, meals and additional expenses of our representatives, if applicable. Our current fee | Upon billing. | At your request, we will send a representative to assist you in the management and operation of your Store. We may also offer additional customized training to you or make |

25

| Type of Fee | Amount | Due Date | Remarks [1] |
|---|---|---|---|
| | for individualized training is $500 per day for training at your Store or another location. We may also provide additional training via Intranet or other form of electronic communication. Our fee for delivering training via Intranet or other electronic form will not exceed the fee for on-site training. | | available training programs we offer franchisees generally which we may deliver via Intranet or other electronic means. |
| | ~~Our then-current fee for attendance at convention. Our current fee depends on the number of Stores you own and operate as follows:~~ ~~Stores 1-2: $500 per Store~~ ~~Stores 3-5: $400 per Store~~ ~~Stores 6-10: $300 per Store~~ ~~Stores 11 and higher: $200 per Store~~ | ~~30 days prior to Convention date~~ | ~~Attendance at our convention is considered mandatory training for you and at least one Store Manager from each Store that you own that is operating. (You may be the Store Manager for one Store.) The fee is payable with respect to a Store whether a Store Manager attends from that Store or not. We may deduct all or a portion of this fee from your royalty commissions, if your royalty commissions are sufficient to pay this fee, and any other amounts you may owe us. Otherwise you must pay any balance due no later than the first day of the month following the Convention. You will be responsible for travel, lodging, meals and additional expenses.~~ |
| | Our then-current fee for attendance at convention. Our current fee depends on the number of Stores you own and operate as follows: Stores 1-2: $500 per Store Stores 3-5: $400 per Store Stores 6-10: $300 per Store Stores 11 and higher: $200 per Store | 30 days before Convention date. | You must pay the fee for each store whether a Store Manager attends from that Store or not. You must pay any balance due no later than the first day of the month following the Convention. You will be responsible for travel, lodging, meals and additional expenses. |
| Ongoing Product Inventory Purchases - | Amount will vary depending upon the sales level you achieve and your | Payment in advance, unless we offer you payment | You may purchase product inventory from us after you use up your initial inventory, but |

| Type of Fee | Amount | Due Date | Remarks [1] |
|---|---|---|---|
| Optional | delivery schedule. | terms of up to 60 days (see Item 10). | you may purchase directly from any approved vendor. Your Provider will not be an approved vendor. |
| Insurance Procurement Fee | The cost for your coverage plus our expenses if we obtain insurance for you. | Payable upon invoice from insurance carrier or us. | You must obtain and maintain insurance coverage we specify. We may obtain the insurance if you fail to do so. You will pay the cost of the insurance premiums, and a fee to us to cover our reasonable expenses of obtaining the coverage. See Item 8. |
| Cleaning costs | Cost of cleaning services. | Payable upon invoice from us. | You must maintain your Store according to our cleanliness standards. We may hire or direct our personnel to clean your Store if you default. You will pay these cleaning costs to us or the vendor. |
| Customer Service Charges | Will vary with the circumstances. | Payable upon invoice from us. | You must resolve service issues with customers and other Wireless Zone franchisees in accordance with our guidelines and cooperate with other franchisees to provide service, exchanges and refunds and then settle accounts. We may resolve any complaints if you do not, and you will reimburse us. |
| Step-in Rights Exercise | Our costs, including attorneys' fees; you will also pay us reasonable compensation which we estimate will not exceed 10% of Gross Sales; you will also indemnify us. | As incurred. | We have the right to operate your Store under certain circumstances if the Store is in jeopardy or if you are in default. |
| Provider Allowances | The amount of Provider charge-backs for signs and Store build out allowance. | As incurred. | You will reimburse us for any Provider charge-backs to allowances previously granted to you. |
| Reserve for Charge-Backs | An amount based on historical data to fund charge-backs against commissions expected to occur six 6 months following termination or expiration of your Franchise Agreement. | Upon termination or expiration of your Franchise Agreement. | You will pay us an amount to establish a reserve for Provider charge-backs occurring after termination or expiration of your Franchise Agreement against commissions already paid to you. |
| Infringement Liquidated | $10,000 per day. | As incurred. | You must pay this amount as liquidated damages and not a |

27

| Type of Fee | Amount | Due Date | Remarks [1] |
|---|---|---|---|
| Damages | | | penalty if you continue to use our intellectual property rights following termination or expiration of your Franchise Agreement (unless you are otherwise in compliance if you are holding over after expiration of the Franchise Agreement when a renewal is pending). |
| Signs, Kiosks, Displays, Inventory and Other ATI Property Removal Costs | Our costs. | As incurred. | If you fail to return our property to us or remove all privately owned signs, kiosks, displays, fixtures, customer files and inventory following termination or expiration, we may do so at your expense. |
| Marketing Development Funds Termination Fees | You will repay any marketing development funds you received if you (or your transferee) close your Store or otherwise terminate your Franchise Agreement after beginning operations within a time period specified by Provider. Also, you will repay a pro rata portion of any marketing development funds you received, based on your shortfall, if you fail to achieve the minimum number of net activations of postpay service that Provider requires that you achieve during your initial period of operation. | Upon termination or expiration of your Franchise Agreement or upon failing to achieve the required minimum number of net activations of postpay service. | Marketing Development Funds may be offered by Provider but are not guaranteed. If offered, Marketing Development Funds are subject to Provider's conditions. |
| Non-Competition and Non-Disclosure Damages and Costs | $100,000 for each violation plus our attorneys' fees and costs for enforcement. | As incurred. | The $100,000 amount is payable as liquidated damages and not a penalty. |
| Indemnification | Amount of loss or damages plus costs. | As incurred. | You must indemnify us, our officers, directors, principals, employees and representatives from and against any claims, liabilities or costs which may be brought against us or any of them because of your operation of the Store. |
| Cure of Lease | Amount we must pay to | As incurred. | If we exercise our rights under |

28

| Type of Fee | Amount | Due Date | Remarks [1] |
|---|---|---|---|
| Defaults and Reletting Expenses | cure your defaults, plus our costs to acquire possession of your Store premises and relet them to another franchisee. | | the collateral assignment of lease, you must reimburse us for the amounts we must pay to take over the premises and relet them, including payments to the landlord to cure your past defaults, attorneys' fees, litigation expenses, repair costs, brokerage fees. |

**Notes:**

(1)   All fees are imposed by and payable to us, except we may collect ongoing software license fees on behalf of third party vendors.   We may license the software from the third-party vendor and relicense the software to you and collect the fees under a license agreement we will have with you.   ~~See Item 11.~~  We may collect any fee by automatic withdrawal from your checking account.

All fees are non-refundable and are uniformly imposed except as specifically provided. Interest on any late payments begins from the date of the underpayment.   We may deduct any of the fees you owe to us from your share of Commissions that we receive and then transmit any remaining balance to you.   If your share of Commissions is less than the amounts you owe us, you will pay us by the first day of the following month.

You will bear the cost of and must pay any sales tax, use tax, gross receipts tax, excise tax, or other similar tax on your payments to us.   We may collect these taxes from you for transmittal to the taxing authority.   You will reimburse us for any taxes we must pay directly to any taxing authority.

(2)   Under our current contract with Provider for your geographic area, certain customer payments are forwarded to Provider and not retained by you or us.   Provider then pays us commissions ("Commissions") on these customer payments attributable to your Store, which we pass along to you as our sub-agent, minus deductions for amounts you owe us. We will deduct from the Provider Commissions we transmit to you, as a Continuing Royalty payable by you to us, the percentages of Commissions attributable to your transactions or your Store, as stated in the table.   We may, but are not obligated to, offer temporary or permanent reductions in the rate of Continuing Royalties we deduct from the Commissions under appropriate circumstances, as, for example, an inducement to develop multiple units or for a multi-unit operator of existing wireless telephone businesses to convert the existing businesses to Wireless Zone Stores.   The factors we will consider include the number of units to be developed or converted, the volume of transactions achieved by existing units, and the population of the market where the units are or will be located.

If your monthly Commissions are less than the payments you owe to us, you will pay the balance no later than the first day of the month that the payments are due.   Any amounts you owe Provider for "demo lines" will also be paid in a like manner ~~pursuant to~~under the Security Agreement and Demo Line Payment, attached to the Franchise Agreement as Exhibit 3.

"Residuals" are Commissions payable by a Provider in consideration of ongoing and continued service and support to subscribers as designated in the Provider Contract, and may also be known as account maintenance fees ("AMF"). New Wireless Zone Stores may receive "One-Time Residuals" which are paid in 1 lump sum for customer activations. "Continuing Residuals" are Residuals paid for a period of time following customer activation. "One-Time Residuals" are paid in one sum in connection with activation, in accordance with the Provider Contract. As of December 2011, aactivations. Our principal Provider ceased payingdoes not pay Continuing Residuals for new activations and upgrades. However, that Provider continues to, but does pay Continuing Residuals for prior activations and upgrades subject to a Provider agreement, and pays One-Time Residuals for certain new activations and upgrades. Residuals are no longer paid by that Provider for new Wireless Zone Stores. If you purchase an existing Store, you may have a right to continue to receive Residuals. We will escrow Residuals paid by Provider on a monthly or quarterly basis as we receive them. For Continuing Residuals, we will retain 20% of the escrowed amount as a Continuing Royalty and we will divide the remainder of the escrow by the present number of qualifying active customers as defined in the Provider's contract. For One-Time Residuals, the amount due to you will be paid for your qualifying active customers as defined in the Provider Contract. You will receive your portion of the escrow based upon the number of your qualifying active customers, subject to deductions described above.

(3)     "Gross Sales" means the total amount charged for all merchandise and services sold or rendered by you, for which compensation is not separately received from Provider, including equipment other than wireless telephones, personal communications devices, other forms of wireless and wireline communications, entertainment and security products and services, and all other products sold from, and all other services offered from, your Store, whether payment for the merchandise and services will be made by cash, check, credit, charge account, barter or exchange and if by credit, whether or not the credit will be collected or not. All amounts charged for work left at your Store will be deemed "Gross Sales" on the day the work is received by you. The term "Gross Sales" will exclude any amounts paid by you for any federal, state, county and city sales taxes or other similar taxes which may now and hereafter be imposed or required to be paid by you as against sales on the premises. If at any time any Commissions, as described in the chart, are no longer paid, then the term "Gross Sales" will be expanded to include the sale of wireless and wireline communications equipment (new or used) and entertainment and security products (new or used) and services.

(4)     For a description of our advertising programs, see Item 11. Your contribution will vary depending upon the co-op program offered by each Provider.

(5)     We may offer installment payment terms for up to 50% of the transfer fee for a new Wireless Zone franchisee entering the system and up to 100% of the transfer fee for an existing Wireless Zone franchisee or qualified Owner of an entity franchisee, as described more fully in Item 10.

(6)     AHWe may offer installment payment terms for up to 100% of the renewal fee, as described more fully in Item 10. The renewal fee for a satellite locationSatellite Location will be the then-current renewal fee prorated from the effective date of the Franchise

Agreement for the ~~satellite location~~Satellite Location to the expiration date of the Franchise Agreement rounded to the nearest full year.

(7) Additional On Site Training is additional training we provide upon your request, after the mandatory initial training program is completed. We may also deliver additional training programs to you at your request via Intranet or other electronic means.

## Item 7

### ESTIMATED INITIAL INVESTMENT

### YOUR ESTIMATED INITIAL INVESTMENT

| Type Of Expenditure | Amount | Method of Payment | When Due | To Whom Payment Is To Be Made |
|---|---|---|---|---|
| Initial Franchise Fee [1] | $1,000 - $30,000 | Lump Sum | At signing of Franchise Agreement | Us |
| Travel and Living Expenses While Training | $1,250 - $5,000 per person | Credit card or cash (as incurred) | During training or 30 days later | Hotels, Restaurants, Airlines, Car Rental |
| Real Estate/Rent [2] | Not Included | Not Included | Not Included | Landlord |
| Real Estate Improvements [2] | $10,000 - $30,000 | As Incurred | As Incurred | Landlord, Various Vendors, Us |
| Business Equipment and Supplies [3] | $9,000 - $15,000 | As Incurred | As Incurred | Various Vendors, Us |
| Computer Equipment [4] | $5,000 - $10,000 | As Incurred | As Incurred | Us |
| Signs, Fixtures, Kiosks and Displays [5] | $15,000 - $95,000 | As Incurred | As Incurred | Various Vendors, Us |
| Miscellaneous Opening Costs [6] | $2,000 - $13,500 | As Incurred | As Incurred | Suppliers, Utilities, Etc. |
| Initial Product Inventory [7] | $50,000 - $150,000 | As Incurred | ~~Prior to~~Before Delivery | Us |
| Initial Marketing Program [8] | $5,000 | As Incurred | As Incurred | Vendor or Us |
| Sales Tax, Use Tax, Other Similar Tax, Freight and Delivery Charges [9] | $3,000 - $38,000 | As Incurred | As Incurred | Government Agencies, Vendors, Us |
| Additional Funds for 3 Months [9,10] | $1,000 - $25,000 | As Incurred | As Incurred | Vendors, Suppliers, Employees, Etc. |
| TOTAL [10, 11,11, 12] (excluding real estate costs) | ~~$99,250~~ ~~$378,500~~$102,250 - $416,500 | | | |

Notes:

(1) The initial franchise fee is described in Item 5.  We may finance up to 50% (for a new franchisee entering the System) or 100% (for an existing franchisee) of the initial franchise fee for 12 months, subject to approval of your credit.   See Item 10.

(2)     If you do not own appropriate retail space, you must lease premises to operate your Store. Your lease must contain certain language or you, your landlord and we will sign the Agreement of Landlord attached as Exhibit 1 to the Franchise Agreement which contains a collateral assignment of the lease to us, exercisable at our option upon a~if you~ default ~by you~ under your lease or upon the termination or expiration of your Franchise Agreement. You must sign the lease as the tenant, so that ~at all times~ the person or entity named as the tenant under the lease is identical to the person or entity that is the franchisee under the Franchise Agreement.

Typical locations will include high traffic plazas, enclosed malls (where the location will be a kiosk, in-line Store or cart), ~as well as~and strip mall locations.  We estimate rent for a kiosk or a Store location will be between $13,200 and $70,000 per year, depending upon ~factors such as~ size, condition and location of the leased premises, ~as well as~the condition of leasehold improvements, ~or~and the prevailing ~rent in a mall~rents in the ~case of a kiosk~area.  The typical Store has between 1,100 and 2,000 square feet of space.  These rent figures for a Store are based on estimates of between $12.00 and $35.00 per square foot, plus common area charges, insurance and taxes, but might be higher in communities and malls which typically command higher rent.  The table does not include any lease deposit or rent payable to the landlord.

Improvements may include completion of interior walls, painting, and installation of flooring and doors.

(3)     Business equipment and supplies may include fax and copy machines, telephones and furniture.

(4)     You must purchase ~one~1 or more computer Point of Sale (POS) workstation setups  to use in the operation of your Store~as more fully described in Item 11, under the heading "Computer Equipment."~.  We may offer to finance the cost of the POS workstation setup, and signs, fixtures, displays, and if applicable, a kiosk, up to a maximum loan amount of $20,000 for all items combined (up to $15,000 of the cost of signs, fixtures, displays, and if applicable, a kiosk, and up to $5,000 of the cost of computer POS workstation setup), for a varying term of ~one~1 to ~three~3 years, depending on the amount of the note.  See Item ~2 and Item~ 10.

(5)     You agree to use in the operation of your Store signs, fixtures, displays, and if applicable to your location, your kiosk, which we have approved.  In certain geographic areas, Provider may reimburse us for all or a portion of the cost of these items (other than fixtures), and we may pass along to you all or a portion of the reimbursement.  Displays may cost you up to $60,000, and signs may cost up to $35,000 each, depending on the programs offered by Provider, not including shipping, which will vary.  The cost of these items for a kiosk location may be less.  A free-standing kiosk for a mall or similar location may cost up to $60,000, not including shipping which will vary.  Signs may require prior approval by your landlord, Provider and/or the local municipality and may take up to ~six~6 months to obtain.  Signs will be our property and/or Provider's property, regardless of whether we or Provider subsidize all or a portion of the costs of your signs.  We may offer to finance the cost of signs, fixtures, displays and POS workstation setup, and if applicable, a kiosk, up to a maximum loan amount of $20,000 for all items combined (up to $15,000 of the cost of signs, fixtures, displays, and if applicable, a kiosk, and up to $5,000 of the cost of computer

POS workstation setup), for a varying term of ~~one~~1 to ~~three~~3 years, depending on the amount of the note. See Item ~~2 and Item~~ 10.

We will provide you with an estimate of the cost of signs, fixtures and displays (including POS workstation setup) needed for the build out of a new Store or a kiosk, and if applicable, the cost for your kiosk. We may require that you pay us a deposit when you sign and acknowledge the cost estimate before we will authorize work to begin. You will pay us for all the remaining cost of signs, fixtures, displays and POS workstation setup, and if applicable, a kiosk, after any subsidies and which we do not finance, within 30 days of receiving an invoice from us with payment to be made via check, ACH or wire transfer (EFT) or by business (not personal) credit card. If ~~payment is made~~you pay by credit card we may charge a credit card fee.

We or Provider may offer to subsidize all or a portion of your cost (after any subsidies described above) for any signs, fixtures, displays, and if applicable, your kiosk cost. ~~If we and/or Provider subsidize all of your cost for signs, they will remain our property and/or Provider's property, as noted above.~~ If we and/or Provider subsidize all of your costs for the display items and/or your kiosk, the items subsidized remain our property and/or property of Provider. If we and/or Provider subsidize only a portion of the cost of your display items and/or your kiosk, you will bear the remaining cost of the item after any subsidies that we and Provider grant.

~~If your Store or kiosk closes, you will be responsible for 100% of the cost of removal of the signs and displays and returning them to us. You may be responsible for reimbursing us for the cost of the signs and displays which were subsidized by us or Provider. We will not have any obligation to pay you for any signs or display items you return to us which we and/or provider are deemed to own, but if you have paid all promissory notes associated with the opening and operation of your Store or kiosk, we may offer to partially reimburse you for your cost based on the percentage of the resale value of any display items for which you paid for all or a portion of their cost.~~

~~If your kiosk closes, you will pay any and all expenses associated with the removal and transportation of the kiosk to us. You may be responsible for reimbursing us for the costs of the kiosk which were subsidized by us or Provider. We will not have any obligation to pay you for the kiosk you return to us which we and/or Provider are deemed to own, but if you have paid all promissory notes associated with the opening and operation of your kiosk, we may offer to partially reimburse you for your cost based on the percentage of the resale value of the kiosk if you paid for all or a portion of its cost.~~

(6) The miscellaneous opening costs include security deposits, utility deposits, incorporation expenses and professional fees, telephone systems, furniture and startup and Internet based training fees for our point of sale software.

(7) Payment for your initial product inventory may be due ~~and payable~~ in full ~~prior to~~before delivery. Payment of your initial product inventory must be processed electronically via ACH or wire transfer (EFT). After we receive verification that the funds for payment of your initial product inventory have cleared our bank, your initial product inventory will be shipped to your Store. ~~We may adopt a program in the future to offer financing for your Initial Product Inventory.~~

(8)     (8)   See Item 11 for more information on the Initial Marketing Program.—The Initial Marketing Program expenses are usually incurred after your Store begins operation. We may offer to finance the $5,000 minimum requirement. See Item 10. You may spend more than $5,000 on your Initial Marketing Program expenses.

(9)     You are responsible for the payment of any sales tax, use tax, gross receipts tax, excise tax, or other similar tax or freight and delivery charges associated with the franchise. These costs vary from state to state.

(910)   The estimate for additional funds which you will require during your first three3 months of operation includes your initial startup expenses, certain inventory and payroll costs, but does not include insurance or any security deposit or rent you pay to the landlord. These figures are estimates and we cannot guarantee that you will not have additional expenses in starting the business. Your costs will depend on factors such as how much you follow our methods and procedures, your management skills and business acumen, local economic conditions, the local market for wireless and wireline communication products and services and entertainment and security products and services, the amount of wireless and wireline communication products and services and entertainment and security products and services sold, the prevailing wage rate, competition and the level of sales reached during the initial three3 month period. Your inventory expenses will increase the more successful you are. The figure does not include continuing royalties or advertising contributions; we cannot estimate your expenses that depend on your sales level. The figure also does not include your personal living expenses which you should provide for separately. Your Store opening may be 16 weeks or more after the date you sign your Franchise Agreement and pay the initial franchise fee to us.

(1011) Payments to third parties may be refundable, according to the policies of these parties; we do not participate in these decisions. All payments to us are non-refundable, except the initial franchise fee which is refundable under the circumstances described in Item 5. We will offer financing to franchisees purchasing company-owned Stores for a portion of their investment. The financing offer is in the development stage.

(1112) We have prepared these estimates based on our approximatelyover 25 years of experience operating and/or franchising Stores. Except as expressly indicated otherwise, these estimates cover your initial cash investment up to the opening of your Store and the first three3 months of operation. These estimates do not include any sales tax, use tax, gross receipts tax, excise tax, or other similar tax or freight and delivery charges. You will be responsible for payment of these amounts. These estimates do not provide for your cash needs to cover any financing you incur or your other business and personal expenses. You should not plan to draw income from the operation during the start-up and development stage of your business, the actual duration of which will vary materially from franchise to franchise and which we cannot predict for your Store (and which may extend for longer than the three3 month initial period described in Note 810). You must have additional sums available, whether in cash or through a bank line of credit, or have other assets which you may liquidate or against which you may borrow, to cover other expenses and any operating losses you may sustain, whether during your start-up and development stage, or beyond. The amount of necessary reserves will vary greatly from franchisee to franchisee and will depend upon many factors, including the rate of growth and success of your Store,

which in turn will depend upon factors such as the demographics and economic conditions in the area in which your Store is located, the presence of other Wireless Zone Stores or other public awareness of our business and trademarks within the general vicinity of your Store, your ability to operate efficiently and in conformance with our recommended methods of doing business, and competition. Because the exact amount required for reserves will vary from operation to operation and we cannot meaningfully estimate it, we urge you to retain the services of an experienced accountant or financial advisor to develop a business plan and financial projections for your particular Store.

You should review these figures carefully with a business advisor before making any decision whether or not to purchase the franchise.

We and our affiliates do not provide financing to franchisees either directly or indirectly for establishing a franchise except we may finance, depending on the circumstances, up to either 50% or 100% of the initial franchise fee, and up to a total loan amount of $20,000 of the cost of a kiosk, displays, fixtures, signs and POS workstation setup (up to $15,000 of the cost of signs, fixtures, displays and if applicable, a kiosk, and up to $5,000 of the cost of POS workstation setup). We are also developing a financing offer to franchisees purchasing company-owned Stores for a portion of their investment. See Notes 1, 2 and See Notes 1, 4, 5 and 8 above and Item 10. The availability and terms of financing obtained from third parties will depend upon such factors as the availability of financing, your credit worthiness, collateral which you may make available, or policies of local lending institutions with respect to the nature of the business, and general economic conditions.

**[THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]**

## Item 8

## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

Except as described ~~below~~in the following paragraphs, you are not required by the Franchise Agreement or ~~any other device or practice~~ATI to purchase or lease products or services (1) from us, our affiliates or parents or other suppliers we have designated or approved, (2) that meet our specifications, or (3) that we have the right to approve (collectively "source-restricted purchases").

Under the terms of your Franchise Agreement, you must purchase furniture, fixtures, equipment, supplies, signs, POS workstation hardware, telephone system, ~~computer software~~ computer software, and inventory as outlined in the Operations Manual (the "Operations Manual") or as we otherwise specify ~~by e-mail, Intranet, written or facsimile correspondence and/or telephone. Counterfeit, unauthorized or illegal goods are strictly prohibited. In addition, we conduct regularly scheduled meetings and ongoing training meetings with all of our franchisees. Attendance at these meetings is mandatory, and during these meetings we will present to you and all other franchisees changes in approved suppliers and/or specifications for furniture, fixtures, equipment, supplies, signs, computer hardware, telephone system, computer software, products, inventory and other products or services~~. We provide our standards and specifications for franchisees in the confidential Operations Manual and lists of approved suppliers for certain items and services. The Operations Manual is a compilation of manuals, books, binders, videos or other electronic media, Intranet postings and other materials containing operating data, specifications, standards, operating procedures, checklists, equipment, services and other information relating to establishment and operation of a Store and to the System. When we say we will provide "written" communication or a notice or information (including the Operations Manual) to you "in writing" we may or may not provide you with a paper ("hard copy") form of the information. We may choose to provide the communication or notice only through electronic communication or posting to our website(s).

~~We are currently an approved supplier.~~ We are an approved supplier, but not the only approved supplier, for equipment inventory, certain computer hardware, and displays, fixtures, and signs for the buildout of your Store. If you do not purchase your computer from us, we will set up your computer system to make sure it meets our specifications and we may charge you a $250 set up fee. We are the only approved supplier for POS workstation hardware and software, including antivirus software, digital signage and monitor equipment, and Providers' wireless and wireline communications services. ~~We do not currently have any parents or affiliates who offer to sell or lease goods and services to our franchisees, except that our wholly-owned subsidiary ATI, LLC may directly, or operating through its subsidiaries, sell Stores it owns to franchisees.~~ No other persons affiliated with us, ~~including any parents,~~ are currently approved suppliers. We may offer to provide other products or services to you and may obtain revenue from you and make a profit without any limit on the amount of profit we may make on any products or services you may purchase from us or our approved or designated suppliers. We may in the future designate an approved sole supplier or approved suppliers, including ourselves and an affiliate or parent who may offer to sell or lease goods or services in the future, for any one or more items, and you will have to purchase from ~~us or our affiliate or parent~~that supplier.

~~Specifications and standards, as well as a list of approved suppliers, are issued for certain items and services in the Operations Manual and otherwise provided to you in writing, including~~

~~exterior signs, fixtures and displays, merchandise for resale, and POS workstation hardware and software and product warranty insurance.~~ You must use computer software and a computerized point of sale system which conforms to our specifications. We are the only approved supplier for the POS workstation hardware. ~~You must submit to us for our approval the complete specifications, including supplier name and address, for the hardware and software you are intending to purchase from another supplier. If you do not purchase from us, we will set up your computer system to make sure it meets our specifications and we may charge you a fee. See Item 6.~~ and software including antivirus software. You must use the software we specify which may be available from a single approved supplier, including us. The software supplier will probably require that you sign a license agreement, including a license agreement with us, if we relicense the software to you. A sample software End User License Agreement is attached as Exhibit 9 to the Franchise Agreement. We may change software suppliers, but we expect a new supplier's license agreement will contain provisions similar to those contained in Exhibit 9. ~~See Item 11 for a fuller discussion of computer hardware and software requirements.~~

~~We disclose some, but not all, of our specifications and standards for furniture, fixtures, equipment, supplies, signs, computer hardware, telephone system, computer software, products and services to suppliers and franchisees. Supplier approval is based upon a supplier's ability to meet our specifications and standards; the demonstration of an acceptable level of quality of construction, performance and appearance; price; production and delivery capability; adequate quality control and recall procedures; and adequate insurance coverage.~~

Through experience and research, we have selected specific brands and models for each of the items of equipment that we require you to offer from your Store. We are currently an approved supplier, but not the only approved supplier, for ~~these items of~~ equipment inventory. You have an option of purchasing the equipment from us, or purchasing equipment of equal or better quality from a supplier of your own choosing. You may purchase these items of inventory and supplies directly from certain manufacturers under Large Accounts Contracts we negotiate ~~on behalf of~~for our franchisees.

We will choose one or more qualified wireless and wireline communications, entertainment, and security products and services Providers that we feel will provide the best service at the best price in the geographic area in which you operate your Store. We will enter into a contract with each Provider (the "Provider Contract") authorizing us to market Provider's services in your geographic area, with the right to engage you as a sub-agent. You will enter into the Provider Compliance Agreement with us in the form attached as Exhibit 8 to the Franchise Agreement as a condition to your acting as sub-agent for Provider. We and Provider will be the only approved suppliers for wireless and wireline communications, entertainment, and security products and services. We will select Providers by exercising our sole and exclusive business judgment, taking into account the best interests of all franchisees. Providers we choose for your geographic area will be the exclusive Providers for all franchisees within your geographic area, and all applications, subscriptions and services which you sell or solicit, both within your Protected Territory (see Item 12) and in any other geographic area covered by a contract between ATI and a Provider, will be made through us alone and in the manner and form we require. You will not offer or sell services from any Provider we have not authorized.

Provider may mandate the use of specific equipment in conjunction with their services, such as authenticatable, GPS (E911) capable software, Universal Memory Exchanger machine, frequency specific, or mode specific equipment. You must comply with these requirements, as

well as any requirements for equipment configuration or installation and any other Provider imposed requirements, which may require you to sign agreements with Provider or us. In addition, you must use our designated point of sale software and designated computer support providers. ~~See Item 11.~~ We require that you use our approved credit card processor.

If you wish to use furniture, fixtures, equipment, supplies, signs, computer hardware, telephone system or computer software, or sell a product or service that we have not previously authorized, other than the wireless and wireline communications services, entertainment, and security products and services you must obtain from Provider and us, you must furnish information to us about the item or service and the supplier, as we reasonably request. We do not charge you any fees in connection with the authorization process. We will notify you within 30 days of our receipt of all requested information as to whether authorization is granted or denied. Supplier approval is based upon a supplier's ability to meet our specifications and standards; the demonstration of an acceptable level of quality of construction, performance and appearance; price; production and delivery capability; adequate quality control and recall procedures; and adequate insurance coverage.

We may revoke our approval of previously designated or approved suppliers and designate new or replacement designated or approved suppliers. We will advise you of these changes through revisions in the Operations Manual, by e-mail, Intranet, written or facsimile correspondence, by telephone or at a meeting we require you to attend. If we revoke approval of a designated or approved supplier, you will cease ordering from the supplier. You may use up your supply of unused inventory and offer for sale any discontinued product or service unless we otherwise specify. We may vary the standards and specifications to take into account unique features of specific locations or types of locations, special requirements and other factors we consider relevant.

~~We must approve in writing your selection of the site for your Store. Providers may also have to consent to your Store location. If we or Providers do not consent to the site you select, you must submit an alternative site for consent. Our consent and Provider's consent of the location do not constitute a representation that your Store will be profitable or that you will attain any predetermined level of sales. Your lease must contain certain language or you, your landlord and we must sign the Agreement With Landlord attached as Exhibit 1 to the Franchise Agreement.~~

~~You must conduct all local advertising and promotion according to our standards and advice. We must approve all local marketing and promotion in advance. You must become a member of one or more civic organizations in your community. We may suggest the organizations to which you should belong and may encourage our franchisees to participate in specific philanthropic programs, including Wireless Zone Foundation for Giving, Inc. In addition, you must participate in all programs we support. We currently require that our franchisees contribute twenty-five cents for each account activation and upgrade transaction to the Wireless Zone Foundation for Giving, Inc.~~

Before you open your Store for business, you must obtain insurance coverage meeting our requirements as specified in the Operations Manual. You must purchase the coverage from a responsible carrier and you must keep the insurance in force during the term of your Franchise Agreement. Certain insurance carriers have offered "special" programs to our franchisees. We have no involvement in any of these programs.

You must use a licensed contractor satisfactory to us to perform construction work at your Store. We must approve in writing all changes to your Store plans before construction. We may require that you install additional lighting, wiring for Broadband access and digital signs and interactivity between displays or other wiring at your Store.

Officers of our company own an interest in our company, a designated and/or approved supplier of wireless and wireline communication services, fixtures and displays, computer systems, signs, and equipment inventory items to our franchisees. ~~Officers of our company also indirectly own an interest in ATI, LLC, a wholly-owned subsidiary that owns and operates Stores (directly or through its subsidiaries), and may sell Stores it owns to franchisees.~~

~~As a result of the acquisition by GLENTEL (USA), Inc., on December 1, 2012, ATI aligned its accounting policy with that of GLENTEL (USA), Inc., with respect to the presentation of Wholesale revenue and related Commissions cost of revenues. Accordingly, effective January 1, 2012, Wholesale revenue is reduced for the amount of cash consideration the Company receives from the service provider that is paid to franchisees for selling devices at a loss which are activated on the service provider's network; accordingly, commission cost of revenue is reduced by the same amount of cash consideration. This change had no impact to profitability. Prior years' financial statements have not been recast for this 2012 change in presentation.~~

We derive revenue from your purchases of products and services. In ~~2012;~~2013, we received $~~134,616,000~~99,157,000 in revenue from purchases made by franchisees, amounting to ~~30~~23% of our total revenues of $~~447,923,000~~423,196,000 reported on our audited financial statements for the period ended December 31, ~~2012;~~2013. Our wholly-owned subsidiary ATI, LLC, sublet the premises of ~~two Stores to franchisees~~1 Store to a franchisee in ~~2012;~~2013. Because ATI, LLC does not recognize revenue on the subleases because ATI, LLC does not mark up the payments due to the landlords under the leases, we do not treat the amount of the sublease payments as revenue from purchases made by franchisees under this Item 8. We require franchisees contribute to the Wireless Zone Foundation for Giving, Inc. (the "Foundation"), a non-stock charitable organization we established. See Item 6. In 2013, our franchisees made mandatory contributions of $168,904 to the Foundation. We did not have any affiliates who offered to sell or lease goods or services to our franchisees or who derived revenue from franchisee purchases or leases in 2013.

If you purchase a franchise to operate a Store, we estimate that source-restricted purchases will equal approximately ~~80~~79% - 99% of your total purchases disclosed in Item 7 in connection with the establishment of your Store and approximately ~~65~~70% - 85% of your total purchases in connection with the ongoing operation of your Store. ~~In addition, our in-house advertising agency retains up to 15% of the advertising revenues to cover its production costs. In 2012, this amounted to $407,000. We did not have any affiliates who offered to sell or lease goods or services to our franchisees or who derived revenue from franchisee purchases or leases in 2012. We do require, however, that franchisees contribute to the Wireless Zone Foundation for Giving, Inc. (the "Foundation"), a non-stock charitable organization we established. See Item 6. In 2012, our franchisees made mandatory contributions of $161,117 to the Foundation.~~

We may receive other forms of compensation directly from Providers and other vendors. This compensation may be either in lieu of or in addition to the Continuing Royalties you pay or which we attribute to you. See Item 6. Suppliers periodically offer program incentives relating to specific products and services. Depending upon the program complexity, the incentive

received by us can range between 0% - 5% of the purchased value of the products and services. In addition a Provider, supplier or other vendors may provide partial reimbursements for Store build out, displays, kiosks, and signage. This incentive is at the discretion of the Provider, supplier or other vendors, and may be based upon performance criteria established by the Provider, supplier or other vendors. We reserve the right to receive rebates, incentives, and other payments from suppliers and others in connection with from franchisees' purchases and to use the fees for our own purposes, and not share them with franchisees, unless we otherwise agree with the supplier.

There are currently no purchasing or distribution cooperatives in which franchisees are qualified to participate. Although we are a member of BuyCell Wireless Group, LLC, a buying group, franchisees cannot make direct purchases from or through BuyCell Wireless Group, LLC. Other members of BuyCell Wireless Group, LLC, may operate retail outlets within your Protected Territory which compete with your Store.

We do negotiate purchase arrangements with suppliers for your benefit. There is no practice in effect by which we provide material benefits to you, such as a right of renewal or the granting of additional franchises, based upon your use of approved suppliers, although you are subject to termination if you do not use the Providers with whom we have exclusive contractual arrangements, or you use Providers not authorized by us.

The requirements described in this Item (and in other Items) represent the Wireless Zone System at the present time. However, we retain the right to change these requirements, including any single-source requirements, as the Wireless Zone System evolves over time and the needs of the Wireless Zone System change.

