**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| FAMILY WIRELESS #1, LLC, et al., Plaintiffs, | : | CIVIL ACTION NO. 15-CV-1310 (JCH) |
| v. | : | |
| AUTOMOTIVE TECHNOLOGIES, INC., Defendant. | : | MAY 4, 2016 |

**RULING RE: PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION (DOC. NO. 83)**

## I. INTRODUCTION

Thirty-five of the forty-two plaintiffs in this diversity action for breach of contract, unjust enrichment, and unfair trade practices (the "PI plaintiffs"), have moved for a preliminary injunction against their mutual franchisor, Automotive Technologies, Inc. ("ATI"). See Pls.' Mot. for Prelim. Inj. ("Motion") (Doc. No. 83). In their Motion, the PI plaintiffs principally ask that the court enter an order prohibiting ATI either from withholding a 5% royalty on certain funds paid to the PI plaintiffs by Verizon Wireless ("Verizon"), or, alternatively, from ceasing to pay the PI plaintiffs certain performance incentive payments and similar sums. Id. ¶¶ 12-13.

ATI has opposed the motion. Def.'s Mem. in Opp. ("ATI's Opposition") (Doc. No. 97). At a telephonic status conference on March 24, 2016, the PI plaintiffs represented that an evidentiary hearing on the Motion was unnecessary, opting instead to rest their case on the voluminous twenty-eight affidavits and other exhibits annexed to their Motion. See Minute Entry (Doc. No. 91). The court held oral argument on the Motion on April 21, 2016.

For the reasons set forth below, the PI plaintiffs' Motion is **DENIED**.

## II. BACKGROUND

The commercial structure at issue in this case was discussed at length in the court's ruling on ATI's Motion to Dismiss, see Ruling (Doc. No. 69) at 2-8, and the court assumes the parties' familiarity with the content of that discussion. However, the court will recount here those facts most pertinent to the instant Motion.

The PI plaintiffs are franchisees of ATI, which is, in turn, an agent of Verizon, a wireless telecommunications provider. Second Amended Complaint (Doc. No. 114) ("Complaint") ¶¶ 56-57. The PI plaintiffs sell wireless devices and Verizon wireless service plans at their stores. Id. ¶¶ 55-61. As subagents of Verizon, the PI plaintiffs are not paid directly by Verizon for the sale of Verizon goods and services at the PI plaintiffs' stores; rather, they receive payments in the form of "Commissions," paid by Verizon to ATI, which then passes them through to the PI plaintiffs. Id. ¶¶ 62-64.

The Franchise Agreements to which the PI plaintiffs and ATI are parties governs the distribution of Commissions. Section 6.02 of the Agreements reads:

> Typically under ATI's Provider Contract for your geographical area, certain customer payments are forward to [Verizon] and not retained by you or ATI. [Verizon] then pays ATI commissions ("Commissions") on these customer payments attributable to your Store, which ATI passes along to you as ATI's subagent, minus deductions for amounts you owe ATI. . . . ATI will deduct from the [Verizon] Commissions ATI transmits to you, as Continuing Royalties payable by you to ATI: (i) ten percent (10%) of Commissions ATI receives from [Verizon] attributable to your customer activations, sales and services; plus (ii) ten percent (10%) of amounts you receive attributable to customer payments you retain for sales of other products and services; plus (iii) twenty percent (20%) of residual customer use Commissions ATI receives from [Verizon] attributable to your Store.

Id. ¶ 63.

Under the parties' current business model, called the "Edge Program," a customer buys both a Verizon service plan and a cellular phone from a franchisee, often with a down payment on the phone. Id. ¶ 84. An installment contract between the purchaser and the franchisee is automatically assigned to Verizon. Id. Verizon then pays a service commission, for the activation of the Verizon service plan, and what the parties term an "Installment Offset" ("IO") to ATI, which passes the Installment Offset to the PI plaintiffs. Id. ¶ 85.