## Item 9

### FRANCHISEE'S OBLIGATIONS

**This table lists your principal obligations under the franchise and other agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this Disclosure Document.**

| Obligation | Section in agreement | Disclosure document item |
|---|---|---|
| a. Site selection and acquisition/lease | Sections 1.04 and 4 of Franchise Agreement | Items 6 and 11 |
| b. Pre-opening purchases/leases | Sections 4 and 10.02 of Franchise Agreement | Item 8 |
| c. Site development and other pre-opening requirements | Section 4 of Franchise Agreement | Items 6, 7 and 11 |
| d. Initial and ongoing training | Sections 9.01, 9.02 and 9.03 of Franchise Agreement | Item 11 |
| e. Opening | Sections 6.01 and 14.01.M. of Franchise Agreement | Item 11 |

| Obligation | Section in agreement | Disclosure document item |
|---|---|---|
| f. Fees | Sections 5.02, 6.01, 6.02, 6.04, 7.01, 7.05, 7.06, 9.01, 9.03, 9.04, 9.07, 10.04, 10.05, 10.08, 10.12, 11.05, 11.06, 11.07, 12.02, 13.01, 13.02, 15.01, 16.01, 16.02, 16.04, and 17.04 of Franchise Agreement; Section 5 of Agreement with Landlord (Exhibit 1 to Franchise Agreement); sample End User License Agreement attached as Exhibit 9 to the Franchise Agreement (Exhibit B) | Items 5 and 6 |
| g. Compliance with standards and policies/operating manual | Sections 2.02, 2.04.A., 8.01 and 10 of Franchise Agreement | Item 11 |
| h. Trademarks and proprietary information | Sections 3 and 10.15 of Franchise Agreement | Items 13 and 14 |
| i. Restrictions on products/services offered | Section 10.02 of Franchise Agreement | Items 8 and 16 |
| j. Warranty and customer service requirements | Sections 9.07 and 10.12 of Franchise Agreement | None |
| k. Territorial development and sales quotas | Sections 1.08, 2.02 and 14.02.C of Franchise Agreement | Item 12 |
| l. Ongoing product/service purchases | Section 10.02 of Franchise Agreement | Item 11 |
| m. Maintenance, appearance, and remodeling requirements | Section 10.05 and 10.06 of Franchise Agreement | Item 11 |
| n. Insurance | Section 10.04 of Franchise Agreement | Items 7 and 8 |
| o. Advertising | Section 7 of Franchise Agreement | Items 6 and 11 |
| p. Indemnification | Sections 15.01.J., 17.04, and 18 of Franchise Agreement; Section 5 of Agreement with Landlord | Item 6 |
| q. Owner's participation/ management/staffing | Sections 10.03, 10.10 and 10.11 of Franchise Agreement | Items 11 and 15 |
| r. Records and reports | Sections 10.07, 10.08 and 11 of Franchise Agreement | Items 6 and 11 |
| s. Inspections and audits | Sections 10.6 and 11.03 of Franchise Agreement | Items 6 and 11 |
| t. Transfer | Section 12 of Franchise Agreement | Item 17 |
| u. Renewal | Section 5.02 of Franchise Agreement | Item 17 |
| v. Post-termination obligations | Sections 10.15, 15.01, 16.01, 16.02, and 16.03 of Franchise Agreement | Item 17 |
| w. Non-Competition covenants | Sections 16.01 and 16.03 of Franchise Agreement | Item 17 |
| x. Dispute resolution | Section 17.06 17.07 of Franchise Agreement | Item 17 |
| y. Other: Guarantee of | Sections 12.02.A.11 and 12.03.C. of | Items 1, 15 and 17 |

| Obligation | Section in agreement | Disclosure document item |
|---|---|---|
| franchisee obligations (note 1) | Franchise Agreement | |

**Note:**

(1) Each individual who owns a 5% or greater interest in a business entity franchisee, and under certain circumstances their spouse, must sign the Guaranty of Performance attached as Exhibit 6 to the Franchise Agreement guaranteeing payment by you to us under the Franchise Agreement, any promissory notes or other agreements, and your performance of your obligations under the Franchise Agreement.

## Item 10

### FINANCING

You must make your own financing arrangements. However, if you meet our credit standards, we may offer to finance (1) up to 50% (for a new franchisee entering the System) or 100% (for an existing franchisee or qualified Owner) of the initial franchise fee or transfer fee for 12 months; (2) up to 100% of any type of renewal fee for 12 months; and (3) up to a total loan amount of $20,000 of the cost of a kiosk, Store displays, signs and POS workstation setup (up to $15,000 of the cost of signs, fixtures, displays, and if applicable, a kiosk, and up to $5,000 of the cost of POS workstation setup) for ~~one~~1 to ~~three~~3 years, depending on the amount financed. We may adopt a program in the future to offer financing for your Initial Product Inventory. ~~We may offer financing to franchisees purchasing company-owned Stores for a portion of the purchase price. The financing offer is in the development stage and we have not determined the categories of investment and amount we may finance.~~

We will charge you interest at a fixed rate at our then-applicable interest rate offered at the date of the loan. For example, on March 1, ~~2012,~~2014, we would charge an interest rate of 12% to finance the initial franchise fee, transfer fee or renewal fee. Payments will be due in 12 equal monthly installments of principal and interest for the franchise fee over the term of the loan. On March 1, ~~2012,~~2014, we would charge an interest rate of 12% to finance the cost of a kiosk, Store displays, fixtures, signs, POS workstation setup, or portion of the purchase price of a company-owned Store. Payments will be due in 12 to 36 equal monthly installments of principal and interest over the term of the loan. You will sign a Promissory Note ("Promissory Note") in the form attached as Exhibit 2 to the Franchise Agreement. If the franchisee is an entity, the entity's 5 % Owners, and under certain circumstances their spouses, must personally guarantee the note ~~as well as~~and the franchisee's other obligations to us. The form of Guaranty of Performance is attached as Exhibit 6 to the Franchise Agreement.

You may prepay a Promissory Note without penalty, at any time, during its term. If you do not pay on time, we can accelerate your obligation to make immediate payment of the full outstanding balance and obtain court costs and attorneys' fees, if a collection action is necessary. Your default under a Promissory Note will be a breach under your Franchise Agreement, and we may have the right to terminate your Franchise Agreement, subject to any right you may have to

cure. We may terminate your Franchise Agreement if you do not make payments on time more than twice during the term of a Promissory Note. We can accelerate your obligation and demand payment of the full outstanding balance of your Promissory Note upon the expiration or termination of your Franchise Agreement. Under the terms of your Promissory Note, you waive certain notices in connection with~~of~~ default or enforcement, and you waive your rights under Connecticut law, which will govern the Promissory Note, to notice or hearing ~~prior to our~~before we attempt to obtain a prejudgment remedy, including an attachment or garnishment against you or your property. You do not waive your rights to assert your defenses or confess judgment to a collection action we may bring. Under the terms of the Promissory Note, you also agree that the Promissory Note will be governed by Connecticut law and we may bring an action against you in Connecticut to enforce your obligations under the Promissory Note. You also waive your right to a jury trial. We have no practice or intent to sell, assign, or discount your Promissory Note or other financing arrangements to a third party.

Following a credit review by our Finance Department, we may provide extended payment terms for purchases of inventory from us. After your initial opening order, which we may require that you pay in advance, electronically via ACH or wire transfer (EFT) or business (not personal) credit card, the Finance Department, in the exercise of its sole and exclusive business judgment, will determine the amount of inventory purchases that we will finance. The Finance Department may determine to put you on a Special Terms Program for a period of time, which may extend for ~~six~~6 months or longer. The Special Terms Program will require you to pay an up-front fixed prepayment amount, established ~~from time to time~~ by the Finance Department, for each wireless device that you order. This amount will be debited from your bank account via Electronic Funds Transfer. Under the Special Terms Program the balance due for your order will be given credit terms due in full on the 10th day of the second month following the order date.

After reviewing your sales and payment performance, the Finance Department may, in its sole discretion, determine to replace the Special Terms Program with extended credit terms. Typically this review occurs on or about the fourth month of operation. If you are given extended credit, you may have up to 60 days to pay for your purchases, depending on the invoice date. The interest rate on all purchases not paid for in full in accordance with these terms is 18% per annum, or the highest rate allowed by law if lower, from the date on which the purchases were made until the date on which the outstanding balances are paid. We retain the right to deduct from Commissions due to you all amounts owed for purchases and other amounts you owe to us. If at any time your financial situation changes, you have a poor payment record, are otherwise not in good standing, or other circumstances exist, we may require that you purchase on a payment in advance or special term basis, or make other arrangements satisfactory to us.

Under the Franchise Agreement, you grant us a security interest in all of your assets, including your equipment, inventory and franchise business to secure all of your obligations to us. You agree to sign the Security Agreement and Demo Line Payment attached as Exhibit 3 to the Franchise Agreement. You agree to authorize us to collect payment ~~pursuant to~~under the Electronic Funds Transfer Authorization attached as Exhibit 4 to the Franchise Agreement. You authorize us to file without your signature (and will also sign, if required), a UCC-1 financing statement, attached as Exhibit 5 to the Franchise Agreement. Your failure to make payment on financing obligations with us could result in the loss of your franchise rights. Under the Franchise Agreement and the Security Agreement and Demo Line Payment, you cannot use the assets of the Store, including accounts receivable, or your ownership interest in a franchisee entity, as collateral for a loan without our consent. We will require that your other lender sign an intercreditor

agreement with us. We do not intend to grant consent for you to use the Store as collateral for a loan to finance an unrelated business or a loan otherwise not related to the Store or your Franchise Agreement.

We are listed on the Franchise Registry, a national online listing of franchise systems whose franchisees receive expedited loan processing when applying for SBA (U.S. Small Business Administration) financial assistance. The Franchise Registry is a partnership between the SBA and FRANdata, created to advance several initiatives central to the SBA's mission. If you obtain a loan guaranteed by the SBA, we and you will sign the SBA Addendum to Franchise Agreement attached as Exhibit E to this Disclosure Document.

Except as noted above, we do not offer or arrange direct or indirect financing. We do not guarantee any of your financing, lease or any other obligations. We do not receive direct or indirect payments for placing financing.

## Item 11

## FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING

**Except as listed below, we are not required to provide you with any assistance.**

### Pre-Opening Assistance

Before you open your Store, we will:

1. Designate a Protected Territory (see Item 12). (Franchise Agreement - Sections 1.04, 1.05, 2.02 and 4.) ~~We may review your lease if you request our assistance or if we consider it advisable, although we will not provide any legal advice to you, and you are responsible for negotiating its terms.~~

2. Approve a site you select for your Store. Generally, you will lease the site from a third party, but we or an affiliate may occasionally offer to sell Stores owned by us or the affiliate, which may also require a sublease or lease assignment. We may review your lease if you request our assistance or if we consider it advisable, although we will not provide any legal advice to you, and you are responsible for negotiating its terms. We consider the following factors in approving your location: general location and immediate surroundings, traffic patterns, visibility, size, layout, rental and lease terms, competition and growth trends in the area. Provider must also approve your Store location in advance and may withdraw approval at any time. Our approval and Provider's approval to a specific location does not warrant or guarantee the suitability of a site, or the profitability or the likelihood of success of your Store. Our approval of a site also does not guarantee that Provider will also approve the site. You must deliver a copy of the ~~fully~~ signed lease to us within 15 days after it is fully signed. (Franchise Agreement – Section 4.) We will coordinate with Provider to obtain final approval of all sites. If we or Provider do not approve the site you select, you must submit an alternative site for consent. If you and we cannot mutually agree on a site for your Store that is also acceptable to Provider within 90 days after we and you

sign the Franchise Agreement, we can terminate the Franchise Agreement. If that occurs, we will refund to you any franchise fees you paid up to the date of termination, less our out-of-pocket expenses incurred to that date if you sign a release. (Franchise Agreement – Section 6.01.) If we do not choose to terminate, you must comply with the development obligations in the Franchise Agreement to open your Store within 180 days after we and you sign the Franchise Agreement and we will not refund any amount even if we terminate for failure to open your Store within the time required. (Franchise Agreement – Section 6.01 and Section 14.01.)

We anticipate that the typical length of time between signing the Franchise Agreement or the first payment of consideration and the commencement of operations of your Store will be approximately 12 to 16 weeks. The factors that affect this time frame include the build-out of the facility, training schedules, arrangement of financing by you, lease negotiations, zoning approvals, sign permit and fabrication, and hiring of staff. Your lease must contain certain language or you, your landlord and we must sign the Agreement with Landlord attached as Exhibit 1 to the Franchise Agreement.

3.      Allow you access to the Operations Manual. The Operations Manual contains the standard specifications and procedures for the construction and operation of your Store. We will furnish updates to you as changes are made in the Wireless Zone franchise System. (Franchise Agreement - Section 9.04.A.)

        The Table of Contents of the Operations Manual as of the end of our last fiscal year, showing the number of pages in each section, is attached as Exhibit I to this Disclosure Document. The total number of pages in the Operations Manual as of this date is ~~173.~~191.

4.      Furnish you with a layout for the interior of a typical Store and provide specific decor specifications. You must use a licensed general contractor we approve to construct your Store. You must also investigate, keep informed of and comply, at your expense, with all local, state, and federal laws, rules, regulations, ordinances, standards, and directives in effect at any time related to the construction and operation of the Store and the use of any furniture, fixtures, equipment and signs. Before you open the Store, you must certify in writing that you have obtained all permits and certifications required to operate the Store, including all business or other licenses and all zoning, access, signs and fire requirements. (Franchise Agreement – Section ~~10.01~~10.01.)

5.      Identify the approved products and services that you must offer at your Store. (Franchise Agreement – Section 10.02.) We will also offer to sell you the items of inventory we offer ~~to sell you if you elect to purchase these items from us.~~.

6.      Provide you and any of your employees (as space permits) with operational, sales and promotional training intended to prepare you for the management and operation of your Store. ~~Training, which will be conducted on an ongoing basis, may include training at our corporate headquarters and/or on-the-job training at a Wireless Zone retail outlet, at your Store, or via the Intranet or other form of electronic communication. We do not charge any initial training fee for one Owner (or previously approved general manager serving as proxy) to attend our entire initial training program, which must be successfully completed by them to our satisfaction. We charge a fee for each additional attendee if additional Owners or employees attend or access a portion of the initial training program. See Item 6. You must also pay the travel and living expenses for yourself and your employees.~~ (Franchise Agreement - Sections 9.01 and 9.03.) See below in this Item 11 for more information about our training program.

7.    If you request in writing, we will provide a representative to train and assist your staff for up to ~~three~~ 3 business days during the period immediately before and following the opening of your Store. (Franchise Agreement - Section 9.04.B.)

8.    We may assist you with the development of an initial marketing program campaign if we require that you develop an initial marketing program campaign. You will bear the cost of any initial marketing program campaign. (Franchise Agreement – Section 7.04.)

## Ongoing Obligations

During the operation of your Store:

1.    We may conduct~~, from time to time,~~ refresher or new product training classes. At a minimum, sessions are held twice a year. In addition, mandatory regularly-scheduled franchise meetings and ongoing training meetings are held at locations within each region, as we define for marketing purposes, to provide updates on procedures, marketing programs, products and other information. We may make your attendance mandatory at these regularly-scheduled meetings and ongoing training meetings during each year of the Agreement. There will be no charge to you for attendance at these meetings, but you are responsible for travel expenses associated with attending these meetings for yourself and your employees. If you or any of your employees register for a training class, meeting or seminar, but fail to attend, or fail to attend a mandatory meeting, we may charge a "no-show fee;" presently this fee is $200 per no-show, and is subject to change ~~from time to time~~. (Franchise Agreement – Section 9.04.B.)

2.    We will furnish the type of ongoing assistance and supervision we deem appropriate. (Franchise Agreement - Section 9.04.C.) This ongoing assistance and supervision might include, by example, merchandising and technical assistance (largely by telephone, Intranet or other electronic means), on-site visits, access to our warehouse, availability of key brands and product lines, return privileges and stock rotation.

3.    Upon your request, after completion of the mandatory training program, we will furnish additional on-site operational, sales and promotional training to assist you in the management and operation of your Store. We will charge you our then-current fee, currently set at $500 per day, and you will be responsible for the costs associated with travel, lodging, meals and any additional out-of-pocket living expenses incurred by our representative during the training. We may also provide at your request additional customized training or make available training programs we offer franchisees generally via Intranet or other form of electronic communication. Our fee for delivering training via Intranet or other electronic form will not exceed the fee for on-site training. (Franchise Agreement – Section 9.03.)

4.    We may provide suggested retail prices, but you will determine the prices at which you offer products and services. (Franchise Agreement – Section 10.09.)

5.    We will continue to provide you access to the Operations Manual. (Franchise Agreement – Section 9.04.A.)

6.    We will modify the standards of operation for your Store, and you must adopt all modifications, which may require that you make reasonable expenditures within the time periods we specify.  (Franchise Agreement – Section 10.01.)

7.    We will let you use our proprietary trademarks.  (Franchise Agreement – Section 3.01.)

## Advertising/Marketing

Most Providers offer a cooperative advertising program, granting advertising allowances, based on new activations and the rate plans of your customers and those of all other Wireless Zone franchisees serviced by the Provider that allow for cooperative advertising.  Each Provider Contract offers a different advertising and promotion compensation program.  We will provide you with information about the specific advertising and promotion program affecting your Store. In order forFor you to be credited with a share of the Provider cooperative advertising funds for your own advertising activities, you must adhere to the guidelines and requirements established by Provider and us, which may change.  We reserve the right to collect and you agree to pay to the Collective Advertising and Promotion Fund an advertising/marketing contribution, not to exceed 5% of your Gross Sales and your portion of commissions paid by Providers, payable by the 10th day of each subsequent month.  We collect these payments by deduction from payments of your share of Commissions or otherwise in the same manner and at the same time we collect Continuing Royalties.  See Item 6.

We may, in the exercise of our sole and exclusive business judgment, spend cooperative advertising allowance monies we receive from Providers on behalf of all of the franchisees, as well asand advertising/marketing contributions we receive from franchisees, on local and regional advertising and marketing, public relations or promotional campaigns or programs which promote and enhance the quality image, identity and patronage of Stores, through the Collective Advertising and Promotion Fund (which is administered by our in-house agency).  We may use the Collective Advertising and Promotion Fund for the formulation, design, development, test marketing, market studies, production and placement of advertisements, point of sale materials, promotional materials, newsletters, public relations, website development, social media site development and costs, electronic advertisements, Intranet development costs, toll-free business locator costs, and all other costs for any advertising, marketing and promotion, including the payment to us, our affiliates or advertising agencies, for administrative expenses (including operating expenses and the proportionate compensation of our employees who devote time and render services in the conduct, formulation, development and production of advertising, marketing and promotion programs or who administer these funds).  We will determine the cost, media, content, format, style, timing, allocation and all other matters relating to advertising/marketing, public relations and promotional campaigns.  (Franchise Agreement - Sections 7.01 and 7.02.) Currently, our regional and local advertising, which is developed by our in-house agency,  may be disseminated through, among other mediums, direct mail, flyers, radio, social media, cable and network television.  Our in-house advertising agency retains up to 15% of the advertising funds collected from the Providers and monthly franchisee contributions, which are used to cover production and other related costs, regardless of whether if we or an outside agency create and produce the advertising materials.

All advertisingmarketing undertaken by the Collective Advertising and Promotion Fund is conducted both regionally (in a "market area," as we define) and locally.  Each market area differs, based upon Provider agreements and overlap of Provider territories.   There is no

obligation to develop, implement or administer these funds to ~~insure~~ensure that expenditures are proportionate or equivalent to payments attributable to a particular Store, or to make expenditures to benefit any particular franchisee or group of franchisees, or for any particular market area, geographic area or on a pro-rata or proportional basis. Franchisees contribute amounts based upon their sales performance and marketing requirements. Company owned units contribute to the Collective Advertising and Promotion Fund on the same basis as franchised units. We are not a fiduciary ~~with respect to~~for monies held by the Collective Advertising and Promotion Fund. Individualized unaudited annual statements of the Collective Advertising and Promotion Fund are distributed to franchisees upon request and may also be accessed by franchisees on the franchisee portal on our website. ATI's expenditures of funds for advertising are also currently available on the franchisee portal and are made available upon the exercise of our sole and exclusive business judgment.

We intend to, but we are not obligated to, spend all advertising/marketing payments collected during the year in which they are made, or within ~~six~~6 months, assuming the Provider(s) allow funds to be held that long after their collection. (Franchise Agreement - Section 7.02.) If there are any remaining amounts after these time periods, we will apply them to the creation and implementation of advertising and marketing programs at our sole discretion. We do not spend any of these advertising/marketing funds for the solicitation of the sale of franchises, although in certain markets advertising and/or marketing will make reference to our print ads and website for employment and franchise information. There are no advertising cooperatives or advertising councils.

In ~~2012, we spent 15~~2013, 18% of ~~the advertising revenue on production of advertisements and other promotional materials and 85% on carrier cooperative initiatives.~~our advertising expenditures were used to administer the Collective Advertising and Promotion Fund and 82% was reimbursed to Wireless Zone Store owners for approved promotional activities.

~~You will~~We require you to aggressively promote your Store in your local geographic area. You may develop advertising and marketing materials for your own use at your own cost, but we must approve these materials in writing in advance of publication or use. You may only solicit within your Protected Territory, unless you have received prior written approval from us. All local marketing and promotion by you of any type must be conducted in a dignified manner and must be approved by us in writing in advance. You must adhere to any cooperative advertising guidelines established by us and Providers. (Franchise Agreement – Section 7.03.)

You must participate in ~~one~~1 or more civic organizations in the community in which your Store is located. We may suggest certain organizations and encourage all of our franchisees to participate in specific philanthropic programs, including the Wireless Zone Foundation for Giving, Inc. In addition, you must participate in all programs we support. (Franchise Agreement – Section 7.05.)

We may require that you develop an initial marketing program campaign. You will bear the cost of any initial marketing program campaign. We may assist you with the development of the initial marketing program campaign. (Franchise Agreement – Section 7.04.)

If you wish to maintain a website, social media sites or use other electronic media, you must first obtain our prior written approval of the form and content, which consent we are under no obligation to provide, as we consider the maintenance of a website or social media site to be a form

of advertising and subject to our requirements. We may require that the only website or social media sites for you and the System will be the website or social media sites that we maintain. (Franchise Agreement – Section 7.03.)

## Computer Equipment

You must purchase ~~one~~1 or more computer Point of Sale (POS) workstation setups from us to be used in ~~conjunction with~~ the operation of your Store. ~~The following is a representative list of the minimum specifications and standards for a POS workstation setup. These minimum specifications and standards apply to all new stores, additional stores purchased by an existing Wireless Zone® franchisee, purchase of existing Wireless Zone® stores, and stores renewing a Wireless Zone® franchise.~~ These requirements will change, requiring you to upgrade your system. Make certain that the system you purchase can be readily upgraded.

~~You must purchase from an approved supplier:~~

~~**POS Workstation Setup**~~

~~**POS Hardware**~~

~~a.~~ ~~Intel Pentium Dual Core 2.6 GHz (or better)~~
~~b.~~ ~~4 GB RAM (or better)~~
~~c.~~ ~~80 GB Hard Drive (or larger)~~
~~d.~~ ~~Six (6) USB Ports (or more)~~
~~e.~~ ~~20" LCD Monitor (or larger)~~
~~f.~~ ~~DVD-RW ROM~~
~~g.~~ ~~System Backup Drive (i.e. disk, tape, or writable CD/DVD) or Online Remote Backup Service~~
~~h.~~ ~~Multi-Function Laser Printer~~
~~i.~~ ~~Appropriately Sized Uninterruptible Power Supply (UPS)~~
~~j.~~ ~~Bar Code hand scanner~~
~~k.~~ ~~Cash Drawer~~
~~l.~~ ~~Credit/Debit Card Machine (or POS integrated solution)~~
~~m.~~ ~~Topaz 4x3 Active LCD B/L Electronic Signature Capture PAD (or other approved model)~~
~~n.~~ ~~Epson T88-V thermal printer (or other supported printer)~~

~~**POS Software**~~

~~o.~~ ~~Windows XP Professional or Windows 7 Professional (Windows 8 is NOT supported by ATI or all Providers at this time)~~
~~p.~~ ~~Microsoft Office 2007 (or newer, including at a minimum Microsoft Word, Excel and PowerPoint)~~
~~q.~~ ~~Internet Explorer 6, 7, 8 or 9 (currently the only versions supported by Verizon) (version 8 and 9 must be used in compatibility mode) (Internet Explorer 10 is NOT supported by Verizon at this time)~~
~~r.~~ ~~McAfee Subscription-based Anti-Virus Software~~
~~s.~~ ~~Sun Java Plug-in (can be downloaded from Sun Microsystems's website)~~
~~t.~~ ~~CellSell Online Point of Sale (POS) System~~

## ~~Network Hardware~~

~~a.     Cisco ISR Firewall or SonicWALL NSA Firewall~~
~~b.     Appropriately sized Network Switch (based on number of workstations, printers and other network devices)~~

## ~~Services~~

~~a.     Broadband Internet Access (T1, fractional T1, Business Class Cable, or DSL) (wireless or cellular connections are NOT Acceptable)~~
~~b.     E-mail — ATJ will provide an e-mail address for your store, which address is to be used for all Wireless Zone® e-mail communications~~
~~c.     Store Security System~~
~~d.     Computer Support — Each store is responsible for having its own local skilled IT support professional for local support~~

A minimum of ~~two~~2 POS workstation setups are required. The estimated cost for the hardware and software is between $2,500 and $4,000 for each workstation setup.  Your cost will be determined by the number of workstation setups in your Store.  If you have multiple networked workstation setups, you may need a server which would increase your overall cost.  Normally, the hardware will have a ~~three~~3 year warranty when purchased from us.  There are no contractual limits on any updates or upgrades that are required for the hardware and third-party software. Upgrades will be needed ~~from time to time~~ to meet technological improvements.  All upgrade and update costs are your responsibility.  The cost of any upgrades will vary and we have no basis for estimating the annual or periodic cost you might incur, which are determined by the manufacturer. Upgrades are included in the license fee for our proprietary Point of Sale (POS) Software discussed in the next paragraph, which you will have to use.

You will furnish us with the ability to download your sales and customer information and all other information we request, on a regular basis, even though we will have independent access to that information.  We will advise you as to the timing, format and content of the information which you agree to make available to us.  You must also have a dedicated data line, e-mail service and Internet access.  We will provide ~~two~~2 e-mail accounts per authorized Wireless Zone location.  One of these e-mail accounts will be for general use by the Store, and ~~one~~1 will be for the use of the sole proprietor of the franchisee if the franchisee is not a business entity, or, if the franchisee is a business entity, an individual who owns a 20% or greater interest in the franchisee, and who is principally responsible for management of the franchisee.  All Owners of the franchisee will use this latter account for all franchise-related communications.  You may request additional e-mail accounts for your Store, Owners and/or your Store employees for an additional fee for each additional e-mail account.  See Item 6.  If you elect to connect to our servers that are synchronized to our outside vendors' and/or Providers' applications, if we authorize and make them available to you, we will charge you a fee for each connection.  See Item 6.  We will have full and complete access to all records and information created by the computer Point of Sale (POS) workstation setup, through direct telephone or other communications method.  ~~There are no contractual limits on our right to access your information.  We have developed an Intranet for data exchange.~~—We may require that you use an approved credit card processing company.

You must use Point of Sale (POS) Software we designate to handle all transactions in your Store. The software maintains a data base of your customers and of products for use in managing your Store. Upgrades to the software will be included in the monthly licensing fee (see Item 6 and the sample End User License Agreement attached as Exhibit 8 9 to the Franchise Agreement). We will have full access to all information and data collected by the software. There are no contractual limits on our right to access your information. If your store closes, you must return the POS workstation router to ATI.

You must contract with the software supplier or with ATI, if ATI relicenses the software to you, to obtain installation, training and support for the POS software. Costs will be variable vary, based on your computer literacy, age and condition and age of your equipment, location of your Store, number of calls you place to the help desk each month and other factors.

You must access our Intranet and e-mail system designed for franchisees and you must use those systems. This Intranet will be used for, among other things: dissemination of reports, notices, procedures, manuals, special promotions and programs, replacing individual e-mails; training; placing orders with our warehouse, replacing faxes and phone calls; and posting of current advertisements.

## Training

Before your Store opens, each person signing the Franchise Agreement as franchisee, or each individual who owns a 20% or greater interest in a business entity franchisee, must complete, to our satisfaction, our mandatory initial training program. If you designate in writing, in a form acceptable to us, one 1 or more Owners or one 1 or more employees as general managers to supervise the operation of your Store who are acceptable to us, then the general managers will serve as your proxy and we will require that only the general managers attend and satisfactorily complete the initial training program. The designated general managers must also attend all future mandatory training programs, even if you attend the training programs yourself. Our convention is currently considered a mandatory training program to our satisfaction. Your Store must always be under the direct supervision of an individual who has satisfactorily completed our initial training program and other mandatory training programs, including our convention. Any replacement general manager we approve must attend and satisfactorily complete our initial training class to our satisfaction. If any designated individual does not complete the initial training program to our satisfaction, the individual will have to repeat the class or portions of it until we are satisfied, or you will have to replace the individual and that replacement will have to attend and complete our initial training class and any mandatory additional training course to our satisfaction.

We do not charge any initial training fee for one 1 Owner (or an approved proxy) to attend our entire initial training program. We do charge a fee per attendee if you send additional employees to a portion of the initial training program. You must pay the costs for travel, lodging, meals and salaries for all the individuals attending training. See Item 6. You and/or your general managers must successfully complete training within 120 days of the date of the Franchise Agreement or we may terminate the Franchise Agreement. In addition, we may conduct periodic training programs, including our conventions. Attendance at these meetings will be mandatory. We will not charge you to attend these programs, except that we currently charge a fee of between $200 and $500 per Store that you own and operate to attend our convention. See Item 6. You

must pay the costs for travel, lodging, meals and salaries for the individuals who attend any mandatory training program.

We give our initial training on an ongoing basis throughout the year. The Operations Manual will be the principal instructional material. Training facilities are divided between (a) our corporate offices or a franchised Store; (b) on-the-job training at a franchised Store; (c) on-the-job training at your own Store; and (d) via Intranet or other form of electronic communication.

The training program for a new franchisee consists of approximately 120 - 160 hours. Each day of training would be approximately ~~eight~~8 hours. The training consists of Store management, carrier relations, product training, sales and marketing strategies and sales floor training. The training schedule appears below in this Item 11. Training will be supervised by Craig Ahrens, our Vice President of ~~System Standards, whose recent experience is set out in Item 2. Mr. Ahrens~~Systems Excellence. Mr. Ahrens has been our Vice President – Systems Excellence since December 2010. He has been conducting training and creating and managing training programs since 1990 for a number of companies, including Burger King, Magic Restaurants and Dunkin Brands. In-house training will be conducted by: Gary Young (our employee since October 2004 and previously our franchisee from 1996 to 2004; training experience with us since April 2007) and James Vincent (our employee and corporate trainer since October 2009). Field training will be conducted by Regional Franchise Directors under the direction of David Staszewski who has been employed by us since August 2006 and has over 25 years' experience in the industry. We may also use others of our staff and third party trainers who will perform their duties under our supervision. Most of the individuals performing training have at least several years of experience with us or have relevant industry experience.

**[THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]**

## TRAINING PROGRAM

| Subject | Hours of Classroom Training[‡] | Hours of On-The-Job Training | Location |
|---|---|---|---|
| New Owner Basic Training<br><br>Sales and Marketing, Wireless Zone philosophies, Provider Training, Warehouse operations, Point of Sale training, Human/Employee Relations | ~~Up to~~Minimum of 40 | 0 | Corporate Headquarters in Middletown, Connecticut, retail location and/or via Intranet or other form of electronic communication |
| New Owner Advanced Training<br><br>Sales, Advanced Point of Sale training, Advertising, Data and Product training, Finance Department training, ~~Small Business sales,~~ Operations Manual, Employee relations | ~~Up to~~Minimum of 40 | 0 | Corporate Headquarters in Middletown, Connecticut retail location and/or via Intranet or other form of electronic communication |
| Working in a Certified Training Store<br><br>Store Operations, Customer Service, Interaction with existing owners and customers, Wireless Zone philosophy training | 0 | ~~Up to~~Minimum of 40 | ATI Approved Field Training Store |
| Store Opening Training<br><br>Sales, Customer Service, Store Operations, Employee relations | 0 | Up to 40 | New Owner's Store |
| Total | Minimum of 80 | 40 to 80 | |

## Item 12

## TERRITORY

You will operate the Store at a specific location that we and Provider must first approve. Your Store will be located in a trade area ("Protected Territory"), which will be your marketing territory defined in your Franchise Agreement by a county, city, town, shopping mall, Zip Codes, other current U.S. Census Department designations and/or specific streets. With the exception of enclosed shopping mall locations, for which the Protected Territory is the enclosed shopping mall itself, each Protected Territory will consist of between a 10,000 and 20,000 person population, subject to market factors that may result in a smaller or larger territory. Before you sign the Franchise Agreement, we will attach a map or description of your Protected Territory. A Protected Territory will specifically exclude exhibition, convention and/or conference halls and centers. We reserve the right for ourselves and/or our franchisees to exhibit or participate at functions conducted at these types of venues. A Protected Territory will also specifically exclude enclosed shopping malls, whether now existing or arising in the future that are otherwise within the description of the Protected Territory, unless the Protected Territory is the enclosed mall itself. We reserve the right to operate ourselves, and/or to license our franchisees to operate Wireless Zone Stores, kiosks, and/or carts in these enclosed shopping malls and in non-traditional locations described below.

You may operate only ~~one~~1 Store in your Protected Territory, unless you are converting a store or stores or if you are opening a ~~satellite operation. See Item 5 and below~~Satellite Location. You will conduct from your Store on-site retail sales, telemarketing and direct sales to the general public and small businesses within your Protected Territory. You must seek and receive our permission to relocate within your Protected Territory. The proposed new location must satisfy our and Provider's site location and lease criteria for your Store. ~~Your lease must contain certain language or you, your landlord and we must sign the Agreement With Landlord attached as Exhibit 1 to the Franchise Agreement. The Provider must approve the Store location.~~ If your lease for your Store expires, is not renewed or is otherwise terminated, you must secure another approved Store location within 90 days after the expiration or termination of the prior lease. You must sign a separate Franchise Agreement, the terms of which may differ materially, and pay an additional franchise fee, in order to operate another Store in your Protected Territory or in a different or additional territory.

You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

~~As long as~~If you are not in default under the Franchise Agreement, and/or in default under the franchise agreements for any other Stores you operate in your Protected Territory, we will not operate Wireless Zone retail Stores or grant Wireless Zone retail franchises or appoint sub-agents within your Protected Territory, except as described below regarding alternative channels of distribution, including non-traditional locations, and except that we also reserve the right to retain any sub-agent we previously established in your Protected Territory. See Item 1. We also expressly reserve for ourselves, for our affiliates and for our other franchisees the right to sell wireless telephones, and other wireless and wireline communications devices and services, entertainment and security products and services, ~~as well as~~and other products and services under other trademarks within or to your Protected Territory. Provider, and other agents of Provider,

may also operate in your Protected Territory. ~~Except for approved cooperative advertising with geographically proximate franchisees, neither we (using the same trademarks) nor you can advertise or solicit orders from within another franchisee's protected territory.~~ You may accept orders from outside your Protected Territory without payment to another franchisee, but you may not solicit any business outside of your Protected Territory except for approved cooperative advertising. We may accept orders from inside your Protected Territory without payment to you.

We retain the right to use alternative channels of distribution, including by way of wholesale, mail order or catalog business, on-line computer sales via the Internet, "e-commerce" or other computer sales methods, specialty sales, or via outbound telemarketing, toll free telephone numbers for delivery, other electronic means, or at or through department stores, big box stores, grocery stores, supermarkets, theme parks, airports, stadiums, arenas, and similar outlets, to offer products and services other than through Wireless Zone retail Stores to locations and customers located anywhere, including those within your Protected Territory, using the mark Wireless Zone and the other Trademarks or under other trademarks, and we do not have to pay any compensation to you. You may not solicit business in any non-retail channel of distribution to any purchaser wherever located, including within your Protected Territory, including by way of catalogs, mail order, toll free telephone numbers, or any form of electronic media or commerce, such as the Internet, except for permitted telemarketing within your Protected Territory. We have established an e-commerce distribution program, and you must participate in the manner set out in the Operations Manual and accept those amounts, if any, that we specify as full and adequate payment for your participation.

You do not receive the right to acquire additional franchises within your Protected Territory (or elsewhere), but, if you have a minimum of ~~one~~1 year operating experience, are a franchisee in good standing, and obtain credit approval from ATI, you may open ~~one~~1 or more ~~satellite locations~~Satellite Locations in your Protected Territory, subject to our prior approval, the payment of a $1,500 ~~satellite location~~Satellite Location initial franchise fee and signing of the then-current form franchise agreement for each ~~satellite location.~~ ~~A satellite location~~Satellite Location, the terms of which may vary materially from your existing franchise agreement. A Satellite Location is a new location within a franchisee's Protected Territory. A ~~satellite location~~Satellite Location does not receive its own Protected Territory. The Franchise Agreement for a ~~satellite location~~Satellite Location has a term that expires at the same time as that of the main Store with which it is associated.

You must maintain a minimum number of monthly activations in order to retain your franchise. Section 1.08 of your Franchise Agreement will specify the minimum number of activations. The minimum number is generally 75, but it may vary, according to the size and other demographic factors in your Protected Territory. If you do not realize the minimum number of monthly activations, as figured on an average basis, during any consecutive ~~three~~3 month period of operation after the first year, you will be in default and we may terminate your Franchise Agreement after providing you with a 90 day period to cure the default. Provided that you meet these minimum sales quotas, you maintain rights to your Protected Territory, even though the population may increase, provided you are not otherwise in default of your Franchise Agreement.

We may establish, and we reserve the right for ourselves and our affiliates to utilize alternative channels of distribution, for branded communications products, such as telephones or wireless Internet devices, using the Trademarks used in ~~connection with~~ your Store or any other trademarks, to any purchaser wherever located, including within your Protected Territory. We

have already established a distribution channel via the Internet using the Trademarks and by establishing outlets within other retail stores, and may also establish alternative distribution channels such as wholesale, mail order or catalog business, on-line computer sales via the Internet, "e-commerce" or other computer sales methods, specialty sales, or via outbound telemarketing, toll free telephone numbers for delivery, other electronic means, or at or through department stores, big box stores, grocery stores, supermarkets, theme parks, airports, stadiums, arenas, and similar outlets, or by any other means other than from a Wireless Zone® Store established in a traditional location under the System using the Trademarks or any other trademarks. You will have the right to sell products under the Trademarks only by retail sale and only through your Store and you will have no right to sell products through any alternative distribution channel. You have no right to share, and you should not expect to share, in any of the proceeds we or our affiliates, franchisees, licensees, representatives, agents, sub-agents or any other person receives in connection with any other channel of distribution, except as we specifically authorize. ~~See Section 2.04 of the Franchise Agreement.~~

We also reserve the right for ourselves and our affiliates, to operate or to license the operation of retail Stores offering wireless and wireline communications products and services and/or entertainment and security products and services outside of your Protected Territory. We also reserve the right for ourselves and our affiliates to develop, operate and franchise similar or dissimilar distribution systems for the same, similar or different products, goods, or services using trademarks, service marks and commercial symbols different from those used in connection with the Wireless Zone System, which may include web-based systems.