The plaintiffs contend that the IO is a reimbursement payment for the purchase price of the wireless device sold to the customer; ATI contends that the IO is a Commission from which ATI is entitled to a 10% royalty under Section 6.02 of the Franchise Agreements. See id. ¶ 93. ATI did not collect any royalty on the IO from March 2014 to December 2014; however, beginning January 1, 2015, ATI began to withhold a 5% royalty—5% less than what it believes itself entitled to—on IO payments, id. ¶ 93, thereby precipitating the instant lawsuit.

During the pendency of this litigation, ATI has paid the PI plaintiffs additional sums of money in the form of "performance incentive payments" ("PIPs"), as well as a specific PIP for the sale of iPhone 6s, referred to by the parties as the "iPhone spiff." See, e.g., Decl. of Jeffrey Swackhammer (Ex. 1-A) (Doc. No. 83-2) ¶¶ 71-76. However, in May 2015, ATI announced a new franchise model and indicated that if the franchisees did not agree to it, that ATI would begin withholding PIPs and iPhone spiffs, as well as require a change to the franchisees' Point of Sales software. See, e.g., id. ¶¶ 172-78. The changes would commence on January 1, 2016, id., and the shortfall of

PIP and spiff payments would first be felt by the franchisees on March 10, 2016, the first reconciliation cycle of 2016. Id. ¶ 183.

In support of their Motion, the PI plaintiffs have submitted 1205 pages of affidavits, sworn to by twenty-eight owners of the thirty-five PI plaintiff companies. Plaintiffs' Exhibit 1. Appended to most affidavits are financial summaries of each plaintiff company, which documents (1) "ATI Commission Royalty" (presumably referring to royalties withheld on service commissions) in 2015; (2) "5% Installment Offset Withheld" in 2015; (3) PIP, iPhone spiff, and total PIP and iPhone spiff compensation in 2015; (4) percent of total revenue in 2014 and 2015 that was made up of IO payments; and (5) "net profit/loss" in 2015 and "estimated net profit/loss" projected for 2016. See, e.g., Pls.' Ex. 1-C (Doc. No. 83-2). Those PI plaintiffs that estimated their 2016 profits or losses did not explain how they arrived at those numbers; other PI plaintiffs failed to offer projected 2016 profits or losses entirely.

## III. LEGAL STANDARD

"A party seeking a preliminary injunction must demonstrate (1) 'either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor,' and (2) 'irreparable harm in the absence of the injunction.'" Faiveley Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 116 (2d Cir. 2009) (quoting County of Nassau, N.Y. v. Leavitt, 524 F.3d 408, 414 (2d Cir. 2008)). Further, the court must ensure that "the public interest would not be disserved by the issuance of a preliminary injunction." Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010) (internal quotation marks and citation omitted).

The fundamental purpose of preliminary relief is, and always has been, to preserve the court's ability to render a final decision on the merits by preventing irreparable harm in the interim. See, e.g., United States v. Adler's Creamery, 107 F.2d 987, 990 (2d Cir. 1939). It is for this reason that a showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999) (internal citation and quotation marks omitted). To establish irreparable harm, the movant bears the burden of demonstrating "'that absent a preliminary injunction, [she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" Faiveley, 559 F.3d at 118 (quoting Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007)). Further, "'[w]here there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.'" Id. (quoting Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 510 (2d Cir. 2005)).

Actions, such as the one before the court, that sound principally in breach of contract seek primarily money damages for quantifiable losses. Consequently, "[c]ourts generally are reluctant to grant preliminary injunctions in breach of contract actions, unless there are damages that are difficult to measure and there is a risk of loss of goodwill, reputation, or business opportunities." PCS Wireless LLC v. A to Z Wireless Sols., Inc., 841 F. Supp. 2d 649, 652 (E.D.N.Y. 2012) (citing CRP/Extell Parcel I, L.P. v. Cuomo, 394 Fed. App'x 779, 781 (2d Cir. 2010) ("[Though it is not true that] a party at risk of suffering a monetary loss may never receive injunctive relief, [it is true that], notwithstanding compensable losses, a movant must provide evidence that it is likely to

suffer damage that cannot be rectified by financial compensation before a district court may providently exercise its equitable power to grant injunctive relief.")).