Our immediate parent GLENTEL (USA), Inc. is the majority owner of Diamond Wireless, LLC, a Utah limited liability company, which owns and operates company-owned outlets operating under the service mark "Diamond Wireless," offering goods and services of a type substantially similar to the goods and services to be offered by you as our franchisee under our trademark Wireless Zone®. ~~Diamond Wireless outlets offer wireless telephones, wireless data, satellite communications, personal communication devices and other forms of wireless, wireline and Internet-based communication devices, services and accessories, and entertainment and security products and services. The Diamond Wireless chain of outlets, like the Wireless Zone® system of Stores, is a Verizon Wireless National Premium Retailer. All outlets currently operated under the Diamond Wireless mark are company-owned outlets owned by Diamond Wireless, LLC.~~ Diamond Wireless, LLC does not presently offer franchises ~~and has no sub-agents, and currently does not have any plans to offer franchises in the future, but Diamond Wireless, LLC maintains the right to adopt the franchise model in the future~~. The Diamond Wireless outlets are not restricted as to where they may solicit or accept orders and they may compete with Wireless Zone® Stores and solicit or accept orders in your Protected Territory. Neither we nor Diamond Wireless, LLC is restricted from expanding geographically and both intend to expand to additional states, including into states where the other system currently has outlets. We and Diamond Wireless, LLC maintain physically separate offices and training facilities and we will each operate independently through our respective separate managements teams and will not consult each other regarding potential conflicts regarding territory, customers, locations or support of the businesses of our respective outlets.

## [THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]

## Item 13

## TRADEMARKS

We grant you the right to operate under the mark "Wireless Zone." You may also use, with our prior written consent, our other current or future trademarks to operate your Store. By trademark, we mean trade names, trademarks, service marks or logos used to identify your retail outlet. You may not use Websites, social media sites or register domain names (whether or not they include the trademarks) without our prior written approval, which we are under no obligation to furnish.

The following are our principal trademarks which have been registered on the Principal Register of the United States Patent and Trademark Office; all required affidavits and renewals have been filed:

Wireless Zone (without design)
Registration Date: March 28, 2000
Registration No. 2,336,387

The logo of "Wireless Zone"
Registration Date: March 19, 2002
Registration No. 2,550,880

The logo of "Wireless Zone"
Registration Date: May 7, 2002
Registration No. 2,568,161

Wireless Zone Foundation for Giving (without design)
Registration Date: September 7, 2004
Registration No. 2,881,710

You must follow our rules when you use these trademarks. You cannot use the names or trademarks, or confusingly similar names or trademarks, as part of a business entity name, e-mail or Internet address or with modifying words, designs or symbols, unless we expressly license their use to you for this purpose. You will not open any vendor accounts using the trademarks. You may not use our name or trademarks in connection with the sale of an unauthorized product or service, for obtaining credit from any lender or lending institution or from vendors, suppliers or merchants, or in any manner not authorized in writing by us. You may not, during the term of the Franchise Agreement or after its expiration or termination for any reason, develop, create, generate, own, license, lease or otherwise use any computer media and/or electronic media (including any Intranet, Internet, World Wide Web, social media sites, bulletin boards, news group, blogs or telenets) that in any manner use or display ATI's trademarks, or confusingly similar names or trademarks. You may not, during the term of the Franchise Agreement or after its expiration or termination for any reason, in any manner use or employ any meta tag, link, frame or similar

FDD 2013 2014                                          58

device to, or ~~with respect to,~~ for any website or social media site of ours. You may not, during the term of the Franchise Agreement or after its expiration or termination for any reason, sell, give, provide to or otherwise assist any third party who is not our franchisee to obtain any advertising, signs, posters, point of sale materials, promotional materials, or other materials containing the Trademarks, including the trade dress.

No agreements limit the right to use or license the use of the trademarks. There are presently no material determinations of the United States Patent and Trademark Office, the Trademark Trial and Appeal Board, the trademark administrator of any state, or any court, nor any pending interference, opposition, or cancellation proceedings or material litigation, involving the principal trademarks.

You must notify us immediately when you learn about an infringement of, or challenge to your use of, our trademarks. We will take the action we think is appropriate. While we are not required to defend you against a claim against your use of our trademarks, we will reimburse you for any damages for which you are held liable and your reasonable costs in connection with defending Wireless Zone trademarks. To receive a reimbursement, you must have notified us immediately when you learn about the infringement or challenge and cooperated with us. We alone will control any action involving the trademarks. You will assist us in our pursuit of the action.

You must modify or discontinue the use of a trademark if we modify or discontinue it. If this happens, we will not reimburse you for your costs of compliance, including for example changing signs and other trademarked materials. You must not directly or indirectly contest our right to the trademarks, trade secrets or business techniques that are part of our System.

We do not know of any infringing uses that could materially affect your use of our trademarks.

**[THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]**

## Item 14

## PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION

There are no patents or pending patent applications that are material to the franchise. We claim copyright protection in the Operations Manual and related materials, and website, social media sites, Intranet, advertisement and promotional materials, although these materials may not have been registered with the United States Registrar of Copyrights. We consider these materials proprietary and confidential and our property and you may use them only as provided in the Franchise Agreement. We also consider our trade dress inherently and uniquely distinctive and protectable under applicable Federal and State law.

There currently are no effective material determinations of the United States Patent and Trademark Office, the United States Copyright Office, or any court regarding any of the copyrighted materials. There are no agreements in effect which significantly limit our right to use or license the copyrighted materials. There are no infringing uses actually known to us which could materially affect your use of the copyrighted materials. We are not required by any agreement to protect or defend copyrights or any patents or to defend you against claims arising from your use of any patented or copyrighted items.

The Operations Manual and other materials we make available to you contain our confidential information, including trade secrets. You must treat the Operations Manual, any other manuals and literature created for or approved for use in the operation of your Store, and the information contained in them, as confidential, and must use all reasonable efforts to maintain this information as secret and confidential. You must not copy, duplicate, record, or otherwise reproduce these materials, or otherwise make them available to any unauthorized person. The Operations Manual will remain our sole property. As described in Item 8, the Operations Manual is a compilation of manuals, books, binders, videos or other electronic media, Intranet postings and other materials. You must keep any physical copies of any portions of the Operations Manual in a secure place at your Store.

We may revise the contents of the Operations Manual, and you must comply with each new or changed standard. You must familiarize yourself with changes to the Operations Manual as they are posted. You must ensure that your copy of the Operations Manual is kept current at all times. In the event of If there are any disputes as to the contents of the Operations Manual, the terms of the master copy we maintain at our home office will be controlling.

## [THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]

## Item 15

## OBLIGATION TO PARTICIPATE IN THE
## ACTUAL OPERATION OF THE FRANCHISE BUSINESS

We do not require that you participate personally in the direct operation of your Store or attend our initial training program.  You may operate your Store through 1 or more Owners or employees, who are acceptable to us, who you designate in writing in a form acceptable to us, to serve as your proxy to supervise the operation of your Store.  You must designate a general manager to serve as your proxy if neither you nor a 5% Owner if you are a business entity franchisee, will devote a minimum of 40 hours per week to the operation of your Store.  You or the designated general manager, if any, must meet our educational and experience standards and must attend and satisfactorily complete the initial training program and all future mandatory training programs.  Any replacement general manager we approve must attend and satisfactorily complete our initial training class.  You or your general manager must devote full time attention, which we estimate as a minimum of 40 hours per week, to managing, operating and developing your Store's business, except for reasonable vacation and sick time.  We do not dictate whom you may appoint as a general manager but we must approve the person you select to act as general manager.  Your general manager does not have to have an equity ownership in your Store.  The general manager must, however, sign a written agreement to maintain confidentiality of the trade secrets, assign developments to us, and comply with the covenants not to compete described in Item 17. The agreement must be in a form satisfactory to us, including specific identification of us as a third party beneficiary, with the independent right to enforce the agreement.  We may require that you attend regularly-scheduled meetings and ongoing training meetings even if you do retain a manager.

We will disclose to you certain confidential or proprietary information and trade secrets. Except as is necessary for the operation of your Store and as we approve, you may not, during the term or at any time after the expiration or termination of the Franchise Agreement, regardless of the cause of termination, directly or indirectly, use for your own benefit or communicate or divulge to, or use for the benefit of any other person or entity, any trade secrets, confidential information, knowledge or know-how concerning the services, advertising, marketing, designs, plans, or methods of operation of your Store.  You may disclose to your employees only that confidential, proprietary or trade secret information as is necessary to operate the business and then only while the Franchise Agreement is in effect.  Any and all information, knowledge, or know-how, including materials, equipment, marketing, and other data, which we designate as secret or confidential will be deemed secret and confidential for purposes of the Franchise Agreement. You also agree under the Franchise Agreement to disclose to us any ideas, concepts, techniques or material concerning the System or the operation of the Store, including advertising materials, that you or your employees create.  All of these creations will be our property.

You must require any personnel having access to any of our confidential information to sign covenants that they will maintain the confidentiality of information they receive in connection with their employment by you.  The covenants must be in a form satisfactory to us, including specific identification of us as a third party beneficiary of the covenants, with the independent right to enforce them. The Confidentiality, Non-Competition and Assignment of Developments Agreement attached as Exhibit 7 to the Franchise Agreement, is currently considered a satisfactory form with respect to for the confidentiality covenants. See Item 15.

~~We also consider our trade dress inherently and uniquely distinctive and protectable under applicable Federal and State law.~~

## ~~Item 15~~

### ~~OBLIGATION TO PARTICIPATE IN THE~~
### ~~ACTUAL OPERATION OF THE FRANCHISE BUSINESS~~

~~We do not require that you participate personally in the direct operation of your Store or attend our initial training program.   You may operate your Store through one or more Owners or employees, who are acceptable to us, who you designate in writing in a form acceptable to us, to serve as your proxy to supervise the operation of your Store.   You must designate a general manager to serve as your proxy if neither you nor a 5% Owner if you are a business entity franchisee, will devote a minimum of 40 hours per week to the operation of your Store.   You or the designated general manager, if any, must meet our educational and experience standards and must attend and satisfactorily complete the initial training program and all future mandatory training programs.   Any replacement general manager we approve must attend and satisfactorily complete our initial training class.   You or your general manager must devote full time attention, which we estimate as a minimum of 40 hours per week, to managing, operating and developing your Store's business, except for reasonable vacation and sick time.   We do not dictate whom you may appoint as a general manager but we must approve the person you select to act as general manager.   Your general manager does not have to have an equity ownership in your Store.   The general manager must, however, sign a written agreement to maintain confidentiality of the trade secrets and assign developments to us described in Item 14, and to comply with the covenants not to compete described in Item 17. The agreement must be in a form satisfactory to us, including specific identification of us as a third party beneficiary, with the independent right to enforce the agreement.   We may require that you do personally participate in the operation of your Store for a minimum of 10 hours per week and attend regularly scheduled meetings and ongoing training meetings even if you do retain a manager.~~

Each individual who owns a 5% or greater interest in a business entity franchisee, and in certain circumstances their spouse, must sign the Confidentiality, Non-Competition and Assignment of Developments Agreement, including the non-competition covenants attached as Exhibit 7 to the Franchise Agreement.   They must also sign the Guaranty of Performance attached as Exhibit 6 to the Franchise Agreement guaranteeing payment by you to us under the Franchise Agreement, any promissory notes or other agreements, and your performance of your obligations under the Franchise Agreement.

## [THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]

## Item 16

### RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must offer and sell only that equipment and those products and services that we have approved. The offer and sale of counterfeit, unauthorized or illegal goods is strictly prohibited.

You must offer, on an exclusive basis, all inventory and services that we designate as being required for all franchisees. You may only use the Provider(s) we designate. You may also need to offer approved products and services of the Provider. These required services include the sale, installation and repair of wireless telephones and other wireless and wireline services and products, including telephones and SMR communications devices, wireless data, satellite and/or cable television and radio systems, as well asand personal communications devices, entertainment and security products and services. You must also market other communications technologies as they develop. See Item 8.

We retain the right to change the types of authorized equipment, products and services, without limitation.

You are restricted as to where you conduct your business. You are limited to the solicitation of customers within your Protected Territory, although you may sell and provide services to any customer who comes to your Store.

### [THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]

## Item 17

### RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION

### THE FRANCHISE RELATIONSHIP

**This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this Disclosure Document.**

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| a. Length of the franchise term | Section 5.01 | 7 years, unless terminated earlier. |
| b. Renewal or extension of the term | Section 5.02 | One additional term of seven7 years. |
| c. Requirements for franchisee to renew or extend | Section 5.02 | Include notice, no material default, no money owed, renovations, pay renewal fee, sign new franchise agreement, sign general release. If we and you are actively pursuing the procedures to renew but the term expires, the Franchise Agreement may continue for up to 180 days while the renewal is pending; you will pay a holdover fee of $200 per month in advance.<br><br>If you seek to renew your franchise at the expiration of the initial term, we may ask you to must sign a newour then-current franchise agreement that contains, which may contain terms and conditions materially different from those in your current franchise agreement, such as different fee requirements and territorial rights. |
| d. Termination by franchisee | None | Not Applicable |
| e. Termination by franchisor without cause | None | We can only terminate for "cause." |
| f. Termination by franchisor with cause | Sections 14.01, 14.02 | See g. and h. below. |
| g. "Cause" defined – curable defaults | Section 14.02 | Include failure to pay, file report, comply operationally, maintain minimum number of monthly activations, any default not listed as non-curable. |
| h. "Cause" defined – non-curable defaults | Sections 14.01, 14.06 | Include bankruptcy or insolvency, unapproved transfer, abandonment, conviction of felony or misdemeanor relating to Store or involving moral turpitude, impair or jeopardize System goodwill, violate confidentiality or non-disclosure covenant, underreport sales, fail to satisfactorily complete training, |

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| | | maintain false books, lose Store lease, repeated defaults, fraudulent acts, fail to agree on a location for your Store within 90 days, failure to open within 180 days, violation of anti-terrorism laws, we terminate franchise agreement for associated base Store if your Store is a ~~satellite location~~Satellite Location, or we terminate any other franchise agreement we have with you, Provider withdraws its approval for you to be our sub-agent for Providers products and services, or the existence of your entity terminates. |
| i.  Franchisee's obligations on termination/non-renewal | Section 15.01 | Include pay all fees, monies, rents; cease use of trademarks and proprietary information; establish reserve for charge-backs; return sign, kiosks and displays and any other items owned by us; transfer phone numbers; return customer files. |
| j.  Assignment of contract by franchisor | Section 12.01 | Freely assignable by us. |
| k.  "Transfer" by franchisee —defined | Section 12.02 | Sale, assignment, transfer, mortgage pledge of interest in the Franchise Agreement, the Store, Store assets, or if you are an entity, any ownership interest in the entity; transfer must include any ~~satellite location~~Satellite Location. |
| l.  Franchisor's approval of transfer by franchisee | Section 12.02 | No transfer without our prior written consent. |
| m. Conditions for franchisor approval of transfer | Sections 12.02, 12.03 | Pay all amounts you owe us; relinquish "demo lines"; establish a reserve for charge-backs; sign release; transferee be qualified; pay transfer fee plus attorneys' fees and any commission; transferee sign new franchise agreement; transferee must comply with requirements for new franchisees, including purchase of Initial Product Inventory from us, even if transferee purchases your inventory (see Item 5); and you or transferee must renovate and modernize the Store.   If you paid a reduced initial franchise fee because you owned franchises for 10 or more Stores (not including any ~~satellite locations~~Satellite Locations), and all of the franchises are owned by the same business entity, the Store must be in operation.   If you are an individual and you wish to transfer the Franchise Agreement and the |

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| | | Store assets to a business entity for convenience of ownership, the entity must be a single purpose entity, its 5% Owners and, under certain circumstances their spouses must guaranty the entity's obligations to us, and the entity and Owners must satisfy additional requirements stated in Section 12.03. |
| n.  Franchisor's right of first refusal to acquire franchisee's business | Section 12.02.A.1 | 30 days on same terms as bona fide offer. |
| o.  Franchisor's option to purchase franchisee's business | Section 15.01.I.2., 12.02.B. | Upon termination or expiration of the Franchise Agreement, we have the right to purchase equipment, fixtures and usable inventory at fair market value, as we determine.  Upon your death or permanent disability, we have an option to purchase your Store for 90 days at fair market value. |
| p.  Death or disability of franchisee | Section 12.02.B | We may assume operation of the Store. We have an option to purchase for 180 days at an agreed price or appraised value if no agreement.  Heirs or personal representative can transfer to a third party or to themselves, subject to transfer procedures if we don't purchase; a transfer must occur within 12 months. |
| q.  Non-Competition covenants during the term of the franchise | Section 16.01 | No ownership interest or involvement in any business offering wireless or wireline communications products and services and/or entertainment and security products and services which are offered as, or are materially similar to, any part of the System; no interference with our employees or another franchisee's employees. |
| | ~~Section 16.03~~ | ~~No discussions or negotiations, nor agency or sub-agency agreement, with any Provider.~~ |
| | Section 16.03 | No discussions or negotiations, nor agency or sub-agency agreement, with any Provider. |
| r.  Non-Competition covenants after the franchise is terminated or expires | Section 16.01 | No ownership interest or involvement for ~~two~~2 years in any business offering wireless or wireline communications products and services and/or entertainment and security products and services which are offered as, or are materially similar to, any part of the System, within ~~25~~10 miles |

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| | | of any Store; no interference with our employees or another franchisee's employees. |
| | ~~Section 16.03~~ | ~~No discussions or negotiations, nor agency or sub-agency agreement, with any Provider for one year.~~ |
| | Section 16.03 | No discussions or negotiations, nor agency or sub-agency agreement, with any Provider for 1 year. |
| s.  Modification of the agreements | Section 17.03 | Only by written agreement of both parties generally, except that we may change the Operations Manual and system standards and specifications. |
| t.  Integration/merger clause | Section 17.02 | Only the terms of the Franchise Agreement, including all schedules, exhibits and ancillary agreements, are binding (subject to state law, see Exhibit L).  Any statements or promises not in the Franchise Agreement or in this Disclosure Document should not be relied upon and may not be enforceable. |
| u.  Dispute resolution by arbitration or mediation | ~~Section 17.06~~None | ~~You agree to mediate any claim in good faith before bringing an action.~~Not Applicable |
| v.  Choice of forum | Section ~~17.06~~17.07 | State or federal court in Connecticut (subject to state law, see Exhibit L); except that we may obtain injunctive relief in any appropriate forum against actual or threatened conduct that will cause us loss or damages, under the usual equity rules. |
| w.  Choice of law | Section ~~17.06~~17.07 | Connecticut law (subject to state law, see Exhibit L). |

A provision in the Franchise Agreement which terminates the Franchise Agreement upon your bankruptcy may not be enforceable under Title 11, United States Code Section 101 *et seq.*

~~California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin may require franchisors to make additional disclosures related to the information contained in this disclosure document and to amend the franchise agreement to address inconsistencies between the franchise agreement and state law in some areas.   If applicable, these additional disclosures and amendments will be furnished to you in a state-specific addendum to this disclosure document. See **Exhibit L** to this disclosure document.~~

## Item 18

### PUBLIC FIGURES

ATI does not presently use any public figure to promote the Wireless Zone franchise.

## Item 19

### FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the Disclosure Document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

Below are tables containing financial performance representations based on Providers' postpay activations and upgrades data (unaudited) of all franchised Stores for the calendar year 2012,2013, as provided to us by Providers. Providers report postpay activations and upgrades data to us using a consistent reporting system applicable to all of the Stores. We have not audited these figures. The average number of postpay activation and upgrade transactions in the tables are net of any deactivations. We offered substantially the same services to all of the Stores whose data is reported in the tables below. The Stores offer substantially the same products and services to consumers.

<div align="center">

**Wireless Zone® Franchised Stores**
**January 1, ~~2012~~2013 – December 31, ~~2012~~2013**
**(unaudited)**

</div>

## _All Franchised Stores Open At Any Time During ~~2012~~2013 (~~444~~409 stores)_

|  |  | Number of Stores that Attained or Surpassed the Average |
|---|---|---|
| **Average Gross Commission per Postpay Activation** | **$4~~19~~18** | (~~201~~219 of ~~444~~409 Stores or 4~~5~~54%) |
| Average Number of Postpay Activations Per Store Per Month | 3~~6~~39 | (~~165~~163 of ~~444~~409 Stores or 3~~7~~40%) |
| **Average Gross Commission per Upgrade** | **$4~~37~~83** | (~~200~~187 of ~~444~~409 Stores or 4~~5~~46%) |
| Average Number of Upgrades Per Store Per Month | 9~~8~~100 | (~~166~~150 of ~~444~~409 Stores or 37%) |
| **Average Gross Commission Per Transaction** (Postpay Activations & Upgrades Combined) | **$4~~32~~465** | (~~204~~210 of ~~444~~409 Stores or 4~~6~~51%) |
| **Average Number of Transactions Per Store Per Month** (Postpay Activations & Upgrades Combined) | ~~134~~139 | (~~160~~153 of ~~444~~409 Stores or 3~~6~~37%) |
| **Average Gross Monthly One-Time Residual Per Store** | **$5~~31~~575** | (~~160~~152 of ~~444~~409 Stores or 3~~6~~37%) |

## ~~_Franchised Stores Open 12 Full Months in 2012 (370 stores)_~~

~~Number of Stores that Attained or Surpassed the Average~~

| | | | | |
|---|---|---|---|---|
| **Average Gross Commission per Postpay Activation** | | **$418** | | (176 of 370 Stores or 48%) |
| Average Number of Postpay Activations Per Store Per Month | | 37 | | (142 of 370 Stores or 38%) |
| **Average Gross Commission per Upgrade** | | **$437** | | (175 of 370 Stores or 47%) |
| Average Number of Upgrades Per Store Per Month | | | 102 | (145 of 370 Stores or 39%) |
| **Average Gross Commission Per Transaction** | (Postpay Activations & Upgrades Combined) | **$432** | | (179 of 370 Stores or 48%) |
| **Average Number of Transactions Per Store Per Month** | (Postpay Activations & Upgrades Combined) | 139 | | (144 of 370 Stores or 39%) |
| **Average Gross Monthly One-Time Residual Per Store** | | **$545** | | (135 of 370 Stores or 36%) |

## _Franchised Stores Open 12 Full Months in 2013_ (358 stores)

|  |  | Number of Stores that Attained or Surpassed the Average |
|---|---|---|
| **Average Gross Commission per Postpay Activation** | **$417** | (188 of 358 Stores or 53%) |
| Average Number of Postpay Activations Per Store Per Month | 40 | (141 of 358 Stores or 39%) |
| **Average Gross Commission per Upgrade** | **$483** | (161 of 358 Stores or 45%) |
| Average Number of Upgrades Per Store Per Month | 104 | (137 of 358 Stores or 38%) |
| **Average Gross Commission Per Transaction** (Postpay Activations & Upgrades Combined) | **$465** | (182 of 358 Stores or 51%) |
| **Average Number of Transactions Per Store Per Month** (Postpay Activations & Upgrades Combined) | **143** | (136 of 358 Stores or 38%) |
| **Average Gross Monthly One-Time Residual Per Store** | **$589** | (140 of 358 Stores or 39%) |

## _Top 10% of Franchised Stores Open 12 Full Months in ~~2012~~2013_ (37~~3~~6 stores)

|  |  | Number of Stores that Attained or Surpassed the Average |
|---|---|---|
| **Average Gross Commission per Postpay Activation** | **$4~~11~~396** | (~~15~~13 of 3~~7~~36 Stores or 4~~1~~36%) (15 of 3~~7~~36 Stores or 4~~1~~42%) |
| Average Number of Postpay Activations Per Store Per Month | 8~~1~~79 |  |
| **Average Gross Commission per Upgrade** | **$4~~38~~485** | (~~17~~15 of 3~~7~~36 Stores or 4~~6~~42%) (~~13~~14 of 3~~7~~36 Stores or 3~~5~~39%) |
| Average Number of Upgrades Per Store Per Month | 2~~40~~237 |  |
| **Average Gross Commission Per Transaction** (Postpay Activations | **$4~~31~~463** | (2~~1~~18 of 3~~7~~36 Stores or 5~~7~~50%) |

|  |  |  |
|---|---|---|
| & Upgrades<br>Combined) |  |  |
| **Average Number of Transactions Per Store Per Month**<br>(Postpay Activations<br>& Upgrades<br>Combined) | ~~321~~318 | (13 of ~~37~~36<br>Stores or<br>~~35~~36%) |
| **Average Gross Monthly One-Time Residual Per Store** | $~~1,223~~1,178 | (~~17~~15 of ~~37~~36<br>Stores or<br>~~46~~42%) |

### ~~Bottom 10% of Franchised Stores Open 12 Full Months in 2012~~ (37 stores)

|  |  | ~~Number of Stores that Attained or Surpassed the Average~~ |
|---|---|---|
| ~~Average Gross Commission per Postpay Activation~~ | ~~$429~~ | ~~(19 of 37 Stores or 51%)~~ |
| ~~Average Number of Postpay Activations Per Store Per Month~~ | ~~15~~ | ~~(14 of 37 Stores or 38%)~~ |
| ~~Average Gross Commission per Upgrade~~ | ~~$416~~ | ~~(17 of 37 Stores or 46%)~~ |
| ~~Average Number of Upgrades Per Store Per Month~~ | ~~31~~ | ~~(19 of 37 Stores or 51%)~~ |
| ~~Average Gross Commission Per Transaction~~ | ~~$420~~<br>~~(Postpay Activations & Upgrades Combined)~~ | ~~(17 of 37 Stores or 46%)~~ |
| ~~Average Number of Transactions~~ | ~~46~~ | ~~(20 of 37 Stores or~~ |

| | | |
|---|---|---|
| Per Store Per Month | | 54%) |
| | (Postpay Activations & Upgrades Combined) | |
| Average Gross Monthly One-Time Residual Per Store | $224 | (18 of 37 Stores or 49%) |

## New

## Bottom 10% of Franchised Stores ~~Opened~~Open 12 Full Months in ~~2012~~2013
(~~23~~36 stores)

Number of Stores that Attained or Surpassed the Average

| | | |
|---|---|---|
| **Average Gross Commission per Postpay Activation** | $~~436~~447 | (~~9~~14 of ~~23~~36 Stores or 39%) |
| Average Number of Postpay Activations Per Store Per Month | ~~46~~15 | (~~7~~13 of ~~23~~36 Stores or ~~30~~36%) |
| **Average Gross Commission per Upgrade** | $~~458~~479 | (~~12~~18 of ~~23~~36 Stores or ~~52~~50%) |
| Average Number of Upgrades Per Store Per Month | ~~10~~236 | (~~8~~19 of ~~23~~36 Stores or ~~35~~53%) |
| **Average Gross Commission Per Transaction** (Postpay Activations & Upgrades Combined) | $~~451~~470 | (~~11~~19 of ~~23~~36 Stores or ~~48~~53%) |
| **Average Number of Transactions Per Store Per Month** (Postpay Activations & Upgrades Combined) | ~~148~~51 | (~~8~~18 of ~~23~~36 Stores or ~~35~~50%) |
| **Average Gross Monthly One-Time Residual Per Store** | $~~734~~212 | (~~8~~16 of ~~23~~36 Stores or ~~35~~44%) |

## New Franchised Stores Opened in 2013 (14 stores)

Number of Stores that Attained or Surpassed the Average

| | | |
|---|---|---|
| **Average Gross Commission per Postpay Activation** | **$427** | (7 of 14 Stores or 50%) |
| Average Number of Postpay Activations Per Store Per Month | 50 | (7 of 14 Stores or 50%) |
| **Average Gross Commission per Upgrade** | **$489** | (9 of 14 Stores or 64%) |
| Average Number of Upgrades Per Store Per Month | 85 | (6 of 14 Stores or 43%) |
| **Average Gross Commission Per Transaction** (Postpay Activations & Upgrades Combined) | **$466** | (6 of 14 Stores or 43%) |
| | 136 | (6 of 14 Stores or 43%) |

---

**Average Number of Transactions Per Store Per Month**

(Postpay Activations & Upgrades Combined)

**Average Gross Monthly One-Time Residual Per Store**   **$852**   (6 of 14 Stores or 43%)

---

The first table above reports data for all ~~444~~409 Stores that were open at any time as a franchised Store for a full month during ~~2012.~~2013.  There were ~~423~~397 franchised Stores open on January 1, ~~2012~~2013 and during the year, ~~23~~15 franchised Stores opened—~~and two company-owned outlets were purchased by franchisees and became franchised Stores~~, totaling ~~448~~412 franchised Stores that were technically open at any time during ~~2012.  Four~~2013.  One store was not open for a full month during 2012; 2 franchised Stores did not do any business in ~~2012~~2013 and were treated as closed on January 1, ~~2012~~2013 for purposes of the table.

The second table reports data for all ~~370~~358 Stores that were open as franchised Stores during the entire calendar year ~~2012.~~2013.  A total of ~~373~~370 franchised Stores open as of January 1, ~~2012~~2013 remained continuously open during the entire calendar year ~~2012.~~2013, of which ~~three~~12 were continuously open but were converted from franchised Stores to company-owned Stores during the year.  These ~~three~~12 company-owned Stores are~~excluded from the second table.  Additionally, two Stores which were company-owned Stores as of January 1, 2012 were continuously opened but were converted from company-owned Stores to franchised Stores during the year and are also~~ excluded from the second table.  The third table reports data for the top 10% of the ~~370~~358 franchised Stores that were open during the entire calendar year ~~2012,~~2013, and the fourth table reports data for the bottom 10% of these ~~370~~358 franchised Stores.  The rankings of the top 10% and bottom 10% of these ~~370~~358 franchised Stores were based on the total number of transactions per Store per month, postpay activations and upgrades combined.

Finally, the last table above reports data for all franchised Stores that opened during ~~2012~~2013 and had at least ~~one~~1 full month of data.  A total of ~~25~~15 franchised Stores opened in ~~2012, two of which were company-owned outlets that were purchased by franchisees and became franchised Stores.  We excluded the two converted company-owned outlets because they did not first open for business in 2012. The data in the five~~2013, 1 which opened in December 2013.  Because we omitted data for the month in which each of these 15 franchised Stores opened, since using only a partial month's data would understate the number of transactions occurring per month, there is no data to report for the 1 franchised Store that opened in December 2013. The data in the 5 tables above is unaudited.

\* \* \* \* \* \* \*

Other than the preceding financial performance representation, Automotive Technologies, Inc. does not make any financial performance representations.  We also do not authorize our employees or representatives to make any such representations either orally or in writing.  If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet.  If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Susan E. Suhr, 34 Industrial Park Place, Middletown, Connecticut 06457, telephone number 860/632-9494 extension 1800, the Federal Trade Commission, and the appropriate state regulatory agencies.

The financial performance representation figures do not reflect the costs of sales, operating expenses, royalties or other costs or expenses that must be deducted from the gross revenue or gross sales figures to obtain your net income or profit. You should conduct an independent investigation of the costs and expenses you will incur in operating your Wireless Zone® Store. Franchisees or former franchisees, listed in this ~~disclosure document~~Disclosure Document, may be one source of this information.

The data reported in the above tables are averages and could vary greatly by geographic region, the length of time the Store has been in business, the length of time Provider has been operating in the area, your particular Provider, the terms of our contract with Provider, the service plan selected by the Store customer and customer usage. Results also vary from Store to Store.

Actual results may vary from franchise to franchise, and we cannot estimate the results of any particular franchise.

Some Stores have realized the number of transactions, commission levels and residuals listed in the charts. Your individual results may differ. There is no assurance that you will realize as many transactions or commission levels or residuals.

Written substantiation for the financial performance representation will be made available to the prospective franchisee upon reasonable request.

**[THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]**

## Item 20

## OUTLETS AND FRANCHISEE INFORMATION

### Table No. 1

### Systemwide Outlet Summary

**For years ~~2010~~2011 to ~~2012And updated for partial year~~ 2013~~*~~**

**WIRELESS ZONE® OUTLETS**

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised | 2011 | 408 | 423 | +15 |
| | 2012 | 423 | 397 | -26 |
| | 2013 | 397 | 375 | -22 |
| Company Owned | 2011 | 14 | 22 | +8 |
| | 2012 | 22 | 20 | -2 |
| | 2013 | 20 | 29 | +9 |
| Total Outlets | 2011 | 422 | 445 | +23 |
| | 2012 | 445 | 417 | -28 |
| | 2013 | 417 | 404 | -13 |

| ~~Outlet Type~~ | ~~Year~~ | ~~Outlets at the Start of the Year~~ | ~~Outlets at the End of the Year~~ | ~~Net Change~~ |
|---|---|---|---|---|
| ~~Franchised~~ | ~~2010~~ | ~~370~~ | ~~408~~ | ~~+38~~ |
| | ~~2011~~ | ~~408~~ | ~~423~~ | ~~+15~~ |
| | ~~2012~~ | ~~423~~ | ~~397~~ | ~~-26~~ |
| | ~~2013*~~ | ~~397~~ | ~~385~~ | ~~-12~~ |
| ~~Company Owned~~ | ~~2010~~ | ~~2~~ | ~~14~~ | ~~+12~~ |
| | ~~2011~~ | ~~14~~ | ~~22~~ | ~~+8~~ |
| | ~~2012~~ | ~~22~~ | ~~20~~ | ~~-2~~ |

|  | 2013* | 20 | 28 | +8 |
|---|---|---|---|---|
| Total Outlets | 2010 | 372 | 422 | +50 |
|  | 2011 | 422 | 445 | +23 |
|  | 2012 | 445 | 417 | −28 |
|  | 2013* | 417 | 413 | −4 |

*Partial year 2013 January 1, 2013 to May 31, 2013

78

Table No. 1

## Systemwide Outlet Summary

### For years ~~2010~~2011 to ~~2012And updated for partial year~~ 2013±

## DIAMOND WIRELESS OUTLETS**

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised | 2011 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 |
| | 2013 | 0 | 0 | 0 |
| Company Owned | 2011 | 147 | 191 | +44 |
| | 2012 | 191 | 213 | +22 |
| | 2013 | 213 | 351 | +138 |
| Total Outlets | 2011 | 147 | 191 | +44 |
| | 2012 | 191 | 213 | +22 |
| | 2013 | 213 | 351 | +138 |

| ~~Outlet Type~~ | ~~Year~~ | ~~Outlets at the Start of the Year~~ | ~~Outlets at the End of the Year~~ | ~~Net Change~~ |
|---|---|---|---|---|
| ~~Franchised~~ | ~~2010~~ | ~~0~~ | ~~0~~ | ~~0~~ |
| | ~~2011~~ | ~~0~~ | ~~0~~ | ~~0~~ |
| | ~~2012~~ | ~~0~~ | ~~0~~ | ~~0~~ |
| | ~~2013*~~ | ~~0~~ | ~~0~~ | ~~0~~ |
| ~~Company Owned~~ | ~~2010~~ | ~~98~~ | ~~147~~ | ~~+49~~ |
| | ~~2011~~ | ~~147~~ | ~~191~~ | ~~+44~~ |
| | ~~2012~~ | ~~191~~ | ~~213~~ | ~~+22~~ |
| | ~~2013*~~ | ~~213~~ | ~~203~~ | ~~-10~~ |
| ~~Total Outlets~~ | ~~2010~~ | ~~98~~ | ~~147~~ | ~~+49~~ |
| | ~~2011~~ | ~~147~~ | ~~191~~ | ~~+44~~ |

| | 2012 | 191 | 213 | +22 |
| | 2013* | 213 | 203 | -10 |

*Partial year 2013— January 1, 2013 to May 31, 2013

**Our immediate parent GLENTEL (USA), Inc. owns and operates company-owned outlets operating under the service mark "Diamond Wireless," offering goods and services of a type substantially similar to the goods and services to be offered by you as our franchisee under our trademark Wireless Zone®. Information about our immediate parent GLENTEL (USA), Inc.'s company-owned "Diamond Wireless" outlets is included in this separate Table 1 and in separate Tables 4 and 5 of this Item 20. Our immediate parent GLENTEL (USA), Inc. does not offer franchises for these businesses.