As Judge Henry Friendly explained in the seminal case of Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970), in which a franchisee of Ford was threatened with the termination of his franchise contract:

> Ford's contention that Semmes failed to show irreparable injury from termination [of his franchise] is wholly unpersuasive. Of course, Semmes' past profits would afford a basis for calculating damages for wrongful termination, and no one doubts Ford's ability to respond. But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income of a damages award. Moreover, they want to continue living. . . . '[A] judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who, as here, has had a Ford franchise for many years.'

Id. (quoting Bateman v. Ford Motor Co., 302 F.2d 63, 66 (3d Cir. 1962)).

Thus, a movant may establish irreparable harm when he demonstrates that, absent preliminary relief, he will face a "threat to the continued existence of h[is] business." JBR Inc. v. Keurig Green Mountain, Inc., 618 Fed. App'x 31, 35 (2d Cir. 2015) (summary order) (citing, inter alia, Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430, 435 (2d Cir. 1993)). As this court has previously explained, to go "out of business" is not the "equivalent to Chapter 7 bankruptcy, but rather [a] substantial loss of business accompanied by loss of good will." Bristol Tech., Inc. v. Microsoft Corp., 42 F. Supp. 2d 153, 161 (D. Conn. 1998) (Hall, J.) (collecting cases). However, it is not enough that a plaintiff can establish "a loss of merely some business . . . . A loss of substantially all of its business is required." Id. at 153 n.19 (citing Jack

Kahn Music Co. v. Baldwin Piano & Organ Co., 604 F.2d 755, 762-63 (2d Cir. 1979) (superseded by Federal Rule of Civil Procedure 52(a) on other grounds as recognized in Weissmann v. Freeman, 868 F.2d 1313, 1322 (2d Cir. 1989)).

## IV. DISCUSSION

The PI plaintiffs have not carried their burden of showing that, absent preliminary relief, they would be irreparably harmed.

As an initial matter, the court observes that this is not a case, like Semmes, where a franchisor has sought to terminate a franchise contract entirely; neither is it a case, like Bristol Technology, in which the defendant has sought to withhold the plaintiffs main source of revenue by refusing to perform a contract to sell to the plaintiff its "principal product and revenue generator," thus precipitating a near-complete loss of customer goodwill. Bristol Tech., 42 F. Supp. 2d at 161. On the contrary, at issue in this case is a 5% royalty on a sum of money that, in 2015, consisted of anywhere from 23.76% to 82% of the PI plaintiff companies' total revenues. Compare Pls.' Ex. 1-V-B (Doc. No. 83-2) (financial summary of Liberty Cove, Inc., indicating that IO reimbursement income made up 23.76% of total revenues) with Pls.' Ex. 1-BB-C (Doc. No. 83-2) (financial summary of PK Roy & Associates, LLC ("PK Roy"), indicating that IO reimbursement income made up 82% of revenues).

As an example of what percentage of total revenue is at stake for the plaintiffs, the court considers the case of O Cubed Wireless, LLC ("O Cubed"), as fairly representative of the PI plaintiffs. According to its financial summary for 2015, IO reimbursement funds consisted of 37.23% O Cubed's total revenues. Pls.' Ex. 1-G-C (Doc. No. 83-2). Extrapolating from the amount ATI is alleged to have withheld on IO

funds ($61,909), O Cubed Received $1,176,271 in IO revenues, making for a total revenue stream of $3,159,470.86. The 5% royalty at O Cubed alleges ATI wrongfully withheld—$61,909—was the equivalent of merely 1.96% of O Cubed's total 2015 gross revenue.