Table No. 2

### Transfers of Outlets from Franchisees to New Owners (other than the Franchisor)
### For years ~~2010~~2011 to ~~2012And updated for partial year~~ 2013*

## WIRELESS ZONE® OUTLETS

| State | Year | Number of Transfers (1) |
|---|---|---|
| Connecticut | ~~2010~~2011 | 4~~3~~ |
| | ~~2011~~ | ~~3~~ |
| | 2012 | 0 |
| | 2013* | 0 |
| Delaware | ~~2010~~2011 | 2~~1~~ |
| | 2012 | 0 |
| | 2013 | 0 |
| | ~~2011~~ | ~~1~~ |
| | ~~2012~~ | ~~0~~ |
| | ~~2013*~~ | ~~0~~ |
| District of Columbia | ~~2010~~2011 | 0~~1~~ |
| | ~~2011~~ | ~~1~~ |
| | ~~2012~~ | ~~0~~ |
| | ~~2013*~~ | ~~0~~ |
| | 2012 | 0 |
| | 2013 | 0 |
| Florida | ~~2010~~2011 | ~~1~~4 |
| | ~~2011~~ | ~~4~~ |
| | 2012 | 2 |
| | 2013* | 0 |
| Illinois | ~~2010~~2011 | 0~~2~~ |
| | 2012 | 1 |
| | 2013 | 0 |

| State | Year | Number of Transfers (1) |
|---|---|---|
| Kentucky | 2011 | 0 |
| | 2012 | 0 |
| | 2013 | 1 |
| Louisiana | 2011 | 0 |
| | 2012 | 0 |
| | 2013 | 0 |
| Maine | 2011 | 1 |
| | 2012 | 2 |
| | 2013 | 0 |
| Maryland | 2011 | 2 |
| | 2012 | 0 |
| | 2013 | 0 |
| Massachusetts | 2011 | 4 |
| | 2012 | 4 |
| | 2013 | 2 |
| Michigan | 2011 | 0 |
| | 2012 | 1 |
| | 2013 | 0 |
| Minnesota | 2011 | 1 |
| | 2012 | 0 |
| | 2013 | 0 |
| New Hampshire | 2011 | 3 |
| | 2012 | 1 |
| | 2013 | 3 |
| New Jersey | 2011 | 0 |
| | 2012 | 1 |
| | 2013 | 0 |
| New York | 2011 | 2 |

| State | Year | Number of Transfers (1) |
|---|---|---|
| | 2012 | ~~1~~2 |
| | 2013 | 0 |
| Ohio | 2011 | 0 |
| | 2012 | 4 |
| | 2013 | 4 |
| Pennsylvania | 2011 | 6 |
| | 2012 | 0 |
| | 2013 | 0 |
| Rhode Island | 2011 | 0 |
| | 2012 | 0 |
| | 2013 | 4 |
| Texas | 2011 | 1 |
| | 2012 | 0 |
| | 2013 | 0 |
| Vermont | 2011 | 0 |
| | 2012 | 1 |
| | 2013 | 0 |
| Virginia | 2011 | 0 |
| | 2012 | 3 |
| | 2013 | 1 |
| Total | 2011 | 31 |
| | 2012 | 22 |
| | 2013* | ~~0~~15 |

Note 1:   Either in whole or in part by existing franchisees or by us for the account of a terminated, abandoning or deceased franchisee.

~~*Partial year 2013—January 1, 2013 to May 31, 2013~~

Table No. 2. WIRELESS ZONE® OUTLETS, Continued

| State | Year | Number of Transfers (1) |
|---|---|---|
| Louisiana | 2010 | 1 |
| | 2011 | 0 |
| | 2012 | 0 |
| | 2013* | 0 |
| Maine | 2010 | 2 |
| | 2011 | 1 |
| | 2012 | 2 |
| | 2013* | 0 |
| Maryland | 2010 | 0 |
| | 2011 | 2 |
| | 2012 | 0 |
| | 2013* | 0 |
| Massachusetts | 2010 | 2 |
| | 2011 | 4 |
| | 2012 | 4 |
| | 2013* | 1 |
| Michigan | 2010 | 4 |
| | 2011 | 0 |
| | 2012 | 1 |
| | 2013* | 0 |
| Minnesota | 2010 | 0 |
| | 2011 | 1 |
| | 2012 | 0 |
| | 2013* | 0 |

Note 1.   Either in whole or in part by existing franchisees or by us for the account of a terminated, abandoning or deceased franchisee.

*Partial year 2013 - January 1, 2013 to May 31, 2013

Table No. 2, **WIRELESS ZONE**® **OUTLETS,** Continued

| State | Year | Number of Transfers (1) |
|-------|------|-------------------------|
| New Hampshire | 2010 | 0 |
| | 2011 | 3 |
| | 2012 | 1 |
| | 2013* | 3 |
| New Jersey | 2010 | 0 |
| | 2011 | 0 |
| | 2012 | 1 |
| | 2013* | 0 |
| New York | 2010 | 1 |
| | 2011 | 2 |
| | 2012 | 2 |
| | 2013* | 0 |
| Ohio | 2010 | 0 |
| | 2011 | 0 |
| | 2012 | 4 |
| | 2013* | 0 |

Note 1:   Either in whole or in part by existing franchisees or by us for the account of a terminated, abandoning or deceased franchisee.

*Partial year 2013 - January 1, 2013 to May 31, 2013

Table No. 2, **WIRELESS ZONE**® **OUTLETS,** Continued

| State | Year | Number of Transfers (1) |
|-------|------|-------------------------|
| Pennsylvania | 2010 | 0 |
| | 2011 | 6 |
| | 2012 | 0 |
| | 2013* | 0 |
| Rhode Island | 2010 | 1 |

|  | 2011 | 0 |
|---|---|---|
|  | 2012 | 0 |
|  | 2013* | 4 |
| Texas | 2010 | 0 |
|  | 2011 | 1 |
|  | 2012 | 0 |
|  | 2013* | 0 |
| Vermont | 2010 | 0 |
|  | 2011 | 0 |
|  | 2012 | 1 |
|  | 2013* | 0 |
| Virginia | 2010 | 3 |
|  | 2011 | 0 |
|  | 2012 | 3 |
|  | 2013* | 1 |
| Total | 2010 | 21 |
|  | 2011 | 31 |
|  | 2012 | 22 |
|  | 2013* | 9 |

Note 1    Either in whole or in part by existing franchisees or by us for the account of a terminated, abandoning or deceased franchisee.

*Partial year 2013—January 1, 2013 to May 31, 2013

## Table No. 3

### Status of Franchised Outlets
### For years 2010 2011 to 2012 And updated for partial year 2013*

## WIRELESS ZONE® OUTLETS

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| AL | 2010 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| | 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013* | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CT | 2010 | 39 | 6 | 3 | 0 | 0 | 0 | 42 |
| | 2011 | 42 | 4 | 2 | 0 | 0 | 0 | 44 |
| | 2012 | 44 | 1 | 2 | 1 | 1 | 0 | 41 |
| | 2013* | 41 | 0 | 2 | 0 | 1 | 0 | 38 |
| DE | 2010 | 7 | 0 | 0 | 0 | 0 | 0 | 7 |
| | 2011 | 7 | 0 | 1 | 0 | 0 | 0 | 6 |
| | 2012 | 6 | 0 | 1 | 0 | 0 | 0 | 5 |
| | 2013* | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| DC | 2010 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2011 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2012 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2013* | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| FL | 2010 | 32 | 5 | 2 | 0 | 4 | 0 | 31 |
| | 2011 | 31 | 6[1] | 9[1] | 0 | 0 | 0 | 28[1] |
| | 2012 | 28 | 1[1] | 11 | 0 | 0 | 0 | 18 |
| | 2013* | 18 | 0 | 0 | 0 | 1 | 0 | 17 |
| GA | 2010 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| | 2011 | 4 | 1 | 0 | 0 | 1 | 0 | 4 |
| | 2012 | 4 | 0 | 1 | 0 | 0 | 0 | 3 |
| | 2013* | 3 | 0 | 0 | 0 | 0 | 0 | 3 |

*Partial year 2013   January 1, 2013 to May 31, 2013

Table No. 3, WIRELESS ZONE* OUTLETS, Continued

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations-Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| IA | 2010 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2011 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2012 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2013* | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| IL | 2010 | 1 | 4 | 0 | 0 | 0 | 0 | 5 |
| | 2011 | 5 | 3 | 1 | 0 | 0 | 0 | 7 |
| | 2012 | 7 | 0 | 1 | 0 | 0 | 0 | 6 |
| | 2013* | 6 | 1 | 0 | 0 | 4 | 0 | 3 |
| IN | 2010 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2011 | 2 | 5 | 0 | 0 | 0 | 0 | 7 |
| | 2012 | 7 | 1 | 1 | 0 | 0 | 0 | 7 |
| | 2013* | 7 | 0 | 0 | 0 | 0 | 0 | 7 |
| KS | 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2011 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2012 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2013* | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| KY | 2010 | 4 | 1 | 0 | 0 | 0 | 0 | 5 |
| | 2011 | 5 | 1 | 0 | 0 | 0 | 0 | 6 |
| | 2012 | 6 | 0 | 1 | 0 | 1 | 0 | 4 |
| | 2013* | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| LA | 2010 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2011 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2012 | 2 | 0. | 1 | 0 | 0 | 0 | 1 |
| | 2013* | 1 | 0 | 0 | 0 | 1 | 0 | 0 |

*Partial year 2013 – January 1, 2013 to May 31, 2013

Table No. 3. **WIRELESS ZONE® OUTLETS**, Continued

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| MA | 2010 | 39 | 3 | 1 | 0 | 2[1] | 0 | 39 |
| | 2011 | 39 | 0 | 4 | 1 | 0 | 0 | 34 |
| | 2012 | 34 | 1[1] | 0 | 0 | 0 | 0 | 35 |
| | 2013* | 35 | 0 | 1 | 0 | 0 | 0 | 34 |
| MD | 2010 | 12 | 1 | 0 | 0 | 0 | 0 | 13 |
| | 2011 | 13 | 0 | 2 | 0 | 0 | 0 | 11 |
| | 2012 | 11 | 3 | 5[2] | 0 | 0 | 0 | 9[3] |
| | 2013* | 9 | 1 | 1 | 0 | 0 | 0 | 9 |
| ME | 2010 | 11 | 1 | 0 | 0 | 0 | 0 | 12 |
| | 2011 | 12 | 1 | 1 | 0 | 0 | 0 | 12 |
| | 2012 | 12 | 0 | 2 | 0 | 0 | 0 | 10 |
| | 2013* | 10 | 0 | 0 | 0 | 1 | 0 | 9 |
| MI | 2010 | 17 | 7 | 0 | 0 | 0 | 0 | 24 |
| | 2011 | 24 | 10 | 0 | 0 | 0 | 0 | 34 |
| | 2012 | 34 | 2 | 0 | 0 | 0 | 0 | 36 |
| | 2013* | 36 | 1 | 2 | 0 | 0 | 0 | 35 |
| MN | 2010 | 9 | 4 | 0 | 0 | 0 | 0 | 13 |
| | 2011 | 13 | 4 | 0 | 0 | 0 | 0 | 17 |
| | 2012 | 17 | 2 | 0 | 0 | 0 | 0 | 19 |
| | 2013* | 19 | 1 | 0 | 0 | 0 | 0 | 20 |
| MO | 2010 | 4 | 2 | 0 | 0 | 0 | 0 | 6 |
| | 2011 | 6 | 0 | 1 | 0 | 0 | 0 | 5 |
| | 2012 | 5 | 0 | 1 | 0 | 0 | 0 | 4 |
| | 2013* | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| NE | 2010 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2011 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2012 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| | 2013* | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

*Partial year 2013 – January 1, 2013 to May 31, 2013

Table No. 3, **WIRELESS ZONE® OUTLETS**, Continued

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non Renewals | Reacquired by Franchisor | Ceased Operations-Other Reasons | Outlets at End of the Year |
|-------|------|-----|-----|-----|-----|-----|-----|-----|
| NH | 2010 | 20 | 2 | 1 | 0 | 0 | 0 | 21 |
|    | 2011 | 21 | 0 | 0 | 0 | 0 | 0 | 21 |
|    | 2012 | 21 | 0 | 0 | 0 | 0 | 0 | 21 |
|    | 2013* | 21 | 0 | 0 | 0 | 0 | 0 | 21 |
| NJ | 2010 | 31 | 4 | 5 | 1 | 0 | 0 | 29 |
|    | 2011 | 29 | 3 | 4 | 0 | 0 | 0 | 28 |
|    | 2012 | 28 | 0 | 4 | 0 | 0 | 0 | 24 |
|    | 2013* | 24 | 1 | 1 | 0 | 0 | 0 | 24 |
| NY | 2010 | 43 | 5 | 0 | 0 | 0 | 0 | 48 |
|    | 2011 | 48 | 3 | 3 | 0 | 0 | 0 | 48 |
|    | 2012 | 48 | 0 | 4 | 1 | 0 | 0 | 43 |
|    | 2013* | 43 | 0 | 0 | 0 | 0 | 0 | 43 |
| OH | 2010 | 7 | 3 | 0 | 0 | 0 | 0 | 10 |
|    | 2011 | 10 | 4 | 1 | 0 | 0 | 0 | 13 |
|    | 2012 | 13 | 1 | 1 | 0 | 0 | 0 | 13 |
|    | 2013* | 13 | 0 | 2 | 0 | 0 | 0 | 11 |
| OK | 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2012 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
|    | 2013* | 2 | 0 | 0 | 0 | 1 | 0 | 1 |
| PA | 2010 | 34 | 10 | 1 | 0 | 0 | 0 | 43 |
|    | 2011 | 43 | 4 | 3 | 0 | 0 | 0 | 44 |
|    | 2012 | 44 | 5 | 4 | 0 | 0 | 0 | 45 |
|    | 2013* | 45 | 0 | 0 | 0 | 0 | 0 | 45 |
| RI | 2010 | 10 | 3 | 0 | 0 | 0 | 0 | 13 |
|    | 2011 | 13 | 0 | 1 | 1 | 0 | 0 | 11 |
|    | 2012 | 11 | 0 | 0 | 0 | 0 | 0 | 11 |
|    | 2013* | 11 | 0 | 0 | 0 | 0 | 0 | 11 |

91

Table No. 3. WIRELESS ZONE® OUTLETS, Continued

*Partial year 2013 - January 1, 2013 to May 31, 2013

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations-Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| TX | 2010 | 6 | 0 | 1 | 0 | 0 | 0 | 5 |
| | 2011 | 5 | 0 | 1 | 0 | 0 | 0 | 4 |
| | 2012 | 4 | 0 | 1 | 0 | 1 | 0 | 2 |
| | 2013* | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| AT | 2010 | 9 | 0 | 1 | 0 | 3 | 0 | 5 |
| | 2011 | 5 | 0 | 1 | 0 | 1 | 0 | 3 |
| | 2012 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2013* | 3 | 0 | 0 | 0 | 0 | 0 | 4 |
| VA | 2010 | 21 | 5 | 4 | 0 | 0 | 0 | 22 |
| | 2011 | 22 | 4 | 0 | 0 | 0 | 0 | 26 |
| | 2012 | 26 | 5 | 3 | 0 | 0 | 0 | 28 |
| | 2013* | 28 | 1 | 3 | 0 | 0 | 0 | 26 |
| VI | 2010 | 4 | 0 | 1 | 0 | 0 | 0 | 3 |
| | 2011 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2012 | 3 | 1 | 1 | 0 | 0 | 0 | 3 |
| | 2013* | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| WV | 2010 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| | 2011 | 1 | 1 | 1 | 0 | 0 | 0 | 4 |
| | 2012 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |
| | 2013* | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| Totals | 2010 | 370 | 69 | 21 | 1 | 6 | 0 | 408 |
| | 2011 | 408 | 55 | 36 | 2 | 3 | 0 | 423 |
| | 2012 | 423 | 25 | 46 | 2 | 3 | 0 | 397 |
| | 2013* | 397 | 9 | 12 | 0 | 9 | 0 | 385 |

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations-Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| AL | 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2012 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CT | 2011 | 42 | 4 | 2 | 0 | 0 | 0 | 44 |
|    | 2012 | 44 | 1 | 2 | 1 | 1 | 0 | 41 |
|    | 2013 | 41 | 1 | 2 | 1 | 3 | 0 | 36 |
| DE | 2011 | 7 | 0 | 1 | 0 | 0 | 0 | 6 |
|    | 2012 | 6 | 0 | 1 | 0 | 0 | 0 | 5 |
|    | 2013 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| DC | 2011 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2012 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2013 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| FL | 2011 | 31 | 6[1] | 9[1] | 0 | 0 | 0 | 28[1] |
|    | 2012 | 28 | 1[1] | 11 | 0 | 0 | 0 | 18 |
|    | 2013 | 18 | 0 | 1 | 0 | 1 | 0 | 16 |
| GA | 2011 | 4 | 1 | 0 | 0 | 1 | 0 | 4 |
|    | 2012 | 4 | 0 | 1 | 0 | 0 | 0 | 3 |
|    | 2013 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| IA | 2011 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2012 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2013 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| IL | 2011 | 5 | 3 | 1 | 0 | 0 | 0 | 7 |
|    | 2012 | 7 | 0 | 1 | 0 | 0 | 0 | 6 |
|    | 2013 | 6 | 2 | 0 | 0 | 5 | 0 | 3 |
| IN | 2011 | 2 | 5 | 0 | 0 | 0 | 0 | 7 |
|    | 2012 | 7 | 1 | 1 | 0 | 0 | 0 | 7 |
|    | 2013 | 7 | 0 | 0 | 0 | 0 | 0 | 7 |
| KS | 2011 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
|    | 2012 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2013 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| KY | 2011 | 5 | 1 | 0 | 0 | 0 | 0 | 6 |

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations-Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| | 2012 | 6 | 0 | 1 | 0 | 1 | 0 | 4 |
| | 2013 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| LA | 2011 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2012 | 2 | 0 | 1 | 0 | 0 | 0 | 1 |
| | 2013 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| MA | 2011 | 39 | 0 | 4 | 1 | 0 | 0 | 34 |
| | 2012 | 34 | $1^1$ | 0 | 0 | 0 | 0 | 35 |
| | 2013 | 35 | 0 | 2 | 0 | 0 | 0 | 33 |
| MD | 2011 | 13 | 0 | 2 | 0 | 0 | 0 | 11 |
| | 2012 | 11 | 3 | $5^2$ | 0 | 0 | 0 | $9^2$ |
| | 2013 | 9 | 1 | 1 | 0 | 0 | 0 | 9 |
| ME | 2011 | 12 | 1 | 1 | 0 | 0 | 0 | 12 |
| | 2012 | 12 | 0 | 2 | 0 | 0 | 0 | 10 |
| | 2013 | 10 | 0 | 0 | 0 | 1 | 0 | 9 |
| MI | 2011 | 24 | 10 | 0 | 0 | 0 | 0 | 34 |
| | 2012 | 34 | 2 | 0 | 0 | 0 | 0 | 36 |
| | 2013 | 36 | 2 | 2 | 0 | 0 | 0 | 36 |
| MN | 2011 | 13 | 4 | 0 | 0 | 0 | 0 | 17 |
| | 2012 | 17 | 2 | 0 | 0 | 0 | 0 | 19 |
| | 2013 | 19 | 2 | 0 | 0 | 0 | 0 | 21 |
| MO | 2011 | 6 | 0 | 1 | 0 | 0 | 0 | 5 |
| | 2012 | 5 | 0 | 1 | 0 | 0 | 0 | 4 |
| | 2013 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| NE | 2011 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2012 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| | 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NH | 2011 | 21 | 0 | 0 | 0 | 0 | 0 | 21 |
| | 2012 | 21 | 0 | 0 | 0 | 0 | 0 | 21 |
| | 2013 | 21 | 0 | 0 | 0 | 0 | 0 | 21 |
| NJ | 2011 | 29 | 3 | 4 | 0 | 0 | 0 | 28 |
| | 2012 | 28 | 0 | 4 | 0 | 0 | 0 | 24 |
| | 2013 | 24 | 2 | 1 | 0 | 0 | 0 | 25 |

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations-Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| NY | 2011 | 48 | 3 | 3 | 0 | 0 | 0 | 48 |
| | 2012 | 48 | 0 | 4 | 1 | 0 | 0 | 43 |
| | 2013 | 43 | 0 | 5 | 2 | 0 | 0 | 36 |
| OH | 2011 | 10 | 4 | 1 | 0 | 0 | 0 | 13 |
| | 2012 | 13 | 1 | 1 | 0 | 0 | 0 | 13 |
| | 2013 | 13 | 0 | 2 | 0 | 0 | 0 | 11 |
| OK | 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2013 | 2 | 0 | 0 | 0 | 1 | 0 | 1 |
| PA | 2011 | 43 | 4 | 3 | 0 | 0 | 0 | 44 |
| | 2012 | 44 | 5 | 4 | 0 | 0 | 0 | 45 |
| | 2013 | 45 | 0 | 2 | 0 | 0 | 0 | 43 |
| RI | 2011 | 13 | 0 | 1 | 1 | 0 | 0 | 11 |
| | 2012 | 11 | 0 | 0 | 0 | 0 | 0 | 11 |
| | 2013 | 11 | 0 | 1 | 0 | 0 | 0 | 10 |
| TX | 2011 | 5 | 0 | 1 | 0 | 0 | 0 | 4 |
| | 2012 | 4 | 0 | 1 | 0 | 1 | 0 | 2 |
| | 2013 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| VT | 2011 | 5 | 0 | 1 | 0 | 1 | 0 | 3 |
| | 2012 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2013 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| VA | 2011 | 22 | 4 | 0 | 0 | 0 | 0 | 26 |
| | 2012 | 26 | 5 | 3 | 0 | 0 | 0 | 28 |
| | 2013 | 28 | 2 | 3 | 0 | 0 | 0 | 27 |
| WI | 2011 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2012 | 3 | 1 | 1 | 0 | 0 | 0 | 3 |
| | 2013 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| WV | 2011 | 1 | 1 | 1 | 0 | 0 | 0 | 1 |
| | 2012 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2013 | 1 | 3 | 0 | 0 | 0 | 0 | 4 |
| Totals | 2011 | 408 | 55 | 36 | 2 | 2 | 0 | 423 |

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Ren ewals | Reacquired by Franchisor | Ceased Operations- Other Reasons | Outlets at End of the Year |
|-------|------|------|------|------|------|------|------|------|
|       | 2012 | 423 | 25 | 46 | 2 | 3 | 0 | 397 |
|       | 2013 | 397 | 16 | 23 | 3 | 12 | 0 | 375 |

Note 1:  To avoid double-counting, one1 Store that was a company Store as of January 1, 2011 was converted from company Store to a franchised Store during the year and was also terminated during the year and is excluded from the table.

95

Three Stores that were company Stores as of January 1, 2011 were converted from company Stores to franchised Stores during the year and are considered as having opened as franchised Stores during 2011.

Two Stores that were company Stores as of January 1, 2012 were converted from company Stores to franchised Stores during the year and are considered as having opened as franchised Stores during 2012.

Note 2: ~~A franchised Store was reacquired and then resold to a new franchisee on the same day in Massachusetts. To avoid double-counting, these offsetting transactions are not shown in this table.Note 3:~~ ——— A franchise in Maryland ceased operating as of December 31, 2011 and we terminated the franchise effective as of January 1, 2012, but we consider the termination to have occurred in 2011 for purposes of the table.

Table No. 4

## Status of Company-Owned Outlets
### For years ~~2010~~2011 to ~~2012 And updated for partial year~~ 2013*

## WIRELESS ZONE® OUTLETS

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired From Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| CT | ~~2010~~2011 | ~~0~~1 | ~~1~~0 | 0 | 0 | 0 | 1 |
| | ~~2011~~ | ~~1~~ | ~~0~~ | ~~0~~ | ~~0~~ | ~~0~~ | ~~1~~ |
| | 2012 | 1 | 0 | 1 | 0 | 0 | 2 |
| | 2013* | 2 | ~~0~~1 | ~~1~~3 | 0 | ~~0~~1 | ~~3~~5 |
| FL | ~~2010~~2011 | ~~0~~5 | ~~1~~0 | ~~4~~0 | 0 | ~~0~~4 | ~~5~~1 |
| | ~~2011~~ | ~~5~~ | ~~0~~ | ~~0~~ | ~~0~~ | 4 | ~~1~~ |
| | 2012 | 1 | 0 | 0 | 0 | 1 | 0 |
| | 2013* | 0 | 0 | 1 | 0 | 0 | 1 |
| GA | ~~2010~~2011 | ~~0~~1 | ~~1~~0 | ~~0~~1 | 0 | 0 | ~~1~~2 |
| | ~~2011~~ | ~~1~~ | ~~0~~ | ~~1~~ | ~~0~~ | ~~0~~ | ~~2~~ |
| | 2012 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2013* | 2 | 0 | 0 | ~~1~~2 | 0 | ~~1~~0 |
| IL | ~~2010~~ | ~~0~~ | ~~0~~ | ~~0~~ | ~~0~~ | ~~0~~ | ~~0~~ |
| IL | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 1 | 0 | 0 | 0 | 1 |
| | 2013* | 1 | 0 | ~~4~~5 | 0 | 0 | ~~5~~6 |
| KY | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 1 | 0 | 0 | 1 |
| | 2013 | 1 | 0 | 0 | 0 | 0 | 1 |
| LA | 2011 | 2 | 11 | 0 | 0 | 0 | 13 |
| | 2012 | 13 | 0 | 0 | 4 | 0 | 9 |
| | 2013 | 9 | 0 | 1 | 1 | 0 | 9 |
| MA | 2011 | 2 | 0 | 0 | 1 | 0 | 1 |
| | 2012 | 1 | 0 | 0 | 0 | 1 | 0 |
| | 2013 | 0 | 0 | 0 | 0 | 0 | 0 |
| ME | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013 | 0 | 0 | 1 | 0 | 0 | 1 |

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired From Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| OK | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2013 | 0 | 0 | 1 | 0 | 0 | 1 |
| TX | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2012 | 0 | 0 | 1 | 0 | 0 | 1 |
|    | 2013 | 1 | 0 | 0 | 0 | 0 | 1 |
| VT | 2011 | 3 | 0 | 1 | 0 | 0 | 4 |
|    | 2012 | 4 | 0 | 0 | 0 | 0 | 4 |
|    | 2013 | 4 | 0 | 0 | 0 | 0 | 4 |
| Totals | 2011 | 14 | 11 | 2 | 1 | 4 | 22 |
|        | 2012 | 22 | 1 | 3 | 4 | 2 | 20 |
|        | 2013 | 20 | 1 | 12 | 3 | 1 | 29 |

Table No. 4, **WIRELESS ZONE* OUTLETS,** Continued

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| KY | 2010 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 1 | 0 | 0 | 1 |
| | 2013* | 1 | 0 | 0 | 0 | 0 | 1 |
| LA | 2010 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2011 | 2 | 11 | 0 | 0 | 0 | 13 |
| | 2012 | 13 | 0 | 0 | 4 | 0 | 9 |
| | 2013* | 9 | 0 | 1 | 0 | 0 | 10 |
| MA | 2010 | 0 | 0 | 3[1] | 0 | 1[1] | 2 |
| | 2011 | 2 | 0 | 0 | 1 | 0 | 1 |
| | 2012 | 1 | 0 | 0 | 0 | 1 | 0 |
| | 2013* | 0 | 0 | 0 | 0 | 0 | 0 |
| ME | 2010 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013* | 0 | 0 | 1 | 0 | 0 | 1 |
| OK | 2010 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013* | 0 | 0 | 1 | 0 | 0 | 1 |
| TX | 2010 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 1 | 0 | 0 | 1 |
| | 2013* | 1 | 0 | 0 | 0 | 0 | 1 |
| VT | 2010 | 0 | 0 | 3 | 0 | 0 | 3 |
| | 2011 | 3 | 0 | 1 | 0 | 0 | 4 |
| | 2012 | 4 | 0 | 0 | 0 | 0 | 4 |
| | 2013* | 4 | 0 | 0 | 0 | 0 | 4 |
| Totals | 2010 | 2 | 3 | 10[1] | 0 | 1[1] | 14 |
| | 2011 | 14 | 11 | 2 | 1 | 4 | 22 |
| | 2012 | 22 | 1 | 3 | 4 | 2 | 20 |
| | 2013* | 20 | 0 | 9 | 1 | 0 | 28 |

Note [1]:   We reacquired one outlet on November 1, 2010 which was sold to a franchisee on same date; both transactions are shown in the table.

~~*Partial Year 2013   January 1, 2013 to May 31, 2013~~

**Table No. 4**

## Status of Company-Owned Outlets
### For years ~~2010~~2011 to ~~2012~~2013
### ~~And updated for partial year 2013*~~

## DIAMOND WIRELESS OUTLETS*~~*~~

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired From Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| | ~~2010~~ 2011 | 0 | ~~0~~1 | 0 | 0 | 0 | ~~0~~1 |
| AL | ~~2011~~ 2012 | 1 | 0 | 0 | 0 | 0 | 1 |
| | ~~2012~~ 2013 | 1 | 0 | 0 | 0 | 0 | 1 |
| | ~~2013*~~ | ~~1~~ | ~~0~~ | ~~0~~ | ~~0~~ | ~~0~~ | ~~1~~ |
| AZ | ~~2010~~ | ~~12~~ | ~~3~~ | ~~0~~ | ~~0~~ | ~~0~~ | ~~15~~ |
| | 2011 | 15 | 6 | 0 | 1 | 0 | 20 |
| AZ | 2012 | 20 | 0 | 0 | 1 | 0 | 19 |
| | 2013* | 19 | 0 | 0 | 3 | 0 | 16 |
| CA | ~~2010~~ | ~~30~~ | ~~16~~ | ~~0~~ | ~~0~~ | ~~0~~ | ~~46~~ |
| | 2011 | 46 | 12 | 0 | 0 | 0 | 58 |
| CA | 2012 | 58 | 7 | 0 | 4 | 0 | 61 |
| | 2013* | 61 | ~~0~~3 | 0 | ~~2~~8 | 0 | ~~59~~56 |
| | ~~2010~~ 2011 | 13 | 0 | 0 | 0 | 0 | 13 |
| CO | ~~2011~~ | ~~13~~ | ~~0~~ | ~~0~~ | ~~0~~ | ~~0~~ | ~~13~~ |
| | 2012 | 13 | 3 | 0 | 2 | 0 | 14 |
| | 2013 | 14 | 0 | 0 | 1 | 0 | 13 |
| | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| CT | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013 | 0 | 11 | 0 | 0 | 0 | 11 |
| | ~~2013*~~ 2011 | ~~1~~0 | 0 | 0 | ~~2~~0 | 0 | ~~1~~0 |
| ~~FL~~DE | ~~2010~~ 2012 | 0 | 0 | 0 | 0 | 0 | ~~0~~ |
| | ~~2011~~ 2013 | 0 | ~~0~~4 | 0 | 0 | 0 | ~~0~~4 |
| | ~~2012~~ 2011 | 0 | ~~1~~0 | 0 | 0 | 0 | ~~1~~0 |
| ~~GA~~FL | ~~2013*~~ 2012 | ~~1~~0 | ~~0~~1 | 0 | 0 | 0 | 1 |
| | ~~2010~~ 2013 | ~~0~~1 | ~~0~~20 | 0 | 0 | 0 | ~~0~~21 |

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired From Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| GA | 2011 | 0 | 3 | 0 | 0 | 0 | 3 |
| | 2012 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2013* | 3 | 0 | 0 | 02 | 0 | 31 |
| HI | 2010 2011 | 45 | 1 | 0 | 0 | 0 | 56 |
| | 2011 | 5 | 1 | 0 | 0 | 0 | 6 |
| | 2012 | 6 | 0 | 0 | 1 | 0 | 5 |
| | 2013 | 5 | 0 | 0 | 1 | 0 | 4 |
| LA | 2013* 2011 | 50 | 04 | 0 | 0 | 0 | 54 |
| | 2012 | 4 | 0 | 0 | 0 | 0 | 4 |
| | 2013 | 4 | 0 | 0 | 0 | 0 | 4 |
| ME | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013 | 0 | 1 | 0 | 0 | 0 | 1 |
| MD | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013 | 0 | 2 | 0 | 0 | 0 | 2 |
| MA | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013 | 0 | 21 | 0 | 0 | 0 | 21 |
| MS | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 1 | 0 | 0 | 0 | 1 |
| | 2013 | 1 | 0 | 0 | 0 | 0 | 1 |
| NV | 2011 | 3 | 2 | 0 | 0 | 0 | 5 |
| | 2012 | 5 | 0 | 0 | 1 | 0 | 4 |
| | 2013 | 4 | 0 | 0 | 1 | 0 | 3 |
| NH | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013 | 0 | 5 | 0 | 0 | 0 | 5 |
| NJ | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013 | 0 | 18 | 0 | 0 | 0 | 18 |
| NM | 2011 | 3 | 3 | 0 | 0 | 0 | 6 |
| | 2012 | 6 | 0 | 0 | 0 | 0 | 6 |
| | 2013 | 6 | 0 | 0 | 0 | 0 | 6 |
| NY | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 7 | 0 | 0 | 0 | 7 |
| | 2013 | 7 | 41 | 0 | 1 | 0 | 47 |

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired From Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| OR | 2011 | 9 | 1 | 0 | 0 | 0 | 10 |
| | 2012 | 10 | 3 | 0 | 0 | 0 | 13 |
| | 2013 | 13 | 2 | 0 | 0 | 0 | 15 |
| PA | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013 | 0 | 12 | 0 | 0 | 0 | 12 |
| RI | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013 | 0 | 3 | 0 | 0 | 0 | 3 |
| TN | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013 | 0 | 1 | 0 | 0 | 0 | 1 |
| TX | 2011 | 23 | 10 | 0 | 1 | 0 | 32 |
| | 2012 | 32 | 1 | 0 | 6 | 0 | 27 |
| | 2013 | 27 | 0 | 0 | 4 | 0 | 23 |
| UT | 2011 | 16 | 0 | 0 | 0 | 0 | 16 |
| | 2012 | 16 | 2 | 0 | 1 | 0 | 17 |
| | 2013 | 17 | 1 | 0 | 2 | 0 | 16 |
| VA | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013 | 0 | 12 | 0 | 0 | 0 | 12 |
| WA | 2011 | 12 | 3 | 0 | 0 | 0 | 15 |
| | 2012 | 15 | 13 | 0 | 1 | 0 | 27 |
| | 2013 | 27 | 1 | 0 | 4 | 0 | 24 |
| WY | 2011 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2012 | 2 | 1 | 0 | 0 | 0 | 3 |
| | 2013 | 3 | 0 | 0 | 0 | 0 | 3 |
| Totals | 2011 | 147 | 46 | 0 | 2 | 0 | 191 |
| | 2012 | 191 | 39 | 0 | 17 | 0 | 213 |
| | 2013 | 213 | 165 | 0 | 27 | 0 | 351 |

*Partial year 2013 January 1, 2013 to May 31, 2013

**Our immediate parent GLENTEL (USA), Inc. owns and operates company-owned outlets operating under the service mark "Diamond Wireless," offering goods and services of a type substantially similar to the goods and services to be offered by you as our franchisee under our trademark Wireless Zone®.

Table No. 4. **DIAMOND WIRELESS OUTLETS**, Continued

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired From Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| LA | 2010 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2011 | 0 | 4 | 0 | 0 | 0 | 4 |
| | 2012 | 4 | 0 | 0 | 0 | 0 | 4 |
| | 2013* | 4 | 0 | 0 | 0 | 0 | 4 |
| MS | 2010 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 1 | 0 | 0 | 0 | 1 |
| | 2013* | 1 | 0 | 0 | 0 | 0 | 1 |
| NV | 2010 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2011 | 3 | 2 | 0 | 0 | 0 | 5 |
| | 2012 | 5 | 0 | 0 | 1 | 0 | 4 |
| | 2013* | 4 | 0 | 0 | 0 | 0 | 4 |
| NM | 2010 | 2 | 1 | 0 | 0 | 0 | 3 |
| | 2011 | 3 | 3 | 0 | 0 | 0 | 6 |
| | 2012 | 6 | 0 | 0 | 0 | 0 | 6 |
| | 2013* | 6 | 0 | 0 | 0 | 0 | 6 |
| NY | 2010 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 7 | 0 | 0 | 0 | 7 |
| | 2013* | 7 | 0 | 0 | 0 | 0 | 7 |
| OR | 2010 | 7 | 2 | 0 | 0 | 0 | 9 |
| | 2011 | 9 | 1 | 0 | 0 | 0 | 10 |
| | 2012 | 10 | 3 | 0 | 0 | 0 | 13 |
| | 2013* | 13 | 0 | 0 | 0 | 0 | 13 |
| TN | 2010 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2011 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2012 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2013* | 0 | 1 | 0 | 0 | 0 | 1 |
| TX | 2010 | 3 | 20 | 0 | 0 | 0 | 23 |
| | 2011 | 23 | 10 | 0 | 1 | 0 | 32 |
| | 2012 | 32 | 1 | 0 | 6 | 0 | 27 |
| | 2013* | 27 | 0 | 0 | 3 | 0 | 24 |
| UT | 2010 | 14 | 2 | 0 | 0 | 0 | 16 |
| | 2011 | 16 | 0 | 0 | 0 | 0 | 16 |
| | 2012 | 16 | 2 | 0 | 1 | 0 | 17 |
| | 2013* | 17 | 0 | 0 | 0 | 0 | 17 |

*Partial year 2013-January 1, 2013 to May 31, 2013

**Our immediate parent GLENTEL (USA), Inc. owns and operates company-owned outlets operating under the service mark "Diamond Wireless," offering goods and services of a type substantially similar to

the goods and services to be offered by you as our franchisee under our trademark Wireless Zone®.
Table No. 4. **DIAMOND WIRELESS OUTLETS**, Continued

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired From Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|-------|------|------|------|------|------|------|------|
| WA | 2010 | 10 | 2 | 0 | 0 | 0 | 12 |
| | 2011 | 12 | 3 | 0 | 0 | 0 | 15 |
| | 2012 | 15 | 13 | 0 | 1 | 0 | 27 |
| | 2013* | 27 | 0 | 0 | 1 | 0 | 26 |
| WY | 2010 | 1 | 1 | 0 | 0 | 0 | 2 |
| | 2011 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2012 | 2 | 1 | 0 | 0 | 0 | 3 |
| | 2013* | 3 | 0 | 0 | 0 | 0 | 3 |
| Totals | 2010 | 98 | 49 | 0 | 0 | 0 | 147 |
| | 2011 | 147 | 46 | 0 | 2 | 0 | 191 |
| | 2012 | 191 | 39 | 0 | 17 | 0 | 213 |
| | 2013* | 213 | 1 | 0 | 11 | 0 | 203 |

Partial Year January 1, 2013 to May 31, 2013

*Our immediate parent GLENTEL (USA), Inc. owns and operates company-owned outlets operating under the service mark "Diamond Wireless," offering goods and services of a type substantially similar to the goods and services to be offered by you as our franchisee under our trademark Wireless Zone®.