The same problems arise for the other allegedly wrongfully withheld sum—PIPs and iPhone spiffs—the absence of which the PI plaintiffs contend will cause them "irreparable harm." For PK Roy, the court may extrapolate from the financial data presented in its financial summary, Pls.' Ex. 1-BB-C (Doc. No. 83-2), that its total 2015 revenues were $825,828.05. In 2015, PK Roy received $16,970 in PIP and iPhone spiff revenues—no more than the equivalent of 2.05% of its total 2015 gross revenue.[1]

Whether one looks to the royalty withheld on IO payments or the termination of PIPs and iPhone spiffs, the PI plaintiffs do not appear to be at risk of losing "substantially all" of their businesses. Bristol Tech., 42 F. Supp. 2d at 161. Rather, a small percentage of typically less than half of their revenues has been or will be withheld by the defendants. It is a readily quantifiable amount that is payable in a damages award and could not be expected to "obliterate" or shutter their respective businesses, see Semmes, 429 F.2d at 1205. For example, in Morales v. United States, 21 F. Supp. 2d 125, 130 (D. Conn. 1998), the court held that "[t]he loss of 60% of one's business [in the form of gross sales] can constitute irreparable harm." See id. (collecting cases from courts in this circuit holding that losing as much as 30% of one's total business activity may constitute irreparable harm). By contrast, plaintiffs, in facing

[1] The court also notes that for PK Roy, which is alleged to have received the highest proportion of any PI plaintiff company in total IO compensation as a percentage of total revenue (82%), the allegedly wrongfully withheld royalty on IO compensation was the equivalent of only 4.32% of total 2015 revenue.

the loss of 5% of less than 100% of their total revenues face a considerably smaller shortfall of business.

The court is also unwilling to find irreparable harm on the record before it for several other reasons. First, three companies have not provided even estimated profit or loss projections for 2016, making it impossible for the court to determine what effect, if any, ATI's conduct will have on the viability of their businesses.[2] The owner of another company, DL Mobile Corp., has averred that he does not "face the same imminent financial peril as [its] fellow franchisees]," without explaining how he knows that his fellow franchisees are in imminent financial peril; such an assertion precludes the possibility that DL Mobile Corp. will suffer the imminent financial peril required for preliminary relief. Decl. of David Lee, Pls.' Ex. 1-S (Doc. No. 83-2) ¶ 43. Yet another company, Empire Investment Group, LLC, failed to provide any information at all concerning its financial health, including an affidavit by its owner. See Pls.' Exs. 1-A-BB (Doc. No. 83-2). As to these companies, the plaintiffs simply have provided no financial information—let alone enough information—on which the court could make a finding of irreparable harm.

Another eleven PI plaintiff companies project earning profits in 2016, though less than in 2015;[3] a twelfth company projects making more money (that is, less loss) in

---

[2] These companies are Liberty Cove, Inc.; Naples Cellular, LLC; and Mandent Solutions, LLC.

[3] Vatao Enterprises, LLC, and Vatao Wireless, Inc., Pls.' Ex. 1-W-C (Doc. No. 83-2) (combined projected profits of $36,000); Cellular Solutions, Inc., Pls.' Ex. 1-X-C (Doc. No. 83-2) (projected profit of $2901); JAS Technology, Inc., Pls.' Ex. 1-A-C (Doc. No. 83-2) (projected profit of $106,850); Elevation Capital, Pls.' Ex. 1-M-B (Doc. No. 83-2) (projected profit of $5727); Airzone Communications, Inc., Pls.' Ex. 1-I-C (Doc. No. 83-2) (projected profit of $50,669); Fritz & Co., LLC, Pls.' Ex. 1-H-C (Doc. No. 83-2) (projected profit of $9577); Musser Wireless, Inc., Pls.' Ex. 1-O-C (Doc. No. 83-2) (projected profit of $116,250); Yash Communications, LLC, Pls.' Ex. 1-P-A (Doc. No. 83-2) (projected profit of $20,563);

2016 than in 2015.[4] Considering the fact that the sums at issue consist of less than 5% of total revenues for these companies, the court simply cannot conclude that the companies are in imminent risk of losing substantially all of their businesses because of the payments at issue.