### Table No. 5

### Projected Openings As Of MayDecember 31, 2013

## WIRELESS ZONE® OUTLETS

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets In The Next Fiscal Year | Projected New Company-Owned Outlets In the Next Fiscal Year |
|-------|------|------|------|
| Alabama | 0 | 1 | 0 |
| Arkansas | 0 | 1 | 0 |
| Connecticut | 0 | 41 | 12 |
| Florida | 0 | 5 | 2 |
| Georgia | 0 | 3 | 0 |
| Illinois | 10 | 4 | 50 |
| Indiana | 0 | 32 | 0 |
| Iowa | 0 | 12 | 0 |
| Kansas | 0 | 1 | 0 |

104

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets In The Next Fiscal Year | Projected New Company-Owned Outlets In the Next Fiscal Year |
|---|---|---|---|
| Kentucky | 0 | 0 | 0 2 |
| Louisiana | 0 | 0 | 1 0 |
| Maine | 0 | 2 1 | 1 0 |
| Maryland | 0 | 2 | 0 |
| Massachusetts | 0 | 2 1 | 0 |
| Michigan | 0 | 5 3 | 0 |
| Minnesota | 1 0 | 4 2 | 0 |
| Missouri | 0 | 1 2 | 0 |
| New Hampshire | 0 | 1 | 0 |
| New Jersey | 0 | 3 1 | 0 |
| New York | 0 | 4 | 0 |
| Ohio | 0 | 4 | 0 |
| Oklahoma | 0 | 2 | 1 0 |
| Pennsylvania | 0 | 3 4 | 0 |
| Rhode Island | 0 | 1 | 0 |
| Texas | 0 | 1 | 0 |
| Vermont | 0 | 1 | 0 |
| Virginia | 0 | 4 | 0 |
| West Virginia | 1 | 2 | 0 |
| Wisconsin | 0 | 3 | 0 |
| **Total** | **1** | **59** | **6** |

Table No. 5. **WIRELESS ZONE® OUTLETS** Continued

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets In The Next Fiscal Year | Projected New Company-Owned Outlets In the Next Fiscal Year |
|---|---|---|---|
| Rhode Island | 0 | 1 | 0 |
| Texas | 0 | 4 | 0 |
| Vermont | 0 | 1 | 0 |
| Virginia | 0 | 4 | 0 |
| West Virginia | 1 | 1 | 0 |
| Wisconsin | 0 | 1 | 0 |
| Total | 3 | 68 | 11 |

[THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]

Table No. 5

## Projected Openings As Of ~~May~~December 31, 2013

**DIAMOND WIRELESS OUTLETS***

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets In The Next Fiscal Year | Projected New Company-Owned Outlets In the Next Fiscal Year |
|---|---|---|---|
| Alabama | 0 | 0 | 0 |
| Arizona | 0 | 0 | ~~1~~2 |
| California | 0 | 0 | ~~3~~1 |
| Colorado | 0 | 0 | ~~2~~0 |
| Connecticut | 0 | 0 | ~~11~~0 |
| Delaware | 0 | 0 | ~~4~~0 |
| Florida | 0 | 0 | ~~20~~0 |
| Georgia | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 1 |
| Louisiana | 0 | 0 | ~~1~~0 |
| Maine | 0 | 0 | ~~1~~0 |
| Maryland | 0 | 0 | ~~9~~0 |
| Massachusetts | 0 | 0 | ~~21~~0 |
| Mississippi | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | ~~5~~0 |
| New Jersey | 0 | 0 | ~~17~~1 |
| New Mexico | 0 | 0 | 1 |
| New York | 0 | 0 | ~~44~~2 |
| North Carolina | 0 | 0 | 4 |
| Oregon | 0 | 0 | ~~2~~1 |
| Pennsylvania | 0 | 0 | ~~12~~3 |
| Rhode Island | 0 | 0 | ~~3~~0 |
| Tennessee | 0 | 0 | ~~1~~0 |
| Texas | 0 | 0 | ~~0~~1 |
| Utah | 0 | 0 | 0 |

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets In The Next Fiscal Year | Projected New Company-Owned Outlets In the Next Fiscal Year |
|-------|--------------------------------------------------|--------------------------------------------------------|------------------------------------------------------------|
| Virginia | 0 | 0 | 0 |
| Washington | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 |
| **Total** | **0** | **0** | **17** |

Table No. 5. **DIAMOND WIRELESS OUTLETS,** Continued

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets In The Next Fiscal Year | Projected New Company-Owned Outlets In the Next Fiscal Year |
|---|---|---|---|
| Utah | 0 | 0 | 1 |
| Virginia | 0 | 0 | 12 |
| Washington | 0 | 0 | 1 |
| Wyoming | 0 | 0 | 1 |
| Total | 0 | 0 | 174 |

*Our immediate parent GLENTEL (USA), Inc. owns and operates company-owned outlets operating under the service mark "Diamond Wireless," offering goods and services of a type substantially similar to the goods and services to be offered by you as our franchisee under our trademark Wireless Zone®.

A list of all operating franchised Wireless Zone® Stores as of December 31, 2012 2013 is attached as Exhibit J. A list of the franchisees who have signed Franchise Agreements for Wireless Zone® Stores which were not yet operational as of December 31, 2012 2013 is included in Exhibit J. We update these lists in Exhibit J as of May 31, 2013 with separate listings as of May 31, 2013.

Below is a list containing the name, city and state, and business telephone number (or if unknown, the last known home telephone number) of every franchisee who has had an outlet terminated, canceled, not renewed, transferred, or otherwise voluntarily or involuntarily ceased to do business under the Franchise Agreement during the most recently completed fiscal year or who has not communicated with us within 10 weeks of the date of this Disclosure Document. We update this list below with a separate listing as of May 31, 2013. If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

**[THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]**

## TERMINATED, CANCELED, NOT RENEWED, TRANSFERRED OR LEFT THE SYSTEM
### 2012

Connecticut
Berlin
William H. Petry       Berlin, CT 06037       (860) 829-0042
Terminated

Hartford
Jonah S. Engler       Brooklyn, NY 11217-3506       (917) 816-6962
Terminated

Wethersfield
Emanuele P. D'Agostino       Wethersfield, CT 06109-4058       (860) 721-8987
Terminated (Non-Renewal)

Delaware
Dover
Ezequiel Francisco       Chester, NY 10918       (845) 642-6124
Paul Kiczek       Lyndhurst, NJ 07071       (201) 240-7494
Jonathan Stuart       Washingtonville, NY 10992       (845) 784-7860
Terminated

Florida
Apalachicola
Steven D Gillum       Fortson, GA 31808       (706) 323-4314
Terminated

Apopka
David R. Santana       Orlando, FL 32825-7409       (407) 349-1594
Terminated

Callaway
Steven D. Gillum       Fortson, GA 31808       (706) 323-4314
Terminated

Delray Beach
Frank J. Salamone, Sr.       Boca Raton, FL 33428       (561) 613-9122
Terminated

Indialantic
Robert E. Beck, III       Fort Lauderdale, FL 33305       (308) 440-5076
Betsy Beck       Fort Lauderdale, FL 33305       (308) 440-5076
Terminated

Inverness
Kim E. Shay       Lake Panasoffkee, FL 33538       (352) 568-5433
Terminated

North Miami Beach

| | | |
|---|---|---|
| William Vilaseca<br>Terminated | Miami, FL 33125 | (305) 397-9507 |
| Orlando<br>Christopher D. Jourdan<br>Ralph D. Macali<br>Nicholas J. Nicastro<br>Transferred | Newburgh, IN 47630<br>Warren, OH 44483-3657<br>Columbus, OH 43215-5339 | (812) 202-2234<br>(330) 372-3013<br>(614) 352-4447 |
| Ormond Beach<br>David R. Santana<br>Terminated | Orlando, FL 32825-7409 | (407) 340-1594 |
| Palatka<br>Connie F. Varnes<br>James D. Varnes<br>Terminated | Palatka, FL 32177<br>Palatka, FL 32177 | (386) 328-3761<br>(386) 328-3761 |
| Ponte-Vedra Beach<br>Hamlet Azizian<br>Transferred | Jacksonville, FL 32207 | (818) 426-5386 |
| Sebastian<br>Robert E. Beck, III<br>Betsy Beck<br>Terminated | Fort Lauderdale, FL 33305<br>Fort Lauderdale, FL 33305 | (308) 440-5076<br>(308) 440-5076 |
| Spring Hill<br>Jamie M. Sheridan<br>Terminated | Spring Hill, FL 34609 | (352) 678-4069 |
| Georgia<br>Dallas<br>Gabrielle Austin<br>Wayne Austin<br>Terminated | Marietta, GA 30064-9798<br>Marietta, GA 30064-9798 | (770) 426-1304<br>(404) 660-2821 |
| Illinois<br>Algonquin<br>Robert Massarelli<br>Thomas Del Regno<br>Terminated | Algonquin, IL 60102<br>Algonquin, IL 60102 | (847) 836-9056<br>(847) 844-7807 |
| Aurora<br>Ahmad M. Khan<br>Transferred | Wayne, IL 60184 | (630) 497-6304 |
| Indiana<br>Evansville (Eastland Mall)<br>Christopher D. Jourdan<br>Ralph D. Macali | Newburgh, IN 47630<br>Warren, OH 44483-3657 | (812) 202-2234<br>(330) 372-3013 |

Nicholas J. Nicastro              Columbus, OH 43215-5339        (614) 352-4447
Terminated

**Kentucky**
Owensboro
Christopher D. Jourdan           Newburgh, IN 47630              (812) 202-2234
Ralph D. Macali                 Warren, OH 44483-3657          (330) 372-3013
Nicholas J. Nicastro            Columbus, OH 43215-5339        (614) 352-4447
Terminated

**Louisiana**
Slidell
Lucas Caruso                    Slidell, LA 70460              (985) 869-2923
Viola Caruso                    Slidell, LA 70460              (985) 869-0047
Terminated

**Maine**
Augusta
Lloyd Smith                     Manchester, ME 04351           (207) 458-3333
Terminated

Ellsworth
Dianne Hunnewell                Ellsworth, ME 04605            (207) 266-0105
Ricky Hunnewell                 Ellsworth, ME 04605            (207) 667-3220
Transferred

Houlton
Craig F. Devlin                 Weirs Beach. NH 03247-5481     (603) 520-4790
Terminated

Lincoln
Chad O'Leary                    Hampden, ME 04444-1053         (207) 659-6021
Transferred

**Maryland**
Bel-Air (Harford Mall)
Refik Agri                      Owings Mills. MD 21117         (410) 581-8038
Melvin Zeiders, III             Owings Mills, MD 21117         (410) 581-8038
Terminated

Edgewood
Refik Agri                      Owing Mills, MD 21117          (410) 952-1455
Melvin Zeiders, III             Owing Mills, MD 21117          (410) 581-8038
Terminated

Eldersburg
Navin Goel                      Edgewood, MD 21040             (410) 612-1419
Terminated

Largo

Mark R. Scott             Hyattsville, MD 20782       (301) 324-1550
Terminated

Salisbury
Navin Goel               Edgewood, MD 21040          (410) 612-1419
Terminated

**Massachusetts**
Chelmsford
Dana Harris              Bedford, NH 03110           (603) 801-3548
Transferred

Dedham
Marvin Asnes             Sharon, MA 02027            (781) 910-5657
Stephen B. Asnes         Stoughton, MA 02072-3187    (781) 910-2714
Transferred

Rowley
Richard Hamel            Plaistow, NH 03865-2547     (603) 382-5013
Susan E. Hamel           Plaistow, NH 03865-2547     (603) 382-5013
Transferred

Saugus
Eric Leung               Randolph, MA 02368          (781) 961-5972
Raymond Leung            Cumberland, RI 02864        (401) 305-6674
Transferred

**Michigan**
Fenton
Joseph J. Bommarito      Ortonville, MI 48462        (248) 793-7043
Transferred

**Missouri**
Lee's Summit
Victoria Sneed           Lee's Summit, MO 64064      (816) 373-4613
Terminated

**Nebraska**
Lincoln
David E. Slattery        Lincoln, NE 68508           (703) 965-4007
John C. Slattery         Glenpool, OK 74033          (918) 518-5192
Terminated

**New Hampshire**
Pelham
Dana Harris              Bedford, NH 03110           (603) 801-3548
William D. Shipley       Tynsboro, MA 01879          (978) 649-6975
Transferred

**New Jersey**

Jackson
Jonah S. Engler                     Brooklyn, NY 11217-3506          (917) 816-6962
Terminated

New Providence
Rajbir Nayar                        Piscataway, NJ 08854             (908) 399-6882
Satnam S. Sarna                     East Windsor, NJ 08520           (609) 443-5792
Transferred

Mount Holy
Waqas Asghar                        Willingboro, NJ 08046            (609) 877-1926
Shabana Mukhtar                     Willingboro, NJ 08046            (609) 877-1926
Terminated

Pennington
Janice Gritz                        Yardley, PA 19067                (215) 860-5590
Terminated

Somers Point
Stephen M. Pagnoni                  Northfield, NJ 08225             (609) 226-9984
Terminated

New York
Albion
David Wolmering                     Fairport, NY 14450               (585) 421-3896
Terminated

Hamburg
Daniel J. Swackhammer, Jr.          Jamestown, NY 14701              (716) 483-6036
Jeffrey A. Swackhammer, Sr.         Cheswick, PA 15024-2446          (412) 436-0153
Terminated (Non-Renewal)

Highland
Brian Hons                          Highland, NY 12528               (845) 691-8004
Kathleen Hons                       Wappinger Falls, NY 12590        (845) 297-0177
Terminated

Irondequoit
Clinton Beard                       Lockport, NY 14450               (585) 425-0453
Transferred

Liverpool
Brian Cavallo                       Warners, NY 13164-9675           (315) 350-1705
Terminated

Patterson
David Robles                        New Milford, CT 06776-3723       (914) 772-0026
Transferred

Pomona

Jonah S. Engler                                                    Brooklyn, NY 11217-3506                    (917) 816-6962
Terminated

Ohio
Austintown
Christopher D. Jourdan                                 Newburgh, IN 47630                       (812) 506-9663
Ralph D. Macali                                               Warren, OH 44483-3657               (330) 372-3013
Nicholas J. Nicastro                                      Columbus, OH 43215-5339            (614) 352-4447
Transferred

Hudson
Christopher D. Jourdan                                 Newburgh, IN 47630                       (812) 506-9663
Ralph D. Macali                                               Warren, OH 44483-3657               (330) 372-3013
Nicholas J. Nicastro                                      Columbus, OH 43215-5339            (614) 352-4447
Transferred

Lewis Center
Anthony Romanelli                                        Westerville, OH 43082                   (614) 895-2118
Terminated

Poland
Christopher D. Jourdan                                 Newburgh, IN 47630                       (812) 506-9663
Ralph D. Macali                                               Warren, OH 44483-3657               (330) 372-3013
Nicholas J. Nicastro                                      Columbus, OH 43215-5339            (614) 352-4447
Transferred

Wadsworth
Christopher D. Jourdan                                 Newburgh, IN 47630                       (812) 506-9663
Ralph D. Macali                                               Warren, OH 44483-3657               (330) 372-3013
Nicholas J. Nicastro                                      Columbus, OH 43215-5339            (614) 352-4447
Transferred

Pennsylvania
Crafton
Robert J. Musser                                            Harrison City, PA 15636-1446      (724) 454-1415
Terminated

Irwin
Joseph DeSimone                                          Lower Burrell, PA 15068-9700     (724) 335-6793
Ralph DeSimone, Jr.                                      Lower Burrell, PA 15068-2561     (724) 337-1511
Terminated

Pittsburgh
Jeffrey A. Swackhammer, Sr.                       Cheswick, PA 15024-2446            (412) 436-0153
Terminated

Somerset
Bryce A. McDowell                                         Ligonier, PA 15658                       (724) 995-8241
Holly J. McDowell                                          Ligonier, PA 15658                       (724) 995-8241
Terminated

**Texas**
Saginaw
Dean R. Weltman                Carrollton, TX 75007              (469) 235-5102
Terminated

**Vermont**
Brattleboro
Michael R. Chudzik             Gill, MA 01354                   (413) 863-2667
James Waitkus                  Montague, MA 01351               (413) 863-9800
Transferred

**Virginia**
Aylett
Betty C. Ragsdale              New Kent, VA 23124               (804) 690-3371
Darlene J. Ragsdale            Highland Springs, VA 23075       (804) 737-2793
Wayne L. Ragsdale              New Kent, VA 23124               (804) 690-9076
Terminated

Blacksburg
Jason M. Tice                  Christiansburg, VA 24073         (540) 230-8601
Transferred

Blacksburg
Jason M. Tice                  Christiansburg, VA 24073         (540) 230-8601
Transferred

Quinton
Betty C. Ragsdale              New Kent, VA 23124               (804) 690-3371
Darlene J. Ragsdale            Highland Springs, VA 23075       (804) 737-2793
Wayne L. Ragsdale              New Kent, VA 23124               (804) 690-9076
Terminated

Danville
Margaret A. Howell             Danville, VA 24540               (434) 836-3639
Transferred

Woodstock
Ivan M. Napotnik               Bridgewater, VA 22812-1506       (540) 150-7775
Terminated

**Wisconsin**
Fitchburg
Patricia Avery                 Lake Mills, WI 53551             (630) 260-3760
William R. Avery               Lake Mills, WI 53551             (630) 260-3760
Terminated

~~We update the information for a portion of the year 2013 to add the name, city and state, and business telephone number (or if unknown, the last known home telephone number) of every franchisee who has had an outlet terminated, canceled, not renewed, transferred, or otherwise voluntarily or involuntarily ceased to do business under the Franchise Agreement from January 1, 2013 through May 31, 2013 to correspond to the 2013 updates in this Item 20 as follows:~~ .

## ~~TERMINATED, CANCELED, NOT~~ RENEWED, TRANSFERRED OR LEFT THE SYSTEM
### ~~Partial Year 2013~~
### ~~January 1, 2013 – May 31,~~

### 2013

**Connecticut**

| | | |
|---|---|---|
| Bloomfield | | |
| Craig ~~C.~~ Cuffie, Sr. | Griswold, CT 06351 | (860) 376-7700 |
| Pauline Cuffie | Griswold, CT 06351 | (860) 376-7700 |
| Terminated | | |
| | | |
| Hamden | | |
| Robert Klicsu | Oxford, CT 06478 | (203) |
| | | 888257-88339001 |
| Terminated | | |
| | | |
| Middletown | | |
| Matthew Pensiero | Farmington, CT 06032 | (860) 674-9395 |
| William Murphy | Farmington, CT 06032 | (860) 982-5618 |
| Terminated (Non-Renewal) | | |
| | | |
| Florida | | |
| Port Charlotte | | |
| Jeffrey Swackhammer, Sr. | Export, PA 15632 | (412-855-6190 |
| Jeffrey Swackhammer, Jr. | Allison Park, PA 15101 | (412) 849-8885 |
| Terminated | | |
| | | |
| Kansas | | |
| Lawrence | | |
| Christina Root | Lawrence, KS 66047 | (785) 865-4149 |
| Terminated | | |
| | | |
| Kentucky | | |
| Louisville | | |
| Hunter Hayes | Louisville, KY 40205 | (502) 523-6864 |
| Erin Lenahan | Louisville, KY 40205 | (502) 905-9059 |
| Transferred | | |

**Maryland**

| | | |
|---|---|---|
| Silver ~~Spring~~Springs<br>Victor ~~N.~~ Emeogo | Laurel, MD 20724 | (301)<br>~~728490-1582~~0146 |
| Terminated | | |

**Massachusetts**

| | | |
|---|---|---|
| Canton<br>Raymond Leung<br>Eric Leung<br>Transferred | Cumberland, RI 02864<br>Quincy, MA 02171 | (401) 305-6674<br>(781) 961-5972 |
| North Adams<br>Mark Florczyk<br>Jill Lampro<br>Transferred | Cheshire, MA 01225<br>Pittsfield, MA 01201 | (413) 822-7117<br>(413) 822-2651 |
| Pittsfield<br>~~Mark~~Marl Florczyk<br>Jill Lampro<br>Terminated | Cheshire, MA 01225<br>Pittsfield, MA 01201 | (413) 822-7117<br>(413) 822-2651 |
| Plymouth<br>Timothy Blakeman<br>Terminated | East Warren, MA 02538 | (617) 579-2575 |

**Michigan**

| | | |
|---|---|---|
| Highland<br>Steve ~~M.~~ Bloom<br>Terminated | Fowlerville, MI 48836 | (810) 623-5091 |
| Novi<br>David ~~J.~~ Kasha<br>Terminated | Warren, MI 48092 | (586) 524-0441 |

**New Hampshire**

| | | |
|---|---|---|
| Laconia<br>~~Laconia~~<br>Craig Devlin<br>~~Transferred~~ | Weirs Beach, NH 03247 | (603) 520-4790 |
| Transferred | | |
| Plymouth, NH<br>~~Plymouth, NH~~<br>Craig Devlin<br>~~Transferred~~ | Weirs Beach, NH 03247 | (603) 520-4790 |

Transferred

Salem
Eric Leung                          Quincy, MA 02171              (781) 961-5972
Raymond Leung                       Cumberland, RI 02864         (401) 305-6674

~~Salem~~
~~Eric Leung~~
~~Raymond Leung~~                   ~~Quincy, MA 02171~~         ~~(781) 961-5972~~
Transferred                         ~~Cumberland, RI 02864~~     ~~(401) 305-6674~~

**New Jersey**

New Providence
Fouad Yasser El Badrawy             Millington, NJ 07946         (908) 647-0002
Terminated

**New York**
Geneva
Andrew Day                          Geneva, NY 14456             (315) 521-2012
Daniel Day                          Geneva, NY 14456             (315) 521-2145
Terminated (Non-Renewal)

Irondequoit
Michael Racaniello                  Fairport, NY 14450           (585) 425-3433
Terminated.

Lakewood
Daniel Swackhammer                  Jamestown, NY 14701          (716) 483-6036
Terminated (Non-Renewal)

Malone
Todd Bender                         Batavia, NY                  (585) 356-5659
Terminated

New Paltz
Brian Hons                          Highland, NY 12528           (845) 489-0396
Kathleen Hons                       Wappinger Falls, NY 12590    (845) 297-0177
Terminated

Ontario
Michael Racaniello                  Fairport, NY 14450           (585) 425-3433
Terminated

Pulaski
Todd Bender                         Batavia, NY                  (585) 356-5659
Terminated

**Ohio**
Cincinnati

| | | |
|---|---|---|
| Mark Pfister<br>Transferred | Columbus, OH 43221 | (614) 481-9151 |
| Cincinnati (Delhi)<br>Mark Pfister<br>Transferred | Columbus, OH 43221 | (614) 481-9151 |
| Columbus<br>Anthony Romanelli<br>Transferred | Westerville, OH 43082 | (614) 895-2118 |
| Dublin<br>Anthony Romanelli<br>Transferred | Westerville, OH 43082 | (614) 895-2118 |

Findlay
Bruce Tichenor               Findlay, OH 45840 ~~1029~~               (419)
                                                                       ~~348424-98659871~~
Christine Tichenor           Findlay, OH 45840 ~~1029~~               (419) 424-9871
Terminated

Poland
~~Ritu Singla~~              ~~Springboro, OH 45066-1557~~           ~~(937) 603-1942~~
George Thomas               Pinkerington, OH 43147 ~~7857~~         (937) 760-0011
Ritu Singla                  Springboro, OH 45066                  (937) 603-1942
Terminated

**Pennsylvania**
Langhorne
Harbir Singh                 Moorestown, NJ 08057                   (586) 439-0767
Terminated

Pittsburgh
Jeffrey A. Swackhammer, Sr.  Export, PA 15632                      (412) 855-6190
Jeffrey A. Swackhammer, Jr.  Allison Park, PA 15101                (412) 849-8885
Terminated

**Rhode Island**

Barrington
Stephen Phelan               Barrington, RI 02806                  (860) 608-9494
Benjamin P. Bairstow         Rumford, RI 02916                     (401) 477-6849
Transferred

Bristol
Stephen Phelan               Barrington, RI 02806                  (860) 608-9494
Benjamin P. Bairstow         Rumford, RI 02916                     (401) 477-6849
Transferred

East Providence
Stephen Phelan               Barrington, RI 02806                  (860) 608-9494

| William Phelan | Canterbury, RI 06331 | (860) 608-9494 |
| Benjamin P. Bairstow | Rumford, RI 02916 | (401) 477-6849 |
| Transferred | | |

Exeter
| David Moone | West Kingstown, RI 02892 | (401) 595-4244 |
| Donald Somers | Wakefield, RI 02879 | (401) 742-6777 |
| Terminated | | |

Portsmouth
| Stephen Phelan | Barrington, RI 02806 | (860) 608-9494 |
| William Phelan | Canterbury, RI 06331 | (860) 608-9494 |
| Benjamin P. Bairstow | Rumford, RI 02916 | (401) 477-6849 |
| Transferred | | |

**Virginia**

Chesapeake
| William Dingler | Clarks Summit, PA 18411 | (757) 639-7135 |
| Joseph Eberwein | Virginia Beach, VA 23456 | (757) 613-3482 |
| Maureen Galvante | Virginia Beach, VA 23462 | (757) 222-4335 |
| Kevin Hughes | Virginia Beach, VA 23456 | (757) 301-2024 |
| William Dingler | Clarks Summit, PA 18411-2713 | (757) 639-7135 |
| Terminated | | |

Colonial Heights, VA
| Faiyaz Gilani | Chester, VA 23831 | (804) 852-8897 |
| Aniz Sabuwala | Mechanicsville, VA 23116 | (296) 559-9798 |
| Terminated | | |
| Terminated | | |

Daleville
| Brian Brady | Roanoke, VA 24012-6569 | (540) 597-9843 |
| Richard Christopher Himmel | Roanoke, VA 24015 | (540) 597-7381 |
| John Whitaker | Roanoke, VA 2401224019-67788422 | (540) 597-9789 |
| Transferred | | |

Roanoke
| Brian Brady | Roanoke, VA 24012-6569 | (540) 597-9843 |
| John Whitaker | Roanoke, VA24012 24019-67788422 | (540) 597-9789 |
| Terminated | | |

Below is a list containing the name, city and state, and business telephone number (or if unknown, the last known home telephone number) of every franchisee who was not yet operational whose franchise agreement was terminated, canceled, not renewed, or who otherwise voluntarily or involuntarily ceased to be a franchisee during the most recently completed fiscal year or who has not communicated with us within 10 weeks of the date of this Disclosure

Document. ~~We update this list below as of May 31, 2013.~~  If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

     None

~~We update the information for a portion of the year 2013 to add the name, city and state, and business telephone number (or if unknown, the last known home telephone number) of every franchisee of who was not yet operational whose franchise agreement was terminated, canceled, not renewed, or who otherwise voluntarily or involuntarily ceased to be a franchisee from January 1, 2013 through May 31, 2013 to correspond to the 2013 updates for this Item 20.   If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system. as follows:~~

     ~~None~~

If we offer you a franchise that was previously-owned by a franchisee but is now under our control, we will disclose the following additional information for the franchise for the last ~~five~~5 fiscal years in a Supplement to this Disclosure Document:  (i) the name, city and state, current business telephone number, or if unknown, last known home telephone number of each previous owner of the franchise; (ii)  the time period when each previous owner controlled the franchise; (iii) the reason for each previous change in ownership; and  (iv) the time period(s) when we retained control of the franchise.

Some of our current and/or former franchisees have signed confidentiality clauses during the last ~~three~~3 fiscal years ~~(and through May 31, 2013)~~.  In some instances, current and former franchisees sign provisions restricting their ability to speak openly about their experience with the Wireless Zone system.   You may wish to speak with current and former franchisees, but be aware that not all such franchisees will be able to communicate with you.

There are no franchisee associations required to be listed in this Disclosure Document.

## [THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]

## Item 21

### FINANCIAL STATEMENTS

Audited financial statements of ATI for the fiscal years ended December 31, ~~2012, 2011~~2013, 2012 and ~~2010,~~2011, and unaudited balance sheet and income statement for the ~~five~~2 month period from January 1, ~~2013,~~2014, ended ~~May 31, 2013,~~February 28, 2014, are attached as Exhibit K.

~~As a result of the acquisition by Glentel (USA), Inc. on December 1, 2012, ATI aligned its accounting policy with that of Glentel (USA), Inc. with respect to the presentation of Wholesale revenue and related Commissions cost of revenues. Accordingly, effective January 1, 2012, Wholesale revenue is reduced for the amount of cash consideration the Company receives from the service provider that is paid to franchisees for selling devices at a loss which are activated on the service provider's network; accordingly, commission cost of revenue is reduced by the same amount of cash consideration. This change had no impact to profitability. Prior years' financial statements have not been recast for this 2012 change in presentation.~~

## Item 22

### CONTRACTS

Exhibit B – Franchise Agreement

|  |  |
|---|---|
| Exhibit 1- | Agreement with Landlord |
| Exhibit 2- | Promissory Note |
| Exhibit 3- | Security Agreement and Demo Line Payment |
| Exhibit 4- | Electronic Funds Transfer Authorization |
| Exhibit 5- | UCC-1 Financing Statement |
| Exhibit 6- | Guaranty of Performance |
| Exhibit 7- | ~~Exhibit 7~~Confidentiality, Non-Competition and Assignment of Developments Agreement |
| Exhibit 8- | Provider Compliance Agreement |
| Exhibit 9- | End User License Agreement |

Exhibit C – Rider to the Franchise Agreement (Transfer)
Exhibit D – Transfer and Release Agreement
Exhibit E – SBA Addendum to Franchise Agreement
Exhibit F – Franchisee Participation Agreement (WZ Rewards)
Exhibit G – Addendum Re: Data Protection and Security
Exhibit H – Bill of Sale and Assignment, and
    Agreement to Purchase and Acceptance of Bill of Sale and Assignment

## Item 23

### RECEIPTS

The last page of this Disclosure Document is a detachable receipt in duplicate for this Disclosure Document (and certain other documents) to be signed by you as a prospective franchisee.

### [THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY]

## Exhibit B

### Franchise Agreement

# AUTOMOTIVE TECHNOLOGIES, INC.

## FRANCHISE AGREEMENT

Effective Date:_____

**Automotive Technologies, Inc.**
a Connecticut Corporation
34 Industrial Park Place
Middletown, CT 06457-1590

and

_____
_____
_____
_____

WZ#_____

AUTOMOTIVE TECHNOLOGIES, INC.
FRANCHISE AGREEMENT

TABLE OF CONTENTS

PAGE

BACKGROUND ................................................................................................................... 1

1.   SIGNIFICANT FRANCHISE AGREEMENT PROVISIONS ........................................ 23

1.01   Date of Franchise Agreement ................................................................... 23
1.02   Expiration Date ........................................................................................ 23
1.03   Renewal Notification Date ....................................................................... 23
1.04   Location of Store ...................................................................................... 23
1.05   Protected Territory ................................................................................... 23
1.06   Initial Franchise Fee .............................. 2 3
1.07   Federal Tax Identification Number ........................................................ 23
1.08   Minimum Monthly Activations ............................................................... 23
1.09   This Franchise Agreement is for a Satellite Store[Yes/No ...................... 2 Location ...... 3
1.10   Base Store Number ............................ 2 [if Satellite Location] ................. 3
1.11   WZ# ........................................................................................................... 23

2.   GRANT OF RIGHTS ...................................................................................................... 23

2.01   Grant .......................................................................................................... 23
2.02   Protected Territory ................................................................................... 34
2.03   Limited Grant ........................................................................................... 34
2.04   Rights Reserved ........................................................................................ 34

3.   TRADEMARKS .............................................................................................................. 45

3.01   Grant of Trademark License .................................................................... 45
3.02   Name of the Business ............................................................................... 45
3.03   Change of the Trademarks ....................................................................... 5
3.04   Trademark Prosecution ............................................................................ 5

4.   FRANCHISED LOCATION ........................................................................................... 56

5.   TERM OF FRANCHISE AGREEMENT AND RENEWAL OPTION .......................... 6

5.01   Term ........................................................................................................... 6
5.02   Renewal ..................................................................................................... 6
5.03   Notice Required By Law ........................................................................... 7

6.   FRANCHISE FEES ......................................................................................................... 78

6.01   Initial Fee .................................................................................................. 78
6.02   Continuing Royalties ................................................................................ 78
6.03   Gross Sales ................................................................................................ 89
6.04   New Programs ........................................................................................... 9
6.05   Withholding Commissions ....................................................................... 9

7.   FRANCHISEFRANCHISEE PROMOTION AND ADVERTISING ............................ 910

7.01   Collective Advertising and Promotion Fund ........................................... 910
7.02   Use of Collective Advertising and Promotion Fund ................................ 910

7.03    Local Promotion ................................................................................................ ~~10~~11
7.04    Initial Marketing Program .............................................................................. ~~10~~11
7.05    Community Service ............................................................................................. ~~10~~11
7.06    Global Fund Contribution ................................................................................ 11

8.      FRANCHISEE IDENTIFICATION ............................................................... 11

8.01    Display ................................................................................................................. 11
8.02    Identity as Franchisee ...................................................................................... 11

9.      TRAINING AND OPERATING ASSISTANCE .......................................... 11

9.01    Initial Training Program ................................................................................. 11
9.02    Staff Training .................................................................................................. ~~11~~12
9.03    Additional Training .......................................................................................... ~~11~~12
9.04    Additional Assistance ....................................................................................... 12
9.05    Limitation of Liability ..................................................................................... ~~12~~13
9.06    ATI as Your Attorney-in-Fact ....................................................................... ~~12~~13
9.07    Customer Service Obligations ......................................................................... ~~12~~13

10.     OPERATION OF THE BUSINESS ............................................................... 13

10.01   Operations ~~Manuals~~ ~~Manual~~ 13
10.02   Approval of Products and Services .............................................................. ~~13~~14
10.03   Management of the Business .......................................................................... 14
10.04   Insurance ........................................................................................................... 15
10.05   Construction, Maintenance and Repair of Store ........................................ ~~15~~16
10.06   Inspection of Store ........................................................................................... 16
10.07   Accounting System ........................................................................................... ~~16~~17
10.08   Compliance With Law; Sales Tax .................................................................. 17
10.09   Suggested Retail Prices ................................................................................... 17
10.10   Your Employees ................................................................................................ 17
10.11   Hours of Operation .......................................................................................... ~~17~~18
10.12   Franchise Cooperation ..................................................................................... ~~17~~18
10.13   Accounts Payable ~~18 10.14 ................... Security Agreement and Demo Line Payment; Electronic~~ ~~Funds Transfer Authorization~~ ............................................................................. 18
10.15   The World Wide Web and Internet ............................................................... 18

11.     ACCOUNTING AND RECORDS .................................................................. 18

11.01   Your Bank Account .......................................................................................... 18
11.02   Sales Records .................................................................................................... 18
11.03   Inspection and Audit ....................................................................................... ~~18~~19
11.04   Periodic Reports ............................................................................................... 19
11.05   Computer/Point of Sale System ..................................................................... 19
11.06   Electronic Funds Transfer .............................................................................. 20
11.07   Interest ............................................................................................................... 20

12.     ASSIGNMENT AND RIGHT OF FIRST REFUSAL ................................. 20

12.01   Assignment by ATI ........................................................................................... 20
12.02   Assignment by You ........................................................................................... ~~20~~21
12.03   Operation by a Business Organization ........................................................ 23

13.     STEP-IN RIGHTS ............................................................................................ 24

| 13.01 | Cause for Step-In | 24 | |
|---|---|---|---|
| 13.02 | Duties of the Parties | 25 | |
| | | | |
| **14.** | **DEFAULT AND TERMINATION** | | **25** |
| | | | |
| 14.01 | Immediate Termination | 25 | |
| 14.02 | Termination With Notice | 27 | |
| 14.03 | Other Defaults | 27 | |
| 14.04 | Cause | 27 | |
| 14.05 | Conformity With Law | 27 | |
| 14.06 | Anti-Terrorism Laws | 27 | |
| | | | |
| **15.** | **RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION** | | **28** |
| | | | |
| 15.01 | Your Obligations | 28 | |
| 15.02 | ATI's Obligation | 30 | |
| | | | |
| **16.** | **NON-COMPETITION AND NON-DISCLOSURE COVENANTS** | | **30** |
| | | | |
| 16.01 | Non-Competition | 30 | |
| 16.02 | Non-Disclosure | 31 | |
| 16.03 | Non-Circumvent | ~~32~~31 | |
| 16.04 | Legal Relief | ~~32~~31 | |
| 16.05 | Application of These Covenants | ~~32~~31 | |
| | | | |
| **17.** | **GENERAL CONDITIONS AND PROVISIONS** | | **32** |
| | | | |
| 17.01 | Titles for Convenience | 32 | |
| 17.02 | Entire Agreement | 32 | |
| 17.03 | Amendment in Writing | 32 | |
| 17.04 | Relationship of the Parties | 32 | |
| 17.05 | No Waiver | ~~33~~32 | |
| 17.06 | No Set-Offs | 33 | |
| 17.07 | Governing Law; Forum; Severability | | |
| ~~33~~17.07 Notice | | 33 | |
| 17.08 | ~~Waiver of Punitive Damages and Jury Trial~~      Notices 33 | | |
| 17.09 | WAIVER OF PUNITIVE DAMAGES | 33 | |
| 17.10 | WAIVER OF JURY TRAIL | 33 | |
| 17.11 | Waiver of Collateral Estoppel | 33 | |
| 17.12 | Force Majeure | ~~34~~33 | |
| ~~17.10~~17.13 | No Discrimination | 34 | |
| ~~17.11   Warranty Disclaimer   34~~17.14 | WARRANTY DISCLAIMER | 34 | |
| | | | |
| **18.** | **ACKNOWLEDGMENT** | | **34** |

EXHIBITS TO THE FRANCHISE AGREEMENT

| Exhibit 1 | Agreement with Landlord |
| Exhibit 2 | Promissory Note |
| Exhibit 3 | Security Agreement and Demo Line Payment |
| Exhibit 4 | Electronic Funds Transfer Authorization |
| Exhibit 5 | UCC-1— Financing Statement |
| Exhibit 6 | Guaranty of Performance |
| Exhibit 7 | Confidentiality, Non-Competition and Assignment of Developments Agreement |
| Exhibit 8 | Provider Compliance Agreement |
| Exhibit 9 | End User License Agreement |

## AUTOMOTIVE TECHNOLOGIES, INC.

### FRANCHISE AGREEMENT

This Franchise Agreement effective the date stated in Section 1.01, is between Automotive Technologies, Inc., a Connecticut corporation ("ATI") and the person or entity signing this Franchise Agreement as franchisee ("you" or "Franchisee") and is intended to describe and establish the relationship between ATI and you during the term of this Franchise Agreement. ATI strongly encourages you to read this Franchise Agreement carefully and with the assistance of a professional advisor who is familiar with franchising and franchise agreements.

### BACKGROUND

A.      ATI is the originator and creator of a system for establishing and operating outlets (a "Store" or "Business") for the retail sale, installation and repair of wireless telephone communications services and equipment, personal communications devices, entertainment and security products and services, and other forms of wireless and wireline services and products (the "System"). The System includes the confidential Operations Manual (as defined in Section 10.01), other proprietary information, proprietary trade names, service marks, trademarks, logotypes and designs (the "Trademarks"), trade dress, design, image, know-how, services and products, trade secrets, market analysis, sales and merchandising methods, training of franchisees and business personnel, advertising and marketing techniques, record keeping and business management, which ATI may change, improve, and further develop from time to time.

B.      ATI grants franchises to qualified individuals and business entities to establish and operate a Store using the System, under the Trademarks, including the mark "Wireless Zone®," which are identified with a reputation for high-quality products and services. The franchise will offer you the benefits of access to the System, such as access to certain products and services, and increased market appeal through quality marketing and assistance.

C.      You have applied for a franchise to enter the business of operating a store (your "Store"), using the Trademarks and the System on the terms and conditions contained in this Agreement. You acknowledge that you have furnished all pertinent information about yourself and your spouse, or if you are a business entity, about the owners of the business entity ("Owners") and their spouses, including representations concerning skill, aptitude, business and financial capacity, and that you have advised ATI of all persons who will hold an interest in this Franchise Agreement and your Store, and if you are a business entity, in the business entity, and that such information was and remains truthful and accurate.

D.      ATI has approved your application in reliance on all of the representations you made in your application.

E.      By executing this Franchise Agreement, you acknowledge the importance of ATI's quality and service standards and agree to operate your Store in accordance with those standards and as described in the System. You also acknowledge that adhering to the terms of this Franchise Agreement and implementing the System, and any changes to the System, as ATI directs, are essential to the operation of your Store, to the System and to all System franchisees.

F.      **You and ATI, to the fullest extent provided by law, WAIVE any right to or claim for any PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, and irrevocably WAIVE TRIAL BY JURY on any action, proceeding or counterclaim, brought by either party, as provided in Section 17.08.**

## AGREEMENT

THEREFORE, in consideration of the mutual agreements, covenants and promises contained in this Franchise Agreement and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, you and ATI agree to be bound legally as follows:

## 1.    SIGNIFICANT FRANCHISE AGREEMENT PROVISIONS

This Section 1 contains data used in other provisions of this Franchise Agreement but which are stated here for ease of reference.   Whenever any item contained in this Section is more specifically described in a subsequent section of this Franchise Agreement, the more specific description will control.

**1.01**     **Date of Franchise Agreement:** _____

**1.02**     **Expiration Date:** _____

**1.03**     **Renewal Notification Date:** _____

**1.04**     **Location of Store:** _____

**1.05**     **Protected Territory:** _____

_____

_____

**1.06**     **Initial Franchise Fee:** _____

**1.07**     **Federal Tax Identification Number:** _____

**1.08**     **Minimum Monthly Activations:** _____

**1.09**     **This Franchise Agreement is for a Satellite ~~Store~~Location [Yes/No]:** _____

**1.10**     **Base Store Number [if Satellite ~~Store~~Location]:** _____

**1.11**     **WZ#:** _____

## 2.    GRANT OF RIGHTS

**2.01    Grant.**    ATI grants to you and you accept the license to use the System and the Trademarks to operate your Store at, and only at, the location and for the term described in this Franchise Agreement.   For purposes of this Franchise Agreement, the license will include the right to conduct sales, installation and servicing of wireless telephone communications equipment, personal communications devices, other forms of wireless and wireline communications, and entertainment and security products and services, including new technologies approved for sale or service by ATI, all of which are offered at or from your Store premises.   You agree as a condition to this grant to comply with the obligations which you accept by signing this Franchise Agreement, including limiting your marketing and promotional activities to the Protected Territory, unless ATI has given you written approval otherwise.   ATI enters into a contract (the "Provider Contract") with one or more qualified wireless and wireline communications service provider(s) or manufacturer(s) (a "Provider" or "Providers") for the geographic area in which you operate your Store.   The Provider Contract authorizes ATI to market Provider's services in the geographic area, with the right to engage you as a sub-agent.   You will enter into the Provider Compliance Agreement with ATI in the form attached as Exhibit 8 to this Franchise Agreement as a condition to your acting as sub-agent for Provider.   If you have a minimum of one year operating experience, are in good standing under your existing franchise agreements, meet ATI's credit requirements, and obtain ATI's prior written approval, ATI may grant you a license to open one or more satellite locations within your Protected Territory, for which you will pay an additional franchise fee and sign the then-current form of franchise agreement, whose term will expire concurrently with that of the Franchise Agreement for the base Store identified in

Section 1.10 (the "Base Store"). You must operate each satellite location in strict conformity with the terms and conditions of the separate franchise agreement. A satellite location does not have its own Protected Territory. Therefore, if this Franchise Agreement is an agreement to operate a satellite location, as indicated in Section 1.09, this Franchise Agreement will automatically terminate if the Franchise Agreement for the Base Store is terminated so that ATI or a new franchisee may have total territorial rights in your Protected Area̶Territory for the Base Store.

**2.02    Protected Territory.** As long asIf you comply with the terms of this Franchise Agreement (and the terms of your franchise agreements for the Base Store and any satellite locations in your Protected Territory, if applicable), ATI will not license another franchisee to operate a Wireless Zone Store, or advertise, in the Protected Territory. ATI, however, expressly reserves for itself, for its affiliates and for its other franchisees the right to sell wireless telephones, other wireless and wireline communications devices and services, entertainment and security products and services, as well asand other products and services, in other channels of distribution, as provided in Section 2.04, and under other trademarks within or to the Protected Territory. Providers and other agents and sub-agents of Providers may also operate in your Protected Territory. Your Protected Territory specifically excludes exhibition, convention and/or conference halls and centers; ATI reserves the right for itself and/or ATI's franchisees to exhibit or participate at functions conducted at these types of venues. Your Protected Territory also specifically excludes enclosed shopping malls, whether now existing or arising in the future, that are or would be within the description of your Protected Territory, unless the Protected Territory is itself an enclosed shopping mall; ATI reserves the right for itself and/or ATI's franchisees to operate Wireless Zone Stores, kiosks and/or carts in these enclosed shopping malls. The description of your Protected Territory is based on certain U.S. Census Bureau, U.S. Postal Service and/or geographical maps existing as of the date of this Franchise Agreement. You are not granted any rights to conduct business on the World Wide Web or the Internet. However, you do agree to participate in ATI's authorized e-commerce programs, as ATI may establish and modify same from time to time, the specifics of which will be set out in the Operations Manual and you agree to accept as full and adequate consideration with regard thereto, those sums, amounts and/or payments as will be specified in the Operations Manual.

**2.03    Limited Grant.** You do acknowledge that this grant is a limited grant of rights. Upon termination for any reason or upon expiration of this Franchise Agreement, your rights to operate the Business will cease and this grant will terminate.

**2.04    Rights Reserved.**

A.    Modification of System. You-further understand and agree that ATI retains the right to modify the Trademarks, logos, color scheme and/or other trade dress of the System, as well as the System itself and products, items and services delivered pursuant tounder this Franchise Agreement, and to modify the standards, specifications and other requirements contained in the Operations Manual. You must comply with any such changes at your expense, as provided in this Franchise Agreement.

B.    Other Channels of Distribution. ATI, in the exercise of its sole and exclusive business judgment, retains the right, directly or through intermediaries or affiliates (including, but not limited to, sub-agents and licensees), to distribute, sell or license the distribution of any products, under or in connection with the Trademarks or any other trademarks, service marks, logos, and commercial symbols owned or licensed by ATI, to any purchaser wherever located via alternative distribution channels by wholesale, mail order or catalog business, on-line computer sales via the Internet, "e-commerce" or other computer sales methods, specialty sales, or via outbound telemarketing, toll free telephone numbers for delivery, other electronic means, or at or through department stores, big box stores, grocery stores, supermarkets, theme parks, airports, stadiums, arenas, and similar outlets, or by any other means other than from a Wireless Zone® Store established in a traditional location under the System using the Trademarks or any other trademarks. You will have the right to sell products under the Trademarks only by retail sale to the general public and small businesses and only through your Store and you will have no right to sell products through any alternative distribution channel. You have no right to share, and you should not expect to share, in any of the proceeds ATI or its intermediaries or affiliates (including, but not limited to,

sub-agents and licensees) or any other person receives in connection with any other channel of distribution except as specifically authorized by ATI.

C.    Other Systems. ` ATI expressly reserves for itself and for its affiliates the right to develop, operate and franchise similar or dissimilar systems, for the same, similar or different products, goods and/or services, under trademarks, service marks and commercial symbols other than the Trademarks, without offering them to you.

## ·3.    TRADEMARKS

**3.01    Grant of Trademark License.**  ATI, by this Franchise Agreement, grants to you a license to use and display the Trademarks, as ATI may direct in writing.  You acknowledge that the Trademarks are valid, and that valuable goodwill belonging solely to ATI is attached to the Trademarks.  You also acknowledge that ATI has licensed and will in the future license the Trademarks to other franchisees, sub-agents and to ATI's affiliates.  You agree that you will never directly or indirectly contest the validity or ownership of the Trademarks and that you will only use the Trademarks in a fashion expressly authorized in writing by ATI.  You agree that you will never directly or indirectly, at any time during or after the term of this Agreement, sell, give, provide to or otherwise assist any third party who is not a franchisee of ATI to obtain any advertising, signs, posters, point of sale materials, promotional materials, or other materials containing the Trademarks, including the trade dress.  You agree that you will not create any Website, social media site or register a domain name (whether containing the Trademarks or not) without ATI's prior written consent, which ATI is under no obligation to provide.  In the eventIf ATI will grantgrants such consent, you must conform your Website and social media sites to ATI's Website and social media site guidelines, as set out in the Operations Manual.  Following the expiration or termination of this Franchise Agreement, you will immediately discontinue the use of the Trademarks, any previously approved Websites, social media sites and/or domain name, e-mail address or URL incorporating the Trademarks which you will assign to ATI or otherwise, as directed.  You expressly appoint ATI as your attorney-in-fact to discontinue your use of the foregoing or to effectuate an assignment of same.  **You hereby ratify and approve all acts of ATI as your attorney-in-fact.  This power, being coupled with an interest, is irrevocable during the term of this Franchise Agreement and post termination where required by this Franchise Agreement.**

**3.02    Name of the Business.**  You will conduct your Business under the name and mark "Wireless Zone" or any other name or mark designated by ATI, without any suffix or prefix attached.  You also agree that you will not display the trademark, service mark, trade name or logo of any other person, firm or company in the Store, without the express prior written consent of ATI.  You will not use the Trademarks as part of any business entity name or in any unauthorized manner, you will not open any vendor accounts using the Trademarks, and you will not make any changes to the Trademarks without ATI's written approval.  You will display the Trademarks according to ATI's guidelines and specifications in the Operations Manual or otherwise and will obtain any fictitious or assumed name registrations required by applicable law, noting the fact of your use of the Trademarks "as a Wireless Zone® franchisee of Automotive Technologies, Inc." in the application, and if ATI directs, in any signs displayed at the Store, stationery and other materials.

**3.03    Change of the Trademarks.**  If ATI determines that one or more of its Trademarks are no longer viable commercially or legally, or determines to modify or change any of its Trademarks, then you agree to change the Trademarks as directed by ATI, at your sole expense.  This may include changing signs, graphics, interior trade dress, exterior decor, labels, products and supplies.  You agree to participate in all future Trademark transition programs.

**3.04    Trademark Prosecution.**  If a third party who is not a franchisee of ATI should use the Trademarks or any variations, ATI will determine whether or not to institute action and will alone control the litigation.  You agree to assist ATI in the pursuit of such litigation, as ATI may request.  You agree to notify ATI if you become aware of potential or actual infringement of ATI's Trademarks.  You agree to notify ATI promptly of any challenge to or litigation instituted by any person or legal entity against you

5 520
                                                                      13

involving ATI's Trademarks. If ATI, in its sole discretion, undertakes the defense or prosecution of any litigation relating to the ATI Trademarks, you agree to sign any and all documents, and to render any assistance as may, in the opinion of ATI's lawyers, be reasonably necessary to carry out the defense or prosecution. ATI will indemnify and hold you harmless from any suits, proceedings, demands, obligations, actions or claims, including costs and reasonable attorneys' fees, for any alleged infringement under federal or state trademark law arising solely from your use of ATI's Trademarks in accordance with this Agreement or as otherwise stated by ATI in writing if you have promptly notified ATI of the claim and cooperated in the defense of the claim.

## 4.    FRANCHISED LOCATION

The license which ATI grants to you by this Franchise Agreement is for the operation of one Store to be located at the address listed in Section 1.04, above, or at a location within the Protected Territory defined in Section 1.05, upon which both you and ATI agree. ATI maintains a right to approve your Store location, and you must seek and receive that approval in writing before you sign any Store lease or otherwise obligate yourself to a landlord. The Provider for your Protected Territory must also approve your Store's location and may withdraw approval at any time. ATI's approval of your Store's location does not guarantee that Provider will also approve the location. ATI will consider such factors as general location and immediate surroundings, traffic patterns, visibility, size, layout, rental and lease terms, competition and growth trends in the area in issuing its consent. ATI may review your lease if you request ATI's assistance or if ATI considers it advisable, but ATI is not obligated to review your lease. If ATI does review your lease, ATI will not provide any legal advice to you. ATI's approval of, and Provider's consent to, a site does not constitute a representation or warranty that the Store will be profitable or that your sales will attain any predetermined levels. Such approval is intended only to indicate that the proposed site meets ATI's and Provider's minimum criteria for identifying sites. You agree that ATI's and Provider's approval or disapproval of a proposed site will not impose any liability or obligation on ATI or Provider. ~~Prior to~~Before entering into a lease for your Store's location, you, your lessor/landlord and ATI will sign the Agreement with Landlord attached as Exhibit 1 to this Franchise Agreement or the lease itself will recite the terms of Exhibit 1. You must sign the lease as the tenant, so that at all times the person or entity named as the tenant under the lease is identical to the person or entity that is the franchisee under this Agreement. You must deliver a copy of the fully signed lease, and Exhibit 1 if applicable, and any lease renewal or amendment, within fifteen (15) days after it is fully signed.

If the lease for your Store location expires, is not renewed or is otherwise terminated, you will secure another approved Store location within ninety (90) days after the expiration or termination of the prior lease. You agree that in order to operate another Wireless Zone location in the Protected Territory or in a different or additional territory, you must sign a separate franchise agreement, the terms of which may differ materially from this Franchise Agreement, and pay an additional franchise fee.

## 5.    TERM OF FRANCHISE AGREEMENT AND RENEWAL OPTION

**5.01    Term.**  The term of this Franchise Agreement will be for seven (7) years, unless terminated earlier for a reason cited in this Franchise Agreement. If your Store is a satellite location, the term of this Franchise Agreement will expire concurrently with the term of the Franchise Agreement for the Base Store. The expiration date is stated in Section 1.02.

**5.02    Renewal.**  You will have an option to renew this Franchise for one additional seven (7) year term, subject to certain conditions which follow:

A.    You must have an effective Store lease covering, at a minimum, the first three (3) years of the renewal term.

B.    You must notify ATI in writing, at least six (6) months before the expiration date of this Franchise Agreement, of your desire to renew this Franchise Agreement for the renewal period. You agree to sign the then-current form Franchise Agreement used by ATI, no later than three (3) months before the

expiration date of this Franchise Agreement (the "Exercise Date"). The new form Franchise Agreement may contain materially different terms and obligations than this Franchise Agreement. You must pay the then-current renewal fee at the time you sign the new Franchise Agreement. If you operate a satellite location, the renewal fee for the satellite location will be the prorated amount of the renewal fee then in effect based on the number of months the satellite location's franchise agreement was in effect as a percentage of the initial term of the Franchise Agreement for the Base Store (84 months), rounded to the nearest full year.

C.     Even though ATI extends this right of renewal, you may not have the right to exercise this renewal option if, as of the Exercise Date, you have not paid all monies which are then due and owing to ATI or its affiliates, or if you have uncured defaults. You will cure any defaults or deficiencies which require correction ~~prior to~~before signing the renewal franchise agreement. ATI may elect to revoke the renewal option if you have received four (4) or more default notices within any two (2) year period during the term of this Franchise Agreement.

D.     You agree, as a condition to the renewal, that you will renovate and modernize the Store in order to meet ATI's then-prevailing design criteria and that you will expend all monies reasonably necessary to complete such renovation and modernization.

E.     You agree, as a condition of renewal, that you will upgrade the computer hardware and software and computerized point of sale system in order to meet ATI's then prevailing specifications, that you will acquire such items only from an approved supplier, and that you will expend all monies reasonably necessary to complete such upgrade.

F.     You will sign a general release, in a form satisfactory to ATI, of any and all claims against ATI, its parent, subsidiaries or affiliates (if applicable) and their officers, directors, attorneys, shareholders, members, employees and agents in ATI's/their corporate and individual capacities.

G.     If ATI and you are actively pursuing the above procedures to renew but the term expires, this Franchise Agreement may continue on a month-to-month basis as provided in this Section 5.02.G. If you fail to sign the renewal franchise agreement ~~prior to~~before the expiration of this Franchise Agreement, and if you continue to operate the Store beyond the term of this Franchise Agreement when a renewal is pending, this Franchise Agreement will be deemed to be on a month-to-month basis under the terms of this Franchise Agreement; provided, however, either party may give the other party 30 days' advanced written notice (or such other notice as may be required by applicable law) that it does not wish to continue to extend the term of this Franchise Agreement and, in such event, this Franchise Agreement will expire on the 30th day after receipt of the notice or, at ATI's election only, the expiration date will be the last day of the same month containing such 30th day. Upon any expiration after or termination during any holdover period, as the case may be, the applicable post-termination obligations contained in this Franchise Agreement ~~shall~~will continue to be applicable. If, for any reason, you continue to operate the Store beyond the term of this Franchise Agreement you will pay ATI on a monthly basis a fee, of $200 per month, which ATI may deduct from your Commissions. If ATI does not elect to deduct or all or part of the $200 fee or if your monthly Commissions are not sufficient to pay the $200 holdover fee and any other amounts you may owe ATI in full, you will pay the balance of the $200 fee no later than the first day of the month following the month in which the fee accrues. Notwithstanding the forgoing, nothing herein implies that you have a right to a holdover and nothing will limit ATI's rights and remedies ~~with respect to~~for such holdover.

**5.03     Notice Required By Law.** If any applicable state or federal law should require ATI to provide you with a longer notice period, then this Franchise Agreement will remain in effect on a month-to-month basis until ATI has given you the amount of notice which the law may require. You must, however, have a Store lease which is effective during this post-expiration period.

## 6. FRANCHISE FEES

**6.01 Initial Fee.** You will, at the same time that you sign this Franchise Agreement, pay ATI the initial franchise fee listed in Section 1.06. The fee is fully earned upon payment, and will not be refunded or forgiven for any reason, except as stated below. If you finance the initial franchise fee with ATI, then you must enter into the Promissory Note which is attached as Exhibit 2 to this Franchise Agreement. If you and ATI do not mutually agree on a location for your Store that is also acceptable to Provider as required under Section 4 within ninety (90) days after the date of this Franchise Agreement, ATI can choose to terminate this Franchise Agreement. If that occurs, ATI will refund any franchise fees you paid up to the date of termination, less ATI's then incurred out-of-pocket expenses. ATI may require that you, and if you are an entity, all Owners, sign a release, as a condition to granting the refund. If ATI does not choose to terminate, you must comply with the development obligations in this Franchise Agreement and we will not refund any amount even if we terminate for failure to open your Store within the time required ~~pursuant to~~under Section 14.01.M.

If you are permitted to open a satellite Store within the Protected Territory, you must sign a separate franchise agreement, on the then-current form, for the satellite Store and pay an initial franchise fee of $1,500. If you are given approval to open an additional Store outside your Protected Territory (which approval ATI is not obligated to give), you must sign a separate franchise agreement for that location and pay the applicable then-current initial franchise fee.

If you paid an initial franchise fee of $1,000 because you were an existing ATI franchisee in good standing who owned franchises for 10 or more Stores (not including any satellite locations), and all of the franchises were owned by the same business entity, you may not transfer any franchise acquired at the $1,000 initial franchise fee unless the Store is in operation.

**6.02 Continuing Royalties.**

A. You will pay ATI continuing royalties during the term of this Franchise Agreement ("Continuing Royalties") calculated either under the basis of Commissions (as defined below) described in this Section 6.02.A or under the Gross Sales basis described in Section 6.02.C. Typically under ATI's Provider Contract for your geographic area, certain customer payments are forwarded to Provider and not retained by you or ATI. Provider then pays ATI commissions ("Commissions") on these customer payments attributable to your Store, which ATI passes along to you as ATI's sub-agent, minus deductions for amounts you owe ATI. Subject to Section 6.02.C, ATI will deduct from the Provider Commissions ATI transmits to you, as Continuing Royalties payable by you to ATI: (i) ten percent (10%) of Commissions ATI receives from Provider attributable to your customer activations, upgrades, enhanced services, and other products or services; and (ii) twenty percent (20%) of Residuals (as defined below) ATI receives from Provider attributable to your Store. Residuals may cease if your Store closes, is transferred, or you fail to meet minimum Provider-imposed performance criteria.

If your monthly Commissions are less than the Continuing Royalties and any other payments you owe to ATI, ATI will retain all of your Commissions for the period and you will pay the balance you owe to ATI no later than the first day of the following month that the payments are due. Any amounts you owe Provider for "demo lines" will also be paid in a like manner ~~pursuant to~~under the Security Agreement and Demo Line Payment attached to this Franchise Agreement as Exhibit 3 and Electronic Funds Transfer Authorization attached to this Franchise Agreement as Exhibit 4.

B. "Residuals" are Commissions payable by a Provider in consideration of ongoing and continued service and support to subscribers as designated in the Provider Contract, and may also be known as account maintenance fees. "Continuing Residuals" are Residuals paid for a period of time following customer activation; "One-Time Residuals" are paid in one sum in connection with activation, in accordance with the Provider Contract. Residuals paid by Providers will be escrowed by ATI on a monthly or quarterly basis, as they are received by ATI from Providers. Twenty percent (20%) of that escrow will be retained by ATI as Continuing Royalties due ATI from you under Section 6.02.A and from

all other franchisees or sub-agents under a similar provision.  For Continuing Residuals, the remainder of the escrow will be divided among ATI franchisees and sub-agents by the present number of qualifying active customers as defined in the Provider Contract.  For One-Time Residuals, the amount due to you will be paid for your qualifying active customers as defined in the Provider Contract.  You will receive your portion of the escrow based upon the number of your qualifying active customers, subject to set-offs as described in Section 6.02.A.

 C. If the economic terms of the Provider Contract used by ATI for services sold at your Store is changed to the detriment of ATI, you agree (1) to pay ATI, by the 10th business day of each subsequent month, Continuing Royalties on the basis of Gross Sales, equal to five percent (5%) of your Gross Sales, as defined in Section 6.03 below, or (2) to the deduction by ATI of the Continuing Royalties in the amounts due ATI in accordance with Section 6.02.A and 6.02.B above; whichever is greater.

 D. You acknowledge that ATI's franchisees may be serviced by different Providers offering different compensation programs.  Therefore, the amounts and methods of paying for Continuing Royalties will vary between franchisees located in different wireless service territories, and may include other forms of payment to ATI by Providers.

 **6.03** **Gross Sales.**  The term "Gross Sales" means the total amount charged for all merchandise and services sold or rendered by you, for which compensation is not separately received from Provider, including equipment other than wireless telephones, personal communications devices, other forms of wireless and wireline communications, entertainment and security products and services, and all other products sold from, and all other services offered from, your Store, whether payment for the merchandise and services will be made by cash, check, credit, charge account, barter or exchange and if by credit, whether or not the credit will be collected or not.  All amounts charged for work left at your Store will be deemed "Gross Sales" on the day the work is received by you.  The term "Gross Sales" will exclude any amounts paid by you for any federal, state, county and city sales taxes or other similar taxes which may now and hereafter be imposed or required to be paid by you as against sales on the premises.  If at any time any Commissions, as described in Section 6.02, are no longer paid, then the term "Gross Sales" will be expanded to include the sale of wireless and wireline communications equipment (new or used) and entertainment and security products (new or used) and services.

 **6.04** **New Programs.**  ATI reserves the right in the exercise of its sole and exclusive business judgment, to provide for a royalty or other form of fee payment by you with regard to programs, marketing efforts, products, services or other revenue generating opportunities, that ATI makes available under the System, at such time as same are introduced into and made part of the System.

 **6.05** **Withholding Commissions.**  During any period that you or any of your Owners are in default under this Franchise Agreement or any other agreement between you or any of your Owners and ATI, ATI may hold the Commissions, and other amounts ATI receives from Providers that are payable to you, after ATI deducts any amounts due to ATI, until you or your Owners have cured the defaults to the satisfaction of ATI or until this Franchise Agreement is terminated.  On termination or expiration of this Franchise Agreement, you authorize ATI to use any such withheld amounts to pay any remaining amounts owed to ATI or to any third parties in connection with your Store (such as vendors and landlords).  After termination or expiration of this Franchise Agreement, ATI may continue withholding for these purposes from amounts accrued before termination or expiration until the later of: (a) receipt by ATI of confirmation that all amounts owed by you to third parties in connection with your Store have been paid in full; or (b) nine (9) months after the date of termination.  Third party creditors of yours are not intended beneficiaries of this Franchise Agreement and do not have any right to compel ATI to make payment to them.  ATI will not be liable to you for any payment it may make to a third party under this Section 6.05.  No Commissions or other amounts will accrue to you following termination or expiration of this Franchise Agreement.

7.   **FRANCHISEE PROMOTION AND ADVERTISING**

7.01   **Collective Advertising and Promotion Fund.**

A.    ATI will expend cooperative advertising monies (the "Collective Advertising and Promotion Fund") on local or regional advertising provided you comply with the rules and requirements of the applicable cooperative advertising program.   The Collective Advertising and Promotion Fund will be funded by payments from Providers based on the Provider Contract in effect for the geographic region in which you operate the Store, or in the absence of Provider payments, by franchisee contributions under Section 7.01.B.  Because the advertising programs vary from Provider to Provider, ATI cannot and will not warrant the type, level or effectiveness of cooperative advertising in the geographic region in which you operate your Store.  In addition to amounts from the Collective Advertising and Promotion Fund expended on a collective basis, there may be other funds made available to you or for which matching funds are available from Provider for local advertising by you if you comply with Provider's and ATI's matching fund requirements.

B.    ~~In the event~~If that Provider discontinues its cooperative advertising allowance program, ATI reserves the option to collect and you hereby agree to pay to the Collective Advertising and Promotion Fund an advertising contribution, not to exceed five percent (5%) of your Gross Sales and your portion of Commissions paid by Providers, payable by the 10th day of each successive month.  Subject to Section 6.02.C, ATI may deduct your advertising contributions from the Provider Commissions ATI transmits to you, or may otherwise collect the advertising contribution in the same manner and at the same time ATI deducts or collects payments of your Continuing Royalties.

7.02   **Use of Collective Advertising and Promotion Fund.**   ATI, in the exercise of its sole and exclusive business judgment, may spend all money collected under Section 7.01 above for local and regional advertising, public relations or promotional campaigns or programs which promote and enhance the quality image, identity and patronage of Wireless Zone locations.  The Collective Advertising and Promotion Fund monies may be used for the formulation, design, development, test marketing, market studies, production and placement of advertisements, point of sale materials, promotional materials, newsletters, public relations, website development costs, social media site development costs, electronic advertisements, Intranet development costs, toll-free business locator costs, and all other costs for any advertising and promotion, including the payment to ATI, its affiliates or advertising agencies for administrative expenses (including operating expenses and the proportionate compensation of ATI's employees who devote time and render services in the conduct, formulation, development and production of advertising and promotion programs or who administer these funds).  You acknowledge that ATI will use its sole and exclusive business judgment in the administration of the Collective Advertising and Promotion Fund and that ATI is not obligated to develop, implement or administer these funds to ~~insure~~ensure that expenditures are proportionate or equivalent to payments attributable to a particular Store, or to allocate or spend money to benefit any particular franchisee or group of franchisees, or to expend money in any particular geographic area on a pro rata basis.  No percentage of the funds collected will be used for advertising that is principally a solicitation for the sale of franchises but ATI reserves the right to include a message or statement in any advertisement indicating that franchises are available for purchase and related information.  You ~~further~~ acknowledge that ATI is not a fiduciary with respect to the Collective Advertising and Promotion Fund and that no fiduciary relationship is created or exists by virtue of the existence of the Collective Advertising and Promotion Fund.  ATI intends, but is not obligated to spend Provider payments and franchisee advertising contributions during the year in which they are made or within six (6) months, assuming Providers allow funds to be held that long after their collection.  If there are any amounts remaining after these time periods, ATI will apply them to the creation and implementation of advertising and marketing programs at ATI's sole discretion.  ATI's expenditure of funds for advertising is for the benefit of all franchisees in the protected territories covered by the selected advertising media, and is under the control and within the exercise of ATI's sole and exclusive business judgment at all times.  All contributions to the Collective Advertising and Promotion Fund made by franchisees are non-refundable.  Once made, the contributions no longer are identified with any particular franchisee nor are they considered as an asset of the contributing franchisee.  ATI will furnish you

annually, on request, with an individualized unaudited accounting of the advertising contributions received and monies expended on advertising expenses. ATI will retain up to fifteen percent (15%) of the Collective Advertising and Promotion monies collected from Providers and monthly franchisee contributions as payment for the production services rendered by its in-house agency, or for coordinating with an outside agency, if one is used.

**7.03    Local Promotion.**    You acknowledge the need to further the public image and recognition of your Store. You agree that you will aggressively promote your Store in your local geographic area but that you will not promote and/or market your Store outside your Protected Territory, unless approved, in writing, in advance, by ATI. All local marketing and promotion by you of any type will be conducted in a dignified manner. All local marketing and promotion will be subject to ATI's prior review and written approval, including Website and social media site content, if allowed by ATI. ATI may require that the only Website and social media sites for you and the System will be the Website and social media sites that ATI maintains. You will adhere to ATI's standards and advice regarding your marketing and promotion efforts and expenditures.

**7.04    Initial Marketing Program.**    ATI may require that you develop an initial marketing program campaign. You will bear the cost of any initial marketing program campaign. You must submit your plan for any required initial marketing program campaign to ATI for review and approval in advance. ATI may assist you in the development of the initial marketing program campaign.

**7.05    Community Service.**    You acknowledge the importance of participating in and servicing community and other philanthropic organizations, and agree to become a member of one or more civic organization(s) in the community in which your Store is located. ATI may suggest certain organizations and may encourage all of its franchisees to participate in specific philanthropic programs, including ~~but not limited to~~ the Wireless Zone Foundation for Giving, Inc. In addition, you agree to participate in all programs supported by ATI which ATI has designated as mandatory.

**7.06    Global Fund Contribution.**    In addition to any other amounts due under this Franchise Agreement, you hereby agree to pay to ATI its then-current global fund contribution determined by ATI. The global fund contribution includes (a) the amount of point of sale software license continuing monthly fees for up to three (3) licenses for your Store; you will pay a point of sale software license fee for any additional licenses at ATI's then-current rate; and (b) other amounts ATI collects on behalf of third party vendors; and may include (c) ATI's gift card program; and (d) other amounts ATI specifies. The global fund contribution will be payable by the 10th day of each successive month. Subject to Section 6.02.C, ATI may deduct your global fund contribution from the Provider Commissions ATI transmits to you, or may otherwise collect the fee in the same manner and at the same time ATI deducts or collects payments of your Continuing Royalties.

## 8.    FRANCHISEE IDENTIFICATION

**8.01    Display.**    You agree to purchase and display in a prominent place and fashion whatever advertising, signs, posters and other materials ATI may specify, including all elements of trade dress (which may include the design of the Store and displays, framed posters, interior colors and choice of furnishings).

**8.02    Identity as Franchisee.**    You agree that at all times and in all of your business dealings and to the general public, you will identify yourself as a franchisee of ATI, in the manner specified by ATI. You also agree that you will never identify yourself as being ATI, a subsidiary, division, partner, joint venturer, agent or employee of ATI, Wireless Zone or of any other Wireless Zone franchisee.

## 9.    TRAINING AND OPERATING ASSISTANCE

**9.01    Initial Training Program.**    ATI will provide, and each person signing this Franchise Agreement as franchisee, or each individual who owns a twenty percent (20%) or greater interest in the Business Organization (as defined in Section 12.03), must complete, to ATI's satisfaction, ATI's

mandatory initial training program. However, if you designate in writing on a form acceptable to ATI, one or more of the individual franchisees, or the Owners the Business Organization, as applicable, or one or more employees, who are acceptable to ATI as general managers to serve as your proxy to supervise the operation of your Store, then only the designated general managers must attend and satisfactorily complete the initial training program. You must designate a general manager if neither you nor an Owner having more than five percent (5%) ownership interest in the Business Organization ("5% Owner") will devote a minimum of forty (40) hours per week to the Business as provided in Section 10.03.B. You and/or the designated general managers must also attend all future mandatory training programs and meet the requirements stated in Section 10.03.B. ATI will provide initial training to one individual without charge. ATI may charge its then-current initial training fee for any additional individual to attend or access all or a portion of ATI's initial training program. You will also be responsible for the costs associated with travel, lodging, meals, and salaries, if applicable, incurred by all attendees while attending the initial training program. The training will be conducted at ATI's corporate headquarters, an ATI facility, your Store, and/or at another location designated by ATI and/or via Intranet or other form of electronic communication. Only after you or your general manager have completed the training will ATI allow you to begin to operate your Store.

**9.02 Staff Training.** You will employ at all times during the term of this Franchise Agreement only employees who have been satisfactorily trained in the ATI System, either by ATI or you, ~~as well as~~and having satisfactorily completed all training programs required by Providers servicing your Protected Territory.

**9.03 Additional Training.** ATI will provide, upon your request, additional on-site operational, sales and promotional training to the management and operation of your Store. ATI may also provide additional mandatory and optional training at another location designated by ATI, including at a convention, and/or via Intranet or other form of electronic communication. ATI may charge its then-current training fee for the type of training program ATI provides. You will be responsible for the costs associated with any travel, lodging, meals and any additional out-of-pocket living expenses incurred by ATI's representative during the training. You will also be responsible for the costs associated with any travel, lodging, meals, and salaries, if applicable, incurred by all attendees.

**9.04 Additional Assistance.** ATI will provide you with the following additional services:

A. Operations Manual. ATI will allow you access to the Operations Manual (which is described more fully below). The Operations Manual will remain the property of ATI while you use it in the operation of the Business.

B. Operating Assistance. In addition to the initial training program, ATI will have a company representative train and assist you and your staff for up to three (3) business days during the period immediately before and following the opening of the Store, if you expressly request this assistance in writing. ATi will coordinate and conduct periodic training programs for its franchisees, as ATI deems necessary in the exercise of its sole and exclusive business judgment. You will participate in these periodic training programs. You also agree to attend regularly scheduled meetings and ongoing training meetings conducted by ATI or its designee. You will attend all special and training meetings conducted by Providers, as scheduled by ATI. ATI may charge ATI's then-current "no-show fee" if you or any of your employees register for a training program, meeting, seminar, or other event, but fail to attend, or fail to attend a mandatory meeting. At the time of execution of this Agreement, this fee is $200 per no-show, and is subject to change ~~from time to time~~.

C. Ongoing Assistance and Supervision. ATI will furnish you with operating assistance and supervision, through company representatives, as ATI deems appropriate. This ongoing assistance might include, by example, on-site visits, reasonable telephone calls, evaluations of your sales and profitability, and recommendations for operational improvements. You will remedy immediately any deficiencies or unsatisfactory conditions which ATI's representatives determine exist, including any failure to adhere to ATI's stringent standards for quality service.

**9.05** **Limitation of Liability.** While ATI agrees that it will apply its skill and judgment to training and assisting you in the operation of your Store, you agree that ATI makes no warranty concerning its services which will be provided **AS IS**, and ATI will not be liable to you or to any third party for the performance or failure to perform of any employee, advisor, consultant or contractor of ATI.

**9.06** **ATI as Your Attorney-in-Fact.** You appoint ATI to serve as your attorney-in-fact to negotiate all Provider contracts, cooperative advertising and market development fund arrangements, and other vendor or industry agreements affecting segments of, or the entire Wireless Zone System. If you are a conversion franchisee, you authorize ATI to receive all existing and future cooperative advertising and market development funds and residual customer use Commissions attributable to your business operation and you appoint ATI as your attorney-in-fact to sign the vendor documentation to evidence the transfer of all these funds. You will assist ATI in securing all information as ATI may request and authorize the vendors to release information about you and your Store to ATI. **You hereby ratify and approve all acts of ATI as your attorney-in-fact. This power, being coupled with an interest, is irrevocable during the term of this Franchise Agreement and post termination where required by this Franchise Agreement.**

**9.07** **Customer Service Obligations.** You will address customer service issues in accordance with ATI's guidelines and cooperate with other Wireless Zone franchisees in resolving customer service issues. You grant to ATI the right to resolve, in the manner ATI determines in the exercise of its reasonable business judgment, any bona fide customer complaint or customer service issues both with customers and other Wireless Zone franchisees which come to ATI's attention and which you cannot first remedy in a timely manner. You will reimburse ATI and/or the customer or other franchisee for any charges, credits or refunds which ATI determines, in ATI's reasonable business judgment, should be made. Reimbursement may be made by way of deduction from Commissions due you by ATI.

## 10.   OPERATION OF THE BUSINESS

**10.01** **Operations Manual.** You will conduct your Business by strictly following the Operations Manual (the "Operations Manual"). You acknowledge that this is vitally important to you, ATI and all other System franchisees, and necessary to protect the reputation and goodwill of ATI and the Trademarks and to maintain the uniform quality standards of operation throughout the Wireless Zone System. The Operations Manual is a compilation of manuals, books, binders, videos or other electronic media, Intranet postings and other materials containing operating data, specifications, standards, operating procedures, checklists, equipment, services and other information relating to establishment and operation of the Business and to the System. When in this Franchise Agreement it refers to ATI providing you with a "written" communication or a notice or information (including the Operations Manual) "in writing," ATI may or may not provide you with a paper ("hard copy") form of the information. ATI may choose to provide the communication or notice only through electronic communication or posting to ATI's website(s).

A.    Confidentiality of Operations Manual. You agree that you will always treat the Operations Manual as confidential and that you will never disclose, copy, duplicate or otherwise reproduce any portion of the Operations Manual. You also agree never to make the Operations Manual available to a person or entity who has not been expressly authorized by ATI to receive same. You will return the Operations Manual to ATI (or cease your access to it) immediately upon the expiration or other termination of this Franchise Agreement.

B.    Modifications. You recognize and agree that ATI will, from time to time, change or modify any standard of operation, specification or operating procedure or any of the Trademarks applicable to the operation of your Store or change all or any part of the System through changes in the Operation Manual's contents or written notice to you. You will accept and adopt all changes and modifications (which may be communicated in tangible or electronic form), make reasonable expenditures associated with the changes and modifications, and do so within the time periods established by ATI. You shallwill

familiarize yourself with changes to the Operations Manual as they are posted. These changes may include the adoption of new technologies and new products and the discontinuance of certain products or services that ATI determines in its sole and exclusive business judgment are no longer appropriate or advantageous for the Wireless Zone System.

C.    Standards and Specifications. You agree that at all times you will follow and apply all standards and specifications applicable to your Store as detailed in the Operations Manual, as same may change from time to time. ATI may vary the standards and specifications to take into account unique features of specific locations or types of locations, special requirements and other factors ATI considers relevant in ATI's sole and exclusive business judgment.

**10.02    Approval of Products and Services.** You will establish, maintain and increase the sales of approved products and services at or from your Store. Toward that end, you will offer for sale at your Store, on an exclusive basis, only those products and services which have been specifically authorized by ATI. ATI has developed and will continue to refine specific standards for the products sold and the services offered from Wireless Zone locations. ATI and its affiliates may be an approved supplier or designated sole supplier for any purchases of products or services and may obtain revenue from you and make a profit. You recognize that the image, reputation and goodwill that ATI has established are based upon the sale of the quality products and services which ATI may specify. Customers of Wireless Zone Stores will rely on the availability of the uniformly high quality and selection of products and services. ATI reserves the right in the exercise of its sole and exclusive business judgment to establish vendor criteria for quality and service, as outlined in the Operations Manual, and you must purchase products and equipment from suppliers approved by ATI that meet the criteria. Providers may specify certain equipment for use with their services, together with certain equipment configurations, and you must comply with Providers' requirements. You must also complete and sign any documents required by Providers. You will maintain at all times an inventory of authorized and approved products, in sufficient supply, to satisfy reasonable customer demand. ATI reserves the right to receive rebates, incentives, and other payments from suppliers and others in connection with franchisees' purchases and to use the fees for ATI's own purposes, unless ATI otherwise agrees with the supplier.

If you wish to buy products or equipment of a brand or from a supplier that is not approved by ATI, or offer for sale products or services not authorized by ATI, you must notify ATI in writing of your intent, and submit specifications, samples and other information that ATI may request. ATI will, within a reasonable time, determine whether the products, equipment, services and/or suppliers are substantially equal in quality, performance, appearance, or reliability and other relevant characteristics to the products or suppliers approved by ATI, or are suitable to be offered by Wireless Zone® Stores, and will either approve or disapprove your request in writing, except that ATI will not authorize alternatives to exclusive Providers.

**10.03    Management of the Business.**

A.    General. You will have sole authority and control over the day-to-day operations of the Business and its employees. With regard to your employees, you will be solely responsible for their training, wages, taxes, benefits, vacation, safety, work schedules and assignments. At no time will you or your employees be deemed employees of ATI. You will comply with all requirements established from time to time by Providers.

B.    Supervision. You (including each person signing this Franchise Agreement as franchisee, or each individual who owns a five percent (5%) or greater interest in the Business Organization) or your designated general manager (described in Section 9.01) will devote a minimum of forty (40) hours per week to managing, operating and developing the Business, except for reasonable vacation and sick time. You must designate a general manager if neither you nor any individual who owns a five percent (5%) or greater interest in the Business Organization will devote a minimum of forty (40) hours per week to the Business. You or the general manager must satisfactorily complete ATI's initial training program and meet the educational and experience standards ATI imposes for the person having management responsibility for your Store. ATI must approve your appointment of any general manager and any replacement general

manager, and the individual must attend and satisfactorily complete ATI's initial training program before the individual assumes responsibility for management of your Store. If any designated general manager does not complete the initial training program to ATI's satisfaction, the individual will have to repeat the class or portions of it until ATI is satisfied, or you will have to replace the individual and that replacement will have to attend and complete ATI's initial training class and any mandatory additional training course to ATI's satisfaction. The general manager may, but does not have to, have an equity ownership in the franchise but the general manager must sign the Confidentiality, Non-Competition and Assignment of Developments Agreement. If the general manager does resign, you must designate a replacement satisfactory to ATI and meeting the requirements contained in this Franchise Agreement so that at all times your Store is under the management of an individual with the education, experience and training necessary to the conduct of the operation of the Store. During the term of this Franchise Agreement, you will not engage in any other business or investment requiring your active participation during normal business hours, unless ATI has expressly approved in writing an arrangement by which your Store is managed by a general manager. In such event, you will devote a minimum of 10 hours per week to oversight of the Business if we direct, and you will also attend regularly-scheduled meetings and ongoing training meetings we conduct, if we direct. While on the Store premises, you will conform to, and cause all your employees to conform to, the dress code as stated in the Operations Manual.

**10.04 Insurance.** You will obtain, ~~prior to~~before the commencement of your business operations under this Franchise Agreement, and maintain in full force and effect at all times during the term of this Franchise Agreement, at your expense, an insurance policy or policies protecting you, ATI and its affiliates, and their respective officers, directors, partners, shareholders, members, agents, and employees against any demand or claim ~~with respect to~~for personal injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring upon or in connection with your Store. This insurance will be, at a minimum, for the coverage and in the amounts as specified in the Operations Manual. The policies will be written by a responsible carrier or carriers acceptable to ATI, and will include the interests of ATI and its affiliates to be noted as additional insured. Nothing contained in this Franchise Agreement or in the Operations Manual will be construed as a representation by ATI that the insurance you obtain will insure you against any and all insurable risks of loss which may or can arise out of or in conjunction with, the operation of your Store. You should, therefore, evaluate your insurance needs with an independent advisor.

A. ATI's Insurance. Your obligation to obtain and maintain the policy or policies in the amounts specified is not limited in any way by reason of any insurance which may be maintained by ATI, nor will your performance of that obligation relieve you of liability under indemnity provisions contained in this Franchise Agreement.

B. Certificates. ~~Prior to~~Before the commencement of any business operations under this Franchise Agreement, and then on an annual basis, you will deliver to ATI certificates of insurance evidencing proper types and minimum amounts of coverage. You will also maintain certificates of insurance evidencing the proper types and minimum amounts of coverage at the Store. All certificates will expressly provide that no less than thirty (30) days' written notice will be given to ATI ~~in the event of~~if there is material alteration to, or cancellation of, coverage evidenced by the certificates, and will include the interests of ATI and its affiliates to be noted as additional insureds.

C. Failure to Obtain. Should you, for any reason, fail to obtain or maintain the insurance required by this Franchise Agreement, as such requirements may be revised by ATI in the Operations Manual or otherwise in writing, ATI has the right and authority (but not the obligation) to obtain the insurance and to charge you for same, which charges, together with a reasonable fee for expenses of ATI in so acting, will be payable by you immediately upon written notice and which may be deducted by ATI from Commissions due you. The foregoing remedies will be in addition to any other remedies ATI may have.

D. Changes in Coverage. ATI may, from time to time, in the exercise of its sole and exclusive business judgment, make changes to minimum policy limits and endorsements as it may determine; provided, however, all changes will apply to all franchisees of ATI who are similarly situated.

**10.05  Construction, Maintenance and Repair of Store.**

A.    Construction of Store.  ATI will survey and furnish you with a layout for the interior of a typical Store and provide specific decor specifications.  You will, at your sole expense, use a licensed general contractor satisfactory to ATI and any approved suppliers to perform construction and installation work at the Store, in accordance with the specifications established by ATI.  ATI may require that you submit to ATI for prior written approval all construction plans, site plans and blueprints for each location ATI approves, including any proposed sites for relocation of your Store and any material alterations of your Store.  You must investigate, keep informed of and comply, at your expense, with all local, state, and federal laws, rules, regulations, ordinances, standards, and directives in effect at any time related to the construction and operation of your Store and the use of any furniture, fixtures, equipment and signs.  You will develop your Store in the manner ATI prescribes, including the implementation of the System, and will use in the operation of your Store only those brands and types of furniture, fixtures, equipment, supplies, signs, computer hardware, telephone system and computer software which meet ATI's standards and specifications.  If you wish to use furniture, fixtures, equipment, supplies, signs, computer hardware, telephone system or computer software that is a brand or from a supplier that is not approved by ATI, you must notify ATI in writing of your intent, and submit specifications, samples and other information that ATI may request.  ATI will review your request under the procedures described in Section 10.02.  ATI and its affiliates may be an approved supplier or designated sole supplier for any purchases of products or services needed in the construction or the operation of your Store and may obtain revenue from you and make a profit.  Before you open your Store, ATI may require that you certify in writing that you have obtained all permits and certifications required to operate your Store, including all business or other licenses and all zoning, access, signs and fire requirements.  You will provide clean restroom facilities for employees and customers in conformity with the applicable rules, laws and regulations.  ATI will not be responsible for any delays in the construction, equipping or decoration of your Store.  If any signs, kiosks and/or displays are provided by ATI and/or Providers at no cost to you, these signs, kiosks and displays remain the property of ATI and/or the Providers.

B.    Maintenance and Renovation. You will at all times, and at your sole expense, maintain the interior and exterior of your Store, including all equipment, fixtures, facilities and windows.  You will repair, refinish or paint the interior and the exterior of the Store at your own expense at such times as reasonably directed by ATI.  You will comply immediately with all orders and regulations of applicable state and local health and safety officials.  From time to time, ATI may direct you to complete renovations, at your own expense, which are part of an individual or System-wide updating program.

C.    Cleanliness of Store.  You will maintain the Store premises following ATI's stringent standards of cleanliness and remove promptly all debris which originates in the area surrounding the Store.  If you do not conform to the standards of cleanliness, then ATI may, but is not obligated to, hire or direct its own personnel to clean the Store premises and you will assume all of these cleaning costs, which may be deducted by ATI from Commissions due you.

**10.06  Inspection of Store.**  In addition to ATI's rights to review financial information under Section 10.07 and Section 11.03, you grant ATI or ATI's representatives or agents the right at any time during normal business hours, and without prior notice, to enter and inspect your Store and all aspects of the operation of your Store, including your general operations, inventory levels, equipment, service methods, cleanliness, management and administration, to determine whether you are complying with the provisions of this Franchise Agreement and the operations standards of ATI.  You will allow ATI or ATI's representatives or agents to make extracts from or copies of any Store records and to take samples of any products sold and immediately remove any unauthorized products without any payment or other liability to you.  You will allow ATI or ATI's representatives or agents (including any "secret shoppers") to take photographs, videos or any electronic record of your Store and to interview employees and customers.  You will provide any notice in the manner required by law to your Store employees and customers necessary to advise them of, and authorize, ATI's inspection and monitoring techniques, and will otherwise direct your Store employees to cooperate with ATI or ATI's representatives or agents.  ATI will have the

exclusive right to use any photograph, video, electronic record or other material prepared in connection with an inspection and to identify your Store and ATI will not have any obligation to obtain your authorization, or to compensate you in any manner, in connection with the use of these materials for advertising, training or other purposes. If ATI gives you notice of any deficiency detected during an inspection, you will diligently correct the deficiency as soon as possible.

**10.07    Accounting System.**  You will prepare and maintain your bookkeeping and accounting records as directed by ATI in the Operations Manual, including the use of any specified accounting software and/or chart of accounts.  You will also submit all required reports and make your records available for inspection by ATI during normal business hours.  ATI may also access your records and retrieve information electronically, through your point of sale system or computer system without notice or further consent.  ATI may use your financial information for any purpose ATI deems advisable.

**10.08    Compliance With Law; Sales Tax.**  You will operate the Business in strict compliance with applicable laws, rules and regulations of all governmental authorities.  You will be responsible for knowledge of, and compliance with, all applicable laws, rules and regulations of the federal, state or local governments, including those governing access to your Store and accommodating employee physical limitations (e.g., the Americans with Disabilities Act), minimum wage, hours, overtime, safety, and other working conditions (e.g., the Fair Labor Standards Act and Occupational Safety and Health Administration regulations), health, sanitation, smoking, fire codes, zoning, building codes, discrimination, employment, sexual harassment, consumer and employee data privacy and protection, taxes, environmental laws, citizenship or immigration status, registration and compliance requirements required with respect to the sales of any specific products or services offered or sold to you, including without limitation limited lines insurance products, and other laws, rules and regulations.  You will prepare and file all appropriate tax returns when due and pay promptly all taxes imposed on you and upon your Business.  You will be responsible for any sales tax, gross receipts tax, excise tax or other similar tax (collectively "Sales Tax"), imposed by law on all payments you make to ATI or its affiliates under this Agreement or otherwise, in connection with the Business, whether assessed on you or on ATI or its affiliate.  ATI and its affiliates may collect Sales Tax from you for transmittal to the taxing authority.  You will reimburse ATI and its affiliates for any Sales Tax ATI or its affiliate must pay directly to any taxing authority.  You will furnish ATI with copies of your business federal, state, and sales tax returns at the same time as you submit them.  This includes all routine sales tax returns and all annual state and federal tax returns.

**10.09    Suggested Retail Prices.**  Providers determine the prices at which ATI and you must offer certain products and services for which ATI and you serve as agent and sub-agent, respectively, for Providers.  Although ATI may provide you with suggested retail prices for certain other products and services, you acknowledge and agree that any list or schedule of prices for such other products and services which ATI furnishes to you is by way of recommendation only and is not binding on you or mandatory.

**10.10    Your Employees.**  You will employ and properly train a sufficient number of competent managers and other employees, of good character and of neat appearance, to service the customers of your Store, in keeping with ATI's quality-oriented philosophy.  You will replace any manager who is not discharging his/her duties in accordance with System standards.  You will obtain a signed Confidentiality Agreement from each of your employees in a form reasonably acceptable to ATI including specific identification of ATI as a third party beneficiary of the covenants, with the independent right to enforce them, except that your manager must also agree to non-competition and assignment of development covenants in a form reasonably acceptable to ATI.  ATI's current form of Confidentiality, Non-Competition and Assignment of Developments Agreement, attached as Exhibit 7 to this Franchise Agreement, contains provisions that are currently acceptable to ATI.  You will create and maintain an employee roster, containing complete names and addresses of all employees and provide same to ATI when you commence operations and when the roster changes.

**10.11    Hours of Operation.**  You agree to be open for business seven (7) days a week and during the hours as set out in the Operations Manual which are subject to change by ATI, subject to the terms of your lease.

**10.12 Franchise Cooperation.** You acknowledge the importance of promoting goodwill within the Wireless Zone franchise System, and you agree to provide service, exchanges and refunds for purchases made by customers at other Wireless Zone franchised outlets. Each franchisee will settle the account directly with the franchisee who provides service, exchange or refund ~~pursuant to~~under this requirement. If you or another franchisee fails to do so, ATI will have the authority and right to resolve the matter by way of Commission off-set and if ATI so acts, ATI will incur no liability to either franchisee, provided ATI acts in good faith and exercises reasonable business judgment.

**10.13 Accounts Payable.** You must make full payment for all accounts with ATI, including, without limitation, inventory purchases, within the terms stated on the invoices, in the Operations Manual, or in any other agreements, documents or instruments that may evidence the accounts, without any defense, claim or off-set other than for defective products and manufacturers' discontinued merchandise, returned under an approved "ATI Return Authorization." You must also pay, ~~prior to~~before an account ~~becoming~~becomes delinquent, your trade accounts and other creditors, including, ~~but not limited to,~~ your landlord.

**10.14 Security Agreement and Demo Line Payment; Electronic Funds Transfer Authorization.** In order to secure your prompt performance of the obligations of this Franchise Agreement, you grant to ATI and ATI takes a first priority security interest in all of your assets, including, without limitation, all present and after acquired inventory and equipment wherever located, accounts, deposit accounts, chattel paper, instruments, contract rights (including your rights under this Franchise Agreement) and general intangibles, including payment intangibles, and all proceeds and products thereof, including insurance proceeds. You will sign ATI's standard Security Agreement and Demo Line Payment, attached as Exhibit 3 to this Franchise Agreement, and standard Electronic Funds Transfer Authorization attached as Exhibit 4. You authorize ATI to file a copy of the Security Agreement and Demo Line Payment, the Electronic Funds Transfer Authorization, and the UCC-1 Financing Statement, in the form of the sample attached as Exhibit 5, and any other documents that may be necessary to perfect ATI's security interest, with or without signature.

**10.15 The World Wide Web and Internet.** You may not, during the term of this Franchise Agreement or after its expiration or termination for any reason, develop, create, generate, own, license, lease or otherwise use any computer media and/or electronic media (including without limitation any Intranet, Internet, World Wide Web, social media sites, bulletin boards, news group, blogs or telenets) that in any manner use or display ATI's or Provider's trademarks, or confusingly similar names or trademarks. You will not, during the term of this Franchise Agreement or after its expiration or termination for any reason, in any manner use or employ any meta tag, link, frame or similar device to, or ~~with respect to~~for, any ATI website or social media site.

## 11. ACCOUNTING AND RECORDS

**11.01 Your Bank Account.** You will open and maintain a bank account for your Business and follow the banking and administrative procedures which ATI specifies. You will maintain the account in a bank which can administer wire transfers. You hereby authorize ATI to make wire transfers into and out of the account and agree to sign any documents required by the bank to confirm this authorization.

**11.02 Sales Records.** You will record all sales exactly as they are made and maintain accurate records, including all data contained in your computer system and point of sale system. You agree that you will use only those invoices or sales tickets approved by ATI. Any intentionally false statements in these or any other reports provided to ATI by you will be grounds for immediate termination of this Franchise Agreement.

**11.03 Inspection and Audit.** You will maintain your records of the Business for a minimum of five (5) years. This includes all cash register tape readings, invoices, sales and other tax returns, bank statements, books of accounts, computer files, and other evidence of Gross Sales, purchases and business

transactions for each year (collectively, the "Business Records"). ATI will retain the right, during regular business hours, to inspect, audit and make copies of the Business Records. ATI may audit the Business Records at least once per year. You authorize the release of all supplier records to ATI without notice to you. You grant ATI the right to communicate with your suppliers without notice to you, and to obtain and examine all records of any supplier relating to your purchases from the supplier. If ATI determines that Gross Sales have been understated, you will pay ATI within ten (10) days of notice the understated amount with interest (at the rate stated in Section 11.07) from the date the amount was due until it is paid at the rate stated in Section 11.07. If ATI determines that your Gross Receipts for any period have been understated by three percent (3%) or more, or if you fail to produce all Business Records at the time and place specified by ATI, you will reimburse ATI for all costs and expenses arising out of or related to the audit, and any re-audit including the charges of any independent accountant, attorneys' fees and all travel related expenses of ATI's or their employees.

**11.04 Periodic Reports.** You will furnish to ATI by facsimile, network download, or other method, the reports, financial statements, state sales tax returns, state and federal income tax returns, and other reports for the Business as ATI may reasonably require, that ATI specifies in the Operations Manual or otherwise in writing, at the times ATI specifies. ATI may request that you furnish certain of these reports or financial statements by mail as well. You will certify the financial statements as being true and correct and will prepare the financial statements and reports following generally accepted accounting principles.

**11.05 Computer/Point of Sale System.** You will purchase, install and use computer hardware and software and a computerized point of sale system, which conform to ATI's specifications, which ATI may modify. If you do not purchase the computer hardware from ATI, ATI will set up the system to conform to ATI's specifications, and ATI may charge you a set up fee. Prior to Before purchasing computer hardware from a vendor other than ATI, you must submit to ATI for its approval the complete specifications, including vendor name and address, for the hardware and software you are intending to purchase. ATI may designate a single supplier for the point of sale software and may change the supplier. You will sign any license agreement required by the supplier, including a license agreement with ATI, if ATI relicenses the software to you. An example of a license agreement the supplier may require you to sign is the End User License Agreement attached to this Franchise Agreement as Exhibit 9. You grant ATI full and complete access to all records and information created by these systems, including by Internet, direct telephone and other dedicated data lines. ATI may, in the exercise of its sole and exclusive business judgment, require the use of new and improved computers and software, including changing the designated supplier, upon prior written notice. ATI will provide at no cost to you two (2) e-mail accounts for your Store. One of these e-mail accounts will be for general use by the Store, and one will be for the use of the sole proprietor of the Franchisee if the Franchisee is not a business entity, or, if the Franchisee is a business entity, a designated individual who owns a twenty percent (20%) or greater interest in the Business Organization and is principally responsible for management of the Franchisee. All Owners of the Franchisee will use this latter account for all franchise-related communications. ATI will charge you ATI's then-current fee for any additional e-mail accounts you may request for your Store, you, individual Owners and/or your Store employees. Each e-mail account that ATI provides must be used solely and exclusively for ATI business-related communications, including communications with ATI, vendors and customers. ATI will have full and complete access to all messages and files transmitted through ATI's e-mail service and your e-mail account. ATI may also require you to use an approved credit card processing vendor, to participate in any gift card program ATI specifies, and to access ATI's Internet intra-net, and to pay ATI reasonable fees for your participation or access.

ATI's Intranet and e-mail system will be used for, among other things: dissemination of reports; notices; procedures; special promotions and programs, replacing individual e-mails; placing orders with the ATI warehouse, replacing faxes and phone calls; and posting of current advertisements. ATI authorizes and makes available to you the opportunity to connect to ATI's servers which are synchronized to ATI's outside vendors' and/or Providers' applications. You will pay ATI's then-current fee for each connection you choose to obtain. You will use ATI's Intranet and e-mail system in strict compliance with the Operations Manual and all standards, protocols, and restrictions imposed by ATI from time to time,

including without limitation, standards, protocols and restrictions relating to retail store privacy and security policies, the encryption of confidential information and prohibitions on transmission of libelous, derogatory or defamatory statements.

**11.06   Electronic Funds Transfer.**   You must participate in ATI's electronic funds transfer program, which authorizes ATI to utilize a pre-authorized bank draft system.   You must sign and deliver to ATI an unconditional, irrevocable authorization to enable ATI's financial institution to:   (a) debit accounts at your bank in order to pay ATI all amounts which you may owe ATI under this Franchise Agreement or any other agreement between you and ATI; and (b) credit accounts at your bank for Commissions and other payments due you from ATI, net of any deductions by ATI.   A sample authorization form is attached as Exhibit 4.   All amounts due ATI must be received by ATI or be credited to ATI's account by pre-authorized bank debit before 2:00 p.m. on the day each payment is due.   You will bear any costs associated with the account and method of payment.   ATI may charge you fees to cover amounts ATI is charged and ATI's administration costs if the electronic funds transfer or other payment attempt is unsuccessful.   ATI will provide you with a written confirmation of electronic funds transfers, which may be made monthly or other period permitted by law.   If ATI permits you to make certain payments by company credit card, ATI may charge you fees to cover amounts ATI is charged and ATI's administration costs.

**11.07   Interest.**   Any late payment under this Franchise Agreement or any other agreement with ATI will bear interest compounded monthly from the due date until paid at ~~the greater of 18% per annum or 3% above the prime rate published in The Wall Street Journal~~1½% per month (or the highest interest rate permitted by law, if that should be less).   Payment for purchases will be considered late if outstanding for 30 days or more.   ATI's right to interest is in addition to any other remedies ATI may have.   ATI can apply your payments to any amount you owe ATI, regardless of any designation you make.

# 12.   ASSIGNMENT AND RIGHT OF FIRST REFUSAL

**12.01   Assignment by ATI.**   ATI may freely transfer or assign its rights and obligations under this Franchise Agreement to any person, corporation or other entity.   The transfer or assignment will be binding upon and will inure to the benefit of the successors and assigns of ATI.

A.      You agree that ATI has the right, now or in the future, to purchase, merge, acquire or affiliate with an existing competitive or non-competitive franchise network, chain or any other business regardless of the location of that chain's or business' facilities and owned or licensed outlets, and to operate, franchise or license those businesses and/or facilities as "Wireless Zone" Stores under the Trademarks or any other marks following ATI's purchase, merger, acquisition or affiliation, regardless of the location of these facilities (which you acknowledge may be within your Protected Territory, proximate thereto, or proximate to any of your Stores).   ~~In the event of~~If there is any territorial conflict or overlap, ATI will use its best efforts to resolve same within nine (9) months of any such purchase, merger, acquisition or affiliation.

B.      You agree and affirm that ATI:   may sell itself, its assets, the Trademarks and/or the System to a third party; may go public; may engage in a private placement of some or all of its securities; may merge, acquire other business entities, or be acquired by another business entity; and/or may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring.   With regard to any of the above sales, assignments and dispositions, you expressly and specifically waive any claims, demands or damages arising from or related to the loss of ATI's name, Trademarks (or any variation thereof) and System and/or the loss of association with or identification of ATI as the franchisor under this Franchise Agreement.

If ATI assigns its rights and delegates its obligations under this Franchise Agreement, nothing in this Franchise Agreement will be deemed to require ATI to remain in business or to offer or sell any products or services to you.

**12.02   Assignment by You.**   You acknowledge that ATI has granted you the rights provided for in this Franchise Agreement in reliance upon your background and business ability or that of your Owners, if you are a Business Organization.   You agree that you will not sell, assign, transfer, give, mortgage, pledge or encumber any interest in this Franchise Agreement, in the Business, any assets of the Business (other than the sales of assets in the ordinary course of business) or if you are a Business Organization, the Owners of the Business Organization will not sell, assign, transfer, give, mortgage, pledge or encumber any ownership interest in the Business Organization (collectively, "Transfer"), except with ATI's express prior written consent.   A satellite location may not be the subject of an independent Transfer, and a Transfer of the Base Store must include all satellite locations.   If you, any Owner of the Business Organization or any other person do or purport to do anything prohibited by this Section 12.02 without ATI's prior written consent, the action is void and is a material breach of this Franchise Agreement that may result in termination of this Agreement.

A.   <u>Permitted Transfers</u>.   ATI will not unreasonably withhold its consent to a Transfer, but will require you to meet each of the following obligations:

1.   ATI will have a right of first refusal to purchase the offered interest according to the following procedures:   You must offer to Transfer the interest to ATI at the same price and on the same terms and conditions which you propose to Transfer the interest.   You must furnish to ATI a signed copy of the bona fide written offer.   Within thirty (30) days after ATI receives the copy of the written offer and all necessary information from the proposed transferee, ATI may give you notice of its election to exercise the option to purchase the offered interest on the terms contained in the written offer, provided that ATI has the right to substitute cash for any non cash consideration described in the written offer.   If ATI exercises this option, ATI must complete the purchase no later than thirty (30) days after ATI's notice to you of ATI's purchase election.   If ATI does not exercise this option during the thirty (30) day period, then you may, during the following one hundred twenty (120) days, transfer the offered interest, and if applicable, assign this Franchise Agreement to the third party on the terms in the written offer, provided that the assignment will be made, without limitation, in compliance with this Section 12.02A.   If any proposed transfer is not completed within the one hundred twenty (120) day period, or if there is any material change in the terms of the proposed transaction ~~prior to~~ before closing, this will constitute a new offer and will again require compliance with this Section 12.02A(1).   If ATI does not exercise the right of first refusal for one offer, it will not affect the right of first refusal for any other offer.   ATI will have fifteen (15) extra days after declining to exercise its right of first refusal and receipt of all necessary information from the proposed transferee to approve or disapprove of the Transfer.

2.   You must pay all monies owed to ATI and its affiliates on or just before the date of the Transfer.

3.   You must relinquish all rights to all "demo lines" and pay all monies due for these accounts promptly.

4.   You must establish and fund a reserve (in an amount to be determined by ATI, based on historical data), to be held by ATI, for charge-backs incurred during the six (6) month period following the Transfer.

5.   You must sign a general release under seal, in the form which ATI provides, of all claims against ATI, its affiliates, principals, shareholders, members, managers, employees and agents in ATI's/their corporate and individual capacities.

6.   You must have the transferee show, to the sole satisfaction of ATI, that the transferee has the financial resources, character and ability to continue to run the Business successfully.

7.   Your transferee must pay to ATI its then-current transfer fee for the Business and any satellite location(s) plus ATI's actual attorneys' fees.

8.      Your transferee must sign ATI's then-current Franchise Agreement (including any applicable addendum to reflect that the Franchise Agreement is for a franchise that has been transferred), must complete, to the sole satisfaction of ATI, the Wireless Zone training program, and must comply with all other requirements of ATI for new franchisees, to the sole satisfaction of ATI.

9.      You or your transferee must agree to renovate and modernize the Store in order to meet ATI's then-prevailing design criteria and to expend all monies reasonably necessary to complete such renovation and modernization; all renovations must be completed before the Transfer may occur, or at ATI's option, your transferee must agree to complete all renovations within the time frame ATI requires.

10.     Your transferee must enter into a lease for the Store, or accept an assignment of your lease, no later than the date of the transfer.

11.     If ATI helps obtain the purchaser of your Business or an interest in the franchisee, then you will pay ATI a commission equal to ten percent (10%) of the purchase price, in addition to all other amounts payable under this Franchise Agreement.

12.     Any Owner of a Business Organization franchisee (as defined below), who engages in a Transfer of his or her ownership interest in the Business Organization and any third party who acquires the ownership interest in the Business Organization will be subject to the provisions of the covenants contained in Section 16 of this Franchise Agreement after the Transfer has been completed and will be required to confirm their respective obligations in writing. The transferee and the transferee's spouse will sign the Guaranty of Performance attached as Exhibit 6 and the Confidentiality and Assignment of Developments Agreement attached as Exhibit 7, or forms then acceptable to ATI at the time of the transfer. If a new Business Organization acquires the assets of the Business and signs a new Franchise Agreement as the franchisee, the 5% Owners of the Business Organization and, under certain circumstances their spouses will sign the Guaranty of Performance and the Confidentiality and Assignment of Developments Agreement, or forms then acceptable to ATI.

13.     You will not retain a security interest in the Business or its assets following the Transfer without ATI's prior written consent, which consent ATI is under no obligation to provide.

14.     If you paid a reduced initial franchise fee of $1,000 because you were an existing ATI franchisee in good standing who owned franchises for 10 or more Stores (not including any satellite locations), and all of the franchises were owned by the same business entity, you may not Transfer any franchise acquired at the $1,000 initial franchise fee unless the Store is in operation.

B.      Transfer Upon Death or Permanent Incapacity. Immediately following your death or permanent incapacity (or, if you are a Business Organization, immediately following the death or permanent incapacity of an Owner who owns 51% or more of the equity of the Business Organization ("51% Owner") or the Owner who is the manager of the Business Organization), ATI or its representative may assume operation of the Business under ATI's step-in rights under Section 13.01. ATI will also have an option to purchase the Business at a price mutually agreed by ATI and your estate or personal representative (or the Business Organization, if applicable), or if the parties do not agree, then at a price representing the average appraisal of the Business made by three (3) independent business appraisers selected by ATI (the "Buy-Out Price"). The cost of the appraisal will be shared equally by the parties. This purchase option will extend for ~~a period of~~ one hundred eighty (180) days following the date of death or permanent incapacity. Your heirs, beneficiaries, successors and/or personal representative (or Business Organization and its Owners) will sign all documents which ATI may require to show that this Franchise Agreement and the Business were acquired, upon the payment of the Buy-Out Price. If ATI does not exercise the purchase option, your heirs or personal representative (or Business Organization and its Owners) will also have the right to sell the Business or their interests in the Business Organization, provided that they follow the requirements of Section 12.02.A. If your heirs or personal representative desire to retain and operate the Business, this will be considered a Permitted Transfer, subject to the requirements of

Section 12.02.A. In any event, any Transfer must be consummated no later than twelve (12) months from the date of death or permanent incapacity.

You agree that permanent incapacity will mean that you are unable to operate the Business on a full-time basis for six (6) months. Once you are considered to be permanently incapacitated, you or your legal representative must transfer the Business as provided for above.

**12.03 Operation by a Business Organization.** If you are a business entity (i.e., a corporation, partnership, limited liability company or other similar entity) (a "Business Organization"), you may sign this Agreement as the franchisee if all of the following conditions are met; and if you are an individual signing this Franchise Agreement, you may later transfer this Franchise Agreement and the assets and liabilities of your Business to a Business Organization for convenience of ownership, if you obtain ATI's written consent and all the following conditions are met:

A.    The Business Organization must conduct no business other than that of your Wireless Zone franchise.

B.    If you are an individual signing this Agreement and you are transferring this Agreement to a Business Organization, you must actively manage the Business Organization and own, control and direct its operations, either through binding written agreements, governing documents or voting power. In addition, you must be a 51% Owner of the Business Organization. If you are a Business Organization signing this Agreement, the persons you represent to ATI to be the Owners of the Business Organization must continue to own all of the ownership interests in the Business Organization, subject transfers effected in the manner permitted under Section 12.02, and they must actively manage the Business Organization, and own, control and direct its operations, either through binding written agreements, governing documents or voting power.

C.    Each Owner of the Business Organization and their spouses must meet ATI's standards and each 5% Owner (together with the Owner's spouse),must personally guarantee performance of all of the Business Organization's obligations under this Franchise Agreement and agree to the confidentiality and non-competition covenants by signing ATI's then-current form of Guaranty of Performance and ATI's then-current form of Confidentiality, Non-Competition and Assignment of Developments Agreement, the current versions of which are attached as Exhibit 6 and Exhibit 7 to this Franchise Agreement. All Owners who did not sign the original of this Franchise Agreement (or a Guaranty of Performance) at the date of this Franchise Agreement, must submit an accurate and complete franchise application to ATI and must meet ATI's then-current requirements for new franchisees.

D.    You must provide ATI with copies of all governing documents (articles of incorporation or organization, bylaws, stock certificates or membership certificates, agreements among Owners, etc.) of the Business Organization.

E.    The governing documents of the Business Organization must recite that the issuance and assignment of any ownership interest (i.e., corporate stock, or partnership or membership interests) are restricted by the terms of this Franchise Agreement.

F.    At the time the Business Organization becomes the franchisee under this Franchise Agreement, and at all times thereafter, the Business Organization must be in good standing in the state of its incorporation or formation, and must be qualified to do business and in good standing in the state in which your Business is located, if applicable because it was not incorporated or formed in that state. You must provide ATI with good standing certificates upon ATI's request.

G.    All issued and outstanding ownership interests must bear a legend reciting or referring to the restrictions of this Franchise Agreement on the issuance and transfer of ownership interests in the Business Organization.

H.      You must promptly notify ATI of any proposed ownership changes or in the governing documents of the Business Organization and obtain ATI's consent to a Transfer (subject to the provisions of Section 12.02) of a majority of the ownership interest in the Business Organization.  A change in majority ownership effected cumulatively in more than one transaction is a Transfer.  In such event, the Business Organization must sign the then-current franchise documents for the remaining term of this Agreement, or at ATI's option you and the Business Entity may enter into an assignment and assumption of this Agreement; and in either event the Business Entity must assume responsibility for all existing liabilities. The Business Organization must pay ATI the then-current transfer fee applicable to a Transfer to a Business Organization, plus ATI's actual attorney's fees incurred in connection with any such changes.  If any new individual approved by ATI acquires a five percent (5%) or greater interest in the Business Organization during the term of this Franchise Agreement, the individual must sign ATI's then-current Guaranty of Performance and Confidentiality, Non-Competition and Assignment of Developments Agreement as required by Section 12.03.C.

I.      If you are an individual signing this Agreement, you may not operate the Business under the name of a Business Organization or transfer this Franchise Agreement and/or the assets and liabilities of your Business to a Business Organization for convenience of ownership unless you follow the requirements of this Section 12.03.  At all times during the term of this Agreement, the lease and legal and beneficial title to the assets of the Business must be in the name of the individual(s) or Business Organization that is named as the franchisee under this Franchise Agreement.  Failure to comply with this Section 12.03 is a default of this Franchise Agreement and may result in immediate termination of this Franchise Agreement without opportunity to cure under Section 14.01.B.

J.      If you are a Business Organization you may not operate the Business under the name of another Business Organization or transfer this Franchise Agreement and/or the assets and liabilities of your Business to another Business Organization, even when it is owned by the same persons and in the same percentages as own your Business Organization for convenience of ownership, unless you follow the requirements of this Section 12.03., with respect to thefor each Business Organization, as applicable.  You or the other Business Organization must pay ATI the then-current transfer fee applicable to a Transfer from a Business Organization to another Business Organization with identical ownership, plus ATI's actual attorney's fees incurred in connection with any such changes.  The other Business Organization will have the right to operate the Business for the remaining term left under this Franchise Agreement.

13.     STEP-IN RIGHTS.

13.01   Cause for Step-In.   If ATI determines that the operation of yourthe Business is in jeopardy or if a default occurs under this Franchise Agreement or any other agreement or obligation of yours, then, if ATI elects to do so, you authorize ATI to take possession of the Store and to operate the Business for as long as ATI believes that it is necessary or practical.  You acknowledge that this right to "step-in" is necessary to preserve the value and integrity of the Wireless Zone System.  Even if ATI exercises this right to step-in, you agree that ATI does not lose or waive a right to exercise any other rights or remedies which ATI may have legally or under this Franchise Agreement.  Among the reasons for which ATI may act under these step-in rights are:  (i) ATI reasonably determines that you are unable to operate the Business because you are absent or incapacitated because of illness or death; (ii) you have not paid your monetary obligations to ATI or others when they are due; (iii) you have not removed liens or encumbrances that have been placed against your Business; or (iv) ATI determines that operational problems require ATI to operate your Business for a period of time.  Whether or not ATI decides to exercise its step-in rights, you will indemnify, defend and hold ATI and its representatives and attorneys harmless from and against any and all losses, damages and liabilities that accrue or occur.

13.02   Duties of the Parties.   During a step-in period, ATI will maintain in a separate account all money which the Business operation generates.  ATI will deduct from the account and, to the extent the account contains sufficient funds, pay all expenses of the Business which will include but are not limited to the Continuing Royalties, Collective Advertising and Promotion Fund contribution and reasonable compensation and expenses for the representatives of ATI. If ATI exercises these step-in rights, then you

will hold harmless ATI and its representatives for all actions or omissions which occur during the course of the temporary operation. ATI will not assume any liabilities of the Business during the step-in period or thereafter. You will pay ATI its reasonable attorneys' fees and costs which arise from the exercise of these step-in rights. Nothing in this Section 13 will prevent ATI from exercising any other rights which it may have under this Franchise Agreement, including the right to terminate, or any other rights of ATI at law or in equity.

## 14.    DEFAULT AND TERMINATION

**14.01    Immediate Termination.**  If any of the following defaults occur, then ATI can terminate this Franchise Agreement immediately upon notice and you will not have any right to cure:

A.    At the option of ATI, if you, or an Owner of your Business Organization and/or their spouse ("Guarantor") who has personally guaranteed your performance of all of your obligations under this Franchise Agreement if you are a business entity, become bankrupt or insolvent or enter into any insolvency arrangement unless you and/or Guarantor (i) promptly undertake to reaffirm the obligations under this Franchise Agreement or to the extent permitted, their guarantee; (ii) promptly comply with all conditions as legally may be imposed by ATI upon such an undertaking to reaffirm this Franchise Agreement or guarantee; (iii) promptly comply with such other conditions and provide such assurances as may be required in relevant provisions of the appropriate bankruptcy rules and regulations; and (iv) in the case of a Guarantor, also promptly provide replacement guarantees or security as may be required by ATI; provided, however, that the parties acknowledge that this Franchise Agreement constitutes a personal service contract and that ATI has relied to a degree and in a manner material to this Franchise Agreement upon your personal promises and/or your directors, officers, shareholders, members, or partners, as the case may be, to participate personally on a full-time basis in the management and operation of your Store, and consequently, the parties agree that any attempt by any other party, including the trustee in bankruptcy or any third party, to assume or to accept an assignment of this Franchise Agreement will be void. For purposes of this Section 14.01 A, "insolvent" means that total liabilities exceed total assets, or that you or Guarantor are unable to pay obligations as they come due. Insolvency may be established either by reference to financial statements or by the payment history established with creditors.

B.    You or an Owner of the Business Organization Transfer, or attempt to Transfer, without first seeking and receiving the prior written approval of ATI, or you issue equity interests in the Business Organization without ATI's prior written consent.

C.    You abandon the Business or cease to operate it yourself or with ATI approved full-time management or you fail to operate for five (5) separate business days within any twelve (12) month period.

D.    You or an Owner of the Business Organization are convicted or plead no contest to: (i) a felony or misdemeanor which relates to the operation of your Business; or (ii) a felony or misdemeanor which involves moral turpitude.

E.    You or an Owner of the Business Organization commit an act or conduct yourself so as to impair substantially or jeopardize the goodwill of the Trademarks, the System or other affiliated or franchised Wireless Zone locations, or if you or an Owner of the Business Organization violate any covenant of confidentiality or non-disclosure contained in Section 16 of this Franchise Agreement, or otherwise disclose, use, permit the use of, copy, duplicate, record, transmit or otherwise reproduce any manuals, materials, goods or information created or used by ATI and designated for confidential use within the System without ATI's prior written approval.

F.    You or an Owner of the Business Organization open, hold an interest in or are employed in a business similar to the Business in violation of Section 16.01.

G.      You, or your employees with your knowledge, do not report or record all sales, three (3) or more times within a twelve (12) month period, or if audits of your Business reveal a pattern of understatement.

H.      You or the Owners of the Business Organization or your manager do not satisfactorily complete the Wireless Zone initial training program and do not receive the certification to operate the Business.

I.      You or the Owners of the Business Organization or their spouses provided ATI with false information or omitted material information in, or in connection with, your initial application, whether written or oral.

J.      The expiration or termination of the underlying Store lease and the failure to secure a replacement Store location within the time allowed in Section 4.

K.      You receive from ATI three (3) or more notices to cure the same or similar defaults or violations of this Franchise Agreement or any other agreement between you and ATI, or any promissory note you delivered to ATI, during any twelve (12) month period, regardless if these defaults or violations are cured.

L.      You or the Owners of the Business Organization engage in fraudulent acts involving customers and/or Providers, such as those acts commonly known as "subscriber fraud," or other dishonest acts.

M.      You and ATI fail to mutually agree on a location for your Store as required under Section 4 within ninety (90) days after the date of this Franchise Agreement; or you fail to open your Business for operation in a location approved by ATI within one hundred eighty (180) days of the date of this Franchise Agreement.

N.      ATI terminates the franchise agreement for the Base Store if your Store is a satellite location of the Base Store.

O.      The termination "for cause" of any other franchise agreement between you and ATI also constitutes "good cause" under this Agreement, with no opportunity for you to cure the default.

P.      You or the Owners of the Business Organization breach the provisions of Section 14.06 concerning Anti-Terrorism Laws.

Q.      You or the Owners of the Business Organization violate or breach any term or provision of this Franchise Agreement, which term or provision itself imposes immediate termination for such violation or breach.

R.      Provider withdraws its authorization ~~pursuant to~~under the Provider Contract which permitted you to be ATI's subagent for Providers products and services.

S.      If you are an entity, your legal existence ceases.

**14.02   Termination With Notice.**   ATI will have the right to terminate this Franchise Agreement upon notice to you upon the following circumstances and in the following manner:

A.      Except ~~with respect to~~for your failure to pay any of the sums due ATI under this Franchise Agreement or under any other agreement with ATI or its affiliates or any promissory note made payable to ATI or its affiliates, or except as otherwise expressly provided in this Franchise Agreement, ATI may terminate this Franchise Agreement upon ten (10) days prior written notice to you, setting forth the breach. If you cure the breach, ~~prior to~~before the end of that period, ATI's right to terminate this Franchise

Agreement will cease; provided, however, that if, because of the nature of the breach, you are unable to cure it within the ten (10) day period, you will be given additional time as is reasonably necessary within which to cure the breach, on the condition that upon receipt of notice from ATI, you will immediately commence to cure the breach and your efforts result in a cure within a reasonable period of time.

B.     ~~With respect to~~For any default by you of your obligation to pay any sums due ATI under this Franchise Agreement or any other agreement with ATI or its affiliates or any promissory note made payable to ATI or its affiliates, ATI may terminate this Agreement upon not less than ten (10) days prior written notice of that default. If you cure the default ~~prior to~~before the end of that period, ATI's right to terminate will cease.

C.     If you fail to achieve and maintain the minimum number of Monthly Activations, as set out in Section 1.08 of this Franchise Agreement, as computed on an average basis during any consecutive three month period of your Store's operation after the first full year of operation, ATI may terminate this Franchise Agreement upon ninety (90) days written notice. If you cure the default ~~prior to~~before the end of that period, ATI's right to terminate will cease. For purposes of this Section, your activation performance must, during the cure period, confirm that for the year in question, you will satisfy the activation requirement stated in Section 1.08 of this Franchise Agreement.

D.     You violate or breach any term or provision of this Franchise Agreement, which term or provision itself imposes termination with notice for the violation or breach.

**14.03   Other Defaults.** The description of any default in any notice served by ATI on you will in no way preclude ATI from specifying additional or supplemental defaults in any action, hearing or suit relating to this Franchise Agreement or its termination.

**14.04   Cause.** You agree that all of the above events of default constitute "good cause" for ATI to exercise its right to terminate this Franchise Agreement, in that all the events of default are material breaches of this Franchise Agreement.

**14.05   Conformity With Law.** If any applicable law or regulation which limits the right to terminate this Franchise Agreement or which requires ATI to provide you with longer notice periods or take other action in connection with such termination, then this Franchise Agreement will be deemed amended to conform to the minimum notice periods which the law or regulations may require.

**14.06   Anti-Terrorism Laws.** You and the Owners of your business entity (if you are a Business Organization), will comply, and assist ATI, to the fullest extent possible, in ATI's efforts to comply with Anti-Terrorism Laws (as defined below). You and the Owners of the Business Organization certify, represent, and warrant that none of your or their property or interests is subject to being blocked under, and that you and they otherwise are not in violation of, any of the Anti-Terrorism Laws of the United States. "Anti-Terrorism Laws" means Executive Order 13224, issued by the President of the United States, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) of 2001 (Public Law 107 56), and all other present and future federal, state, and local laws, ordinances, regulations, policies, lists, and other requirements of any governmental authority, addressing or in any way relating to terrorist acts and acts of war. You and the Owners of your business entity (if you are a Business Organization): (i) have not been designated as a "Specially Designated National and Blocked Person" or other banned or blocked person, entity, nation, or transaction ~~pursuant to~~under the Executive Order, the USA PATRIOT Act or any other law, order, rule, or regulation, (ii) are currently in compliance with and will at all times during the Term (including any extension thereof) remain in compliance with Executive Order 13224, the USA PATRIOT Act and regulations of the Office of Foreign Assets Control of the United States Department of the Treasury and any statute, executive order and other governmental action relating thereto; and (iii) are not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation. Any violation of the Anti-Terrorism Laws by you or the Owners of the Business Organization, or any blocking of your or your Owners' assets under

the Anti-Terrorism Laws, will constitute good cause for immediate termination of this Franchise Agreement:

## 15. RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION

**15.01 Your Obligations.** Upon the expiration or termination of this Franchise Agreement for any reason, you will peacefully leave the Store premises to the possession of ATI, without any formal demand or notice to you, unless ATI notifies you expressly that it will not assume the operation of your Store. In addition, upon expiration or termination, you will immediately:

A. Pay all Continuing Royalty fees and all other charges or money owed to ATI, including without limitation charge-backs, warehouse account balances, interest charges and indemnity obligations.

B. Pay the remaining balance due ATI on all outstanding promissory notes including interest and charges.

C. Reimburse ATI for any Provider charge-backs for signs and Store build out allowance, including any out-of-pocket expenses.

D. Pay all rents due to your landlord through the expiration or the date of termination of this Franchise Agreement.

E. Establish a reserve (which may include using trailing Commissions and Residuals, and based on historical data) to be held by ATI for charge-backs incurred during the six (6) month period following termination or expiration (the "Reserve"). ATI will have the right to offset against the Reserve all amounts that you owe to ATI.

F. Cease to hold yourself out as a Wireless Zone franchisee, and cease to use the Trademarks, System and System materials, including the trade dress, and cease all forms of advertising, including meta tags, links and frames. Continued use of the Trademarks and/or the System, including the trade dress, subsequent to expiration or termination subjects you to damages for infringement, which ATI may collect at your cost and expense under applicable law. Due to the fact that such damages are difficult to calculate, you agree that for each day you infringe upon the Trademarks and/or the System, including the trade dress, ATI is entitled to $10,000 as liquidated damages and not as a penalty.

G. Return all copies of the Operations Manual, all other manuals, books, forms, invoices and other documentation, or signs, kiosks, displays, and any other materials containing the Trademarks or otherwise identifying or relating to a Wireless Zone location and materials bearing trademarks of the Providers.

H. Return, in good and usable condition, all signs, kiosks and displays and any other items that are owned by ATI. You hereby appoint ATI as your attorney-in-fact to remove these signs, kiosks, displays and other property of ATI. You may, at ATI's election, be responsible to ATI for the entire cost of any signs, kiosks, displays and other items owned by ATI and for their removal and return to ATI. **You hereby ratify and approve all acts of ATI as your attorney-in-fact under this Section 15.01.H. and Sections 15.01.J. and 15.01.M. below. This power, being coupled with an interest, is irrevocable during the term of this Franchise Agreement and post termination where required by this Franchise Agreement.**

I. At the option of ATI:

1. Remove all privately owned signs, fixtures, displays and inventory from the Store premises. You agree that should you fail to do so, ATI or a designated agent may enter the Store at any time to do so at your sole risk and expense and without any liability for trespass, and you agree to allow ATI or its designated agent access to your Store for such purpose; or

2.　Sell the equipment, fixtures, and usable inventory to ATI at their fair market value, as ATI may reasonably determine. You will also transfer all transferable licenses and permits. ATI will not be liable for payment to you for licenses, permits, customer information or goodwill.

J.　At the request of ATI, transfer, at your cost, all telephone, facsimile, Internet numbers, domain names and e-mail addresses in use or owned by you on the date of termination to ATI (or such other party nominated by ATI), and inform the Yellow Pages and any other directory of the transfer. Where no such request is made, you will promptly cancel and discontinue use of the telephone, facsimile and/or Internet numbers(s) and addresses which served your Store at the time of termination or expiration and delete your listing in the Yellow Pages for the area of the Store's location and any other directory, including directories on the Internet. You will de-install any of ATI's proprietary software and allow ATI access to your computer system for removal of customer and other data files. You hereby constitute and irrevocably appoint ATI, ~~pursuant to~~under the terms of this Franchise Agreement, with full power of substitution and revocation by ATI, as your true and lawful attorney-in-fact, to the full extent permitted by law to cancel, terminate, assign, discontinue or take any and all lawful action ~~with respect to~~for all telephone, facsimile, Internet numbers, domain names and e-mail addresses which serve your Store, including, without limitation, the power to take the steps as, in the opinion of ATI, may be necessary to delete your listing or advertising in the Yellow Pages and any other directories and to terminate any other listing which indicates that you are or were affiliated with the Wireless Zone System. You will indemnify and hold harmless each telephone company, directory publisher, Internet provider and other person or entity against all costs, damages, attorneys' fees, expenses and liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance on the foregoing power of attorney.

K:　Cooperate with ATI in providing records of the Business and disclosing all other pertinent information.

L.　Return all customer files to ATI; and

M.　Sign all documents which ATI may reasonably require to evidence the termination of this Franchise Agreement and the termination of your rights to use the Trademarks and System. This may include a general release under seal of ATI, its affiliates, stockholders, officers, directors, employees, agents and representatives in their respective corporate and individual capacities. You will also take all such action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to your use of the Trademarks. You appoint ATI as your attorney-in-fact, with full power and authority, to take all such action(s) and to sign all necessary documents on your behalf. **You hereby ratify and approve all acts of ATI as your attorney-in-fact. This power, being coupled with an interest, is irrevocable during the term of this Franchise Agreement and post termination where required by this Franchise Agreement.**

N.　Repay any Marketing Development Funds that Provider offered and you received, if you close your Store within a time period specified by Provider. You will also repay a pro rata portion of any Marketing Development Funds you received, based on your shortfall, if you fail to achieve the minimum number of net activations of postpay service that Provider requires that you achieve during your initial period of operation. "Marketing Development Funds" means an amount offered by Provider to ATI and extended by ATI to you to be applied to the cost of signage for your Store. You acknowledge and agree that Marketing Development Funds may be offered by Provider, and extended by ATI to you, but are not guaranteed; and that if you accept Marketing Development Funds, if offered, receipt is subject to Provider's conditions.

**15.02　ATI's Obligation.** Upon the transfer or termination or expiration of this Agreement for any reason, ATI will only be obligated to pay you Commissions earned by you as of the date of transfer, termination or expiration, subject to set-off for amounts you owe ATI. You have no right to Commissions (including, without limitation, Residuals) accruing for any period subsequent to the date of transfer, termination or expiration.

## 16. NON-COMPETITION AND NON-DISCLOSURE COVENANTS

### 16.01 Non-Competition.

A.     You agree that during the term of this Franchise Agreement, you and each 5% Owner of the Business Organization and their spouse, any manager of your Store, and others identified in Section 16.06, will not directly or indirectly engage in, hold any interest in, be employed by or be involved in any way with any wireless or wireline communications business and/or entertainment and security products business, other than the Store, which offers products and services which are offered as, or are materially similar to, any part of the System. This prohibition against competition will apply to participation in, ownership of, or interest in, all methods of distribution, including, without limitation, mail order sales and Internet sales.

B.     You agree that for two years following the termination or expiration of this Franchise Agreement for any reason, or from the date of the last breach of this covenant, whichever is later, you and each 5% Owner of the Business Organization and their spouse, any manager of your Store, and others identified in Section 16.06, will not directly or indirectly engage in, hold any interest in, be employed by or be involved in any way with any wireless or wireline communications business and/or entertainment and security products business located at the premises of your Store, or within a 25~~10~~ mile radius of your Store or of a then existing franchised or affiliated Store, which offers products and services which are offered as, or are materially similar to, any part of the System. This prohibition against competition will apply to participation in, ownership of, or interest in, all methods of distribution, including, without limitation, mail order sales and Internet sales.

C.     You ~~further~~ agree that during the term of this Franchise Agreement and for one year following the termination or expiration of this Franchise Agreement for any reason, you and each 5% Owner of the Business Organization and their spouse, any manager of your Store, and others identified in Section 16.06, will not solicit for employment or employ any person who is an employee of ATI or any other franchisee of ATI, or convince any person employed by ATI or ATI's franchisee, to leave his or her employment unless ATI or ATI's franchisee give prior written consent.

D.     ~~The amounts of time and distance stated above may be divisible into units of one month and one mile and will be deemed to be reduced to the extent or in the manner as necessary for those provisions to be valid and enforceable to the greatest extent possible should a court find them to be unreasonable. ATI also has the right to reduce the scope of any of the covenants contained in this Section 16.01, without your consent, effective immediately upon your receipt by written notice of ATI's election to do so and you will immediately comply with any covenant as so modified.~~ In the event that the restrictions stated in this Franchise Agreement are found by any court to be unenforceable because they continue too long or extend over too great a geographical area, the restrictions will be interpreted to continue only so long and/or to extend only to the maximum geographical area for which they are found to be enforceable by such court.

E.     ATI will have the right to seek injunctive relief to enforce its rights under this Section 16.01. You will pay ATI's attorneys' fees and costs in connection with enforcement of this provision. If you violate this provision during the term of this Franchise Agreement, then ATI can terminate this Franchise Agreement as described in Section 14.01.

F.     The provisions of this Section 16.01 will not prohibit you, any Owner of the Business Organization or their spouse, or any manager of your Store, from operating any other franchise which ATI grants or owning less than a two percent (2%) beneficial interest of the outstanding equity securities of any publicly held entity.

### 16.02 Non-Disclosure.

A.     You acknowledge that disclosure of any aspect of the System, or duplication or disclosure of the terms of this Franchise Agreement or of the Operations Manual, could harm ATI, you and other franchisees.   You agree that at no time during or after the term of this Franchise Agreement will you, any 5% Owner of the Business Organization and their spouse, any manager of your Store, and others identified in Section 16.06, disclose or duplicate in any way, or make available, the contents of the Operations Manual, the terms of this Franchise Agreement, Trade Secrets or Confidential Information (as defined below) belonging to ATI, or other aspects of the System to any person, corporation or professional advisor, except to your employees, professional advisors or other persons but only to the extent necessary for the transaction of business by you.   You agree that no one will be permitted to hold any materials or copies of or notes concerning any of these materials.  All of the above will be returned to ATI immediately upon termination or expiration of this Franchise Agreement.  ATI will have the right to injunctive relief to enforce the provisions of this Section and you will pay ATI's attorneys' fees and costs in connection with seeking such injunctive relief.

B.     "Trade Secrets" means information belonging to ATI or licensed to it, including information in the Operations Manual or otherwise communicated by ATI and proprietary methods of operation, components of the System, technical or non-technical data, marketing plans, and customer, vendor or supplier lists, to the extent such items: (i) derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons or entities who can obtain economic value from their disclosure or use; and (ii) are the subject of efforts by ATI that are reasonable under the circumstances to maintain their secrecy. "Confidential Information" means information other than Trade Secrets that belongs to ATI or is licensed by or to it, that is, or may reasonably be construed to be, of a confidential or secret nature, material to ATI, and that is not generally known to the public.   Restrictions and obligations under this Section will not apply to any Trade Secrets or Confidential Information after it: (i) becomes generally available to the public through any means other than a breach by you or your affiliates or your employees of your obligations under this Franchise Agreement; (ii) is disclosed to you without an obligation of confidentiality by a third party who has a right to make such disclosure; or (iii) can be demonstrated by you to ATI's reasonable satisfaction to have been known by you before the time of its disclosure by ATI to you.

C.     You will disclose promptly to ATI any new items, systems, software, services, ideas, concepts, techniques or material concerning the System or the operation of the Store that you or any of your employees create, including promotion and advertising for the Store.  These creations will be deemed works made for hire and ATI will own all rights in them.  If these creations do not qualify as works made for hire, by signing this Agreement you assign to ATI ownership of any and all rights in these creations. ATI and its franchisees and licensees may use any creations or other information you provide to ATI in any manner in your relationship with ATI without any compensation to you.  This Section will not apply to creations that you establish through credible evidence were developed entirely on your own time without using the Store's equipment, supplies, facilities or any Confidential Information that does not relate to the Store or the System.

**16.03   Non-Circumvent.**  You may not engage in direct or indirect discussions or negotiations, nor enter into an agency or sub-agency agreement, with any Provider during the term of this Franchise Agreement and for one (1) year after termination, expiration or non-renewal.

**16.04   Legal Relief.**  In addition to the equitable relief which ATI can seek for a violation of the non-competition or non-disclosure covenants contained in this Article 16, you acknowledge that ATI is entitled to receive as liquidated damages, and not as a penalty, the amount of $100,000 for each violation of Sections 16.01, 16.02, or 16.03, plus attorneys' fees and costs associated with any legal action brought to enforce the covenants contained in this Article 16.

**16.05   Application of These Covenants.**  The above non-competition covenants will apply to you, each Owner of the Business Organization, officers, directors, and employees and their respective

immediate family members, which will mean parents, children, spouse, siblings and any other household members. You will obtain a signed Confidentiality, Non-Competition and Assignment of Developments Agreement in a form reasonably acceptable to ATI including specific identification of ATI as a third party beneficiary of the covenants, with the independent right to enforce them, from 5% Owners of the Business Organization and their spouse, any manager of your Store, officers, directors and their immediate family members as ATI requests, and from each of your other employees and their immediate family members. ATI's current form of Confidentiality, Non-Competition and Assignment of Developments Agreement, attached as Exhibit 7 to this Franchise Agreement, contains provisions that are currently acceptable to ATI.

## 17. GENERAL CONDITIONS AND PROVISIONS

**17.01 Titles for Convenience.** The titles of the sections and paragraphs are for convenience only and are not a part of the text of this Franchise Agreement. The BACKGROUND Section at the beginning of this Agreement contains contractual terms that are not mere recitals.

**17.02 Entire Agreement.** This Franchise Agreement, including any incorporated documents, reflects the entire agreement of the parties. All negotiations, commitments, representations and understandings of the parties which have taken place are merged into this Franchise Agreement, provided that you may rely on ATI's representations in the most recent Franchise Disclosure Document ATI delivered to you, including its exhibits and any amendments, in connection with this Franchise Agreement. There are no other oral or written understandings or agreements which relate to this Franchise Agreement.

**17.03 Amendment in Writing.** The parties agree that no modification of this Franchise Agreement will be valid unless both parties sign such modification in writing, except for modifications to the Operations Manual, which will be made solely by ATI.

**17.04 Relationship of the Parties.**

A. You are an independent contractor and not an agent, partner, employee or joint venturer of ATI. Unless expressly provided for in this Franchise Agreement, ATI will not be obligated to any person because of an agreement, representation or warranty made by you. You will open and maintain all utility and trade accounts, leases and other obligations in your name only and not directly or indirectly state or give the impression that ATI or Wireless Zone is responsible for payment of any such obligations. ATI will not be obligated to pay any money or pay for damages to a third party because of your action, failure to act, negligent act or willful conduct.

B. ATI will not be responsible for the actions of your Owners, employees or agents, financially or otherwise, including for any fraud, discrimination, harassment, or other torts allegedly perpetrated by them. ATI will not have any control over your employees' employment, discharge, pay, work performance, or working conditions.

C. You will be responsible for all loss or damage originating in or in connection with the operation of the Store and from all claims resulting therefrom. You will indemnify and hold harmless ATI, its officers, directors, principals, employees, attorneys and representatives from and against any claims, liabilities or costs which may be brought against ATI or them because of your operation of the Store or the actions of your Owners, employees or agents, including for any fraud, discrimination, harassment, or other torts allegedly perpetrated by them. This provision will survive indefinitely the expiration or termination, for any reason, of this Franchise Agreement.

**17.05 No Waiver.** ATI will not be liable if ATI waives any breach or default in performance by you or other franchisees. ATI may require strict compliance with this Franchise Agreement even if it has waived a breach or breaches during an earlier period under this Franchise Agreement.

**17.06 No Set-Offs.** You agree that you may not withhold or escrow any amounts due to ATI, or set-off any such amounts against any amounts you claim that ATI or its affiliates owe you. The existence

of any claim or cause of action that you may have against ATI will not constitute a defense or bar to the enforcement of any of the provisions of this Franchise Agreement and must be pursued by you through separate court action.

**17.07 Governing Law; Forum; Severability.** This Agreement will be governed by and interpreted by the laws of the State of Connecticut. You agree that any cause of action between ~~the parties with respect to~~you and ATI for any issue arising out of or relating to this Franchise Agreement, the breach thereof, the relationship between ~~Franchisor~~you and ~~Franchisee~~ATI or any other issue or dispute will only be brought in either the state or federal courts of Connecticut except that ATI may obtain injunctive relief in any appropriate forum against actual or threatened conduct that will cause loss or damages, under the usual equity rules. You irrevocably submit to the jurisdiction of these courts, waive any objection you may have to either the jurisdiction or venue of these courts and agree not to argue that these courts are inconvenient forums. You must bring a cause of action against ATI only within one year of the occurrence of the facts which give rise to the claim. ~~You will attempt to mediate any claim with ATI in good faith before you pursue a cause of action in court.~~ If any provision of this Franchise Agreement or the Operations Manuals is found to be invalid, the remaining provisions of this Franchise Agreement or the Operations Manuals will be considered valid and enforceable.

**~~17.07~~17.08 Notices.** You agree that all written notices which are required by this Franchise Agreement or the Operations Manual will be considered delivered three (3) days after being placed in the U.S. Mail, by certified mail, return receipt requested or one (1) day after being sent by Federal Express or other receipted overnight courier service, if they are sent to the address for each party cited at the beginning of this Franchise Agreement or to another address, as long as the party with the changed address has notified the other party in writing in accordance with this Section 17.07 and, in all cases to a physical address to which a nationally recognized overnight courier delivery service will deliver (and not, for example, a post office box). Notwithstanding the foregoing, rejection or refusal to accept any notice, or the inability to deliver any notice because of a changed address of which no notice was given ~~pursuant to~~under this Section 17.07, will be deemed receipt of the notice.

**~~17.08~~17.09 WAIVER OF PUNITIVE DAMAGES ~~AND JURY TRIAL~~.** YOU AND ATI HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES AND AGREE THAT ~~IN THE EVENT OF~~IF THERE IS A DISPUTE BETWEEN YOU AND ATI, EXCEPT AS OTHERWISE PROVIDED HEREIN, EACH PARTY WILL BE LIMITED TO THE RECOVERY OF ACTUAL DAMAGES SUSTAINED.

**17.10 WAIVER OF JURY TRAIL. YOU AND ATI HEREBY IRREVOCABLY WAIVE TRIAL BY JURY ON ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, BROUGHT BY ~~EITHER PARTY~~YOU OR BY ATI.**

**17.11 Waiver of Collateral Estoppel.** You and we agree we each should each be able to settle, mediate, litigate, arbitrate, or compromise disputes in which they are involved with third parties, without having the disposition of such disputes directly affect the contract or relationship between you and ATI. You and ATI therefore each agree that a decision of an arbitrator or court of law in a dispute to which one of us is not a party will not in any manner prevent the person that was a party to such action from making similar arguments, or taking similar positions, in any subsequent action between you and ATI. You and ATI therefore waive the right to assert that principals of collateral estoppel prevent either of us from raising any claim or defense in an action between you and ATI as a result of one of us having lost a similar claim or defense in another action.

**~~17.09~~ 17.12 Force Majeure.** Except for your obligation to pay any Continuing Royalty, Collective Advertising and Promotion Fund contributions or other payments under this Franchise Agreement, neither party will be liable to the other for failure to perform under this Franchise Agreement, in whole or in part, when the failure is due to governmental restrictions, failure of utilities, strikes, labor troubles, riots, storms, fires, explosions, floods, wars, embargoes, blockades, legal restrictions, insurrections, acts of God or any

other cause similar thereto which is beyond the reasonable control of the parties. In the event of such~~If~~ there is a delay, the time for performance will be extended by a period of time equal to the delay if the extension is reasonably needed.

~~17.10~~**17.13** **No Discrimination.** ATI agrees to use "Reasonable Business Judgment" in the exercise of its rights, obligations and discretion under this Franchise Agreement, except where otherwise indicated. "Reasonable Business Judgment" means that ATI's determination will prevail even in cases where other alternatives are also reasonable, so long as ATI is intending to benefit or is acting in a way that could benefit the Wireless Zone System by enhancing the value of the Trademarks, increasing customer satisfaction, or minimizing possible customer, brand or location confusion. ATI will not be required to consider your particular economic or other circumstances or those of other Wireless Zone franchisees when exercising its Reasonable Business Judgment. At no time are you or any third party (including, ~~but not limited to,~~ any third party acting as a trier of fact) entitled to substitute your or its judgment for a judgment which has been made by or on behalf of ATI that meets the definition of Reasonable Business Judgment, in recognition of the fact that the long-term goals of a franchised system, and the long-term interests of both ATI and all Wireless Zone franchisee taken together, require that ATI have the latitude to exercise Reasonable Business Judgment in administering, managing and overseeing the Wireless Zone System.

~~17.11~~**17.14** **WARRANTY DISCLAIMER.** YOU AGREE THAT ATI MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, ~~WITH RESPECT TO~~FOR ANY OF THE SIGNS, FIXTURES, DISPLAYS, FURNISHINGS, KIOSKS, DÉCOR, APPROVED EQUIPMENT, OTHER EQUIPMENT, PRODUCTS, SUPPLIES AND MATERIALS USED IN CONNECTION WITH YOUR STORE (COLLECTIVELY REFERRED TO AS THE "MATERIALS") UNLESS SPECIFIED IN THIS FRANCHISE AGREEMENT. ATI MAKES NO WARRANTY OF MERCHANTABILITY OF THE MATERIALS, NOR OF THE FITNESS OF THE MATERIALS FOR ANY PARTICULAR PURPOSE. ORAL STATEMENTS MADE BY ATI'S EMPLOYEES OR AGENTS, OR STATEMENTS CONTAINED IN ATI'S OPERATIONS MANUAL OR PRINTED MATERIAL OR ANY PROVIDER'S GENERAL ADVERTISING OR PRINTED MATERIAL, DO NOT CONSTITUTE WARRANTIES AND YOU AGREE THAT YOU DO NOT RELY UPON THEM.

## 18. ACKNOWLEDGMENT

You acknowledge that ATI or its agent has provided you with a Franchise Disclosure Document not later than fourteen (14) calendar days before the execution of this Franchise Agreement, or fourteen (14) calendar days before any payment of any consideration, or earlier in the sales process if you requested it. You acknowledge that before furnishing a Franchise Disclosure Document to you, ATI or its agent advised you of the formats in which the Franchise Disclosure Document is made available and any prerequisites for obtaining and conditions necessary for reviewing the Franchise Disclosure Document in a particular format. You ~~further~~ acknowledge that you have read ATI's Franchise Disclosure Document and understand its contents.

You acknowledge that you have had an opportunity to review this Franchise Agreement, ~~as well as~~and the Franchise Disclosure Document and that you have had the chance to consult with an attorney or other professional advisor. You acknowledge that you received a completely filled in Franchise Agreement which did not differ materially from the form of Franchise Agreement attached to ATI's Franchise Disclosure Document, or if it did differ materially, (i) you received a completely filled in Franchise Agreement at least seven (7) calendar days ~~prior to your signing~~before you sign this Franchise Agreement, or (ii) the differences were a result of negotiated changes you requested and you had an opportunity to review the changes before signing this Franchise Agreement.

You also confirm your understanding that the success of the Business licensed by this Franchise Agreement is speculative and depends to a large extent on your ability as an independent business person ~~as well as~~and other factors. You also recognize and acknowledge that you may incur expenses or obligations which this Franchise Agreement may not address.

You acknowledge and agree that no salesperson, representative or other person has made any representation regarding the actual or potential sales, income or profit from franchised or company or affiliate-owned Stores other than what is stated in Item 19 of ATI's Franchise Disclosure Document, except as permitted as described in Item 19 relating to (1) the actual records of an existing Store you considered buying; or (2) a supplement to the information provided in Item 19. In fact, you acknowledge that you have entered into this Franchise Agreement after making an independent investigation of the Business and of ATI.

You are aware of the fact that other present or future franchisees of ATI may operate under different forms of agreement(s), and consequently that ATI's obligations and rights with respect tofor its various franchisees may differ materially in certain circumstances.

You will indemnify, defend and hold harmless ATI, its officers, directors, principals, employees, attorneys and representatives (collectively "Indemnitees"), from and against any and all claims, liabilities or costs incurred by the Indemnitees arising out of or in connection with any misrepresentation by you in this Franchise Agreement, including your representations in connection with your application as described in Background paragraph C, and your representations in this Section 18, any breach by you of the terms of this Franchise Agreement, the actions or inactions of your employees or persons for whom you are legally responsible, and the operations and activities of your Store and Business.   This provision will survive indefinitely the expiration or termination, for any reason, of this Franchise Agreement.

[SIGNATURES ON THE FOLLOWING PAGE]

**This Franchise Agreement will not be effective until accepted by ATI as evidenced by the dating and signing of same by an authorized officer of ATI.**

IN WITNESS WHEREOF, the parties intending to be bound legally, have fully signed, sealed and delivered this Franchise Agreement as of the day and year first above written.

AUTOMOTIVE TECHNOLOGIES, INC.

By: _____
Witness                                         Officer

Date: _____

FRANCHISEE:

By: _____
Witness

Date: _____

4830-1167-7210, v. 6

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2016, a copy of the foregoing Plaintiffs' Second Amended Complaint was filed electronically and served upon all counsel of record using the US District Court E-Filing system.


/s/ Briar J. Siljander
Briar J. Siljander