For the remaining PI plaintiffs who project net losses for 2016 (the "net loss plaintiffs"), the court is unable to draw concrete conclusions concerning a number of facts that would be essential in determining irreparable harm. None of the net loss plaintiffs provided information concerning company equity, credit, or cash on hand. For those companies that provided this information to ATI in discovery, it appears that they possess sufficient liquidity and credit to absorb the marginal percentage revenue loss associated with the 5% withholding and suspension of PIP and spiff payments. See, e.g., Def.'s Ex. 12 (showing that 4 One Enterprises, LLC, which projects a loss of $26,272 in 2016, has $70,117 cash on hand). Furthermore, the plaintiffs failed to explain, using the financial data available to their companies, exactly how they reached their conclusions concerning projected 2016 losses. For example, though PK Roy projects a $24,000 loss in 2016, Pls.' Ex. 1-BB-C (Doc. No. 83-2), material produced to ATI in discovery shows internal projections of a 19.53% profit margin for January 2016, a 25.06% profit margin for February, and a profit margin of 35.91% for March.

What the net loss plaintiffs all share, however, is a failure to submit concrete "evidence regarding their current capitalization [or] their ability to withstand a significant loss in business, or even closure, for a short period of time." Sunni, LLC v. Edible

---

Entrepreneur Investment Corp., Pls.' Ex. 1-R-B (Doc. No. 83-2) (projected profit of $63,728); Family Wireless #1, LLC, Pls.' Ex. 1-T-B (Doc. No. 83-2) (projected profit of $6696).

[4] Corridor Ventures, Inc., Pls.' Ex. 1-L-C (Doc. No. 83-2) (projecting a net loss in 2016 of -$81,218.90 after sustaining a net loss in 2015 of -$126,744.37).

Arrangements, Inc., No. 14 Civ. 461(KPF), 2014 WL 1226210, *11 (S.D.N.Y. 2014). The plaintiffs appear to have offered the court their worst case scenario—that the loss of PIPs and the iPhone spiff, or the continued withholding of a 5% royalty on installment offsets, will drive away customers, jack up prices, and result in the imminent and permanent closure of their businesses. Yet, an injunction "should not issue upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong but upon a concrete showing of imminent, irreparable injury." USA Network v. Jones Intercable, Inc., 704 F. Supp. 488, 491 (S.D.N.Y. 1989).

In short, the PI plaintiffs have not shown that the losses stemming from the continued withholding of a 5% royalty on IOs and the imminent withholding of PIPs and the iPhone spiff will generate unquantifiable harm justifying a preliminary injunction.[5] Because the court finds that the PI plaintiffs have not established irreparable harm, the court will not consider the likelihood of the plaintiffs' success on the merits.

## V. CONCLUSION

The PI plaintiff's Motion for a Preliminary Injunction (Doc. No. 83) is **DENIED**. However, the parties are again advised that the court expects to hold a trial on the merits early next year.

---

[5] The change in the Point of Sale ("POS") system and increase of warehouse markups, see Motion at 3, do not affect the outcome of this decision. The increased costs associated with the POS system change are not likely to exceed roughly $200 per week, or $800 per month. See Opposition at 17 n.6. Further, the plaintiffs have not put forward sufficient evidence on which the court could conclude how severely the purported increases in warehouse markups may affect each of the 35 PI plaintiffs; and even if they had, the operative Second Amended Complaint does not seek relief concerning the alleged markups. See Complaint; see also, e.g., McKinnon v. Tresman, No. 02-CV-2305 (WWE), 2004 WL 78091, at *1 (D. Conn. Jan. 9, 2004) ("To prevail on a motion for preliminary injunctive relief, the moving party must establish a relationship between the injury claimed in the motion and the conduct giving rise to the complaint."). For these reasons, the court finds that the plaintiffs have not carried their burden to show irreparable harm, even when the changes to the POS system, and the purported warehouse markups (to the extent that there is evidence of their affects) are taken into account.

**SO ORDERED**.

Dated at New Haven, Connecticut, this 4th day of May, 2016.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge